UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DANIEL S. NEWMAN, as Receiver for
Founding Partners Capital Management
Company; Founding Partners Stable-Value          Case No.
Fund, L.P.; Founding Partners Stable-Value       Proceeding Ancillary to
Fund II, L.P.; Founding Partners Global          No. 2:09-cv-229-FtM-29SPC (M.D. Fla.)
Fund, Ltd.; and Founding Partners Hybrid-
Value Fund, L.P.,

       Plaintiff,

v.

SUN CAPITAL, INC., a Florida corporation,
SUN CAPITAL HEALTHCARE, INC.,
a Florida corporation, and HLP PROPERTIES
OF PORT ARTHUR, LLC, a Texas limited liability
company,

       Defendants.

_____/

## COMPLAINT

Plaintiff, DANIEL S. NEWMAN, solely in his capacity as duly appointed Receiver for Founding Partners Capital Management Company; Founding Partners Stable-Value Fund, L.P.; Founding Partners Stable-Value Fund II, L.P.; Founding Partners Global Fund, Ltd.; and Founding Partners Hybrid-Value Fund, L.P., by and through undersigned counsel, hereby files this action against Defendants, SUN CAPITAL HEALTHCARE, INC.; SUN CAPITAL, INC.; and HLP PROPERTIES OF PORT ARTHUR, LLC, and alleges as follows:

## I. PRELIMINARY STATEMENT

1.      On April 20, 2009, the Securities and Exchange Commission filed a five-count securities fraud complaint (the "SEC Complaint") naming Founding Partners

1

Capital Management Company ("Founding Partners") and William L. Gunlicks ("Gunlicks") as defendants. The SEC Complaint also named Founding Partners Stable-Value Fund, L.P.; Founding Partners Stable-Value Fund II, L.P.; Founding Partners Global Fund, Ltd.; and Founding Partners Hybrid-Value Fund, L.P., as relief defendants (nominal defendants). *See Securities and Exchange Commission v. Founding Partners Capital Management Co. and William L. Gunlicks*, et al., Case No. 2:09-cv-229-FtM-29SPC (M.D. Fla.) (the "Commission Proceeding").[1]

2. On April 20, 2009, Judge John E. Steele of the United States District Court for the Middle District of Florida entered an order (the "Initial Receivership Order") appointing a receiver (the "Initial Receiver") for Founding Partners; Founding Partners Stable-Value Fund, L.P.; Founding Partners Stable-Value Fund II, L.P.; Founding Partners Global Fund, Ltd.; and Founding Partners Hybrid-Value Fund, L.P. (collectively, the "Receivership Entities"). The Initial Receiver was subsequently removed by Court Order on May 13, 2009. Daniel S. Newman, Esq. (the "Receiver"), was appointed Replacement Receiver by Court Order on May 20, 2009 (the "Replacement Receivership Order"), which Order superseded the Initial Receivership Order. A true and correct copy of the Replacement Receivership Order is attached hereto as **Exhibit A**.

3. The Receiver was appointed pursuant to the Court's inherent equity powers to carry out the purposes of the Commission Proceeding, which was brought under the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940.

---

[1] Sun Capital, Inc., and Sun Capital Healthcare, Inc., were initially named as Relief Defendants but later dismissed as Relief Defendants.

4.      In accordance with 28 U.S.C. § 754, the Initial Receiver filed a copy of the SEC Complaint and a copy of the Initial Receivership Order in the United States District Courts for the districts where property of the Receivership Entities is known to exist, including the Southern District of Florida, where Defendants have their principal place of business.  The Receiver subsequently filed the Replacement Receivership Order in those same jurisdictions.

5.      Pursuant to the Replacement Receivership Order, the Receiver is ordered to, among other things, "take immediate possession of all property, assets and estates of every kind of [the Receivership Entities] … and institute such actions and legal proceedings … as the Receiver deems necessary."

## II. JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 15 U.S.C. § 78aa, 28 U.S.C. § 754, and principles of ancillary or supplemental jurisdiction under 28 U.S.C. § 1367.  This complaint is brought to accomplish the objectives of the Replacement Receivership Order; therefore, this matter is ancillary to the Court's exclusive jurisdiction over the receivership estate.

7.      The Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. §§ 1692 and 754.

8.      The Court has *in rem* jurisdiction over all property belonging to the Receivership Entities pursuant to 28 U.S.C. § 754.

9.      Venue in this District and Division is proper under 28 U.S.C. §§ 1391 and 754, because this action is related to the Commission Proceeding pending in this District and because the Receiver was appointed in this District.

3

10.     Nothing in the loan agreements to which Sun Capital Healthcare, Inc., and Sun Capital, Inc., are parties and that form the basis for this complaint affects any right that Plaintiff may otherwise have to bring any lawsuit, action, or proceeding related to the loan agreements against any person or its properties in the courts of any jurisdiction.

### III.  PARTIES

11.     Plaintiff Daniel S. Newman is the duly appointed receiver for the Receivership Entities.

12.     Sun Capital, Inc., is a Florida corporation with its principal place of business in Palm Beach County, Florida.

13.     Sun Capital Healthcare, Inc., is a Florida corporation with its principal place of business in Palm Beach County, Florida.

14.     HLP Properties of Port Arthur, LLC, is a Texas limited liability company with its principal place of business in Palm Beach County, Florida.

15.     The individuals that control Defendants Sun Capital Healthcare, Inc., Sun Capital, Inc., and HLP Properties of Port Arthur, LLC, are Howard Koslow, Peter Baronoff, and Lawrence Leder (the "Controlling Individuals").

