Reply Memorandum in Further Support of
Sun Capital's Motion for Preliminary Injunction
(Part 1)

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA – FORT MYERS DIVISION

Case No. 2:09-cv-445-FtM-29SPC
(Ancillary to Case No. 2:09-cv-229-FtM-29SPC)

---

DANIEL S. NEWMAN, as Receiver for Founding Partners
Capital Management Company; Founding Partners Stable-
Value Fund, L.P.; Founding Partners Stable-Value Fund II,
L.P.; Founding Partners Global Fund, Ltd.; and Founding
Partners Hybrid-Value Fund, L.P.,

                              Plaintiff,

vs.

SUN CAPITAL, INC., a Florida corporation, SUN
CAPITAL HEALTHCARE, INC., a Florida corporation,
and HLP PROPERTIES OF PORT ARTHUR, LLC, a
Texas limited liability company,

                              Defendants.

---

## REPLY MEMORANDUM IN FURTHER SUPPORT OF
## SUN CAPITAL'S MOTION FOR PRELIMINARY INJUNCTION

Jonathan Galler, Esq.
  Florida Bar No. 0037489
PROSKAUER ROSE LLP
2255 Glades Road, Suite 340W
Boca Raton, FL 33431
Tel: (561) 241-7400
Fax: (561) 241-7145
jgaller@proskauer.com

Sarah S. Gold, Esq. (*pro hac vice*)
  Florida Bar No. 0032190
Karen E. Clarke (*pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
Tel: (212) 969-3000
Fax: (212) 969-2900
sgold@proskauer.com
kclarke@proskauer.com

March 2, 2010

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Table of Authorities ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 2

CORRECTING THE FACTUAL RECORD ......................................................... 7

    A.    The Parties' Performance of Their Modified Agreements ........................ 8

        1.    The Very Early Modifications of the Borrowing Base and Financial Reporting and Requirements ......................................... 10

        2.    The Lender's 2002 Interest-Maximizing Modifications ............... 11

        3.    The Wholesale Modification of the Uses of Loan Proceeds ......... 12

            a.    DSH Healthcare Receivables Financing............................ 13

            b.    The Expansion into Hospital and Real Estate Acquisitions 15

        4.    The Modifications of the SCI Credit Agreement .......................... 18

    B.    The Restructuring Plan and Hospital Commitments ................................ 21

    C.    The Lender's Repudiation of the Credit Agreement and Its Aftermath .... 24

ARGUMENT.......................................................................................................... 28

I.    The Receiver Misconceives His Own Rights and Sun Capital's Duties .............. 28

    A.    The Receiver Misapprehends His Powers and Rights............................... 28

    B.    The Receiver's Legal Rights Are No Greater than the Lender's ............. 33

II.    Sun Capital's Position Is Likely to Succeed on the Merits ................................. 34

    A.    The Alleged Historical Defaults Were Not Defaults................................. 36

        1.    The Cited CSA Provisions Were Modified and Superseded ......... 37

        2.    At a Minimum the Lender Waived Enforcement of the CSA ....... 45

    B.    The Alleged 2009 Defaults Were Not Defaults........................................ 48

        1.    The Lender's January 2009 Repudiation Excused Sun Capital's Further Performance ................................................................... 49

        2.    The Parties' Last Modification Eliminated Interest Payments ...... 56

    C.    The Receiver's Arguments Are Unavailing ............................................. 57

        1.    The "Sham" Arguments Are Unfounded and Irrelevant ............... 58

        2.    The Original CSA Clauses Are No Bar........................................ 61

            a.    CSA Sections 14 and 8.3 ................................................. 62

            b.    CSA Sections 8.4 and 21(i) .............................................. 65

        3.    The Lender's Own Conduct Caused Sun Capital's "Defaults"..... 69

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

|  |  |  | 4. | The Purported July 2009 Revocations Were Ineffective | 74 |
|  | D. | Equity Bars the Receiver's Unfair, Exploitive Tactics | | | 80 |
|  |  |  | 1. | Technical Breaches Do Not Justify a Great Forfeiture | 81 |
|  |  |  | 2. | The Receiver's Self-Help Tactics Breach Good Faith and Fair Dealing | 83 |
|  | E. | Injunctive Relief Is Appropriate in These Circumstances | | | 86 |
| III. | The Irreparable Injury Is Obvious and Unrebutted | | | | 88 |
|  | A. | The Loss of Even a Struggling Business Is Irreparable Injury | | | 90 |
|  | B. | The Sundry Jabs at Koslow's Affidavits Are Unfair and Pointless | | | 95 |
| IV. | A Balancing of the Harms Favors Sun Capital | | | | 101 |
| V. | An Injunction Serves the Public Interest | | | | 106 |
| VI. | The Receiver Shows No "Unclean Hands" Bar | | | | 107 |
| VII. | The Receiver Shows No Basis for a Bond | | | | 111 |
| VIII. | There Is No Need for an Evidentiary Hearing | | | | 114 |
| CONCLUSION | | | | | 116 |

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

## Table of Authorities

Page(s)

## Cases

*1523 Real Estate v. E. Atl. Props.*,
    2009 WL 2340668 (N.Y. Sup. Ct. Aug. 27, 2009) ...............................................................78

*ADC Orange, Inc. v. Coyote Acres, Inc.*,
    7 N.Y.3d 484 (2006) ...............................................................................................................71

*Advanced Safety Sys. NY, Inc. v. Mfrs. & Traders Trust Co.*,
    592 N.Y.S.2d 159 (App. Div. 1992) .........................................................................................84

*AGCO Corp. v. Massey Tractor Co.*,
    2009 WL 1010047 (S.D. Ala. Apr. 14, 2009) ........................................................................103

*A.H.A. Gen. Constr., Inc. v. New York City Hous. Auth.*,
    92 N.Y.2d 20 (1998) ........................................................................................................ 70-72

*A.I. Credit Corp. v. Hi-Tech Commcns., Inc.*,
    2002 WL 389424 (Tex. App. 2002) .........................................................................................53

*Albany Medical College v. Lobel*,
    745 N.Y.S.2d 250 (App. Div. 2002) .........................................................................................47

*AM Cosmetics Inc. v. Solomon*,
    67 F. Supp. 2d 312 (S.D.N.Y. 1999) .......................................................................................55

*American Bag & Metal Co. v. Alcan Aluminum Corp.*,
    497 N.Y.S.2d 787 (App. Div. 1985) .........................................................................................64

*American List Corp. v. U.S. News & World Report, Inc.*,
    75 N.Y.2d 38 (1989) ................................................................................................................55

*Anostario v. Vicinanzo*,
    59 N.Y.2d 662 (1983) ..............................................................................................................44

*Arrington v. Fuller*,
    237 F. Supp. 2d 1307 (M.D. Ala. 2002) ..........................................................................99-100

*Ashton v. Board of Educ.*,
    255 N.Y.S.2d 154 (Sup. Ct. 1963),
    *aff'd*, 255 N.Y.S.2d 245 (App. Div. 1964) .............................................................................79

iii

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*B. Reitman Blacktop, Inc. v. Missirlian,*
  860 N.Y.S.2d 211 (App. Div. 2008)..................................................................41-42

*Baldree v. Cargill, Inc.,*
  758 F. Supp. 704 (M.D. Fla. 1990),
  *aff'd*, 925 F.2d 1474 (11th Cir. 1991)....................................................................113

*Bancredit Cayman Ltd. v. Regions Bank Corp.*
  *(In re Bancredit Cayman Ltd.),*
  2009 WL 3762337 (Bankr. S.D. Fla. Nov. 6, 2009)...............................................34

*Barclays Bank of New York, N.A. v. Heady Electric Co.,*
  571 N.Y.S.2d 650 (App. Div. 1991).........................................................................68

*Beacon Terminal Corp. v. Chemprene, Inc.,*
  429 N.Y.S.2d 715 (App. Div. 1980).........................................................................38

*Benipal v. Herath,*
  674 N.Y.S.2d 815 (App. Div. 1998).........................................................................39

*Binghamton Masonic Temple, Inc. v. City of Binghamton,*
  602 N.Y.S.2d 310 (Sup. Ct. 1993).....................................................................50, 53

*Bombardier Capital Inc. v. Reserve Capital Corp.,*
  744 N.Y.S.2d 232 (App. Div. 2002).........................................................................53

*Bonar v. Dean Witter Reynolds, Inc.,*
  835 F.2d 1378 (11th Cir. 1988) ...............................................................................66

*Bresloff-Hernandez v. Horn,*
  2007 WL 2789500 (S.D.N.Y. Sept. 25, 2007).........................................................50

*Brook-Lea Country Club, Inc. v. Hanover Ins. Co.,*
  306 N.Y.S.2d 780 (Sup. Ct. 1969)...........................................................................60

*Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.,*
  482 F. Supp. 2d 1065 (E.D. Wis. 2007)..................................................................112

*Cablevision Sys. Corp. v. Town of E. Hampton,*
  862 F. Supp. 875 (E.D.N.Y. 1994) ..........................................................................50

*Calloway v. Ptrs. Nat'l Health Plans,*
  986 F.2d 446 (11th Cir. 1993) ...............................................................................109

iv

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Calpine Energy Servs., L.P. v. Reliant Energy Elec. Solutions, L.L.C.*
  (*In re Calpine Corp.*),
  2009 WL 1578282 (Bankr. S.D.N.Y. May 7, 2009)...............................................71

*Campoverde v. Sony Pictures Entmt.*,
  2002 WL 31163804 (S.D.N.Y. Sept. 30, 2002).....................................................52

*Camrex Contractors (Marine) Ltd. v. Reliance Marine Applicators, Inc.*,
  579 F. Supp. 1420 (E.D.N.Y. 1984) ......................................................................38

*Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank*,
  524 N.Y.S.2d 531 (App. Div. 1988).....................................................43, 73-74, 84

*Carabetta Enters. v. The City of Asbury Park*
  (*In re Carabetta Enter., Inc.*),
  162 B.R. 399 (Bankr. D. Conn. 1993) ..................................................................112

*Carco Group, Inc. v. Maconachy*,
  644 F. Supp. 2d 218 (S.D.N.Y. 2009)..........................................................50, 51, 55

*Carmichael v. Birmingham Saw Works*,
  738 F.2d 1126 (11th Cir. 1984) .............................................................................89

*Carvel Corp. v. Diversified Mgmt. Group Inc.*,
  930 F.2d 228 (2d Cir. 1991)...................................................................................83

*Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.*,
  807 F. Supp. 1007 (S.D.N.Y. 1992).......................................................................71

*CBS Broadcasting Inc. v. Primetime 24 Joint Venture*,
  48 F. Supp. 2d 1342 (S.D. Fla. 1998) .........................................................108-110

*Central La. Electric Co. v. Dolet Hills Mining Venture*,
  116 F. Supp. 2d 726 (W.D. La. 2000).....................................................................87

*Christian Dior-New York, Inc. v. Koret, Inc.*,
  792 F.2d 34 (2d Cir. 1986).....................................................................................63

*Cobalt Multifamily Investors I, LLC v. Shapiro*,
  2008 WL 833237 (S.D.N.Y. Mar. 28, 2008) ........................................................34

*Components Direct, Inc. v. European Am. Bank & Trust Co.*,
  572 N.Y.S.2d 359 (App. Div. 1991).......................................................................84

*Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*,
  747 N.Y.S.2d 468 (App. Div. 2002) ...............................................................52, 55

v

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Computer Strategies, Inc. v. Commodore Business Machs., Inc.*,
  483 N.Y.S.2d 716 (App. Div. 1984) ........................................................78

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
  321 F.3d 878 (9th Cir. 2003) ...............................................................111

*Continuum Co. v. Incepts, Inc.*,
  873 F.2d 801 (5th Cir. 1989) ...............................................................113

*Corrigan Dispatch Co. v. Casa Guzman, S.A.*,
  569 F.2d 300 (5th Cir. 1978) ...............................................................111

*County of Los Angeles v. Davis*,
  440 U.S. 625 (1979) ..............................................................................99

*Credit Suisse First Boston Corp. v. Pitofsky*,
  4 N.Y.3d 149 (2005) ..............................................................................39

*Dalton v. Educational Testing Serv.*,
  87 N.Y.2d 384 (1995) ............................................................................83

*Daniggelis v. Pivan*,
  513 N.E.2d 92 (Ill. App. 1987) ..............................................................75

*Destiny USA Holdings, LLC v. Citigroup Global Mkts. Realty Corp.*,
  2009 WL 2163483 (N.Y. Sup. Ct. July 17, 2009) .................................88

*Deutsche Asset Mgmt., Inc. v. Callaghan*,
  2004 WL 758303 (S.D.N.Y. Apr. 7, 2004) ............................................38

*Deutsche Bank AC v. JP Morgan Chase Bank*,
  2007 WL 2823129 (S.D.N.Y. Sept. 27, 2007),
  *aff'd*, 331 Fed. Appx. 39 (2d Cir. May 29, 2009) .................................51

*Diamond Waste, Inc. v. Monroe County*,
  796 F. Supp. 1511 (M.D. Ga. 1992) ......................................................90

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
  269 F.3d 1149 (10th Cir. 2001) .............................................................90

*Doran v. Salem Inn, Inc.*,
  422 U.S. 922 (1975) ..............................................................................90

*Dorf Overseas, Inc. v. Chemical Bank*,
  457 N.Y.S.2d 513 (App. Div. 1983) ......................................................46

vi

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Duffield v. First Interstate Bank of Denver,*
  13 F.3d 1403 (10th Cir. 1993) .............................................................84

*E*Trade Fin. Corp. v. Deutsche Bank AG,*
  631 F. Supp. 2d 313 (S.D.N.Y. 2009).................................................66

*Eberhard v. Marcu,*
  530 F.3d 122 (2d Cir. 2008)................................................................33

*ESPN, Inc. v. Office of Comm'r of Baseball,*
  76 F. Supp. 2d 416 (S.D.N.Y. 1999)...................................................50

*Estate of Anglin v. Estate of Kelley,*
  705 N.Y.S.2d 769 (App. Div. 2000)....................................................65

*European Am .Bank v. Mr. Wemmick, Ltd.,*
  554 N.Y.S.2d 628 (App. Div. 1990)....................................................68

*Evergreene Nursing Care Ctr. v. Leavitt,*
  2007 WL 1601476 (W.D. Va. June 4, 2007)......................................98

*Fifty States Mgmt. Corp. v. Pioneer Auto Parks,*
  46 N.Y.2d 573 (1979).........................................................................81

*Fla. Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n,*
  274 F.3d 924 (5th Cir. 2001)..............................................................34

*Fleming v. Lind-Waldock & Co.,*
  922 F.2d 20 (1st Cir. 1990)................................................................33

*Food Mgmt. Group, LLC v. Matrix Realty Group, Inc.*
  *(In re Food Mgmt. Group, LLC),*
  372 B.R. 171 (Bankr. S.D.N.Y. 2007)............................................49-50

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., LP,*
  7 N.Y.3d 96 (2006) .........................................................................46. 78

*GE Capital Mortgage Servs, Inc. v. Pinnacle Mortgage Invstmt. Corp.,*
  897 F. Supp. 842 (E.D. Pa. 1995) ......................................................67

*Global Crossing Bandwidth, Inc. v. Locus Telecom., Inc.,*
  632 F. Supp. 2d 224 (W.D.N.Y. 2009).................................................38