### IV.  FACTS

16.     This complaint is founded on the default of two or more loans totaling approximately $550 million (the "Sun Loans") made by Founding Partners Stable-Value Fund, L.P. (f/k/a Founding Partners Multi-Strategy Fund, L.P.), one of the Receivership Entities ("Stable-Value"), to Defendants Sun Capital, Inc. ("SCI"), and Sun Capital Healthcare, Inc. ("SCHI") (collectively, the "Sun Entities").

17.    This complaint is also founded on the default of a loan totaling approximately $5 million (the "HLP Loan") made by Stable-Value to Defendant, HLP Properties of Port Arthur, LLC ("HLP").

18.    The terms of the Sun Loans are documented in two Credit and Security Agreements, pursuant to which Stable-Value agreed to loan to the Sun Entities up to the maximum amount of credit specified in the Credit and Security Agreements.

19.    The funds advanced under the Credit and Security Agreements were to be used to purchase eligible accounts receivable of healthcare providers and other commercial entities.

20.    Proceeds of the Sun Loans were used to purchase accounts receivable that were not Eligible Accounts as defined in the Credit and Security Agreements ("Eligible Accounts").

21.    In violation of the Credit and Security Agreements, the Sun Entities included in their Borrowing Base, as defined in the Credit and Security Agreements (the "Borrowing Base"), accounts receivable that are older than 120 days, i.e., Defaulted Accounts, as defined in the Credit and Security Agreements ("Defaulted Accounts").

22.    The Sun Entities also used proceeds of the Sun Loans to fund related-party transactions and other ventures, including real estate transactions, for the benefit of the Controlling Individuals.

23.    Proceeds of the Sun Loans were used to purchase accounts receivable of entities owned or controlled by the Controlling Individuals.

24.    Proceeds of the Sun Loans were used to purchase accounts receivable of bankrupt and insolvent healthcare entities.

25.   Proceeds of the Sun Loans were also used directly or indirectly to purchase businesses to be owned by entities under common control with SCI and SCHI or by the Controlling Individuals.

26.   Proceeds of the Sun Loans were advanced directly or indirectly to businesses owned or controlled by the Controlling Individuals.

27.   Proceeds of the Sun Loans were used to make real estate loans directly or indirectly to entities owned or controlled by the Controlling Individuals, most of which loans are not secured by mortgages.

28.   Proceeds of the Sun Loans were also used to make exorbitant payments to the Controlling Individuals.

29.   Approximately twelve percent of the $550,000,000 of the Sun Loans are secured by accounts receivable that are Eligible Accounts due from unrelated third parties, such as private healthcare insurers, governmental agencies, and unrelated commercial businesses.

30.   Pursuant to Sections 1.6 and 3.1 of the Credit and Security Agreements, SCI and SCHI agreed to pay interest on outstanding amounts due pursuant to the Sun Loans.

31.   Stable-Value has not received any interest payments on the Sun Loans since December 31, 2008.

32.   For these and other reasons, the Sun Loans are in default.

33.   The Credit and Security Agreements contain cross-default language that makes a default under one Credit and Security Agreement a default under the other.

34.     Section 8.4(d) of the Credit and Security Agreements states that the each of the Sun Entities "waives any defense (other than payment in full) which it might now or hereafter have with respect to its liability under this Agreement."

35.     In the Credit and Security Agreements, the Sun Entities agree to pay all of Plaintiff's costs and expenses associated with enforcing its rights under the Credit and Security Agreements.

36.     Stable-Value agreed to loan $5 million to HLP pursuant to the terms of the HLP Loan as amended.

37.     In the related HLP Secured Promissory Note (the "HLP Note"), HLP waives all right of notice of default from Plaintiff.

38.     In the HLP Note, HLP agrees to pay Plaintiff's costs and expenses associated with enforcing its rights under the HLP Note.

39.     The HLP Note is in default.

40.     The maturity date of the HLP Loan has passed; and, pursuant to its terms, all principal and accrued and unpaid interest, costs, and any other amounts required to be paid to Lender pursuant to the HLP Note are now due.

## A. The Loan to Sun Capital Healthcare, Inc.

41.     On June 6, 2000, SCHI entered into a credit and security agreement (the "SCHI Agreement") with Stable-Value.   A true and correct copy of the SCHI Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.

42.     Pursuant to the terms of the SCHI Agreement and subject to its terms and conditions, Stable-Value agreed to lend funds to SCHI, to be used to purchase eligible healthcare receivables.

43.    As security for repayment of the Sun Loans, SCHI granted Stable-Value a first-priority security interest in all of its assets, including but not limited to, all of its accounts, chattel paper, commercial tort claims, deposit accounts documents, general intangibles (including payment intangibles and software), goods (including fixtures, equipment, and inventory), instruments, investment property, letter of credit rights, letters of credit, money, oil, gas, or other mineral rights before extraction, all personal property of any nature or type, accessions to, substitutions for or replacements of any of the foregoing property, and all products or proceeds of the foregoing property. *See* **Exhibit B**.

44.    The SCHI Agreement permits SCHI to use the proceeds of the Sun Loans for only two purposes: to purchase eligible accounts ("SCHI Eligible Accounts") or to repay the Sun Loans.