*GoTo.com, Inc. v. Walt Disney Co.,*
  202 F.3d 1199 (9th Cir. 2000) ..........................................................113

vii

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Hamilton v. Flowers*,
   134 Fla. 328 (1938).................................................................................33

*Harper v. City of Newburgh*,
   145 N.Y.S. 59 (App. Div. 1913)...........................................................60

*Headquarters Rest Corp. v. Reliance Vending Co.*,
   519 N.Y.S.2d 662 (App. Div. 1987)......................................................82

*Healy v. Williams*,
   818 N.Y.S.2d 121 (App. Div. 2006).......................................................42

*Hidden Meadows Devel. Co. v. Parmelee's Forest Prods. Inc.*,
   734 N.Y.S.2d 264 (App. Div. 2001).......................................................71

*Home Sav. Bank of Upstate N.Y. v. Baer Props. Ltd.*,
   460 N.Y.S.2d 833 (App. Div. 1983)......................................................82

*In re Adelphia Business Solutions, Inc.*,
   341 B.R. 415 (Bankr. S.D.N.Y. 2003)............................................50, 73

*In re Burton Wiand Receivership Cases*,
   2008 WL 818504 (S.D. Fla. Mar. 26, 2008)...........................................33

*In re Prime Motor Inns, Inc.*,
   131 B.R. 233 (Bankr. S.D. Fla. 1991)....................................................90

*India.com, Inc. v. Dalal*,
   412 F.3d 315 (2d Cir. 2005)..................................................................72

*Island Estates Mgmt., Inc. v. MBA-Manorhaven, LLC*,
   2008 WL 4700416 (N.Y. Sup. Ct. 2008).................................................77

*Ixe Banco, S.A. v. MBNA Am. Bank*,
   2009 WL 3124219 (S.D.N.Y. Sept. 29, 2009).........................................72

*J&R Landscaping, Inc. v. Damianos*,
   769 N.Y.S.2d 52 (App. Div. 2003)........................................................42

*Jafari v. Wally Findlay Galleries*,
   741 F. Supp. 64 (S.D.N.Y. 1990).........................................................52

*Janmort Leasing, Inc. v. Econo-Car Int'l, Inc.*,
   475 F. Supp. 1282 (E.D.N.Y. 1979)......................................................93

viii

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Javitch v. First Union Secs., Inc.,*
    315 F.3d 619 (6th Cir. 2003) ............................................................................34

*John E. Andrus Memorial, Inc. v. Daines,*
    2008 WL 5705732 (Mag. S.D.N.Y. July 17, 2008),
    *aff'd,* 600 F. Supp. 2d 563 (S.D.N.Y. 2009) ..................................................98

*Johnson v. Tampa Sports Auth.,*
    2006 WL 2970431 (M.D. Fla. Oct. 16, 2006) ..............................................113

*Joint Venture Asset Acquisition v. Bhogaonker,*
    769 F. Supp. 532 (S.D.N.Y. 1991) ................................................................67

*JTH Tax, Inc. v. H&R Block Eastern Tax Servs., Inc.,*
    128 F. Supp. 2d 926 (E.D. Va. 2001),
    *aff'd in part & vac'd in part on oth. grds.,*
    28 Fed. Appx. 207 (4th Cir. 2002) ....................................................... 108-110

*K.M.C. Co. v. Irving Trust Co.,*
    757 F.2d 752 (6th Cir. 1985) ........................................................................84

*Karabu Corp. v. Pension Benefit Guaranty Corp.,*
    1997 WL 759462 (S.D.N.Y. Dec. 10, 1997) ..................................... 82, 86-87

*Kenyon & Kenyon v. Logany, LLC,*
    823 N.Y.S.2d 72 (App. Div. 2006) ....................................................46-47, 63

*Kirke La Shelle Co. v. Paul Armstrong Co.,*
    263 N.Y. 79 (1933) ......................................................................................70

*Kooleraire Serv. & Installation Corp. v. Board of Educ.,*
    28 N.Y.2d 101 (1971) ...................................................................................71

*LaGuardia Assocs. v. Holiday Hospitality Franchising, Inc.,*
    92 F. Supp. 2d 119 (E.D.N.Y. 2000) ........................................... 47-48,79, 90

*Lank v. N.Y. Stock Exch.,*
    548 F.2d 61 (2d Cir. 1977) ...........................................................................37

*Latham Four P'ship v. SSI Med. Serv.,*
    581 N.Y.S.2d 891 (App. Div. 1992) ..............................................................42

*Lee v. Wright,*
    485 N.Y.S.2d 543 (App. Div. 1985) ..............................................................64

ix

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Legend Artists Mgmt., Inc. v. Blackmore,*
  709 N.Y.S.2d 85 (App. Div. 2000)........................................................................52

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,*
  51 F.3d 982 (11th Cir. 1995) ..............................................................................116

*Lipsky v. Commonwealth United Corp.,*
  551 F.2d 887 (2d Cir. 1976)..................................................................................50

*Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC,*
  811 N.Y.S.2d 47 (App. Div. 2006),
  *aff'd,* 8 N.Y.3d 59 (2006)..............................................................................46, 77

*Manpower Inc. v. Mason,*
  377 F. Supp. 2d 672 (E.D. Wis. 2005)................................................................112

*Marathon Enters., Inc. v. Schroter GmbH & Co.,*
  2003 WL 355238 (S.D.N.Y. Feb. 18, 2003)...........................................................48

*Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots,*
  878 F.2d 41 (2d Cir. 1989)....................................................................................38

*McCandless v. Furlaud,*
  296 U.S. 140 (1935)...............................................................................................33

*McDonald's Corp. v. Robert A. Makin, Inc.,*
  653 F. Supp. 401 (W.D.N.Y. 1986)..................................................................54-55

*McMillen v. Drive Financial Services, L.P.,*
  2005 WL 1041343 (D. Kan. Feb. 7, 2005),
  *aff'd,* 172 Fed. Appx. 896 (10th Cir. 2006) ........................................................30

*Merrill Lynch & Co. v. Allegheny Energy, Inc.,*
  500 F.3d 171 (2d Cir. 2007)..................................................................................52

*Merrill, Lynch, Pierce, Fenner & Smith v. Dunn,*
  191 F. Supp. 2d 1346 (M.D. Fla. 2002)..............................................................110

*Merzon v. Lefkowitz,*
  735 N.Y.S.2d 106 (App. Div. 2001)......................................................................71

*Meyer v. Brown & Root Constr. Co.,*
  661 F.2d 369 (5th Cir. 1981) ................................................................................89

*Mid-America AG Network, Inc. v. Monkey Isl. Devel. Auth.,*
  109 Fed. Appx. 187 (10th Cir. July 8, 2004) ........................................................87

x

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Mitchell Co. v. Campus,*
    2009 WL 1606844 (S.D. Ala. June 4, 2009) .................................................................109

*Motors Acceptance Corp. v. Rozier,*
    597 S.E.2d 367 (Ga. 2004).................................................................................30

*NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,*
    262 F. Supp. 2d 134 (S.D.N.Y. 2003).......................................................................52

*Nassau Trust Co. v. Montrose Concrete Prods. Corp.,*
    56 N.Y.2d 175 (1982) ...........................................................................38, 75-78, 80

*Natale v. Ernst,*
    881 N.Y.S.2d 232 (App. Div. 2009) ...................................................................46-47

*National Indem. Co. v. Ryder Truck Rental,*
    630 N.Y.S.2d 621 (Sup. Ct. 1995),
    *aff'd,* 646 N.Y.S.2d 169 (App. Div. 1996) ................................................................78

*Neuro-Rehab Assocs., Inc. v. Amresco Comm'l Fin., L.L.C.,*
    2006 WL 1704258 (D. Mass. June 19, 2006) ............................................................86

*N.Y. State Urban Devel. Corp. v. Paul T. Freund Corp.,*
    2009 WL 839858 (N.Y. Sup. Ct. Mar. 31, 2009) ......................................................39

*Noble v. Tooley,*
    125 F. Supp. 2d 481 (M.D. Fla. 2000) ..........................................................115-116

*O'Connor v. Curcio,*
    724 N.Y.S.2d 171 (App. Div. 2001) ....................................................38, 46-47, 62, 76

*Oracle Real Estate Holdings I, LLC v. Adrian Holdings Co. I, LLC,*
    582 F. Supp. 2d 616 (S.D.N.Y. 2008)...........................................................108-109

*Pac. Rollforming, LLC v. Trakloc Int'l, LLC,*
    2007 WL 4181258 (S.D. Cal. Nov. 21, 2007) ...................................................111, 113

*Paul Y. by Kathy Y. v. Singletary,*
    979 F. Supp. 1422 (S.D. Fla. 1997) ...................................................................115

*Peck v. Peck,*
    649 N.Y.S.2d 22 (App. Div. 1996)..................................................................65-66

*PenneCom B.V. v. Merrill Lynch & Co.,*
    372 F.3d 488 (2d Cir. 2004)............................................................................109

xi

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Plainfield Specialty Holdings II, Inc. v. Children's Legal Servs. PLLC,*
    634 F. Supp. 2d 833 (E.D. Mich. 2009)..................................................103

*Rau v. Apple-Rio Mgmt. Co.,*
    85 F. Supp. 2d 1344 (N.D. Ga. 1999),
    *aff'd,* 251 F.3d 161 (11th Cir. 2001)..................................................89

*Recon Car Corp. of N.Y. v. Chrysler Corp.,*
    515 N.Y.S.2d 829 (App. Div. 1987)..................................................38, 42

*Reich v. Occupational Safety & Health Review Comm'n,*
    102 F.3d 1200 (11th Cir. 1997)..................................................99

*Reid v. Key Bank of S. Maine,*
    821 F.2d 9 (1st Cir. 1987)..................................................84-85

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan,*
    397 F.3d 56 (1st Cir. 2005)..................................................92-93

*Rose v. Spa Realty Assocs.,*
    42 N.Y.2d 338 (1977)..................................................37, 40-42, 44-45, 62

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.,*
    749 F.2d 124 (2d Cir. 1984)..................................................90

*Royal Palm Senior Investors, LLC v. Carbon Capital II, Inc.,*
    2009 U.S. Dist. LEXIS 57452 (S.D.N.Y. 2009)..................................................68

*Ryan v. Volpone Stamp Co.,*
    107 F. Supp. 2d 369 (S.D.N.Y. 2000)..................................................55

*Sarcona v. DeGiaimo,*
    641 N.Y.S.2d 479 (App. Div. 1996)..................................................42-43

*Savasta v. 470 Newport Assocs.,*
    579 N.Y.S.2d 167 (App. Div. 1992),
    *aff'd,* 82 N.Y.2d 763 (1993)..................................................47

*Scavenger, Inc. v. GT Interactive Software, Inc.,*
    708 N.Y.S.2d 405 (App. Div. 2000)..................................................46

*Schiavo v. Schiavo,*
    357 F. Supp. 2d 1378 (M.D. Fla. 2005)..................................................115

xii

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Schubert v. Lucent Techs.
(In re Winstar Commcns., Inc.),
554 F.3d 382 (3d Cir. 2009)...................................................38,41, 76-77

Schuster v. Dragone Classic Motor Cars, Inc.,
98 F. Supp. 2d 441 (S.D.N.Y. 2000)...................................................67

Segovia v. Equities First Holdings, LLC,
2008 WL 2251218 (Del. Super. May 30, 2008) ...................................................53

Shatel Corp. v. Mao Ta Lumber & Yacht Corp.,
697 F.2d 1352 (11th Cir. 1983) ...................................................109

Sirken v. Fourteenth Street Store,
108 N.Y.S. 830 (App. Div. 1908) ...................................................58

Smallbizpros, Inc. v. Court,
414 F. Supp. 2d 1245 (M.D. Ga. 2006) ...................................................109-110

Staten Island Univ. Hosp. v. Comprehensive Habilitation Servs., Inc.,
2008 WL 680715 (N.Y. Sup. Ct. Mar. 13, 2008) ...................................................75

Steinberg v. Alpha Fifth Group,
2008 WL 906270 (S.D. Fla. Mar. 31, 2008)...................................................34

Stone v. Freeman,
298 N.Y. 268 (1948) ...................................................58

Suits v. Suits,
698 N.Y.S.2d 203 (App. Div. 1999)...................................................82

T&N West Galla Pizzeria, Inc. v. CF White Plains Assocs.,
586 N.Y.S.2d 266 (App. Div. 1992)...................................................42

Tancogne v. Tomjai Enter. Corp.,
408 F. Supp. 2d. 1237 (S.D. Fla. 2005) ...................................................109-111

Taylor v. Blaylock & Partners, L.P.,
659 N.Y.S.2d 257 (App. Div. 1997)...................................................42

Tejani v. Allied Princess Bay Co.,
612 N.Y.S.2d 227 (App. Div. 1994)...................................................39

Temple Univ. v. White,
941 F.2d 201 (3d Cir. 1991) ...................................................113

xiii

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

. .

*Thornock v. Kinderhill Corp.,*
    749 F. Supp. 513 (S.D.N.Y. 1990) ................................................................ 66-67

*Travellers Int'l AG v. Trans World Airlines, Inc.,*
    684 F. Supp. 1206 (S.D.N.Y. 1988) .............................................................. 90-91

*Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.,*
    805 F.2d 351 (10th Cir. 1986) ......................................................................... 91

*Trylon Realty Corp. v. Di Martini,*
    34 N.Y.2d 899 (1974) ..................................................................................... 72

*TSS-Seedman's Inc. v. Elota Realty Co.,*
    72 N.Y.2d 1024 (1988) ................................................................................... 64

*Tunnell Pub'g Co. v. Straus Commcns., Inc.,*
    565 N.Y.S.2d 572 (App. Div. 1991) .......................................................... 81-82

*Ultracashmere House, Ltd. v. 38 Town Assocs.,*
    473 N.Y.S.2d 120 (Sup. Ct. 1984) .................................................................. 66

*University Books & Videos, Inc. v. Metro. Dade County,*
    33 F. Supp. 2d 1364 (S.D. Fla. 1999) ........................................................... 113

*University of Texas v. Camenisch,*
    451 U.S. 390 (1981) ...................................................................................... 116

*Urologix, Inc. v. Wood,*
    2008 WL 2790230 (M.D. Fla. July 18, 2008) .............................................. 112

*Verschel v. Pike,*
    445 N.Y.S.2d 489 (App. Div. 1981) ............................................................... 60

*Wassink v. Hawkins,*
    763 P.2d 971 (Ala. 1988) ................................................................................ 67

*Wechsler v. Hunt Health Sys., Ltd.,*
    330 F. Supp. 2d 383 (S.D.N.Y. 2004) ............................................................ 55

*Weintraub v. Schwartz,*
    516 N.Y.S.2d 946 (2d Dep't 1987) ................................................................. 75

*Werking v. Amity Estates, Inc.,*
    2 N.Y.2d 43 (1956) ......................................................................................... 65

xiv

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Wieder v. Skala,*
    80 N.Y.2d 628 (1992) ........................................................................................70

*Won's Cards, Inc. v. Samsondale/Haverstraw Equities, Ltd.,*
    566 N.Y.S.2d 412 (App. Div. 1991) ..............................................................78

*WRH Mortgage, Inc. v. S.A.S. Assocs.,*
    214 F.3d 528 (4th Cir. 2000) .........................................................................53

*Wuliger v. Mfrs. Life Ins. Co. (USA),*
    567 F.3d 787 (6th Cir. 2009) .........................................................................34