45.    Pursuant to Section 1.37 of the SCHI Agreement, SCHI Eligible Accounts

a.    must be payable in U.S. dollars by a "Third Party Obligor" (i.e., a health insurer like Blue Cross or a governmental agency) satisfactory to Stable-Value for healthcare services rendered or healthcare goods provided by a healthcare provider in the United States;

b.    cannot be a "Defaulted Account." (A Defaulted Account is one as to which 150 days have passed since the healthcare service was rendered and the Third Party Obligor had not paid into the Lockbox an amount equal to the face amount of the factored account.);

c.    had to have been purchased less than 61 days after the date the healthcare service was rendered; and

    d.     Had to have been billed to the Third Party Obligor prior to purchase.

46.    SCHI must have good and marketable title to the accounts receivable purchased.

47.    Stable-Value must have a fully perfected, first-priority security interest in the accounts receivable purchased.

48.    The SCHI Agreement specifically prohibits the purchase of Defaulted Accounts, defined in Section 1.32 as Accounts for which at least 120 days have passed since the date of service for such Accounts.

49.    In 2004, SCHI began purchasing workers' compensation accounts receivable ("WC Accounts"), some or all of which were not SCHI Eligible Accounts.

50.    As Howard Koslow, one of the principals of SCHI, admitted in his testimony before the SEC, there are no written amendments to the SCHI Agreement changing the definition of Eligible Account or Defaulted Account.[2]

51.    SCHI defaulted under the terms of the SCHI Agreement by purchasing accounts that were not SCHI Eligible Accounts in contravention of Section 1.37.

52.    Most or all of the WC Accounts are Defaulted Accounts.

53.    The WC Accounts purchased by SCHI now total approximately $52 million, according to the books and records of SCHI.

54.    At the current rate of collection, the WC Accounts will not fully be collected for 18.5 years if ever.

---

[2] The Receiver is aware of purported, one-time waivers by Gunlicks on behalf of Stable-Value, which are limited in time and scope, no longer applicable (see paragraph 88 *infra*) and which do not affect the relief requested herein.

55.    In 2004, SCHI began using proceeds of the Sun Loans to purchase Medicare/Medicaid Disproportionate Share accounts receivable (hereinafter "DSH Receivables") of healthcare entities, most of which are controlled by the Controlling Individuals.

56.    DSH Receivables are determined by government agencies that reimburse healthcare entities for providing a disproportionate share of healthcare services to Medicaid uninsured and underinsured patients.

57.    DSH Receivables payments are cost reimbursement payments and are not based on specific healthcare services provided.

58.    DSH Receivables are not for "health care services" as contemplated by Section 1.37(a) of the SCHI Agreement.

59.    The DSH Receivables purchased by SCHI now total approximately $146 million, according to the books and records of SCHI.

60.    At the current rate of collections, DSH Receivables will not be fully collected for approximately 2.9 years if ever.

61.    DSH Receivables of healthcare entities that have ceased doing business will not be paid by governmental payers and therefore are not collectable.

62.    The purchase of DSH receivables with proceeds of the Sun Loans is contrary to Section 1.37(c) of the SCHI Agreement.

63.    DSH Receivables are highly speculative and provide little or no valuable consideration in exchange for the use of the Sun Loan proceeds.

64.    DSH Receivables did not provide Stable-Value with reasonably equivalent value in exchange for the Sun Loan proceeds used for the acquisition of such receivables.

65.     Proceeds of the Sun Loans were used to fund unsecured advances or intercompany loans to healthcare facilities owned or controlled by the Controlling Individuals.

66.     Proceeds of the Sun Loans were used to finance other business ventures owned or controlled by the Controlling Individuals.  No collateral was provided to securitize these insider transactions.

67.     The Controlling Individuals fraudulently transferred proceeds of the Sun Loans for their own benefit and to the detriment of Stable-Value, its investors, and creditors.

68.     After the execution of the SCHI Agreement, the Controlling Individuals, through companies owned or controlled by the Controlling Individuals, began acquiring stock and debt of healthcare facilities using proceeds of the Sun Loans.

69.     Stable-Value did not receive reasonably equivalent value in exchange for the proceeds of the Sun Loans.

70.     The Controlling Individuals did not grant Stable-Value or SCHI a security or equity interest in the assets acquired with proceeds of the Sun Loans and retained the equity of the healthcare facilities for themselves or for entities controlled by them.

71.     The Controlling Individuals had an inherent conflict of interest in the purchase and funding of healthcare facilities acquired for the direct or indirect benefit of the Controlling Individuals using proceeds of the Sun Loans without providing Stable-Value a first-priority security interest in such facilities and without pledging the stock of such facilities to Stable-Value or to SCHI.

72.     The use of the Sun Loan proceeds for acquisition and funding of healthcare facilities is not permitted by the terms of the SCHI Agreement.

73.     Stable-Value executed no written amendments modifying the SCHI Agreement to permit the use of loan proceeds for purposes other than acquisition of eligible healthcare receivables by SCHI.[3]

74.     The acquisition and funding of healthcare facilities owned or controlled by the Controlling Individuals created fraudulent transfers of proceeds of the Sun Loans with actual intent to hinder, delay, or defraud Stable-Value or, in the alternative, were done in a manner in which Stable-Value received less than reasonably equivalent value and constitute fraudulent transfers under Florida Statutes § 726.105.

75.     The SCHI Agreement determines the amount of money available to loan to SCHI under the SCHI Agreement by subtracting the outstanding amount of the Sun Loans (plus accrued and unpaid costs and interest) from the amount of the Borrowing Base, which can only include Eligible Accounts.