*Wuliger v. Owens,*
    365 F. Supp. 2d 838 (N.D. Ohio 2005) ........................................................34

*Young v. Hunter,*
    6 N.Y. 203 (1852) ..........................................................................................71

*Young v. Whitney,*
    490 N.Y.S.2d 330 (App. Div. 1985) ..............................................................72

## Statutes and Rules

N.Y. Civ. Prac. L. & R. § 3218(a),
    7B McKinney's Consol. L. of N.Y. Ann. (West 2005). .................................66

N.Y. U.C.C. § 1-102(3),
    62½ McKinney's Consol. L. of N.Y. Ann. (West 2002) ...............................68

N.Y. U.C.C. § 1-203,
    62½ McKinney's Consol. L. of N.Y. Ann. (West 2002) ...............................83

N.Y. U.C.C. § 2-209(5),
    62½ McKinney's Consol. L. of N.Y. Ann. (West 2002) ...............................78

N.Y. U.C.C. § 9-617(a)(1),
    62½ McKinney's Consol. L. of N.Y. Ann. (West 2002) ...............................30

Fed. R. Civ. P. 26(a)(2) (West 2009) ...................................................................114

Fed. R. Civ. P. 65(c) (West 2009) .......................................................................111

## Other Authorities

13 Williston on Contracts § 39:3 (4th ed. rev. 1999) ...........................................71

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Restatement (2d) of Contracts § 245 (1981)..................................................................72

Steven Weise, *U.C.C. Article 9: Personal Property Secured Transactions,*
    62 Bus. Law. 1633 (2007)..........................................................................................30

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Sun Capital Healthcare, Inc. ("SCHI") and Sun Capital, Inc. ("SCI") (together, "Sun Capital") submit this Reply Memorandum in further support of Sun Capital's July 22, 2009 motion for a preliminary injunction prohibiting any further Transfer Notices or other self-help steps by the Receiver, pending the final adjudication of the parties' rights and obligations under their credit agreements.[1]

Sun Capital also submits the Affidavit of Lawrence Leder, the CFO of Sun Capital, which summarizes the parties' performance of their modified credit agreements from 2000 to 2009 and responds to a number of allegations made by the Receiver, his purported expert, Mr. Kennelly, and Mr. Philip Fues in the Receiver's opposition papers. Also to rebut those faulty assertions, Sun Capital submits the Declarations of Michael Mazzarino of SFN Professional Services LLC d/b/a Tatum, a management consulting firm that has been working with Sun Capital's affiliates, Promise Healthcare, Inc. ("Promise") and Success Healthcare, LLC ("Success") since June 2009; James Hopwood of Focus Management Group, a turnaround consulting firm that has been analyzing Sun Capital's cash flows and operations since April 2009; and Jill Frew of Cain Brothers & Co., a medical services investment banking firm that was retained in November 2008 to explore opportunities to raise capital for Promise and its affiliates through a refinancing or recapitalization transaction.

---

[1]  Sun Capital did not have a contractual relationship with "Founding Partners," which the Receiver defines to include <u>all</u> the receivership entities (Mem. Opp. at 1-2 & n.1), but only with one of the entities, Founding Partners Stable-Value Fund, L.P. (f/k/a Founding Partners Multi-Strategy Fund, L.P.) ("Stable-Value" or "Lender").  (See Pl. Exs. U, X).  Stable-Value and the other investment funds were managed by Mr. Gunlicks through his company, Founding Partners Capital Management Co. ("FPCM" and, together with the funds it managed, "FP").

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

## PRELIMINARY STATEMENT

The fundamental question here is whether the Receiver should be permitted, ostensibly pursuant to the long-ago superseded original Credit and Security Agreements ("CSAs"), to implement a draconian bank account seizure that would bring an immediate end to Sun Capital's healthcare financing business and the business of its hospital clients that are dependent upon that financing. The issues remain, as they were when this Court initially granted the temporary restraining order prohibiting that extreme measure, whether Sun Capital has a likelihood of success on the merits of its position that it was not in default within the meaning of the actual, substantially modified credit agreements under which it and the Lender had been successfully operating for eight years, and whether irreparable injury would result to Sun Capital, its principals, and its hospital clients if that asset seizure were permitted.

After several months of discovery in which Sun Capital and its affiliates produced 974,000 pages of documents and gave seven days of depositions (but the Receiver never even tried to complete his document production), the Receiver still has no real justification for his draconian Transfer Notices. He has submitted a sprawling diatribe in opposition to the injunction motion, full of erroneous assumptions, factual misstatements, unfounded hyperbole, and a persistent refusal to acknowledge the reality of the contracting parties' relationship prior to his arrival. Rather than simply addressing the four injunction factors in a straightforward, credible manner, the Receiver has used the motion as a platform for unjustified attacks on the veracity, competence, and morality of the principals of Sun Capital. His goal obviously is simply to take over control of Sun

2

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Capital's business, as well as the businesses of Promise and Success, so that he can serve his own and perhaps a handful of FP investors' perceived short-term interests in pursuing a hasty liquidation of those assets, even though the loan is not due until 2013 (and even though such a liquidation ultimately would provide far less to the investors).

Since the Court rejected the Receiver's assertion that he could issue the Transfer Notices for "any reason or no reason at all" (Doc. 13 at 5, 31; Doc. 19 at 7), the Receiver is constrained to identify a number of purported Events of Default that would, under the original written CSA, theoretically suffice as triggers for the Transfer Notices. Although the Receiver goes on at length discussing all these purported defaults on a "factual" basis, he utterly fails to address the dispositive legal point (plainly raised in the moving papers) that the CSAs were substantially modified by the parties, through oral agreements, written materials, and a lengthy course of conduct, and therefore what the Receiver calls defaults were never viewed as defaults by the contracting parties. Moreover, because these were bilateral modification agreements, not just one-time waivers and consents, they could not be undone by the Receiver's unilateral revocation of any "waivers and consents" in July 2009, a week before he brought suit (and six months after the agreements had already been terminated by the Lender's repudiation).

Thus, although the Receiver barely addresses the applicable legal principles, we show below in Point II that Sun Capital is indeed likely to succeed on the merits of the Transfer Notices, for the proposed asset seizure (a) is not legally justified, insofar as the various acts and conditions that the Receiver strains to cite as "defaults" under the original CSAs were not defaults under the parties' actual modified agreements, and were

3

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

not suddenly converted into defaults when the Receiver revoked "waivers," and (b) is not equitably justified, for it would effect an unconscionable forfeiture without any countervailing justification, since the status of the Lender's security is no worse now than it was when the Lender agreed to make the loans or when the Receiver first sought to seize Sun Capital's accounts, and indeed has improved in several respects.

As discussed below in Point III, Sun Capital has already demonstrated that the potential harm to Sun Capital, its clients, and their patients and employees if the asset seizure were allowed is obvious, grave, and irreparable. Since Sun Capital's financing business and, in turn, its hospital clients' businesses are so heavily dependent upon Sun Capital receiving and promptly using the funds that flow into the lockbox accounts, shutting off that flow of funds – particularly since Sun Capital has had no other source of funds since January 2009 – will obviously have a disastrous effect on Sun Capital's financing business and its clients' businesses.

The Receiver does not really contend otherwise. He merely argues that the threatened injury is acceptable because in his opinion Sun Capital's principals have not done a good job managing their companies and thus "deserve" the harm he proposes to inflict. Indeed, the Receiver speciously suggests that the threat of patient-related injury has been "mooted" because once he takes control of Sun Capital's bank accounts, he and his purported expert will make good funding decisions to avoid killing patients. None of the Receiver's (unfounded) attacks on the Sun Capital principals' integrity or competence can erase the simple reality that, if Sun Capital is deprived of its funds and its hospital clients are deprived of their funds, they will go out of business. That certainly qualifies

4

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

as irreparable injury.

As shown below in Point IV, the Receiver, on the other hand, does not suffer any cognizable injury in being prevented from taking control of Sun Capital's assets and destroying its business. His only legitimate interest is to monitor the value of the security for the Lender's loans to Sun Capital, which are not due to be repaid until 2013. That interest can be and has been amply protected through Sun Capital's provision of financial information concerning the various types of security for the loans, all of which were discussed, understood, and approved by the Lender for years before the Receiver took over its management.

Any specter of injury to the Lender's interest in ensuring adequate security is illusory, because (a) notwithstanding the Receiver's endless accusations of dissipation and diversion and squandering of "his" collateral, the evidence shows that all Sun Capital has done, and continues to do, is to use the loan proceeds and lockbox funds for the purposes authorized and approved by the Lender in accordance with the parties' actual, modified credit agreements (which benefited the FP investors for many years); (b) even despite the unplanned expenditures resulting from the Receiver's heavy-handed litigation tactics and Sun Capital's struggle to cover obligations to third parties that were supposed to have been funded by the Lender, Sun Capital has managed to keep the collateral value steady for the last year; and (c) in fact, given that Sun Capital has been operating for over 13 months now since all its funding was abruptly cut off in January 2009, Sun Capital has in fact done an excellent job of remaining afloat despite receiving zero funding, by consolidating assets, reducing costs and obligations, and maximizing profitable activities.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Thus, even though Sun Capital has been making "unfettered use" of its own assets for ten months since the Receivership began, the Receiver cannot show <u>any</u> resulting injury to the Lender's security.

Notwithstanding the Receiver's efforts at obfuscation and misdirection, it is important to review what is <u>not</u> at issue in this motion (or even in this case). This motion is not about how to appease investors who are unhappy with the historical management of or disclosures about the FP hedge funds. Irrelevant here are the unsupported and false allegations of a few FP investors (of hundreds in total) that they were misled by the Sun Capital principals as well as Mr. Gunlicks and FPCM, for there are no individual misrepresentation claims here and the Transfer Notices' validity depends only upon contractual defaults, not speculative fraud claims. The motion does not turn on whether the Receiver approves of how the Sun Principals have run their business since 2000, whether the Receiver or his consultants would do a "better" job of managing Sun Capital, whether Sun Capital has crafted a future business plan to benefit FP investors, or whether some investors might prefer a quick liquidation over a long-term strategy.

Not even under the original written CSAs did the Lender ever have the power to control Sun Capital's decision-making or dictate that Sun Capital's business be operated to serve the FP investors' interests. Sun Capital's principals have always been free to exercise their own business judgment and serve their own or their clients' interests, based upon their knowledge of the healthcare industry and financing methodologies. They were not operating an investment advisory program and had no duty to Stable-Value's investors. They were, and are, operating their own independent, legitimate financing

6

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

business with borrowed funds that are not due for repayment until 2013. Neither the fact (if true) that FP mistreated its investors nor the arrival of new management at FP suddenly creates any new rights or obligations that were never a part of the credit agreements.

In any event, as noted in Point V, even if the FP investors' interests were relevant under the "public interest" injunction factor, they would not be served by putting Sun Capital and its clients out of business. If hospitals go out of business, then many of their accounts receivable become uncollectible and the Lender's collateral will lose great value, reducing the potential return for FP investors. Thus, the Receiver's brash takeover attempt would disserve the FP investors' interests as well as harming Sun Capital, its hospital clients, their patients, their employees, and the communities they serve.

## CORRECTING THE FACTUAL RECORD

The Receiver came into this matter with a preconceived notion that Sun Capital and its principals must be intentional wrongdoers who were lying and stealing and dissipating the loan proceeds, and he has been trying to prove that ever since. The Receiver, like his predecessor, refused to listen to Sun Capital's explanation of what the actual credit agreements and relationship between the parties had been, refused to continue negotiating a restructuring transaction as Mr. Gunlicks had been doing prior to his removal, and instead chose to attack with hyperbolic accusations and bludgeoning tactics. He seeks excuses to take over the assets of Sun Capital and its affiliates, and to do so quickly, without regard to the 2013 maturity date – all presumably to bring some assets into the Receivership and appease the few investors who may still seek an early

7

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

liquidation of Stable-Value, even if at a loss.

The Receiver continued to pursue this misguided course even after this Court ruled twice that Sun Capital was not a mere receptacle of Gunlicks' allegedly ill-gotten funds but rather an arm's-length business with a legitimate interest in the funds it had received from Stable-Value. Indeed, by the time the TRO was entered on July 24, 2009, the Receiver had already had several months to sift through FP's records and would have been able to support his preconceived notions if they were true. Nonetheless, the Receiver sought a period of discovery so that he could troll for evidence of wrongdoing, while at the same time studiously ignoring all the documents supporting what Sun Capital had explained months earlier about the eight-year reality of the contractual relationship.

Now, even with several months' worth of discovery and analysis, the Receiver is still straining to paint a distorted and incomplete factual picture to fit his preconceived – but erroneous – theories of misconduct by Sun Capital and his dramatic, false accusations of misleading the Court. Meanwhile the discovery record (despite its incompleteness due to the Receiver's discovery failures) has supported rather than refuted Sun Capital's initial presentation in July. To correct a few of the Receiver's distortions, Sun Capital here supplements its prior factual statement.

### A.    The Parties' Performance of Their Modified Agreements

In his zeal to paint a picture of "waste," "dissipation," and "diversion" of funds that might justify his rash conduct in seizing Sun Capital's bank accounts, the Receiver has mischaracterized a number of facts concerning the parties' agreements and the financial information he has been provided. He insists upon disregarding the reality of

8

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

the parties' 8½-year contractual relationship and instead substituting his own *post hoc* views of how the parties should have operated. However, everything he chooses to call dissipation and diversion is in truth just Sun Capital's continuing uses of the loan proceeds and recycled receivables funds in accordance with its actual agreements with the Lender, accounted for and reported to the Lender in the same way it had been doing with the Lender's approval for many years. Despite ample discovery, including both voluminous documentary evidence and detailed testimony by Sun Capital principals, the Receiver has not identified any uses of funds or financial reports that contravene what the actual Lender authorized and agreed to.[2]

The Receiver acknowledges that the original SCHI CSA "was amended in two respects," to increase the available credit line from $2 million to $550 million and to extend the final maturity date from 2005 to 2013, and that these written amendments occurred repeatedly – a total of 29 times – over 8½ years. (Mem. Opp. at 17). (The SCI CSA was also amended several times, to increase the credit line from $8 million to $20 million and to extend the maturity date from 2003 to 2013.) (Mem. Opp. at 18). However, the Receiver completely ignores the surrounding context, communications, and course of conduct that delineated the genesis and purpose of these very significant increases in the size and length of the credit relationship. Briefly, the development of the relationship, and the several substantive modifications of Sun Capital's permitted uses of

---

[2]  The SEC has recently filed a Consent of Defendant William L. Gunlicks to entry of judgment against him, in which he agreed not to contest any of the allegations in the SEC's complaint. (No. 2:09-cv-229, Doc. 197-1 ¶¶ 11, 12). Those allegations include that Gunlicks approved the purchases of workers' compensation and DSH receivables and also approved using Stable-Value borrowings to help Sun Capital's principals operate the hospitals. (No. 2:09-cv-229, Doc. 1 ¶ 30).

9

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

the loan proceeds to produce profitable returns to the Lender, follows.

**1.      The Very Early Modifications of the Borrowing
Base and Financial Reporting and Requirements**

After the parties entered into the SCHI CSA in June 2000, it quickly became

apparent that Mr. Gunlicks was not interested in strict compliance by either party with the

CSA, which his lawyers had drafted as though for a regular bank lender.