76.     All Defaulted Accounts (accounts over 120 days old) must be removed from the Borrowing Base.

77.     In contravention of the SCHI Agreement, SCHI included in the Borrowing Base accounts receivable that were not SCHI Eligible Accounts; for example, SCHI included the accounts receivable of bankrupt healthcare facilities in the Borrowing Base. *See* Section 1.37(b) and (i) of SCHI Agreement.

78.     SCHI has not collected factoring fees ("Factoring Fees") from entities owned or controlled by the Controlling Individuals.

---

[3] See footnote 2 *supra*.

79.     Uncollected Factoring Fees are not Eligible Accounts as defined in Section 1.37 of the SCHI Agreement.

80.     Uncollected Factoring Fees of approximately $77,000,000 are included as SCHI accounts receivable on the books and records of SCHI.

81.     SCHI is including uncollected Factoring Fees in determining the Borrowing Base computed pursuant to the SCHI Agreement and thereby making additional loans to entities owned or controlled by the Controlling Individuals.

82.     By failing to collect Factoring Fees when due, the Controlling Individuals are depriving SCHI of income that could be used to repay the Sun Loans.

83.     As of May 31, 2009, according to the books and records of SCHI, the amount of the outstanding loans to SCHI was approximately $530,569,670.

84.     Stable-Value has not received any interest payments on the Sun Loans since December 31, 2008.

85.     SCHI has stated that is no longer a going concern.

86.     On April 29, 2009, the Initial Receiver delivered a Notice of Default to SCHI pursuant to Section 8 of the SCHI Agreement (the "SCHI Notice of Default"). A true and correct copy of the SCHI Notice of Default is attached hereto as **Exhibit C**.

87.     The SCHI Notice of Default declared the entire principal amount plus accrued interest and costs immediately due and payable in accordance with Section 8.2.3 of the SCHI Agreement.

88.     On July 7, 2009, the Receiver notified SCHI that, to the extent that SCHI had relied and was continuing to rely on purported consents and waivers of the terms and conditions of the SCHI Agreement, the Receiver, on behalf of Founding Partners and its

13

related entities, revoked, withdrew, and rescinded all such purported waivers and consents.

89.     SCHI's defaults of the SCHI Agreement described herein and in the SCHI Notice of Default are continuing and ongoing and all applicable cure periods have lapsed.

90.     Section 8.2.2 of the SCHI Agreement permits Stable-Value to protect and enforce its rights by suit in equity, action at law, or other appropriate proceedings.

91.     Section 8.2.2 of the SCHI Agreement states that nothing in this section "shall limit or be interpreted to limit in any way or by any means [Stable-Value's] right to vindicate or prosecute or otherwise protect or sue upon any right of any kind under the Agreement . . . whether at law, in equity, or otherwise."

92.     Section 16 of the SCHI Agreement states, "NOTHING IN THIS AGREEMENT OR ANY OTHER PROGRAM DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY LAWSUIT, ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER PROGRAM DOCUMENT AGAINST ANY PERSON OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION."

93.     Section 16 of the SCHI Agreement also states, "EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY LAWSUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER PROGRAM DOCUMENT IN ANY COURT REFERRED TO IN THIS SECTION 16.  EACH OF THE PARTIES

HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH LAWSUIT, ACTION OR PROCEEDING IN SUCH COURT.  EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 13."

94.     Section 8.4(d) of the SCHI Agreement states that SCHI "waives any defense (other than payment in full) which it might now or hereafter have with respect to its liability under this Agreement."

### B.  The Loan to Sun Capital, Inc.

95.     On January 24, 2002, SCI entered into a credit and security agreement (the "SCI Agreement") with Stable-Value.  A true and correct copy of the SCI Agreement is attached hereto as **Exhibit D** and incorporated herein by reference herein.

96.     Pursuant to the terms of the SCI Agreement, Stable-Value agreed to lend funds to SCI subject to the terms and conditions of the SCI Agreement.

97.     As security for repayment of loans made pursuant to the SCI Agreement, SCI granted Stable-Value a first-priority security interest in, among other things, all of its accounts, chattel paper, commercial tort claims, deposit accounts documents, general intangibles (including payment intangibles and software), goods (including fixtures, equipment, and inventory), instruments, investment property, letter of credit rights, letters of credit, money, oil, gas or other mineral rights before extraction, all personal property of any nature or type, accessions to, substitutions for or replacements of any of the

15

foregoing property, and all products or proceeds of the foregoing property. *See* **Exhibit D**.

98.     In the SCI Agreement, SCI agreed, *inter alia*, to use funds loaned pursuant to the SCI Agreement exclusively to purchase certain commercial, non-healthcare accounts receivable as part of its factoring business or to repay the Sun Loans.

99.     SCI has not collected factoring fees ("Factoring Fees") from entities owned or controlled by the Controlling Individuals.

100.    Uncollected Factoring Fees are not Eligible Accounts as defined in Section 1.37 of the SCI Agreement.

101.    Uncollected Factoring Fees of approximately $900,000 are included as accounts receivable on the books and records of SCI.

102.    SCI is including uncollected Factoring Fees in determining the Borrowing Base computed pursuant to the SCI Agreement and thereby making additional loans to entities controlled by the Controlling Individuals.

103.    By failing to collect Factoring Fees when due, the Controlling Individuals are depriving SCI of income that could be used to repay the Sun Loans.

104.    As of May 31, 2009, according to the books and records of SCI, the amount of the outstanding loans to SCI was approximately $18,509,647.