First, it very soon became clear that the complex Borrowing Base formula was

unworkable.  The parties agreed that the CSA formula should be disregarded, and Mr.

Gunlicks specifically directed SCHI's CFO, Mr. Leder, instead to use the amount of

outstanding loans plus the amount being requested as the Borrowing Base for each

borrowing request.  That is how Sun Capital defined and presented the Borrowing Base

figure in every one of the 198 SCHI Officer's Certificates (and the SCI Certificates as

well) over the entire 8½-year relationship; and Stable-Value, obviously well aware of that

definition, accepted and honored every one of those borrowing requests until January

2009.  (Leder Aff. ¶¶ 9-11).

It also very early became apparent that Mr. Gunlicks had no desire for all the

duplicative financial reports required by the CSA.  Instead, considering the reporting

requirements in the CSAs to be "at the discretion of the [Lender]," Mr. Gunlicks

instructed Sun Capital that he wanted only "certain collateral and financial information

on a monthly basis." (Pl. Ex. A at 32).  Accordingly, Sun Capital provided only monthly

reports providing the requested collateral and financial information for the entire 8½-year

period, and the Lender never objected.  To the extent that Mr. Gunlicks ever wanted

10

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

additional information, he asked and was provided with it on an *ad hoc* basis. (Leder

Aff. ¶ 7, Exs. 1, 2).

Audited Sun Capital financial statements were provided for the first four years, as

required by the CSA. However, after 2004, the Lender decided with Ernst & Young,

LLP ("E&Y") (the FP auditor, which was also auditing Sun Capital's finances for FP's

benefit) that the annual Sun Capital audited financial statements would be replaced by

certain "agreed-upon procedures" by which E&Y would examine Sun Capital's collateral

for the Stable Value loans. (Leder Aff. Ex. 3). This change was apparently initiated by

E&Y, due to certain accounting changes that would have delayed timely reporting by

Stable-Value to its investors, and Sun Capital had no role in the decision. (Leder Aff. ¶ 8

& n. 2, Exs. 4-5).

## 2.      The Lender's 2002 Interest-Maximizing Modifications

The biggest substantive changes to the terms of the CSAs began in the latter half

of 2002, and resulted from the Lender's efforts to maximize return to its investors by

maximizing the amount of interest payable by Sun Capital.

The SCHI CSA contemplated voluntary prepayments upon one day's notice to

Stable-Value. (Pl. Ex. U § 4.4). For the first two years of the relationship, SCHI made

full use of all the borrowed funds and had no occasion to prepay any amounts. However,

in late 2002, SCHI received a large receivable repayment and had no immediate use for

the money to purchase new receivables, so it sought to make a prepayment of debt. (Pl.

Ex. A at 118-19; Leder Aff. ¶ 13). In breach of the CSA, however, Mr. Gunlicks insisted

that he would not accept any prepayments because he wanted to keep Stable-Value's

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

funds fully invested in order to maintain a high return to its investors, and if he had to

return the principal to investors then he might not be able to raise additional funds in the

future when they were needed.  (*Id.*)  Rather than terminating the agreement due to the

Lender's early repudiation of the repayment option, Sun Capital acquiesced, and this led

to its efforts to find ways to expand Sun's financing activities to make greater use of

funds loaned by Stable-Value and to provide a continuing and increasing stream of high-

rate interest payments to Stable-Value.  Although this agreement was made orally, it was

also reflected in internal memos.  (Leder Aff. ¶¶ 14-15, Exs. 8, 9).

There were also occasions as early as 2001 when funds that Stable-Value had

raised could not immediately be used by Sun Capital.  Mr. Gunlicks dictated that, despite

no provision in the CSA requiring it, SCHI would have to pay interest at 9% per year on

those funds before they were borrowed.  (The Lender referred to these payments as

"make-up" interest – making up the difference between the interest FP earned in a money

market account and the interest it planned to pay investors.)  (Pl. Ex. A at 121, Leder Aff.

¶ 16, Ex. 10).  Again, Sun Capital acquiesced in this demand, making these payments by

oral agreement with FP.  Sun Capital ultimately paid $742,000 in make-up interest before

Mr. Gunlicks agreed, in conjunction with the complete change of the business strategy in

2003 (which resulted in having immediate use for all available funds), to end these

additional charges to Sun Capital in June 2003.  (Leder Aff. ¶ 16).

### 3.   The Wholesale Modification of the Uses of Loan Proceeds

As the Receiver acknowledges, each of the four principal uses of funds that were

not originally contemplated in the SCHI CSA were first approved in writings signed by

12

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Mr. Gunlicks. (Mem. Opp. at 38 n.40). These uses include the financing of Disproportionate Share ("DSH") and workers' compensation receivables, hospital acquisitions and related costs, and real estate acquisition and construction financing. The Lender's encouraging and permitting these uses, for years, effectively modified several provisions of the CSA, including § 7.11 concerning uses of Loan proceeds, § 2.2 concerning application of Loan proceeds, § 1.37 concerning Eligible Accounts, § 5.2 concerning the officer's certificate requirements and other conditions to each loan, and § 6.10 concerning permitted activities.

These early events triggered Sun Capital's efforts – with the Lender's endorsement and encouragement – to find expanded uses of loan proceeds to make full use of the funds Stable-Value had available, and led to a complete reworking of the substantive scope of the credit agreements. Even before that, though, Mr. Gunlicks had already approved and encouraged Sun Capital's purchase of DSH receivables.

### a. DSH Healthcare Receivables Financing

The first financing of DSH receivables was for Parkview Hospital in 2001, and (as the Receiver acknowledges) the Lender's approval was confirmed in a writing signed by Mr. Gunlicks when E&Y noted that DSH receivables were beyond the scope of the written CSA. (Mem. Opp. at 38 n.40; Pl. Ex. DD; Leder Aff. ¶ 18). Although the definition of Eligible Accounts had previously been modified (in writing) from 120 days to 150 days (Leder Aff. Ex. 11), DSH receivables are generally not expected to be paid within 150 days; and thus the Lender's agreement to permit DSH purchases effectively further modified the definition of Eligible Accounts.

13

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Following that transaction, Mr. Gunlicks sought to learn more about DSH payments. When he learned that most other healthcare factoring companies had not yet begun to factor DSH receivables, he suggested that Sun Capital's brokers should advertise that it financed DSH receivables, giving Sun Capital a niche to generate additional business. (Pl. Ex. E at 162-63). Thus, DSH receivables became a regular – and substantial – part of SCHI's hospital financing business, with the Lender's full knowledge and blanket approval. (Leder Aff. ¶ 20). Numerous documents confirm the Lender's awareness and continuing approval of these ongoing DSH receivables purchases and their longer collection times. (Leder Aff. ¶ 21, Exs. 5, 12, 13, 14).

In fact, not only did the Lender approve the DSH financing, it often participated in SCHI's due diligence for new DSH financing opportunities. The last such occasion,

## REDACTED

The Lender itself (including Mr. Fues) conducted extensive due diligence and was very involved in the decision to take on these hospitals as clients and to fund that initial transaction. (Pl. Ex. F at 158; Leder Aff. ¶ 22 & n.6, Exs. 17, 18). The Lender expressly approved the large DSH purchase by wiring the funds necessary for the purchase directly to                           . (Leder Aff. ¶ 22, Exs. 15, 16; Pl. Ex F at 158).

The Lender's blanket consent to DSH financing was also shown when it informed its auditors, E&Y, of its approval of the DSH purchases and the application of a longer collection period than the 150 days; and when it directed its lawyers to begin drafting a

14

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

proposed new credit agreement that specifically accounted for DSH purchases and their longer collection period. (Leder Aff. ¶¶ 23-24, Exs. 21, 22). Throughout the parties' relationship, the Lender (including Mr. Fues after he arrived in 2006) routinely examined SCHI's DSH purchases and the corresponding accounting records. Also, at the Lender's direction, SCHI periodically provided aging analyses and concentrations identifying DSH receivables in SCHI's portfolio. (Leder Aff. ¶ 25, Exs. 23-25).

        **b.**      **The Expansion into Hospital and Real Estate Acquisitions**

In 2003, the Lender agreed with Sun Capital to fundamental changes in the scope and strategy of the lending relationship by authorizing, in writing, SCHI's financing of the acquisition of nine hospitals and related real estate by Promise Healthcare and an affiliated real estate company, LH Acquisition, from Camelot Healthcare LLC and its affiliates. (Leder Aff. ¶ 30; Mem. Opp. at 38 n.40; Pl. Ex. EE). Over the next several years, additional opportunities arose with respect to acquiring other hospitals, and FP was involved and authorized each of the acquisitions funded by Sun Capital. Sun Capital's business thus moved from solely purchasing third-party accounts receivable to financing the acquisition and operation of hospitals. In total, between 2003 and January 2009, Stable Value authorized, and Sun Capital financed, the acquisition and turnaround of 19 hospital campuses. (Leder Aff. ¶¶ 30-46).

This transition in Sun Capital's business was intended to, and did, serve several purposes for the Lender: it enabled Stable-Value to keep all its investment funds fully invested; it greatly increased Sun Capital's borrowings, which would allow Stable-Value

15

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

to use the funds it expected to come in from investors and would maximize the interest payments Stable-Value would receive; and building a hospital system created substantial additional value and security for the loans. (Leder Aff. ¶ 31, Ex. 35).

The Receiver does not contend that these numerous hospital financing transactions were not actually authorized by the Lender, but just that they constituted improper diversions of funds for purposes not contemplated in the original CSA, as "working capital advances" and "due from related party" transfers. (Mem. Opp. at 21). However, in repeatedly encouraging and authorizing Sun Capital to finance these transactions, the Lender effectively modified the original CSA provisions that did not permit related-party transactions (Pl. Ex. U § 7.18), as well as the provisions restricting the use and application of Loan proceeds and permissible activities (§§ 7.11, 2.2, 6.10).

The 2003 Camelot transaction involved each of the types of hospital financing about which the Receiver and his expert now complain: acquisition costs, assumption of liabilities (funded by working capital loans), and the purchase and financing of related real estate. (Mem. Opp. at 21; Kennelly Rpt. at 3). That acquisition involved payment of $1.133 million in outstanding IRS tax liabilities and the assumption of approximately $55 million in other liabilities; and funding the acquisition of the Lagniappe Hospital real estate. This transaction provided an investment vehicle to use the excess cash flow that Sun Capital was not allowed to repay under the modified CSA. That cash flow would instead be used to provide financing to Promise to cover the assumed liabilities and other working capital expenditures needed to improve the hospitals' operations and results. (Leder Aff. ¶¶ 32, 39-40, Exs. 36, 46-48).

16

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

The Lender thereafter continued to authorize Sun Capital to advance loan proceeds to Promise to make additional hospital and related real estate acquisitions, to construct new hospitals, and to finance the working capital needs of those hospitals. Some of these Promise acquisition opportunities, as well as all three of the hospital acquisitions made by Success, arose when SCHI clients became insolvent. The acquisitions were intended to ensure that those hospitals remained open and that Sun Capital receivables (and Stable-Value collateral), including large DSH payments outstanding from state governments, would not be lost.[3]  (Leder Aff. ¶ 34 & n.15).

The Lender continually encouraged the growth of Promise.  For example, in a January 2005 meeting, Sun Capital and Mr. Gunlicks discussed the continued growth possibilities for Promise, including buying facilities and entire companies and covering various costs such as startup costs for new acute-care facilities.  (Leder Aff. ¶ 35, Ex. 38). An internal FP memorandum in February 2007 exemplified its view that the growth of Promise and its working capital financing provided a good opportunity for investor funds. (Leder Aff. Ex. 39). ,

# REDACTED

---

[3]  DSH payments, unlike traditional insurance payments, are generally only made if the hospital is open at the time of the payment.  Because of the various states' DSH payment schedules, and the requirement that the hospital be operating at the time of payment, there is a risk that, if a hospital ceases operations prior to the DSH payment date, it may forfeit some or all of the DSH payments to which it would otherwise have been entitled.  (Leder Aff. ¶ 34 n.15, Ex. 37; Pl. Ex. A at 162, Ex. F at 154).

17

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

# REDACTED

All of the acquisitions were made pursuant to the agreed strategy "to grow the business of both Promise Healthcare and Sun Capital Healthcare," to "increase the aggregate amount of working capital financing (and bridge real estate financing in the case of Promise hospitals) needed to support growth," and to create more opportunities for funds "from investors identified by Founding Partners." (Leder Aff. ¶¶ 37-38, Ex. 39; see also Exs. 41-45).

In addition to hospital acquisitions, the Lender repeatedly authorized Sun Capital to use loan proceeds cash flow from third-party receivables to enable Promise affiliates to purchase hospital real estate and construct new hospitals. The first real estate transaction was part of the Camelot transaction, which the Lender authorized in writing. (Leder Aff. ¶¶ 39-40, Exs. 46-48, 32). In total, the Lender authorized, and, Sun Capital financed, a total of six real estate projects, including acquisitions, construction and/or related costs. For each of these transactions, Sun Capital had meetings and discussions with Mr. Gunlicks, and he or his associates often traveled with Sun Capital on due diligence trips. (Leder Aff. ¶¶ 41-42, Exs. 49-53, 9, 102).

At all times, Sun Capital provided its Lender with information on all of the uses of funds, and routinely discussed those uses and how they were accounted for in Sun Capital's financial reporting. (Leder Aff. ¶¶ 58-61).

### 4.    The Modifications of the SCI Credit Agreement

SCI had been in the commercial receivables business for many years, with financing provided by another company, before it entered into its agreement with Stable-

18

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Value in January 2002. The commercial receivables business mostly involved small businesses, often without proper financial controls, and thus it was more difficult to ensure against fraud. However, Sun Capital's principals had developed an excellent reputation in that business, with a network of brokers who could assist in developing the SCHI business as well. Thus the commercial business was maintained, though it was significantly smaller than the healthcare financing. (Leder Aff. ¶ 55).

Because of the Sun Capital principals' experience in commercial financing, from an early point the Lender permitted SCI to exercise its own business judgment to select clients, effectively eliminating the tier 1/tier 2 requirement of § 1.13(d)(ii) of the CSA; and to determine client requirements and make over-advances to certain clients as Sun Capital deemed appropriate. (Leder Aff. ¶ 55 n.29, Ex. 73; Pl. Ex. D at 60-62; Pl. Ex. J at 292-95, Ex. 37). The Lender's agreement to permit over-advances effectively modified § 6.19 of the SCI CSA, which imposed limitations on the amounts advanced, and included the over-advances to Symbio and Kanterman about which the Receiver complains (Mem. Opp. at 23). (Leder Aff. ¶¶ 55, 99-103; Pl. Ex. D at 68-69, 75-76, 123, 126-28; Ex. J at 308, 311-12).