105.    Stable-Value has not received any interest payments on the loans made pursuant to the SCI Agreement since December 31, 2008.

106.    SCI has stated that it is no longer a going concern.

107.    SCI has defaulted on the SCI Agreement.

108.    On April 29, 2009, the Initial Receiver delivered a Notice of Default to SCI pursuant to Section 8 of the SCI Agreement (the "SCI Notice of Default").   A true and correct copy of the SCI Notice of Default is attached hereto as **Exhibit E.**

109.    The SCI Notice of Default declared the entire principal amount plus accrued interest and costs under the SCI Agreement immediately due and payable in accordance with Section 8.2.3.

110.    The Defaults described herein and in the SCI Notice of Default are continuing and ongoing and all applicable cure periods have lapsed.

111.    On July 7, 2009, the Receiver notified SCI that, to the extent that SCI had relied and was continuing to rely on purported consents and waivers of the terms and conditions of the SCI Agreement, the Receiver, on behalf of Founding Partners and its related entities, revoked, withdrew, and rescinded all such purported waivers and consents.

112.    Section 8.2.2 of the SCI Agreement provides that Stable-Value may proceed to protect and enforce its rights by suit in equity, action at law, or other appropriate proceedings.

113.    Section 8.2.2 of the SCI Agreement also provides that nothing in Section 8.2.2 "shall limit or be interpreted to limit in any way or by any means [Stable-Value's] right to vindicate or prosecute or otherwise protect or sue upon any right of any kind under the Agreement . . . whether at law, in equity, or otherwise."

114.    Section 16 of the SCI Agreement states, "NOTHING IN THIS AGREEMENT OR ANY OTHER PROGRAM DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY LAWSUIT,

ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER PROGRAM DOCUMENT AGAINST ANY PERSON OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION."

115.    Section 16 of the SCI Agreement also states, "EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY LAWSUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER PROGRAM DOCUMENT IN ANY COURT REFERRED TO IN THIS SECTION 16.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH LAWSUIT, ACTION OR PROCEEDING IN SUCH COURT.  EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 13."

116.    Section 8.4(d) of the SCI Agreement states that SCI "waives any defense (other than payment in full) which it might now or hereafter have with respect to its liability under this Agreement."

### C. The Loan to HLP Properties of Port Arthur, LLC

117.    On June 28, 2006, HLP entered into a loan and security agreement with Stable-Value (the "HLP Agreement").  A true and correct copy of the HLP Agreement is attached as **Exhibit F** and incorporated herein by reference.

118.     Pursuant to the terms of the HLP Agreement, Stable-Value agreed to lend $5 million to HLP subject to the terms and conditions of the HLP Agreement and the HLP Note.  A true and correct copy of the HLP Note is attached hereto as **Exhibit G** and incorporated herein by reference.

119.     As security for repayment of the loan made pursuant to the HLP Agreement, the Controlling Individuals, also the principals of HLP, pledged to Stable-Value their membership interests in HLP and their stock of Promise Healthcare, Inc. ("Promise"), another entity owned by the Controlling Individuals.  A true and correct copy of the relevant Amended and Restated Pledge Agreement (the "Pledge Agreement") is attached hereto as **Exhibit H** and incorporated herein by reference.

120.     The Maturity Date, as defined in the HLP Note, was extended by written amendment to June 28, 2009.  A true and correct copy of this amendment is attached hereto as **Exhibit I** and incorporated herein by reference.

121.     Pursuant to the terms of the HLP Agreement and the HLP Note, on the Maturity Date, all unpaid principal, interest, charges, and other amounts due under the HLP Agreement and the HLP Note are immediately due and payable.

122.     HLP has not paid the amounts due to Stable-Value.

123.     The HLP Note is in default.

124.     All conditions precedent to this action have been performed, occurred or been waived.

## COUNT I

### Breach of Contract against Sun Capital Healthcare, Inc.

125.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-94, as if fully stated herein.

126.    Pursuant to the terms of the SCHI Agreement, Defendant SCHI agreed to comply with the terms and conditions stated therein, including repayment of all amounts due under the SCHI Agreement.

127.    SCHI has defaulted under the SCHI Agreement by, without limitation:

a.    Using the proceeds of the Sun Loans for purposes other than those set forth in Sections 2.1.3, 2.2 and 5.2.1(e);

b.    Failing to make payments when due in violation of Section 4;

c.    Allowing a Borrowing Base Deficiency to exist and continue to exist, in violation of Sections 4.3 and 5.2.1(f);

d.    Allowing a Default to exist under the SCI Agreement in violation of Section 5.2.10;

e.    Failing to submit the financial information to Stable-Value required by Section 6.5(d);

f.    Failing to submit the reports to Stable-Value required by Section 6.5(e);

g.    Purchasing Accounts in violation of Section 6.28;

h.    Including in the Borrowing Base accounts receivable that are not SCHI Eligible Accounts, in violation of Sections 7.9;

i.      Engaging in activities other than those contemplated by the SCHI Agreement, in violation of Section 7.17;

j.      Purchasing Accounts from Sellers that are Affiliates of SCHI, in violation of 7.18;

k.      Being insolvent, not being able to pay its debts as they come due, and having unreasonably small capital with which to conduct its business, in violation of 7.19; and

l.      Failing to report the existence of the foregoing and other Defaults to Founding Partners, in violation of Sections 6.5(a) and 6.5(f).

128.    Plaintiff has delivered to SCHI the SCHI Notice of Default, as required by the SCHI Agreement, all applicable cure periods have lapsed, and the Defaults are continuing and ongoing.