In 2003, Sun Capital discovered that a commercial customer, Command Software, Inc., was committing a sophisticated fraud against it. Sun Capital executed on its liens under the loan documents, taking the assets of Command. The situation was fully disclosed to, and discussed with, Mr. Gunlicks at the time; and Sun Capital agreed to execute a note to repay Stable-Value

**REDACTED**

19

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

**REDACTED**           (Leder Aff. ¶ 56, Exs. 74-75).

The Command situation led to a modification of the solvency requirement and related-party transactions provisions of the credit agreements in 2003. As a result of the Command fraud loss and the need to repay                  , SCI alone was certainly insolvent. However, with SCHI guaranteeing the SCI note and the principals' pledge of Promise stock, Mr. Gunlicks modified § 6.24 of the SCI CSA (Pl. Ex. X) requiring solvency. Instead, he directed that SCHI and SCI report their financial information on a consolidated basis, including their collateral, which would be evaluated together for purposes of determining Stable-Value's security for its loans to Sun Capital. (Leder Aff. ¶ 57, Ex. 76; Pl. Ex. F at 229-30; Pl. Ex. D at 78, 116; Pl. Ex. J at 342-43). In addition, Mr. Gunlicks instructed that SCI should no longer draw down on its own line of credit, but instead should borrow from Stable-Value through SCHI's credit line and record these transactions as inter-company loans. The effect of that instruction was to modify §§ 6.27 and 7.18 of the SCI CSA (Pl. Ex. X), which had prohibited related-party transactions. Accordingly, SCI did not draw down on its line of credit for the next four years, but borrowed money through SCHI, and those borrowings appear on Sun Capital's general ledgers provided to E&Y. (Leder Aff. ¶ 57, Ex. 77; Pl. Ex. F at 228-29; Ex. J at 338).

The parties consistently performed their agreements in accordance with the foregoing agreed modifications from mid-2000 to January 2009. This involved scores of individual loan transactions in which the Lender received an Officer's Certificate and made the requested loan with knowledge of the intended and prior uses of the loan

20

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

proceeds and the nature of the security for the loans.  Every month throughout this 8½-year period, Sun Capital provided reports summarizing the collateral and financial information the Lender requested, and then discussed the underlying details with the Lender.  (Leder Aff. ¶ 67).  At no point during this period did the Lender complain that Sun Capital was in breach or had defaulted.  (7/22/09 Koslow Aff. ¶ 8, Leder Aff. ¶ 97).[4]

Although the Receiver and his expert attempt retroactively to erase all Sun Capital's profits by deducting 2009 "unpaid" interest, Sun Capital in fact had profits over the years from the collection of fee income, and the credit agreements imposed no restriction on how Sun Capital's owners could use their profits.  Some of those profits were used for personal loans and investments, including those the Receiver wrongly complains of at page 24 of his brief.  No Stable-Value loan proceeds were used for those loans and investments,

**REDACTED**

## B.   The Restructuring Plan and Hospital Commitments

In connection with the increasing investments in hospitals, in 2005 the parties began discussing that the financing of the hospital acquisitions and related costs – which

---

[4] The Receiver wrongly assails Mr. Koslow's affidavit testimony that the Lender did not ever declare Sun Capital in default during the parties' 8½-year course of conduct under their actual agreement.  (Mem. Opp. at 38 n.39).  The only evidence of default claims the Receiver cites is from February 2009, after the Lender had defaulted in late January 2009 and the SEC had begun investigating Founding Partners.  By that time, Mr. Fues and Founding Partners' lawyers were attempting to optically improve the Lender's legal position for other audiences, and Mr. Fues was looking for "potential technical defaults" that could belatedly be asserted against Sun Capital.  (Leder Aff. ¶ 97 & n.44, Exs. 5, 95).

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

by their nature are much longer-term investments than accounts receivable financing –
should be treated as equity investments and not debt.  In 2006, it was agreed that a
restructuring of their relationship was necessary, through which the working capital and
hospital acquisition portion of the outstanding debt amount would be converted into an
equity holding for Stable-Value, and that future working capital loans would be equity
investments, not debt.  Sun Capital was concerned about the prospect of paying 16%
interest on funds used for long-term capital investments that did not generate cash flow,
and wanted to reduce the interest rate for those capital investments.  (Leder Aff. ¶¶ 47-
48).  Gunlicks, for his part, was concerned about the possibility that, if Promise or Sun
Capital were ever to have a liquidity event, *i.e.*, raise capital by going public or
recapitalizing, Stable-Value's steady stream of ever-increasing high monthly interest
payments might stop, leaving FP with excess investment funds that could not be fully
employed.  In early 2007, following an offer made by Goldman Sachs & Co. to
recapitalize Promise, replacing all the loans from Stable-Value (through Sun Capital),
Gunlicks made numerous assurances that he would provide the capital to grow Promise
and work diligently to reduce the cost of capital and finalize the direct lending
relationship with Promise and the conversion of debt to equity.  After these discussions,
Promise and Sun Capital turned down the Goldman offer.  The plan to convert debt to
equity would enable Stable-Value to share in the upside of any future sale of Promise,
while reducing Sun Capital's total debt and interest burden.  (Leder Aff. ¶¶ 48-50, Exs.
63-67, 8, 39).

     Despite the FP assurances, the actual restructuring was never consummated.  The

22

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

basic agreement was that the existing Sun Capital lending relationship would be split into two parts. Stable-Value would establish a direct credit relationship with Promise, which would assume all of Sun Capital's existing debt to Stable-Value related to Promise, and the portion of that debt that had been used for hospital acquisition and working capital would be converted into equity for FP. A separate credit agreement would cover Sun Capital's regular receivables financing for non-Promise parties.

REDACTED

In reliance on Gunlicks' confirmation of his commitment to grow Promise and Success, and his promise to provide the necessary funding, Sun Capital made several

---

5

REDACTED

23

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

commitments of funding for Promise and Success hospital acquisition and construction

projects in the latter half of 2008.  In November 2008, Success acquired the City of

Angels hospital in Los Angeles, and in December 2008 Success acquired two Envision

hospitals in Missouri for ؛

                    Stable-Value agreed to fund both of these after participating in

due diligence and understanding their need for substantial operating cash to effect a

turnaround.  (Leder Aff. ¶¶ 43-44, Exs. 44, 55-60).  Gunlicks had previously committed

to provide $100 million in funding for the construction of four Florida acute-care

hospitals, including one called Promise Hospital of the Villages, for which a Certificate

of Need (CON) had been sought in 2006 and awarded in 2007 by the State of Florida,

based upon that funding commitment.  In 2008, Promise entered into a construction

contract on the Villages project, relying on Gunlicks' funding commitment, which would

require payments of ؛    **REDACTED**      (Leder Aff. ¶¶

45-46, Exs. 61, 62).

     In part in anticipation of the funding needs for these 2008 commitments, on

January 9, 2009, Gunlicks agreed to increase SCHI's existing line of credit from $525

million to $550 million.  (Leder Aff. ¶ 74; Pl. Ex. V).  Meanwhile, the parties continued

to work on the planned restructuring.  (Leder Aff. ¶ 81).

**C.**      **The Lender's Repudiation of the Credit Agreement and Its Aftermath**

     Under the SCHI credit agreement, as modified, the Lender was required to

provide loans of specific requested amounts within three business days of SCHI's

drawdown request, up to the maximum credit line of $550 million.  (Pl. Ex. U § 2.2.2;

24

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Ex. V).  Since the amount drawn down to that point was only $525.97 million, an additional $24.03 million remained available.  (Pl. Ex. JJ).  On January 27, 2009, Sun Capital made a request for $5 million in funding under the SCHI credit agreement.  Mr. Gunlicks advised, however, that the Lender would not honor that funding request.  At a meeting with Sun Capital's principals in Naples on January 29, 2009, he further stated that the Lender would not provide any further funding to Sun Capital, including both the $24.03 million remaining under the SCHI agreement and the $1.5 million remaining under the SCI agreement, as well as the additional $100 million of funding for Promise and Success hospital acquisition and construction that he had previously committed to provide.  (Leder Aff. ¶¶ 76-78).

This abrupt cessation of funding would have a huge impact on Sun Capital's current wherewithal and ability to carry out its current obligations, let alone the looming new obligations to which it had committed in reliance on the promised funding for new hospital projects.  Recognizing this, and that the existing credit agreement was at an end and should be restructured and/or recapitalized as had been contemplated, the parties (a) immediately agreed to eliminate interest payments going forward, pending completion of the recapitalization transaction that Promise's investment banker had been working on, (b) proceeded apace with negotiations and drafting of the restructuring transaction to convert some of Sun Capital's debt into equity in Promise for Stable-Value, and (c) entered into a series of standstill agreements preserving their legal rights in the interim. (Leder Aff.¶¶ 79-81).

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

In the January 29, 2009 meeting, the parties discussed that Sun Capital could not both meet its financing commitments and make the huge interest payments without a continuing flow of funds from the Lender.  Mr. Gunlicks agreed that, since protecting the value of the hospital collateral was most important, the interest payments would be deferred.

**REDACTED**

This agreement was memorialized in a February 3, 2009 Koslow memorandum to Gunlicks,[6] which the parties described in their standstill agreement – a document signed by lawyers – as having "modified" the credit agreement.  (Pl. Ex. NN, quoted in Mem. Opp. at 36).[7]  Sun Capital provided

---

[6]

**REDACTED**

[7] The Receiver erroneously asserts that the standstill agreement provided that the February 3 memorandum's terms "would govern only during the limited 'Standstill Periods,' … but otherwise would have no effect." (Mem. Opp. at 36).  The standstill agreement does not say the credit agreements are amended for a week; it says the parties will stand still (legally) for a week (¶ 1), and during that time Sun Capital will agree to be "in compliance with the Credit Agreements, as modified by the 2/3/09 letter attached hereto as Exhibit 'A,' other than for any allegedly existing defaults … (the 'Historical Defaults')." (Pl. Ex. NN ¶ 2, quoted in Mem. Opp. at 36).  Thus, Sun Capital was agreeing only to honor the agreements in their modified form of excluding interest payments.  This agreement to treat the credit agreement as continuing in existence rather than as a breached and terminated agreement was a temporary accommodation to maintain the *status quo* during the standstill period, after which the parties could reassert their legal positions if the restructuring were not completed.

26

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

consideration for the no-interest modification, as reflected in ¶ 4 of the standstill agreement, by forgoing its right to request further funding under the credit agreement (and not suing for breach, anticipating a satisfactory work-out through the restructuring and recapitalization transactions). (Pl. Ex. NN at ¶ 4, quoted in Mem. Opp. at 36).

The standstill agreements provided that neither party would sue the other or employ any self-help remedies (which in Sun Capital's case could include a bankruptcy filing) during the standstill period, the stated purpose of which was "for the parties to continue good faith discussions to come to an agreement to amend the Credit Agreements." (Pl. Ex. NN at ¶ 1 & p. 2). The parties negotiated and exchanged drafts of the proposed new agreement over the next several weeks. (Leder Aff. ¶ 81).

While the no-interest modification was intended to be an interim agreement, to be superseded when the entire contractual relationship was restructured, it never was superseded or altered because investor and SEC allegations overtook Gunlicks and he was unable to proceed. In a Texas investor litigation, an injunctive order was issued on March 29, 2009, which prevented Gunlicks from further proceeding with the proposed restructuring. (Leder Aff. ¶ 54, Ex. 71). At the SEC's request, Gunlicks was thereafter ousted from control of FPCM and Stable-Value and replaced by the initial Receiver on April 20, 2009. (No. 09-cv-229 Doc. 9).

The Initial Receiver then, for the first time in the history of the parties' credit relationship, issued notices of default to Sun Capital on April 29, 2009, claiming, among other things, defaults arising from the nonpayment of interest, despite the fact that the parties had just agreed in late January that no interest would be due. That is, despite itself

27

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

not complying with its funding obligations under the CSAs as amended, the Lender (under new management) was insisting that the Borrower must comply with its obligations. The current Receiver apparently continues to adhere to that view.

## ARGUMENT

Sun Capital demonstrated that it met the four-part test for a preliminary injunction in its papers supporting its motion for a temporary restraining order (Doc. 11), and the Court agreed in its July 24, 2009 order granting the TRO (Doc. 19). Now, months later, despite ample discovery, the Receiver still has no valid arguments that would call for a different conclusion on any of the four factors. The arguments that the Receiver does offer are fallacious, based upon his refusal to recognize the parties' adoption of a substantially modified credit agreement, his *post hoc* relabeling of Lender-approved financing activities as "dissipation" and "diversion," and his overstatement of his own rights respecting Sun Capital's and its clients' businesses.

## I.    The Receiver Misconceives His Own Rights and Sun Capital's Duties

The Receiver argues as though he has a Court-ordered right and duty to take control of Sun Capital's assets as if they are really Stable-Value's or its investors' assets; that Sun Capital is obliged to operate its business as the Receiver prefers; and that he is free to ignore all the binding approvals and lengthy course of conduct of the actual Lender to craft new breach claims here. His premises are incorrect.

### A.    The Receiver Misapprehends His Powers and Rights

The Receiver does not have any right or duty to take control of Sun Capital's (or

28

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Promise's or Success's) assets.  The May 2009 Order Appointing Replacement Receiver did not authorize the Receiver to seize assets of third parties just because they originally came from an FP entity.  It only authorized the Receiver to "[i]nvestigate the manner in which the affairs of [the FP entities] were conducted" and "institute such actions and legal proceedings" as are needed to recover "improperly misappropriated or transferred money or other proceeds."  (Doc. 73, ¶ 2(b)).  Even if the Receiver genuinely believed that Sun Capital received "improperly misappropriated or transferred" funds from one of the FP entities, he cannot proceed as though Sun Capital has already been adjudicated liable for some misappropriation.[8]

Nor is the Receiver free to disregard the Court's prior rulings that Sun Capital has a legitimate interest in the funds it received from Stable-Value.  This Court has held twice that Sun Capital's assets are not the FP entities' assets, rejecting the SEC's and the Receiver's efforts to treat Sun Capital as a mere relief defendant without any legitimate claim of its own to the funds received from Stable-Value.  (No. 2:09-cv-229 Doc. 70 at 4-5 (5/13/09), Doc. 89 at 2, 5-7 (6/8/09)).  Far from being a mere repository of FPCM's and Gunlicks' ill-gotten funds, the Court held that Sun Capital has a "legitimate ownership interest" in the loan proceeds from Stable-Value (Doc. 89 at 6), and for which it has paid $230 million in interest, and therefore cannot be subject to disgorgement or asset freeze remedies of the type sought against FPCM and Gunlicks.  (*See also* Doc. 19 (order

---

[8]  Indeed, the Receiver's complaint does not even allege that Sun Capital misappropriated any Lender funds.  He alleges only – as he must in view of the SEC's allegations against FPCM and Gunlicks – that Sun Capital accepted and used funds that were voluntarily provided by the Lender, for uses approved by the Lender, pursuant to their longstanding contractual relationship.

29

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

granting TRO) at 2-3).  The Receiver has no basis to treat Sun Capital's funds as though they "belong to" him or the Stable-Value investors.

Nor does the Receiver have any such basis under the original CSAs that he seeks to enforce.  Once the loans were made, the funds became Sun Capital's assets, not the Lender's, and neither the CSAs nor the related agreements gave the Lender a present ownership interest in any of the assets in the lockbox accounts.  The Lender has only a security interest in those account funds, which becomes enforceable only if Sun Capital defaults on a Credit Obligation.  (Pl. Ex. U, §§ 8.2.4(b), 10.1).  Since the loan principal is not due until 2013, and the interest payments were excused upon the Lender's January 2009 repudiation of the contract, there has been no default and the Receiver has no right to act as though these are already "his" funds.

Indeed, even after a default, a creditor does not obtain any ownership rights in the collateral until it follows the prescribed steps to obtain possession of the collateral and apply the funds in satisfaction of the loan.[9]  Here, although the Receiver attempted to gain possession, his Transfer Notices were voided on July 24, 2009 and he did not obtain any ownership rights.  Unless and until such a (proper) transfer of possession occurs, the funds in Sun Capital's bank accounts, even though they were derived in part from loan proceeds in 2000-2008, remain Sun Capital's assets, not the Lender's assets.