129.    Section 8.4(d) of the SCHI Agreement states that SCHI "waives any defense (other than payment in full) which it might now or hereafter have with respect to its liability under this Agreement."

130.    Defendant SCHI has agreed to pay all of Plaintiff's costs and expenses associated with enforcing its rights in the SCHI Agreement pursuant to Section 9.1(a)(iii) of the SCHI Agreement.

131.    As a result of these and other Defaults by Defendant SCHI, Plaintiff is entitled to recover the outstanding loan balance plus (i) all costs and charges incurred in the collection or enforcement hereof, including, attorneys' fees and court costs; (ii) continuing and accruing interest at the Default Rate as defined in the SCHI Agreement; and (iii) all other amounts and charges due and owing under the SCHI Agreement.

WHEREFORE, Plaintiff requests this Court to enter a judgment against Defendants for all damages incurred including, but not limited to, all costs, prejudgment interest, and reasonable attorney's fees, decree that the security interest of Stable-Value upon the Collateral is prior, paramount and superior to any and all right, title and interest of any other defendant to this action and any person claiming, by, through or under such parties since the institution of this action, and all other relief this Court deems just.

## COUNT II

### Breach of Contract by Sun Capital, Inc.

132. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-116, as if fully stated herein.

133. Pursuant to the terms of the SCI Agreement, Defendant SCI agreed to comply with the terms and conditions stated therein, including repayment of all amounts due under the SCI Agreement.

134. SCI has defaulted under the SCI Agreement by, without limitation:

    a. Using the proceeds of the Sun Loans for purposes other than those set forth in Sections 2.1.3, 2.2 and 5.2.1(e);

    b. Failing to make payments when due, in violation of Section 4;

    c. Allowing a Default to exist under the SCHI Agreement, in violation of Section 5.2.10;

    d. Taking actions that could impair the rights of Stable-Value in the Collateral, in violation of Section 6.35;

    e. Engaging in activities other than those contemplated by the SCI Agreement, in violation of Section 7.17;

f.      Purchasing Accounts from Sellers that are Affiliates of SCI, in violation of 7.18;

g.      Being insolvent, not being able to pay its debts as they come due, and having unreasonably small capital with which to conduct its business, in violation of 7.19; and

h.      Failing to report the existence of the foregoing and other Defaults to Stable-Value, in violation of Sections 6.5(a) and 6.5(f).

135.    Plaintiff has delivered to SCI the SCI Notice of Default, as required by the SCI Agreement, all applicable cure periods have lapsed, and the Defaults are continuing and ongoing.

136.    Section 8.4(d) of the SCI Agreement states that SCI "waives any defense (other than payment in full) which it might now or hereafter have with respect to its liability under this Agreement."

137.    Defendant SCI has agreed to pay all of Plaintiff's costs and expenses associated with enforcing its rights under the SCI Agreement pursuant to Section 9.1(a)(iii) of the SCI Agreement.

138.    As a result of these and other Defaults by Defendant SCI, Plaintiff is entitled to recover the amount of the outstanding loan balance plus (i) all costs and charges incurred in the collection or enforcement hereof, including, attorneys' fees and court costs; (ii) continuing and accruing interest at the Default Rate (as defined in the SCI Agreement); and (iii) all other amounts and charges due and owing under the SCI Agreement.

WHEREFORE, Plaintiff requests this Court to enter a judgment against Defendants for all damages incurred including, but not limited to, all costs, prejudgment interest, and reasonable attorney's fees, decree that the security interest of Stable-Value upon the Collateral is prior, paramount and superior to any and all right, title and interest of any other defendant to this action and any person claiming, by, through or under such parties since the institution of this action, and all other relief this Court deems just.

## COUNT III

### Breach of Contract against HLP Properties of Port Arthur, LLC

139.   Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-124, as if fully stated herein.

140.   Pursuant to the terms of the HLP Agreement and the HLP Note, Defendant HLP agreed to comply with all of the terms and conditions of the HLP Agreement and HLP Note, including repayment of all unpaid principal, interest, charges, and other amounts owed on the Maturity Date.

141.   The Maturity Date has passed and no such payments have been made by HLP to Plaintiff.

142.   Defendant HLP waives all right to notice of default from Plaintiff pursuant to Sections 4.4 and 4.6 of the HLP Note.

143.   Defendant HLP agrees to pay all of Plaintiff's costs and expenses associated with enforcing its rights under the HLP Agreement pursuant to Section 9.3 of the HLP Agreement.

144.   As a result of these and other Defaults by Defendant HLP, Plaintiff is entitled to recover the amount of the outstanding loan balance plus (i) all costs and

charges incurred in the collection or enforcement hereof, including, attorneys' fees and court costs; (ii) continuing and accruing interest at the Default Interest Rate (as defined in the HLP Note); and (iii) all other amounts and charges due and owing pursuant to the HLP Agreement and the HLP Note.

WHEREFORE, Plaintiff requests this Court to enter a judgment against Defendants for all damages incurred including, but not limited to, all costs, prejudgment interest, and reasonable attorney's fees, decree that the security interest of Stable-Value upon the Collateral is prior, paramount and superior to any and all right, title and interest of any other defendant to this action and any person claiming, by, through or under such parties since the institution of this action, and all other relief this Court deems just.

## COUNT IV

### Replevin

145.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-116, as if fully stated herein.