---

[9] *See* Steven Weise, *U.C.C. Article 9: Personal Property Secured Transactions*, 62 Bus. Law. 1633, 1644 (2007) ("A debtor under a secured transaction remains the owner of the collateral until the secured party has actually sold the collateral or accepted the collateral in satisfaction of the debt."); *Motors Acceptance Corp. v. Rozier*, 597 S.E.2d 367, 368 (Ga. 2004); *McMillen v. Drive Financial Services, L.P.*, 2005 WL 1041343, *4-5 (D. Kan. Feb. 7, 2005), *aff'd*, 172 Fed. Appx. 896 (10th Cir. 2006); N.Y. U.C.C. § 9-617(a)(1), 62½ McKinney's Consol. L. of N.Y. Ann. (West 2002) ("A secured party's disposition of collateral after default: (1) transfers to a transferee for value all of the debtor's rights in the collateral.").

30

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Nor does the Receiver have any right to dictate how Sun Capital or its affiliates run their businesses. While the Lender had many rights and remedies under the original written CSAs, it never had the right to take any managerial role in Sun Capital's business or to require it or its hospital clients to be operated in the best interests of Stable-Value investors.[10] Thus, not even under the original CSAs that the Receiver seeks to enforce here did Sun Capital ever have any duties toward Stable-Value's investors. And not even in the event of default would the Receiver have the power to decide which hospitals remain open and which are closed, as he apparently believes. (Mem. Opp. at 76 & n.63). Those would in all events be hospital managers' decisions.

The Receiver, in the shoes of the Lender, does have a right to monitor the status of the cash and other security for the Lender's outstanding loan – and he and his team have in fact been given current financial information, including the same monthly financial information as was previously given to the Lender and additional electronic lockbox viewing rights, to facilitate that monitoring. (7/22/09 Koslow Aff. ¶¶ 13, 21, 22, 36; Leder Aff. ¶ 83). However, he does not have the right to simply take over the ownership of Sun Capital's assets or the management of its business to serve his own ends, or to demand immediate repayment of loans due in 2013.

Finally, the Receiver can derive no greater powers by casting himself as the vindicator of the rights of certain FP investors who claim they were misled by the Sun

---

[10]  Indeed, the Stable-Value offering memoranda made clear that FP did not run Sun Capital's financing business, but was only making loans to Sun Capital that were subject to numerous nonpayment risks. (*E.g.*, 1/07 Offering Memo [No. 09-cv-229 Doc. 84-4] at 16-17, 18-20, 23-25).

31

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Capital principals. (Mem. Opp. at 2-4). The Receiver's dramatic accusations that Sun Capital "was an integral and knowing part of the fraudulent enterprise that victimized the investors" (Mem. Opp. at 2) are not only totally unsupported but also wholly irrelevant. The issue here is whether Sun Capital has breached its credit agreements with Stable-Value, not whether it participated in a securities fraud. The Receiver has no standing even to assert the claims of individual investors, let alone to presume a favorable future adjudication permitting recovery from Sun Capital assets.[11]

Regardless of whatever went wrong at Stable-Value, Sun Capital is a separate, legitimate company that is entitled to continue operating its business as it wishes. Sun Capital did not ever undertake to manage an investment fund, and has no duty to place investor or Lender interests above its own or its hospital clients' interests. The Receiver cannot impose upon Sun Capital any obligations it did not previously have, nor arrogate to himself any powers that the Lender did not previously have.

---

[11] There is no basis for the Receiver's mystifying assertion that, to obtain the requested injunction, "the Sun Principals [who are not parties here] must prove, at a minimum, that they disclosed the full extent of Sun's manifold deviations from the loan agreements and diversions of hundreds of millions of dollars to their own businesses and their own pockets." (Mem. Opp. at 3). Aside from the Receiver's argumentative mischaracterizations of Sun Capital's approved uses of loan proceeds (which infect every page of his brief and that of his "expert"), the imagined fraud claims of the FP investors have no relevance to this motion. Sun Capital has no burden on this motion to prove anything at all about disclosure duties the Receiver hypothesizes for individual investor claims he has no standing to assert. The Sun Principals had no duty of disclosure to Stable-Value's investors or the public at large, but even if they did, such claims would not be a part of this motion. If the individual investor claims were to be litigated, it would be the investors' burden to prove the claimed duty to disclose, as well as their own actual and reasonable reliance – which would be difficult given the specific language in the prospectus barring any reliance on external representations and the extensive warnings about the risks of the investments and the General Partner's ability to revise its investment strategies at any time. (1/07 Offering Memo [No. 09-cv-229 Doc. 84-3 to 84-4] at pp. i, 1-2, 4, 9, 12, 14-15, 16, 19, 36-38).

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

**B.**     <u>The Receiver's Legal Rights Are No Greater than the Lender's</u>

The Receiver issued the Transfer Notices and brought this contract suit as the Lender (under new management).  As such, the Receiver does not have any greater legal rights than the Lender itself had, and is bound by whatever strictures bound the Lender.

It is well settled that "the plaintiff in his capacity of receiver has no greater rights or powers than the corporation itself would have." *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 25 (1st Cir. 1990) (quoting *McCandless v. Furlaud*, 296 U.S. 140, 148 (1935)); *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008).  In any lawsuit, the receiver "stands in the shoes of the corporation and can assert only those claims which the corporation could have asserted." *Eberhard*, 530 F.3d at 132 (quoting *Lank v. N.Y. Stock Exch.*, 548 F.2d 61, 67 (2d Cir. 1977)); *see Hamilton v. Flowers*, 134 Fla. 328, 343 (1938) ("a receiver takes the rights, causes and remedies which were in the corporation, individual or estate whose receiver he is, or which were available to those whose interests he was appointed to represent").  "In other words, the receiver can only make a claim which the corporation could have made." *Fleming*, 922 F.2d at 25; *see In re Burton Wiand Receivership Cases*, 2008 WL 818504, *5 (S.D. Fla. Mar. 26, 2008) (rejecting receiver's effort to assert claims effectuating SEC enforcement and disgorgement powers; receiver has no greater rights or powers than the corporation in receivership).

Accordingly, receivers may not assert claims that could not have been asserted by the entity or individual in receivership;[12] and are held subject to the same defenses that

---

[12]  *See, e.g., Eberhard*, 530 F.3d at 133 (receiver for individual lacked standing to assert fraudulent conveyance claim that the individual himself could not have brought because he was

33

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

the receivership entity would have been subject to.[13]

Consequently, the Receiver here is bound by all the knowledge and conduct of Stable-Value while under prior management, and is subject to the same claims and defenses that it would have been. Thus, Sun Capital's defenses of modification, estoppel, waiver, unclean hands, and others are all just as valid against the Receiver as they would be if Stable-Value were asserting the breach claims that the Receiver now asserts.

## II.   Sun Capital's Position Is Likely to Succeed on the Merits

The issue presented is, as the Court stated in its July 24, 2009 decision, Sun Capital's likelihood of success concerning the impropriety of the Transfer Notices because Sun Capital was not in default under the parties' actual credit agreements, as against the Receiver's claim that Sun Capital was in default under the terms of the original written CSAs. (Doc. 19 at 6, 7-8). The record is now more developed (though

---

not a creditor but the fraudulent transferor); *Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 627 (6th Cir. 2003) (receiver was bound to arbitration agreements to same extent the receivership entities were); *Fla. Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n*, 274 F.3d 924, 933-35 (5th Cir. 2001) (various claims asserted by insurance receiver failed due to the prior knowledge, agreement, and conduct of the insurance company in receivership); *Cobalt Multifamily Investors I, LLC v. Shapiro*, 2008 WL 833237, *4-5 (S.D.N.Y. Mar. 28, 2008) (receiver lacked standing to assert malpractice and other claims against attorneys that corporation could not assert due to its own collaboration in the alleged misconduct).

[13]   *See, e.g., Wuliger v. Mfrs. Life Ins. Co. (USA)*, 567 F.3d 787, 797-99 (6th Cir. 2009) (receiver's rescission claim subject to unclean hands defense based upon receivership entity's fraudulent conduct); *Steinberg v. Alpha Fifth Group*, 2008 WL 906270, *4-5 (S.D. Fla. Mar. 31, 2008) (receiver subject to defense based on settlement and release executed by receivership entity); *Wuliger v. Owens*, 365 F. Supp. 2d 838, 842, 844 (N.D. Ohio 2005) (receiver subject to statute of limitations defense based upon receivership entity's inquiry notice of fraud); *BancreditCayman Ltd. v. Regions Bank Corp. (In re Bancredit Cayman Ltd.)*, 2009 WL 3762337, *8-9, 15-16 (Bankr. S.D. Fla. Nov. 6, 2009) (bank liquidators subject to statute of limitations and ratification defenses based upon notice to and approval by prior bank management).

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

not fully so),[14] and the conclusion is the same.

All the Receiver's claimed breaches are specious, insofar as they either (a) rest upon provisions of the original CSAs that were long ago modified, explicitly or implicitly, by mutual agreement of the parties as evidenced in oral and written statements and course of conduct for many years, which the Receiver is now estopped to deny, or (b) rest upon conduct occurring after the Lender itself materially breached and repudiated the credit agreements in January 2009, terminating the agreements and excusing any further performance by Sun Capital, or (c) were mere technical breaches that, in equity, ought not be applied to permit a forfeiture of Sun Capital's entire business. The Receiver's July 2009 effort unilaterally to revoke all the Lender's prior "waivers and consents" cannot retroactively create breaches, or even alter Sun Capital's obligations going forward, because (a) these were bilateral modifications that cannot be unilaterally revoked, (b) the Lender is estopped from enforcing old CSA provisions, having induced Sun Capital to rely on their non-enforcement for years, and (c) in any event, the Lender had already forfeited any right to continue demanding performance from Sun Capital when it repudiated the agreements in January 2009. While the Receiver has seized upon every possible excuse to declare Sun Capital in default, ostensibly to justify an acceleration of the loan and takeover of Sun Capital's bank accounts, there is no real default and no justification for such harsh (and counterproductive) measures.

---

[14] The injunction-related discovery requested by Sun Capital has not been completed. The Receiver has not completed his own production of documents requested in August 2009, and has effectively delayed by months the production of relevant documents by Ernst & Young.

35

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

## A.    The Alleged Historical Defaults Were Not Defaults

Now recognizing that the CSAs required a Borrower default to permit the acceleration of the loan and the bank account seizure (Mem. Opp. at 16), the Receiver cites, in addition to the nonpayment of interest in 2009, various long-standing practices that he contends have constituted defaults.[15]  These include allegedly providing false financial reports, allegedly being insolvent, using loan proceeds for purposes other than receivables purchases, having a borrowing base deficiency, not providing duplicative periodic reports, and allegedly providing false officer's certificates – all continuing for many years.  (Mem. Opp. at 18-31).

The Receiver now concedes that at least some of the uses of loan proceeds that he previously called defaults are not defaults, for he has discovered what he calls "written, signed waivers" specifically permitting those uses.  (Mem. Opp. at 38 n.40).  Yet he continues to view other substantively identical uses of loan proceeds as constituting defaults because they occurred subsequent to those initial written agreements.  As has been explained and is not even disputed, Sun Capital's uses of the loan proceeds for purposes beyond those contemplated in the original written CSAs were all authorized, agreed to, and indeed encouraged by the Lender, and numerous individual loans were made for those approved purposes.  As discussed below, the Lender's approvals, which reflected mutual assent and were supported by consideration, created bilateral

---

[15]  The list of defaults the Receiver now rests upon differs from the list in the April 2009 notices of default issued by the Initial Receiver, the list in the Receiver's July 15, 2009 complaint seeking foreclosure remedies, and the list in the Receiver's July 24, 2009 opposition to Sun Capital's motion for temporary restraining order.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

modifications of the parties' credit agreement, binding on a going-forward basis unless and until they were mutually remodified.  Alternatively, at a minimum, they constituted ongoing waivers of certain restrictive CSA terms which, having been relied upon, are estopped from being withdrawn.

The Receiver, despite Sun Capital's clear reference to both modification and estoppel in its July motion papers (Doc. 11 at 21), completely fails to address the applicability of either of those doctrines.  Rather, he misdescribes Sun Capital's position as resting solely on waivers, particularly "waivers of defaults," and asserts the primacy of the original CSA provisions restricting waivers without regard to the parties' actual agreements and performance for years.  He does not even try to explain why any of the case law discussed below – especially the analysis of *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343-44 (1977), which Sun Capital cited in its moving brief (Doc. 11 at 21) – does not soundly defeat his position.  Instead, in a footnote, he urges the Court not to "delve into this area of the law" – even though it is the central area of law on this motion – because he has assertedly identified breaches as to which there were no waivers. (Mem. Opp. at 41-42 n.41).  That conclusion depends upon adopting the Receiver's premise that only signed, written waivers are effective; but that premise is contrary to the very body of law the Receiver evades, which holds that a waiver, modification, or estoppel can indeed arise through words or conduct.

### 1.    The Cited CSA Provisions Were Modified and Superseded

The alleged misuses of loan proceeds and other claimed past defaults were not defaults because the actions were in compliance with the parties' substantial

37

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

modifications of the original contract terms.

A modification is a new agreement between the parties which "pro tanto supplants the affected provisions of the original agreement while leaving the balance of it intact." *Camrex Contractors (Marine) Ltd. v. Reliance Marine Applicators, Inc.*, 579 F. Supp. 1420, 1430 (E.D.N.Y. 1984) (quoting *Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 718 (App. Div. 1980)); *accord Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots*, 878 F.2d 41, 46 (2d Cir. 1989) (upon a modification, "the terms of the old contract are still to be followed so far as not changed or as inconsistent with the new terms"). A modification, like any contract, requires mutual assent to the new terms and consideration. *See id.*; *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 183-84 (1982). A modification, like any bilateral agreement, "is binding according to its terms and may only be withdrawn by agreement." *O'Connor v. Curcio*, 724 N.Y.S.2d 171, 173 (App. Div. 2001).

The requisite "objective manifestations" of assent to a modification may be gleaned from unsigned writings or "established through conduct." *Deutsche Asset Mgmt., Inc. v. Callaghan*, 2004 WL 758303, *15, 16 (S.D.N.Y. Apr. 7, 2004). "Modifications of written contracts may be proved circumstantially by the conduct of the parties." *Recon Car Corp. of N.Y. v. Chrysler Corp.*, 515 N.Y.S.2d 829, 833 (App. Div. 1987); *Global Crossing Bandwidth, Inc. v. Locus Telecom., Inc.*, 632 F. Supp. 2d 224, 234-35 (W.D.N.Y. 2009); *see Schubert v. Lucent Techs. Inc. (In re Winstar Commcns., Inc.)*, 554 F.3d 382, 409, 410-11 (3d Cir. 2009) (applying New York law) (modification found based upon course of conduct); *Marine Transp. Lines*, 878 F.2d at 43-44 & n.3, 45

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

(modification found based upon unsigned memorandum and parties' conduct).