146.    This is an action for replevin.

147.    As set forth above, Plaintiff has a valid, perfected first-priority security interest in the all of the Sun Entities' Property, as defined in the SCHI Agreement and the SCI Agreement (the "Collateral").

148.    As a result of the Defaults under the SCHI Agreement and the SCI Agreement, Plaintiff is entitled to permanent possession, custody, and control of the Collateral.

149.    As a result of the Sun Entities' breach of the Credit and Security Agreements, Plaintiff has elected to repossess the Collateral of the Sun Entities as set

forth in the Agreements and further detailed in the UCC-1 financing statements attached as **Exhibit J**.

150.    By reason of the Sun Entities' default, Plaintiff is lawfully entitled to possession of the Collateral under the SCHI Agreement and the SCI Agreement.

151.    Plaintiff is without knowledge as to the approximate value of the Collateral but believes that the value of the Collateral does not exceed the amounts due under the SCHI Agreement and SCI Agreement.

152.    To the best of Plaintiff's knowledge, on information and belief, the Sun Entities are detaining the Collateral and do not wish to have Plaintiff avail himself of his right to repossession as a secured party under the SCHI Agreement and the SCI Agreement.

153.    Plaintiff does not believe the Collateral has been taken for a tax assessment or fine pursuant to law.

154.    Plaintiff does not believe the Collateral has been taken under an execution or attachment against the Collateral.

155.    Plaintiff is entitled to a permanent order of possession, custody, and control of the Collateral.

WHEREFORE, Plaintiff requests from this Court:

        a.    Entry of order of judgment on the SCHI Agreement and SCI Agreement;

        b.    Entry of judgment for possession of the Collateral as set forth on the Agreements;

c.      Issuance of an order granting Plaintiff immediate possession of the Collateral;

d.      Issuance of an order notifying the accounts receivable debtors that payment should be made directly to Plaintiff; and

e.      Entry of judgment for all costs incurred by Plaintiff by reason of the Sun Entities' failure to surrender the Collateral, together with prejudgment interest, attorney's fees, and costs incurred.

## COUNT V

### Foreclosure of Security Interest against the Sun Entities

156.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-116, as if fully stated herein.

157.    In order to further secure the Credit and Security Agreements, the Sun Entities granted Stable-Value a first-priority security interest in all of the Sun Entities' Property, as defined in the SCHI Agreement and the SCI Agreement (the "Collateral").

158.    In order to perfect Stable-Value's security interest in the Collateral, the Sun Entities filed with the Florida Secretary of State several UCC-1 financing statements which more particularly described the Collateral. *See* **Exhibit J**.

159.    Accordingly, pursuant to the Credit and Security Agreements, Stable-Value holds a perfected security interest in the Collateral.

160.    At the time of the execution of the Credit and Security Agreements, the Sun Entities were the owners of the Collateral.

161.    The Sun Entities breached of the Credit and Security Agreements as more fully described above.

162.    As a result of the Sun Entities' breach of the Credit and Security Agreements, Stable-Value is entitled to foreclose the Collateral, including any and all rents, income, or proceeds generated by the Collateral.

WHEREFORE, Plaintiff requests that this Court:

a.      Take jurisdiction of the subject matter of this cause and the parties hereto;

b.      Ascertain and determine the sums due and payable to Stable Value pursuant to the Credit and Security Agreements;

c.      Decree that the sums of money found to be due from the Sun Entities to Stable Value be a lien upon the Collateral or rents, income, or proceeds otherwise related to or generated from the Collateral, which lien is prior, paramount and superior to the interest of any other defendant or third party;

d.      Upon failure of the Sun Entities to pay the amount of money found to be due to Stable-Value, enter a judgment of foreclosure, providing that the Collateral, and the rights created by the Credit and Security Agreements be sold or otherwise transferred to Stable-Value (through the Receiver) and that the proceeds of such sale be applied to satisfy the indebtedness due to Stable-Value;

e.      Order that in the event the proceeds from the sale are insufficient to satisfy the amount found to be due and owing to Stable-Value pursuant to the Credit and Security Agreements, that a deficiency judgment be entered against the Sun Entities; and

f.      Decree that the security interest of Stable-Value upon the Collateral is prior, paramount and superior to any and all right, title and interest of any other defendant to this action and any person claiming, by, through or under such parties since the institution of this action.

## COUNT VI

### Foreclosure of Security Interest against HLP and Promise

163.   Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-124, as if fully stated herein.

164.   In order to further secure the HLP Loan, the Controlling Individuals granted Stable-Value a first-priority security interest in all of their membership interests in HLP and their stock in Promise (the "Collateral").

165.   Pursuant to the terms of the Pledge Agreement, the Controlling Individuals delivered the certificates or instruments evidencing the Collateral to Stable-Value.

166.   Accordingly, pursuant to the Pledge Agreement, the HLP Agreement and the HLP Note, Stable-Value holds a valid, perfected first-priority security interest in the Collateral.

167.   At the time of the execution of the HLP Agreement and the HLP Note, the Controlling Individuals were the owners of the Collateral.

168.   HLP breached the HLP Agreement and the HLP Note as more fully described above.

169. As a result of the HLP's breach of the HLP Agreement and the HLP Note, Stable-Value is entitled to foreclose the Collateral, including any and all rents, income, or proceeds generated by the Collateral.