The modification agreement will alter not only those original provisions that are expressly affected, but also those that are necessarily or impliedly affected by the modification. *See Credit Suisse First Boston Corp. v. Pitofsky*, 4 N.Y.3d 149, 154-55 (2005) (employment agreements that incorporated provisions of employer's dispute resolution program impliedly modified and superseded the arbitration provisions of the prior Form U-4 agreements signed by employees); *Benipal v. Herath*, 674 N.Y.S.2d 815, 816 (App. Div. 1998) (although clause of original commercial lease prohibiting third-party beneficiary status was never explicitly modified, the several material modifications to the lease and the parties' relationship compelled the conclusion that plaintiff was in fact a third-party beneficiary of the modified lease); *Tejani v. Allied Princess Bay Co.*, 612 N.Y.S.2d 227, 228-29 (App. Div. 1994) (court found that seller's time to perform was "necessarily supplanted" and "implicitly extended" by a modification agreement that explicitly only reduced the purchase price due to buyer's financial troubles); *N.Y. State Urban Devel. Corp. v. Paul T. Freund Corp.*, 2009 WL 839858, *3 (N.Y. Sup. Ct. Mar. 31, 2009) (parties modified funding grant contract to extend employment goals by two years; defendant later claimed that contract expired on original expiration date, but court found that "the only reasonable, logical conclusion" was that the modification extending employment goals also "impliedly supplanted" the expiration date).

Here, as explained above, there was a set of substantial, interrelated modifications fundamentally altering the scope and purpose of the credit agreement in 2002 and 2003, followed over the years by a series of further specific examples of the general 2002-03

39

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

modifications, all manifested through a combination of oral conversations, written materials, and a lengthy course of conduct reflecting mutual assent.  Given the substantial modification of the principal substantive terms of the credit agreement, other more trivial or general clauses, though not specifically discussed by the parties, were also impliedly modified to the extent that they were inconsistent with the substantively modified agreement.

These modifications are enforceable notwithstanding that the original written CSAs contained a clause prohibiting non-written amendments.  New York's highest court has instructed that an oral modification may be enforced despite such a restrictive clause when (1) the oral modification has been fully performed or, (2) there has been partial performance that is unequivocally referable to the oral modification, or (3) a party has induced the counter-party's significant reliance upon the oral modification, creating an estoppel.  *Rose*, 42 N.Y.2d at 343-44.  Each of these exceptions is applicable here.

The *Rose* Court observed that the New York statute allowing clauses requiring a writing was intended to protect the counter-party against false claims of modification where the <u>only</u> evidence of the modification was the alleged oral exchanges; the requirement of a writing thus serves to ensure the authenticity of the amendment.  *Id.* at 343.  Exceptions to the writing requirement may be made when other circumstances support the authenticity of the amendment.  First, "when the oral agreement to modify has in fact been acted upon to completion, the same need to protect the integrity of the written agreement from false claims of modification does not arise."  Thus, "[o]nce executed, the oral modification may be proved."  *Id.* at 343 (noting also that "a contract

40

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

once made may be unmade, and a contractual prohibition against oral modification may itself be waived"). Second, "[w]here there is partial performance of the oral modification sought to be enforced, the likelihood that false claims would go undetected is similarly diminished. Here, too, the court may consider not only past oral exchanges, but also the conduct of the parties." If the partial performance is "unequivocally referable to the oral modification," the modification is enforceable. *Id.* at 343-44. Third, there is the principle of equitable estoppel. "Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that oral modification." The "conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written." *Id.* at 344.

In *Rose*, the oral modification was effective and enforceable because there had been partial performance that was unequivocally referable to the modification, as it did not comport with the terms of the existing written agreement. *Id.* at 345. Alternatively, since the sellers knowingly acquiesced in the purchasers' substantial investments to proceed on the project, lulled the purchasers into thinking the modification had been accepted, and participated in conduct that was not otherwise compatible with the written agreement, the sellers were estopped from denying the oral modification. *Id.* at 345-46.

Following the *Rose* analysis, courts routinely find non-written modifications enforceable despite a clause requiring a writing.[16] In particular, lenders are unable to

---

[16] *See Schubert*, 554 F.3d at 409-11 (modification established by parties' course of conduct, which was unequivocally referable to modification; rejecting breacher's theory that there was only a waiver which it withdrew); *B. Reitman Blacktop, Inc. v. Missirlian*, 860 N.Y.S.2d 211, 212

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

hide behind such restrictive clauses if their conduct supports one of the three exceptions.

In *Sarcona v. DeGiaimo*, 641 N.Y.S.2d 479 (App. Div. 1996), the defendant seller sent

the buyers a default notice triggering the acceleration of the full amount due on the

promissory note for the purchase price.  The buyers sued for an injunction against

defendant's exercise of post-default remedies, denying any default because there had

been an oral modification restructuring their payment obligations.  *Id.* at 480.  Plaintiffs

had partially performed in accordance with the modification, which they had confirmed

in a letter, and the defendant knowingly accepted the plaintiffs' reduced payments for ten

months following that letter.  Thus, defendant was not entitled to summary judgment,

because "[a]t the very least plaintiffs raised a factual issue whether the payments were

---

(App. Div. 2008) (defendant's acceptance of the extra work plaintiff performed while installing a driveway on defendant's property demonstrated a "mutual departure from the written agreement" and waived the contractual requirement of written modification); *Healy v. Williams*, 818 N.Y.S.2d 121, 124 (App. Div. 2006) (oral modification enforceable where defendant had provided consideration in exchange for the modification reducing his child support payments and plaintiff had accepted the reduced payments for five years, demonstrating partial performance referable to the oral modification); *J&R Landscaping, Inc. v. Damianos*, 769 N.Y.S.2d 52, 53 (App. Div. 2003) ("both parties, by actively continuing to seek the removal at issue well after the 120-day period, effectuated a modification of the contract as to this time constraint"); *Taylor v. Blaylock & Partners, L.P.*, 659 N.Y.S.2d 257, 259-60 (App. Div. 1997) (employer established oral modification to a written employment agreement under which employees worked without salary, but retaining their benefits, for a period while the firm was experiencing financial difficulty; undisputed evidence showed both parties performed in accordance with the modification for three months and there was an exchange of consideration); *T&N West Galla Pizzeria, Inc. v. CF White Plains Assocs.*, 586 N.Y.S.2d 266, 271-72 (App. Div. 1992) (finding enforceable an oral modification expanding the use clause of a lease, where consideration was given and the tenant undertook renovations in reliance on the modification and performed in accordance with the modification); *Latham Four P'ship v. SSI Med. Serv.*, 581 N.Y.S.2d 891, 893 (App. Div. 1992) (oral modification enforceable due to estoppel where landlord agreed to extend lease term with full knowledge of tenant's situation and tenant relied on the modification to its detriment by releasing third party from a prior obligation to provide tenant with leased space during the extension period); *Recon Car Corp.*, 515 N.Y.S.2d at 833 (oral modification expanding scope of contract was proved circumstantially by the conduct of the parties for several years, as the parties' conduct "indicates the existence of an implied-in-fact contract" which is "evidenced by the acts of the parties" and "is a true contract").

42

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

unequivocally referable to the oral modification, and thus constituted partial performance sufficient to excuse the requirement of a writing." *Id.* at 481.

*Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank*, 524 N.Y.S.2d 531 (App. Div. 1988), addressed whether the bank properly accelerated Canterbury's loan upon certain alleged defaults under the revolving credit agreement.  While the Bank was considering Canterbury's application for an increased credit line, for several months the Bank officer allowed Canterbury to substantially exceed the existing credit line while the officer monitored Canterbury's finances and gave advance approvals for checks to be drawn on the credit line.  The Bank then suddenly fired that officer, dishonored the pre-approved checks, and seized Canterbury's incoming receivables, strangling its economic lifeline and forcing it into bankruptcy. *Id.* at 533, 534.  These facts raised triable issues concerning "the existence of a valid, enforceable modification of the original debt limit of the revolving credit agreement, or a possible estoppel," and concerning "whether Canterbury's detrimental reliance on the Bank officer's assurances as to those checks prevented the Bank from dishonoring them." *Id.* at 534.

Here, too, the parties' demonstrated course of conduct for many years (well beyond the few months deemed sufficient in the cases above) jointly performing their agreed-upon modifications eliminates any doubt that the amendments were authentic. There is ample documentary evidence of this ongoing course of conduct, of the bilateral nature of the parties' understanding, and of the consideration exchanged for the modifications (including the greatly maximized interest payments).  (Leder Aff. ¶¶ 2-63, 67).  There were many, many completed transactions in which Sun Capital requested a

43

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

loan for a purpose other than to purchase "Eligible Accounts," the Lender advanced the funds with knowledge of the intended purpose and the nature of the security, and Sun Capital then used the loan proceeds in the agreed manner. Financial reports aggregating this information were provided to and discussed with the Lender every single month. (Leder Aff. ¶ 69).

These numerous loan transactions in reliance on the modifications were in fact fully performed, the loans being made and the proceeds applied as agreed, in 2001-08. That fact, standing alone, validates the modifications. *Rose*, 42 N.Y.2d at 343. Even if viewed as only partial, the parties' performance was clearly and unequivocally referable to the "oral" modifications (which were in fact reflected in various informal writings) because it involved repeated affirmative acts by both parties that plainly did not fit within the limited terms of the original written CSAs and would not have occurred but for the agreed-upon expansions of the contract terms.[17]

Alternatively, the same facts support an estoppel analysis: The Lender repeatedly gave oral and written approvals of purchasing activities well beyond the CSA terms, encouraged the finding of such expanded investment opportunities, and routinely increased the credit line to accommodate such expansions. None of this was compatible

---

[17] The sole case the Receiver cites concerning conduct found not to be "unequivocally referable" to the alleged oral agreement, *Anostario v. Vicinanzo*, 59 N.Y.2d 662, 664 (1983) (Mem. Opp. at 43) is wholly inapposite. It did not concern an oral modification at all, addressing only whether a claimed oral agreement that defendant would convey to plaintiff a one-half interest in real estate was barred by the statute of frauds. The plaintiff's acts were "reasonably explained by the possibility of other expectations" besides the alleged agreement and could have been preparatory steps toward an agreement to be consummated in the future, rather than any existing agreement. Here, in contrast, the modification agreement was already in place and was in fact performed by both parties for several years – a reality that is not altered by the fact that the parties were also planning a different, superseding written agreement in the future.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

with the original written CSAs.  Sun Capital relied on all these approvals and assurances to its detriment, operating pursuant to a greatly modified credit program in which it repeatedly forwent its right to pay down the loan amount and instead vastly increased its borrowings, agreed to pay very high interest on ever-increasing principal amounts, and took on very substantial hospital funding commitments and liabilities to third parties. Sun Capital never would have or could have incurred such large financial obligations to Stable-Value or third parties if the original CSA (including its $2 million debt limit) had been adhered to.

The Receiver does not and cannot actually refute any of these facts concerning the contracting parties' numerous oral and written exchanges and multi-year course of conduct, which clearly demonstrate that the modifications were valid and enforceable on all three *Rose* grounds.  As shown in Point I.B above, these modifications are just as binding on the Receiver as on the Lender under prior management.  The Receiver thus has no legitimate ground to claim any "defaults" under the parties' actual credit agreement.

### 2.    At a Minimum the Lender Waived Enforcement of the CSA

The Receiver erroneously labels the substantial modifications discussed above as waivers.  Even if they were waivers rather than modifications, though, the result would be the same – that the Receiver cannot now claim any defaults based upon past events that the Lender did not treat as breaches.

"Contractual rights may be waived if they are knowingly, voluntarily, and intentionally abandoned."  This "may be established by affirmative conduct or by failure

45

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

to act so as to evince an intent not to claim a purported advantage," so long as there is a "clear manifestation of intent to relinquish a contractual protection." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., LP*, 7 N.Y.3d 96, 104 (2006); *Natale v. Ernst*, 881 N.Y.S.2d 232, 233 (App. Div. 2009); *O'Connor*, 724 N.Y.S.2d at 173.

Thus, a waiver may be found based upon either affirmative conduct or acquiescence in conduct at variance with the contract. *See Natale*, 881 N.Y.S.2d at 233-34 (record established defendant's waiver of subdivision deadline in property contract as a matter of law, based on defendant's correspondence and acquiescing conduct); *Kenyon & Kenyon v. Logany, LLC*, 823 N.Y.S.2d 72, 74 (App. Div. 2006) (defendant's "failure to insist on such notice for nearly 10 months after receiving plaintiff's oral notification, while acting as if it had accepted the oral exercise of the option, … constituted a waiver of any right to insist on written notice"); *Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC*, 811 N.Y.S.2d 47, 54-55 (App. Div. 2006) (landlord's repeated acceptance of late rent payments without objection constituted a waiver of the lease provision requiring timely payment), *aff'd*, 8 N.Y.3d 59 (2006); *Scavenger, Inc. v. GT Interactive Software, Inc.*, 708 N.Y.S.2d 405, 406 (App. Div. 2000) ("defendant's claim that plaintiff breached the parties' agreement by failing to deliver the CD-ROM games on time had been waived by defendant's requests for significant modifications in the games and by defendant's acceptance and marketing of the games without objection"); *Dorf Overseas, Inc. v. Chemical Bank*, 457 N.Y.S.2d 513, 514 (App. Div. 1983) ("By surrendering the documents and accepting a substantial portion of the goods, plaintiff waived its right to seek strict enforcement of the letter of credit").

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

The waiving party then cannot claim the other party is in breach of the original contract term, and may itself be held in breach if it fails to honor its own waiver. *See Natale*, 881 N.Y.S.2d at 234-35 (due to his waiver of subdivision deadline, defendant was found to be in breach when he failed to cooperate in plaintiff's later subdivision efforts); *Madison Ave.*, 811 N.Y.S.2d at 55 (since landlord had waived the lease provision requiring timely payment, tenant had not committed any monetary defaults and therefore the guaranty, which was conditioned upon the existence of such defaults, never became effective); *Kenyon & Kenyon*, 823 N.Y.S.2d at 74 (due to landlord's waiver of notice provision, option was deemed to "hav[e] clearly been exercised," requiring landlord to perform); *O'Connor*, 724 N.Y.S.2d at 173 (by virtue of mother's express waiver of future child support payments during period when child was residing with father, father was not in default and no arrears accrued).

A particular example is when a party waives a breach. If, following a breach, a party continues performance without terminating or giving notice of the breach, that party "surrenders [its] right to terminate later based on that breach." *Albany Medical College v. Lobel*, 745 N.Y.S.2d 250, 252 (App. Div. 2002) (defendant waived right to terminate contract based upon past breaches because he continued to enjoy income and other benefits after those breaches occurred); *see Savasta v. 470 Newport Assocs.*, 579 N.Y.S.2d 167, 169 (App. Div. 1992) (plaintiffs, who accepted cash-flow profits and other benefits of partnership agreement for 22 months after cooperative conversion and did not object to partnership accounting documents, waived their right to seek termination of partnership due to conversion), *aff'd*, 82 N.Y.2d 763 (1993); *LaGuardia Assocs. v.*

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Holiday Hospitality Franchising, Inc.*, 92 F. Supp. 2d 119, 130 (E.D.N.Y. 2000) ("by not terminating on the April 1999 default for nearly ten months, but instead essentially abandoning that right until February 2000, [Holiday] waived its right to rely on that default ... as a basis for termination of the Agreements"); *Marathon Enters., Inc. v. Schroter GmbH & Co.*, 2003 WL 355238, *6 (S.D.N.Y. Feb. 18, 2003) ("A non-breaching party that either continues to perform or accepts the performance of the breaching party affirms the contract and waives its right to terminate").