WHEREFORE, Plaintiff requests that this Court:

a. Take jurisdiction of the subject matter of this cause and the parties hereto;

b. Ascertain and determine the sums due and payable to Stable Value pursuant to the HLP Agreement and the HLP Note;

c. Decree that the sums of money found to be due from HLP to Stable Value be a lien upon the Collateral or rents, income, or proceeds otherwise related to or generated from the Collateral, which lien is prior, paramount and superior to the interest of any other defendant or third party;

d. Upon failure of HLP to pay the amount of money found to be due to Stable-Value, enter a judgment of foreclosure, providing that the Collateral, and the rights created by the HLP Agreement and the HLP Note be sold or otherwise transferred to Stable-Value (through the Receiver) and that the proceeds of such sale be applied to satisfy the indebtedness due to Stable-Value;

e. Order that in the event the proceeds from the sale are insufficient to satisfy the amount found to be due and owing to Stable-Value pursuant to the HLP Agreement and the HLP Note, that a deficiency judgment be entered against the Controlling Individuals; and

f. Decree that the security interest of Stable-Value upon the Collateral is prior, paramount and superior to any and all right, title and interest of any other defendant to this action and any person claiming, by, through or under such parties since the institution of this action.

## COUNT VII

### Fraudulent Transfer under Florida Statutes § 726.105

170. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-116, as if fully stated herein.

171. Plaintiff is a creditor of the Sun Entities.

172. Plaintiff at all times maintained a legal and equitable interest in the funds transferred under the SCHI Agreement and the SCI Agreement.

173. The Sun Entities' use of the Sun Loan proceeds to purchase Defaulted Accounts and accounts receivable that do not meet the definition of Eligible Account were done with actual intent to hinder, delay, or defraud Stable-Value and constitute fraudulent transfers under Florida Statutes § 726.105.

174. The Sun Entities' transfer of the Sun Loan proceeds obtained from Stable-Value to entities owned or controlled by the Controlling Individuals was done with actual intent to hinder, delay, or defraud Stable-Value and constitute fraudulent transfers under Florida Statutes § 726.105.

175. The Sun Entities were insolvent at the time the transfers were made, and they received less than the reasonably equivalent value for the funds transferred. The Sun Entities' debts exceed their assets at fair valuation, or the Sun Entities are not paying their debts as they become due.

176.    The transfers described above should be set aside as fraudulent and the Sun Loan proceeds involved in such transfers returned to the Plaintiff immediately.

WHEREFORE, Plaintiff requests this Court to enter a judgment against Defendants SCHI and SCI for all damages incurred including, but not limited to, all costs and prejudgment interest, and all other relief this Court deems just.

## COUNT VIII

### Fraudulent Transfer under Florida Statutes § 726.106

177.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-116, as if fully stated herein.

178.    Plaintiff is a creditor of the Sun Entities.

179.    Plaintiff has at all relevant times maintained a legal and equitable interest in the funds transferred under the SCHI Agreement and the SCI Agreement.

180.    The Sun Entities' transfers of the Sun Loan proceeds obtained from Stable-Value to entities owned or controlled by the Controlling Individuals were made to "insiders," as defined in Florida Statutes § 726.106.

181.    Plaintiff's claim arose before the transfers were made.

182.    Upon information and belief, the transfers were made to satisfy an antecedent debt.

183.    Upon information and belief, the Sun Entities were insolvent at the time the transfers were made.

184.    The insiders to whom the transfers were made had reasonable cause to believe that the Sun Entities were insolvent at the time the transfers were made.

185.   The transfers described above should be set aside as fraudulent and the Sun Loan proceeds involved in such transfers returned to the Plaintiff immediately.

WHEREFORE, Plaintiff requests this Court to enter a judgment against Defendants SCHI and SCI for all damages incurred including, but not limited to, all costs and prejudgment interest, and all other relief this Court deems just.

## COUNT IX

### Aiding and Abetting Breach of Fiduciary Duty

186.   Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-116, as if fully stated herein.

187.   Gunlicks was the President, a director, and Chief Executive Officer of Founding Partners Capital Management Company, which is the general partner of Stable-Value.

188.   Gunlicks owed a fiduciary duty to act in the best interest of the Receivership Entities.

189.   Gunlicks breached his fiduciary obligations to the Receivership Entities by, among other things, allowing or acquiescing in the Sun Entities' use of Stable-Value funds to purchase Defaulted Accounts and accounts receivable that did not meet the definition of Eligible Account, to fund the working capital needs of entities owned or controlled by the Controlling Individuals, and to engage in improper related-party transactions.

190.   Defendants knew the requirements and conditions under the SCHI and SCI Agreements and further knew that Gunlicks acted in violation of his fiduciary duties

33

to the Receivership Entities in allowing the Sun Entities to purchase receivables and transfer Stable-Value funds in violation of these Agreements.

191.    The Sun Entities knowingly induced, aided and abetted, and participated in Gunlicks' breach of fiduciary duty by purchasing receivables and making transfers of Stable-Value funds in violation of the SCHI and SCI Agreements.

192.    The Receivership Entities suffered damage as a result of Gunlicks' breach of his fiduciary duty to the Receivership Entities.

WHEREFORE, Plaintiff requests this Court to enter a judgment against Defendants SCHI and SCI for all damages incurred including, but not limited to, all costs, and prejudgment interest, as well as all other relief this Court deems just.

Dated July 13, 2009.

Respectfully submitted,

**BROAD AND CASSEL**
Attorneys for Receiver
100 N. Tampa Street
Suite 3500
Tampa, FL 33602
Tel: (813) 225-3011
Fax: (813) 204-2137
mmagidson@broadandcassel.com

By: _____
Michael D. Magidson, Esq.
Florida Bar No. 36191