Here, at a minimum, the Lender waived any right to terminate the contract or accelerate the loan based on any of the past alleged breaches that were not acted upon at the time. There was never any declaration of default nor any remedial measures sought during the 8½ years during which the Receiver says Sun Capital was constantly defaulting. Any practices that could have been viewed as breaches or defaults were repeatedly waived by the Lender and can no longer be claimed as grounds for acceleration or account seizure.

## B.   The Alleged 2009 Defaults Were Not Defaults

In addition to claiming that all the ongoing approved practices continued to constitute defaults in 2009, the Receiver also cites as defaults Sun Capital's nonpayment of interest since January 2009 and two instances of SCI modifying the debt without consulting the Receiver in 2009, assertedly in violation of § 6.31 of the SCI CSA. (Mem. Opp. at 18, 23-24). However, these do not constitute breaches because (1) the Lender's prior material breach and repudiation in late January 2009 had terminated the contract and excused all the Borrower's executory performance obligations, including the interest

48

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

payments and reporting and consulting obligations, and (2) indeed, following that repudiation the parties immediately modified the contract to eliminate the interest payments until the planned refinancing transaction was concluded.  Because Sun Capital's obligations were excused both by operation of law and contractual modification, the nonpayment of interest and other alleged 2009 breaches cannot justify acceleration or asset seizure remedies.

1.  **The Lender's January 2009 Repudiation**
    **Excused Sun Capital's Further Performance**

In January 2009, the Lender breached the SCHI credit agreement by failing to meet the $5 million drawdown request and, even more significantly, anticipatorily repudiated both credit agreements by declaring that it would not provide any of the remaining credit available under either agreement (a total of over $25.5 million).  This material breach and repudiation effectively discharged any remaining obligations of Sun Capital under the agreements, nullifying any alleged defaults occurring after January 2009, including the nonpayment of interest and any failure to consult the Receiver or provide weekly (or other) financial reports.[18]

"[A] party to a contract commits an anticipatory breach of the contract when, prior to the time set for performance under the contract, it declares expressly or by its conduct that it will not perform its part of the bargain." *Food Mgmt. Group, LLC v. Matrix Realty Group, Inc. (In re Food Mgmt. Group, LLC)*, 372 B.R. 171, 189 (Bankr.

---

[18] Sun Capital's failure to consult the Receiver before converting the Symbio and Kanterman debts is inconsequential in any event.  The Symbio debt was converted to a note, *increasing* Sun Capital's security, while the Kanterman debt was reduced to a signed agreement under which timely payments have been made. (Leder Aff. ¶¶ 100-103).

49

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

S.D.N.Y. 2007); *see Binghamton Masonic Temple, Inc. v. City of Binghamton*, 602

N.Y.S.2d 310, 311-12 (Sup. Ct. 1993) (defendant found liable for anticipatory breach of

its agreement to loan money to plaintiff to renovate its premises); *In re Adelphia Business*

*Solutions, Inc.*, 341 B.R. 415, 428 (Bankr. S.D.N.Y. 2003) (finding that lender's failure to

fund under credit agreement constituted an anticipatory repudiation).

The Lender's breach and repudiation were indisputably material.  A material

breach is one that "would justify the other party to suspend performance" or that "is so

substantial as to defeat the purpose of the entire transaction." *Lipsky v. Commonwealth*

*United Corp.*, 551 F.2d 887, 895 (2d Cir. 1976).  "[A] breach is material if it defeats the

object of the parties in making the contract and 'deprives the injured party of the benefit

that it justifiably expected.'  Materiality does not depend upon the amount of provable

money damages, it depends upon whether the nonbreaching party lost the benefit of its

bargain." *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 416, 421

(S.D.N.Y. 1999).[19]

For example, in *Carco Group, Inc. v. Maconachy*, 644 F. Supp. 2d 218 (S.D.N.Y.

2009), concerning defendant's alleged inadequate performance as an employee, the court

found it clear that the parties intended for adequate performance "to be an essential

element of [the agreement]," because the Performance Clause was the first term of the

agreement, and the rest of the agreement reflected that the parties intended for

---

[19]  In contrast, a non-material breach is a technical, inadvertent, or unimportant omission or defect
such that the effect of the breach on the "whole of the contract" is negligible. *Cablevision Sys.*
*Corp. v. Town of E. Hampton*, 862 F. Supp. 875, 885 (E.D.N.Y. 1994); *see Bresloff-Hernandez v.*
*Horn*, 2007 WL 2789500, *11 (S.D.N.Y. Sept. 25, 2007) (non-material breach is one that does
not defeat the object of the agreement).

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

defendant's performance "to be one of, if not *the* essential item" that plaintiff expected to receive. *Id.* at 235. Similarly, here, the Lender's failure and refusal to make further loans went to the heart of the parties' agreement. Its name, "Credit and Security Agreement," indicates that the primary purpose of the agreement was to provide credit to Sun Capital, as does the fact that "The Credit" section is the first section of the agreement following the definitions. Clearly, the Lender's promise to provide periodic loans up to the credit limit was the most important term for Sun Capital.

Indeed, courts routinely find that a lender's failure to fund a line of credit constitutes a material breach. For example, *In re Adelphia* concerned a DIP credit facility provided by the debtor's former parent, ACC. Although ACC made an aggregate of $15 million in advances under the DIP loan, out of the total $27 million that had been authorized, its failure to fund a draw request and statement that it would not make further disbursements on the facility was found to be a material breach of the DIP facility. 341 B.R. at 427.

Likewise, in *Deutsche Bank AC v. JP Morgan Chase Bank*, 2007 WL 2823129 (S.D.N.Y. Sept. 27, 2007), *aff'd*, 331 Fed. Appx. 39 (2d Cir. May 29, 2009), Genuity notified nine banks that were parties to a $2 billion credit agreement that it sought to draw the entire $850 million amount then available to it under the agreement. Deutsche Bank, one of the nine banks, refused to provide its share. *Id.* at *1. In a litigation between the banks, the Court found that Deutsche Bank had breached the Genuity credit agreement by refusing to fund the request, and that breach was material because it "[went] to the root of the agreement between the parties." *Id.* at *9.

51

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

"Under New York law, when one party has committed a material breach of a contract, the non-breaching party is discharged from performing any further obligations under the contract." *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 145 (S.D.N.Y. 2003) (plaintiffs' breach of the settlement agreement by failing to make payments excused defendants' performance of remaining terms thereunder). *See Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 747 N.Y.S.2d 468, 476 (App. Div. 2002) (plaintiff's repudiation of agreement by entering into conflicting agreement immediately discharged all defendant's remaining obligations under the agreement, so nothing defendant did thereafter constituted a breach of contract); *Legend Artists Mgmt., Inc. v. Blackmore*, 709 N.Y.S.2d 85, 92 (App. Div. 2000) ("defendant was entitled to terminate the agreement, and to avoid payment of any future commissions, on the ground of plaintiff's material breach"); *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186-87 (2d Cir. 2007) (even though defendant purchaser had already received the primary intended benefit of the contract, if the cumulative effect of plaintiff's breach of warranties in sale agreement was material, that non-performance would excuse defendant's obligation to perform the executory portion of the sale agreement); *Campoverde v. Sony Pictures Entmt.*, 2002 WL 31163804, *7 (S.D.N.Y. Sept. 30, 2002) (plaintiffs' allegations that defendants breached their agreement to pay plaintiffs up front and demanded a new contract were sufficient to excuse plaintiffs' performance); *Jafari v. Wally Findlay Galleries*, 741 F. Supp. 64, 68 (S.D.N.Y. 1990) (when buyer materially

52

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

breached by failing to tender payment at the required time, seller's performance obligation was discharged).[20]

     This general rule applies to excuse a borrower's performance when a lender breaches a loan agreement. *See Binghamton Masonic Temple*, 602 N.Y.S.2d at 312 (defendant's anticipatory breach of loan agreement "excused plaintiff's obligation of future performance under that agreement, including the obligation to repay the proceeds previously advanced"); *Bombardier Capital Inc. v. Reserve Capital Corp.*, 744 N.Y.S.2d 232, 235 (App. Div. 2002) (finding triable issue as to whether lender's breach of implied covenant of good faith excused borrower's obligation to make interest payments); *WRH Mortgage, Inc. v. S.A.S. Assocs.*, 214 F.3d 528, 532-33, 534 (4th Cir. 2000) (under common law, bank receiver's repudiation of Construction Loan and Lease Agreement pursuant to FIRREA provision discharged borrower's obligation to repay the loan; this did not impose an unfair forfeiture, being only the consequences of the receiver's breach of contract); *A.I. Credit Corp. v. Hi-Tech Commons., Inc.*, 2002 WL 389424, *1 (Tex. App. 2002) (affirming judgment that borrower's obligation to repay the loan was discharged by lender's material breach of finance agreement); *Segovia v. Equities First Holdings, LLC*, 2008 WL 2251218, *22, 23 (Del. Super. May 30, 2008) (finding that lender's material breaches of loan and pledge agreements excused borrower from future performance under the loan agreement and notes). *See also In re Adelphia*, 341 B.R. at

---

[20] The Receiver suggests that the non-breaching party's performance is excused only to the extent that its performance "is conditioned upon" the breaching party's performance (Mem. Opp. at 49), but the cited cases do not impose such a limitation. Rather, they stand for the general point that a material breach excuses the other party's further performance.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

428 (DIP lender that materially breached credit agreement would thereafter be unable to enforce covenants in that agreement as against the debtor).

Consequently, the effect of the Lender's material breach and repudiation in January 2009 was to relieve Sun Capital of its remaining obligations under the contract, so none of Sun Capital's conduct thereafter could constitute a breach.

The Receiver attempts to evade this effect by quoting off-point language that it is improper "to permit a party to a contract to repudiate the contract or his obligation under it, and at the same time retain the consideration he has received." (Mem. Opp. at 49, quoting *McDonald's Corp. v. Robert A. Makin, Inc.*, 653 F. Supp. 401, 403 (W.D.N.Y. 1986)). The quote is inapposite on its face because Sun Capital did <u>not</u> repudiate the contract; the Lender did. In *McDonald's*, McDonald's sued a franchisee for nonpayment of franchise fees, which were required to continue using the licensed property. The franchisee asserted various affirmative defenses and counterclaims alleging ongoing antitrust violations, lack of good faith, and tortious interference by McDonald's; but significantly, as the court found, none of these claims and defenses would excuse the franchisee's obligation to pay the fees, either under the contract or by law. *Id.* at 403, 404, 405. Here, in contrast, Sun Capital has asserted a strong defense that the Lender's material breach and total repudiation terminated the contract and excused Sun Capital's further performance by law. The *McDonald's* franchisee did not assert any such repudiation terminating the contract and excusing further performance, and instead continued to take the fruits of the contract, operating the McDonald's business with the

54

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

licensed property, but without paying for those fruits. Sun Capital has not taken any fruits of the credit agreement since it was terminated by the Lender's repudiation.

As stated in the case the Receiver quotes, upon the Lender's breach, Sun Capital had two options: either stop performance and sue for total breach or continue to perform and sue for partial breach. (Mem. Opp. at 50, quoting *Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 397-98 (S.D.N.Y. 2000)). *See also AM Cosmetics Inc. v. Solomon*, 67 F. Supp. 2d 312, 317-18 (S.D.N.Y. 1999); *Food Mgmt. Group*, 372 B.R. at 190-91. Sun Capital obviously chose the former. However, the Receiver also asserts, without case support, that Sun Capital would have to "cease performance and seek rescission of the CSAs," which assertedly would require Sun Capital immediately to return all the funds previously loaned. (Mem. Opp. at 50-51 & n.48). But the cases do not limit the non-breaching party to rescission. The breach may be redressed by damages as well, as noted in one of the Receiver's cases, *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 429 (S.D.N.Y. 2004) (non-breaching party may "terminate the contract and recover liquidated damages").[21] Sun Capital's counterclaims seek damages for the Lender's breaches. It has not sought rescission, and is not required to.

Contrary to the Receiver's rhetoric, Sun Capital is not "reap[ing] a complete windfall in the meantime." (Mem. Opp. at 51). Sun Capital is not reaping any benefits under the agreement, because the Lender stopped providing the promised benefits 13

---

[21] *See also American List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 44 (1989) (party's repudiation "entitles the nonrepudiating party to immediately claim damages for a total breach"); *Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 747 N.Y.S.2d 468, 475 (App. Div. 2002) ("Besides giving the nonrepudiating party an immediate right to sue for damages for total breach, a repudiation discharges the nonrepudiating party's obligations"); *Carco Group*, 644 F. Supp. at 239.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

months ago and Sun Capital has been suffering from that abrupt funding cut-off ever since.  The proceeds from the prior loans belong to Sun Capital until the principal is due in 2013.  And the interest payments, as executory obligations, were excused (and modified) due to the Lender's repudiation.[22]  These are simply the consequences of the Lender's own total breach, following several years in which the parties' at the Lender's behest, sought to maximize the outstanding principal balance.  Any "inequitable result" is of the Lender's own making.

### 2.   The Parties' Last Modification Eliminated Interest Payments

Sun Capital's nonpayment of interest since January 2009 is also justified because, due to the Lender's breach and repudiation, the parties entered into a final modification of the credit agreement which eliminated the remaining interest payments.  As noted above (pp. 26-27), in recognition of the fact that the sudden cut-off of funding would have a huge detrimental impact on Sun Capital, which could not sustain both its commitments to third parties and its interest payments without the promised funding, the parties immediately agreed to the no-interest modification to enable Sun Capital to direct its funds to activities that would protect the value of the hospital collateral.  There was

---

[22]  The cases cited by the Receiver to claim that the future interest payments were current obligations rather than excusable future obligations (Mem. Opp. at 51 n.49) are completely inapposite.  Two of the cases address the computation of pre-judgment interest for a successful contract claim, and the other addresses the calculation of interest for a marital property distribution award.  They do not concern the situation where a contracting party's performance is excused by the other party's repudiation, as here.

56

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

written evidence of Gunlicks' assent, of consideration, and the parties' own reference to the February 3, 2009 Koslow memorandum as having "modified" the credit agreement.[23]

When the standstill period ended, the parties were free to assert their legal rights, but the modification, having been bilaterally agreed upon, did not simply evaporate. It remained as the last modification of the credit agreement by the contracting parties, overlapping and consistent with the natural legal consequences of the Lender's repudiation in specifically excusing performance of the interest obligation.

In sum, Sun Capital's executory obligations under the credit agreements were all excused due to the Lender's material breach and repudiation, and in addition the interest payments were specifically addressed in the last modification agreement. Thus, no alleged breach of the moribund credit agreement since January 2009 can qualify as a default justifying any self-help remedy.

### C.    The Receiver's Arguments Are Unavailing

The Receiver offers four principal arguments to support his claims of defaults justifying the attempted acceleration of the loan and bank account seizure:  (1) that the Lender's "waivers of defaults" were ineffective because they were part of a fraudulent scheme; (2) that all the contract modifications may be disregarded because they were barred by provisions of the original CSAs (Mem. Opp. at 38-41, 47-48); (3) that the Lender's own 2009 breach may be disregarded because it was theoretically justifiable due to Sun Capital's alleged prior defaults (Mem. Opp. at 46-47); and (4) that at a minimum,

---

[23]  As noted above (Point II.A.1), these objective manifestations of assent are sufficient to establish a modification notwithstanding the absence of a single signed document.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**