Reply Memorandum in Further Support of
Sun Capital's Motion for Preliminary Injunction
(Part 2)

Sun Capital began being in default in July 2009, as soon as the Receiver purportedly revoked any prior waivers and consents on which Sun Capital had been relying (Mem. Opp. at 44-45). These arguments, elevating form over substance and myth over reality, do not suffice to create actionable defaults under the real-world circumstances of the parties' credit relationship.

### 1.   The "Sham" Arguments Are Unfounded and Irrelevant

The Receiver argues that the modifications (which he calls "waivers") do not legally exist because they were all a "sham" and/or obtained by concealing facts from the Lender. (Mem. Opp. at 32-34). These arguments are meritless.

First the Receiver contends that unspecified "contractual waivers" are not enforceable because they were given when both Sun Capital and Mr. Gunlicks knew they "were in furtherance of a fraudulent scheme," an assertion resting entirely on unproven allegations by certain FP investors that they were misled by the Sun Principals. (Mem. Opp. at 32, 2). As noted above, those investor claims are both factually incorrect and legally deficient. (See p. 32 & n.11, *supra*; Leder Aff. ¶¶ 122-24; Docs. 69-4, 69-5). The Receiver does not provide any competent evidence showing what the alleged fraudulent scheme was or how the "waivers" operated in furtherance of such scheme. Moreover, the Receiver's legal citations are completely inapposite. In both *Sirken v. Fourteenth Street Store*, 108 N.Y.S. 830, 832-33 (App. Div. 1908), and *Stone v. Freeman*, 298 N.Y. 268, 271 (1948), the court refused to enforce a contract that was illegal because the seller had procured it by bribing the purchaser's agent, a criminal act. Here no criminal acts are even alleged, and the credit agreement is not illegal.

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL

Next, inconsistently, the Receiver asserts that Sun Capital defrauded the Lender: He claims the numerous waivers "*likely* were procured by misleading Mr. Gunlicks about the status of Founding Partners collateral," and Sun Capital "actively misled" the Lender "with fraudulent financial statements." (Mem. Opp. at 32-33 (emph. added)); and then that Sun Capital cannot claim defaults were waived because it "concealed" from the Lender all the "hidden defaults" relating to those allegedly false financial statements. (Mem. Opp. at 33-34).

Again, the Receiver offers no evidence that the Lender (*i.e.*, Mr. Gunlicks) was ever actually defrauded or misled by any of the financial statements, and in fact he was not. Mr. Gunlicks (and Mr. Fues, after he arrived in 2006) was well aware of how the accounting was being handled, including the idiosyncrasy of the Factor PC software program, and had monthly discussions with Sun Capital concerning the details of the collateral and financial reports. He knew what the security was for all the funds provided to the Promise hospitals, having been involved in due diligence and valuation activities before approving the major hospital investments, and that the collateral had not been (and could not be) calculated strictly according to the "eligible accounts" formula since 2001. (Leder Aff. ¶¶ 9-11, 17-46, 55-57, 59-62, 77, 69-72, 89). Sun Capital thus could not have "concealed" from Gunlicks these financial facts that he already knew and had discussed many times; so if something about the financial statements constituted "defaults," then the Lender was well aware of them all along yet nonetheless kept making the requested loans and never claimed any default, thereby waiving any such claim. (See *supra* pp. 47-48).

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Moreover, the cases the Receiver cites as support here (Mem. Opp. at 33 n.36) are not at all on point. *Brook-Lea Country Club, Inc. v. Hanover Ins. Co.*, 306 N.Y.S.2d 780, 784 (Sup. Ct. 1969), and *Harper v. City of Newburgh*, 145 N.Y.S. 59, 61 (App. Div. 1913), both address unilateral mistake and rescission. The Receiver does not assert unilateral mistake here, nor offer any evidence of any actual mistake on the Lender's part. *Verschel v. Pike*, 445 N.Y.S.2d 489, 491-92 (App. Div. 1981), concerned a marital separation agreement that was partly unenforceable due to the wife's nondisclosure of a zoning problem, because "[a]greements between spouses, unlike ordinary business contracts, involve a fiduciary relationship requiring the utmost of good faith." *Id.* at 492. This is obviously inapposite. In addition to the absence of evidence that Gunlicks was actually misled or unaware of the true financial or collateral situation, the Receiver offers no pertinent legal support for his assertion that "waivers" (*i.e.*, modifications) were not effective.

Finally, as discussed above, the Receiver errs in arguing that the parties' last modification of the credit agreement, providing that no interest would be paid until the refinancing transaction occurred, was not effective. (Mem. Opp. at 34-37). His characterization of Mr. Koslow's February 3, 2009 memo as a "unilateral" document is wrong given the evidence that (a) both parties referred to it in their standstill agreement as having "modified" the credit agreement, and (b) Mr. Gunlicks directed his CFO, Ms. Aller, to comply with that modification (see *supra* p. 26), so it was obviously a bilateral understanding, not a unilateral request. Mr. Fues' recollection of the January 29, 2009 meeting is irrelevant in light of the fact that the actual decision-maker, Mr. Gunlicks,

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

obviously did assent and directed his CFO accordingly.  The two Lender letters

demanding interest for the month of January, dated January 31, 2009 (Pl. Exs. JJ, KK)

were form letters generated (by computer) every month, issued before Mr. Gunlicks

directed Ms. Aller to "accrue" the interest, and were disregarded by both Sun Capital and

FP as inconsistent with Gunlicks' agreement.  The Receiver's strained reading of the

standstill agreement language is incorrect, as ¶ 2 does not say that the modification memo

would be in effect only during the standstill period (Mem. Opp. at 36, 37); it says that

Sun Capital agrees "to be in compliance with" the credit agreements during the standstill

period (*i.e.*, it was agreeing temporarily not to assert its legal position that its obligation

to comply with the credit agreements had been discharged by the Lender's repudiation).

And the fact that Mr. Gunlicks later raised his demand for "operating costs" fees from

$150,000 to $400,000 is irrelevant, for that monthly amount – whatever was ultimately

agreed to – was not intended to begin being paid until the restructuring agreement was

completed.  (Leder Aff. ¶ 80 n.36).

In any event, the precise effect or duration of the no-interest modification makes

little difference insofar as it merely reinforces the natural legal consequences of the

Lender's material breach and repudiation, namely, to discharge Sun Capital's obligation

of further performance.  The Receiver completely ignores this dispositive point, to which

he has no response.

   2.   __The Original CSA Clauses Are No Bar__

The Receiver cites several clauses of the original CSA that assertedly bar Sun

Capital's showing of modification, waiver, and estoppel respecting the alleged breaches

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

(although, as noted, the Receiver barely even acknowledges the modification and estoppel points). The Receiver states that "[d]iscovery has revealed that the vast majority of purported waivers relied upon by Sun, were oral or were based simply on Mr. Gunlicks' inaction or the parties' course of dealing, all of which are barred by the express terms of the Agreements." (Mem. Opp. at 38). That is, the Receiver does not dispute that Mr. Gunlicks actually did consent, either orally or through a course of conduct, to the practices complained of (nor could he, as the documentary evidence is substantial). Rather, he argues only that those continuing "waivers" were "not effective" because they were barred by certain provisions of the original CSAs. (Mem. Opp. at 38-41). But reliance on generic restrictive contract clauses cannot carry the day, in the face of evidence of the numerous communications and prolonged course of conduct that explicitly and implicitly modified the contract terms (including those restrictive provisions) and estopped the Lender from denying such modifications.

### a.   CSA Sections 14 and 8.3

First the Receiver cites § 14 of the CSA, a boilerplate paragraph providing that a course of dealing will not operate as a waiver, a waiver will not extend into the future, no delay or omission will operate as a waiver, and any amendment or waiver must be in a signed writing. This type of clause does not operate as the wholesale bar that the Receiver hopes. A "contractual provision which sets forth requirements for a legally enforceable waiver may itself be waived." *O'Connor v. Curcio*, 724 N.Y.S.2d 171, 173 (App. Div. 2001); *see Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343 (1977) ("a contract once made can be unmade, and a contractual prohibition against oral modification may

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL

itself be waived"); *Christian Dior-New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 39 (2d Cir.

1986) ("the doctrine is well established that, even where a contract provides that there

shall be no waiver or amendment not evidenced by a writing, 'the prohibition of oral

waiver may itself be waived'"; thus defendant was entitled to prove its waiver defense at

trial despite such clause); *Kenyon & Kenyon*, 823 N.Y.S.2d at 74 (the "existence of a

nonwaiver clause does not in itself preclude waiver of a contract clause").

     Thus, whether there has been a waiver or estoppel depends upon a substantive

analysis of the particular factual circumstances, regardless of whether such purportedly

restrictive clauses are present.  For example, in *Fundamental Portfolio*, the Court of

Appeals found that plaintiff had waived enforcement of a non-compete provision even

though the agreement included a provision stating that no delay or omission would

operate as a waiver and that a waiver on one occasion would not operate on any other

occasion. *Id.* at 102.  Since plaintiff had "actively encouraged and assisted" the

defendant's competitive activity for some time, there was clearly at least a partial waiver,

but a factual issue remained regarding whether it could amount to a full waiver. *Id.* at

104-05.

     In *Madison Ave.*, although the guaranty contained a no-waiver clause stating that

the guarantors' obligations would not be affected by the landlord's non-assertion of rights

under the lease or grant of any extension of time to the tenant, the court nonetheless

found that the landlord's repeated acceptance of tenant's late payments without objection

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL

constituted a waiver, eliminating any breach.  811 N.Y.S.2d at 52, 54.[24]  Clearly, in all

cases the outcome is determined according to the real factual circumstances, without

regard to generic prohibitory clauses.

Next the Receiver cites § 8.3 of the original CSA, which provided that the

"making of any Loan during the existence of any Default or Event of Default shall not

constitute a waiver of such Default or Event of Default."  (Mem. Opp. at 41).  This

provision, too, could itself be waived or modified as explained above.  Moreover, despite

this provision, the Lender could indeed be found to have waived any defaults by

performing the credit agreement – repeatedly making large loans – despite its awareness

of the supposedly breaching conduct.  Realistically, though, although the Lender was

obviously aware of the supposedly breaching conduct – uses of loan proceeds, borrowing

base calculations, financial reports, and officer's certificates – the Lender would not have

perceived "the existence of any Default" in such conduct, given the parties' mutual

understandings and agreements concerning these matters.  In that case, this clause would

be subjectively irrelevant to the parties.  In any event, though, since the law is clear that

continuing to perform in the face of non-conforming conduct may effect a waiver or

---

[24] *See also TSS-Seedman's Inc. v. Elota Realty Co.*, 72 N.Y.2d 1024, 1027 (1988) (where prior to
serving notices of default, landlord had accepted tenant's payments of rents it had previously
withheld, defaults had been waived and thus notices were ineffective; non-waiver clauses of
leases did not alter this waiver of defaults); *American Bag & Metal Co. v. Alcan Aluminum Corp.*,
497 N.Y.S.2d 787, 789 (App. Div. 1985) (despite contract provision requiring modifications or
waivers to be in an executed writing, there were factual issues concerning whether defendant's
acquiescence in assignment of contract to plaintiff amounted to a waiver of provision prohibiting
assignment); *Lee v. Wright*, 485 N.Y.S.2d 543, 544 (App. Div. 1985) (notwithstanding the no-
waiver clause, landlord's knowing acceptance of rent without any effort to terminate the lease
justified inference that landlord had waived any violations).  *See also* the cases cited at pp. 42-44
above finding modifications despite clauses prohibiting non-written modifications.

64

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

estoppel regardless of a restrictive clause (see pp. 47-48 above, pp. 77-79 below), this clause is no bar here.

### b.      CSA Sections 8.4 and 21(i)

The Receiver also invokes § 8.4(d) of the CSAs, which provided that "[t]o the extent that such waiver is not prohibited by the provisions of applicable law that cannot be waived, the Borrower hereby waives ... any defense (other than payment in full) which it may now or hereafter have with respect to its liability under this Agreement or any other Program Document or with respect to the Credit Obligations." (Mem. Opp. at 47-48).  This vague clause cannot sensibly be construed to prohibit the types of defenses that Sun Capital asserts here – modification, waiver, estoppel, breach of good faith and fair dealing, and prior default by the Lender, which did not exist at the time the original contract was signed but arose later, and which go fundamentally to whether the contract plaintiff alleges even exists anymore.

New York law generally is that there can be no effective waiver of rights that are unknown or not presently existing. *See Werking v. Amity Estates, Inc.*, 2 N.Y.2d 43, 52 (1956) (waiver is "the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it"; finding no waiver was effected because plaintiff had no knowledge of the right at issue); *Estate of Anglin v. Estate of Kelley*, 705 N.Y.S.2d 769, 772 (App. Div. 2000) ("A waiver, to be effectual and beyond recall, must be of some present existing right"; finding no waiver by decedent of estate's rights which did not come into existence until decedent died); *Peck v. Peck*, 649 N.Y.S.2d 22, 23 (App. Div. 1996) ("Waiver requires proof of a voluntary and intentional relinquishment

65

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

of a known and otherwise enforceable right").

Ambiguous or generic language will not suffice to effect a waiver or release of unknown rights. *See E\*Trade Fin. Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313, 379-80 (S.D.N.Y. 2009) (court found release language ambiguous and insufficiently specific; "[a]bsent a clear and unambiguous statement that it was relinquishing its rights to unknown future claims, E\*Trade cannot be said to have waived its present claims"); *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1386-87, 1387-88 (11th Cir. 1988 (applying New York law) (plaintiff did not waive right to punitive damages in arbitration merely by signing contract stating that it was governed by New York law, which bars arbitrators from awarding punitive damages, for signing such an ambiguous agreement could not constitute intentional relinquishment of a known right); *Ultracashmere House, Ltd. v. 38 Town Assocs.*, 473 N.Y.S.2d 120, 122 (Sup. Ct. 1984) ("unusually broad" clause preventing tenant from asserting any defense was "clearly unconscionable" and unenforceable to bar fraudulent inducement defense).[25]

Specifically as respects credit obligations, a waiver clause will bar a defense to enforcement of a note only "provided that the waiver explicitly addresses the defense in question and that it was knowingly entered into by the promisor." *Thornock v. Kinderhill Corp.*, 749 F. Supp. 513, 519 (S.D.N.Y. 1990) (finding that lengthy and specific disclaimer clause did constitute an explicit waiver of any claim that the loans were

---

[25] Given its facial breadth, the waiver of defenses clause would operate as the equivalent of a confession of judgment. But in New York a confession of judgment is not valid unless it meets certain very specific substantive requirements, including an affidavit stating the specific sum to be confessed, the venue for entry of the judgment, and facts showing how the debt arose and that the sum confessed is justly due or to become due. N.Y. Civ. Prac. L. & R. § 3218(a), 7B McKinney's Consol. L. of N.Y. Ann. (West 2005).

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

fraudulently induced); *see Joint Venture Asset Acquisition v. Bhogaonker*, 769 F. Supp.

532, 536-37 (S.D.N.Y. 1991) (same).  Here, the broad and generic waiver language did

not explicitly address the defenses at issue, and those defenses did not even exist yet, so

they could not have been "knowingly" waived.

Such later-arising modification defenses have been held not barred by a generic

waiver clause.  In *Schuster v. Dragone Classic Motor Cars, Inc.*, 98 F. Supp. 2d 441

(S.D.N.Y. 2000), cited by the Receiver (Mem. Opp. at 48), the court explained that while

a waiver clause might bar certain defenses such as fraud or failure of consideration, it

"does not, however, preclude defenses concerning the validity of the waiver clause itself,

including defenses of novation or modification, which turn on events occurring after

execution of the contract and that therefore are not encompassed by the language of the

contract."  It thus did not bar the obligor's defense that the original promissory note had

been extinguished and replaced by an oral agreement.  *Id.* at 447.[26]  In *GE Capital*

*Mortgage Servs, Inc. v. Pinnacle Mortgage Invstmt. Corp.*, 897 F. Supp. 842, 848-49

(E.D. Pa. 1995) (applying New York law), a guarantor was permitted to assert an oral

modification to the underlying loan, notwithstanding the clause waiving all defenses to

the enforcement of the guaranty, because "the court does not consider the Oral

Agreement to constitute such a defense.  Instead, the [guarantor's] ability to raise the Oral

Agreement 'follows from the notion that the guarantor cannot be liable for an amount

---

[26] *See also Wassink v. Hawkins*, 763 P.2d 971, 975 (Ala. 1988) (because agreement did not
expressly waive future defenses, and such a waiver is disfavored, the court would not infer a
waiver of future defenses and would "construe the clause to include only defenses which involve
action ... prior to the date of the waiver.").

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

greater than that for which the principal is liable.'" Thus, "[t]he Oral Agreement, if legally effective, erases [the principal's] default under the Credit Agreement." *Id.* at 849.[27]

Here, too, Sun Capital's modification (and estoppel/waiver) defense arose through events occurring after the execution of the contract that substantially altered the basic contract terms; and it essentially erases the alleged default, eviscerating plaintiff's *prima facie* claim.

In any event, this type of restrictive clause, like the others discussed above, could be modified, waived, or subject to an estoppel through a course of conduct, just the same as any other contract provision. Even if the original waiver clause could be construed to bar later-arising defenses, it was necessarily nullified by implication when the contract was substantially modified to be inconsistent with the original substantive terms. That extensive substantive modification also implicitly modified the more technical or generic provisions of the contract that would be inconsistent with the agreement as modified and which the Lender would be estopped from invoking to avoid agreed-upon substantive modifications pursuant to which the parties performed for many years. *See* cases cited

---

[27] A waiver clause will also not preclude defenses based upon a breach of good faith and fair dealing. *See European Am. Bank v. Mr. Wemmick, Ltd.*, 554 N.Y.S.2d 628, 629-30 (App. Div. 1990) (in case where lender made oral assurances and encouraged defendant to expand its business and enlarge its debt, clause waiving setoffs and counterclaims did not bar breach of good faith claim or estoppel defense); *Barclays Bank of N.Y. v. Heady Electric Co.*, 571 N.Y.S.2d 650, 653 (App. Div. 1991) (clause waiving right to assert setoffs or counterclaims would not be construed to bar claims or defenses based upon UCC requirements of good faith and reasonableness); *Royal Palm Senior Investors, LLC v. Carbon Capital II, Inc.*, 2009 U.S. Dist. LEXIS 57452, *29-31 (S.D.N.Y. 2009) (since UCC obligations of good faith and reasonableness may not be disclaimed, waiver of defenses clause did not bar guarantor's defense alleging breach of good faith and fair dealing); N.Y. U.C.C. § 1-102(3), 62½ McKinney's Consol. L. of N.Y. Ann. (West 2002).

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

above (pp. 39, 41-43) concerning implied modifications and estoppels. For any or all of these reasons, the vague waiver of defenses clause in the original CSAs cannot be deemed to bar the defenses Sun Capital asserts here.

Finally, although the Receiver also cites § 21(i) of the CSAs, which limited the types of damages Sun Capital could recover for Lender misconduct (Mem. Opp. at 48), that clause is not relevant at this point. Even if that clause were deemed still extant despite the substantial modifications to the substantive credit relationship, it would become relevant only when determining the amount or nature of damages due to Sun Capital in connection with its counterclaims against the Receiver. That issue is not presently before the Court.

### 3.   The Lender's Own Conduct Caused Sun Capital's "Defaults"

The Receiver attempts to excuse the Lender's January 2009 breach and repudiation by now asserting – although the Lender did not at the time – that the Officer's Certificate was false because Sun Capital was in default, the borrowing base was negative, and the funds were allegedly being used improperly, so the Lender had no obligation to provide the requested funds. (Mem. Opp. at 46). That is, the Receiver is apparently asserting the failure of a condition precedent to the Lender's obligation under § 5.2.1 of the CSA. This is unavailing for two reasons.

First, this condition precedent clause had been implicitly modified *in pari passu* with the modifications to the substantive contract terms. Since the parties had agreed upon modified definitions concerning the uses of loan proceeds, treatment of the borrowing base, and other matters that otherwise might have been defaults, those

69

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

modifications of the substantive provisions necessarily must also apply when they are

cited elsewhere, either in the condition precedent section or in the Officer's Certificate.

Thus, when properly interpreted in accordance with the parties' actual agreement, the

conditions were met, there was no default, and the Certificate was not false.  At a

minimum, because the Lender had accepted the same Certificate and made requested

loans under the same supposedly improper circumstances, without objection, on over 190

prior occasions over eight years, on which Sun Capital relied to its detriment in taking on

ever-increasing debt and interest obligations to the Lender as well as commitments to

third parties (and forgoing cheaper financing alternatives), the Lender is estopped from

claiming a default or failure of condition precedent on this ground.

      Second, the doctrine of prevention or frustration defeats any claim by the

Receiver that Sun Capital failed to meet the conditions precedent, for those failures were

substantially caused by the Lender itself.

      As New York's highest court has explained, every contract contains "the implied

obligation of a party not to 'do anything which will have the effect of destroying or

injuring the right of the other party to receive the fruits of the contract.'"  *A.H.A. Gen.*

*Constr., Inc. v. New York City Hous. Auth.*, 92 N.Y.2d 20, 31 (1998) (quoting *Kirke La*

*Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933)).  "The idea is simply that

when A and B agree that B will do something it is understood that A will not prevent B

from doing it.  The concept is rooted in notions of common sense and fairness."  *Wieder*

*v. Skala,* 80 N.Y.2d 628, 637 (1992).

      Thus, "a party cannot insist upon a condition precedent, when its non-

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

performance has been caused by himself," and "cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." *A.H.A. Gen. Constr.*, 92 N.Y.2d at 31 (quoting *Young v. Hunter*, 6 N.Y. 203, 207 (1852) and *Kooleraire Serv. & Installation Corp. v. Board of Educ.*, 28 N.Y.2d 101, 106 (1971)); *see ADC Orange, Inc. v. Coyote Acres, Inc.*, 7 N.Y.3d 484, 490 (2006) (doctrine potentially applicable where defendant allegedly hindered plaintiff's ability to timely obtain subdivision approval under contract).  "The prevention doctrine is substantially related to the implied covenant of good faith and fair dealing, ... [which] requires a promisor to reasonably facilitate the occurrence of a condition precedent by either refraining from conduct which would prevent or hinder the occurrence of the condition, or by taking positive action to cause its occurrence." *Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.*, 807 F. Supp. 1007, 1022-24 (S.D.N.Y. 1992) (defendant could not use non-occurrence of conditions precedent as excuse for its non-performance, where its own bad-faith conduct prevented the conditions from being met).[28]

The doctrine excuses a non-occurrence if the other party "was instrumental in preventing or frustrating its occurrence." *Merzon v. Lefkowitz,* 735 N.Y.S.2d 106, 107 (App. Div. 2001).  It need not appear that the party completely prevented the

---

[28] Similarly, as to any type of performance, "a party to a contract cannot rely on the failure of another to perform when he has frustrated or prevented the performance." *Hidden Meadows Devel. Co. v. Parmelee's Forest Prods. Inc.*, 734 N.Y.S.2d 264, 266 (App. Div. 2001) (citation omitted) (defendant's admitted failure to complete clean-up did not constitute a breach because plaintiff's refusal to grant defendant further access to the property frustrated defendant's ability to perform); *Calpine Energy Servs., L.P. v. Reliant Energy Elec. Solutions, L.L.C. (In re Calpine Corp.),* 2009 WL 1578282, *5 (Bankr. S.D.N.Y. May 7, 2009) (noting also that "the party who prevents performance is 'not allowed to recover damages for the resulting nonperformance or otherwise benefit from his or her wrongful acts.'") (quoting 13 Williston on Contracts § 39:3 (4th ed. rev. 1999)).

71

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

performance, only that it "hindered" performance. *See A.H.A. Gen. Constr.*, 92 N.Y.2d at

31 (the inquiry is "whether [defendant's] misconduct prevented or hindered" plaintiff

from satisfying the condition); *Young v. Whitney*, 490 N.Y.S.2d 330, 332 (App. Div.

1985) (defendant did not need to show that plaintiff's obstruction made his performance

impossible, only that plaintiff's acts "greatly disrupted and frustrated his performance");

*Ixe Banco, S.A. v. MBNA Am. Bank*, 2009 WL 3124219, *5-6 (S.D.N.Y. Sept. 29, 2009)

(rejecting argument that but-for causation must be shown and instead requiring only that

the defendant "materially hindered" plaintiff's ability to meet the condition); Restatement

(2d) of Contracts § 245 (1981) (where a party's breach "contributes materially" to the

non-occurrence of a condition, the non-occurrence is excused.").[29]

     Thus, the Receiver cannot now rely on his allegations of past defaults, borrowing

base deficiency, or improper uses of loan proceeds as non-performance or non-

occurrence of conditions precedent, because the Lender's own conduct was instrumental

in bringing about the situations that the Receiver now calls defaults.  Starting in 2002, the

Lender refused to accept any repayments of loan principal from Sun Capital, and instead

affirmatively encouraged Sun Capital to take advantage of expanded investment activities

well beyond the original CSA terms, so the Lender could lend much greater sums to Sun

Capital than were originally contemplated and reap much greater interest payments on

ever-increasing principal balances.  The majority of the hospital investments that the

Lender encouraged thus generated long-term financing commitments without a short-

---

[29] In addition, "bad faith is not necessarily an essential ingredient to a finding of wrongful
prevention." *Trylon Realty Corp. v. Di Martini,* 34 N.Y.2d 899, 899 (1974); *accord India.com,
Inc. v. Dalal,* 412 F.3d 315, 323 n.4 (2d Cir. 2005); *Ixe Banco,* 2009 WL 3124219 at *4.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

term cash flow recovery – which would be fine in the long term as hospitals started becoming profitable, but was unprofitable in the short term and not viable without the promised funding from the Lender.

Then, after several years pursuing the expanding-obligations program, and in particular after inducing Sun Capital to take on great commitments to hospital sellers and the Florida government for big new CON hospital development projects, the Lender suddenly pulled the funding plug.  This sudden withholding of all previously-promised funds had a huge detrimental impact on Sun Capital, for it would not be able to meet its obligations to third parties without the anticipated funding from the Lender.  (Nor could it possibly cure the alleged long-standing "default" conditions encouraged by the Lender and only asserted later by the Lender's new management.)  Even aside from the previous eight years' worth of dependency-inducing conduct, the Lender's breach and repudiation in January substantially prevented Sun Capital from being able to meet all its obligations; and Gunlicks accordingly agreed that in order to protect the collateral value, Sun Capital should cease making the interest payments and instead use its funds to preserve the hospitals' value and collateral.  (Leder Aff. ¶ 79).

On point is *Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank*, 524 N.Y.S.2d 531 (App. Div. 1988).  The bank was attempting to enforce a guaranty after the borrower allegedly defaulted by suspending its business.  There was evidence showing that the bank itself had unfairly brought about the occurrence of that condition by suddenly withholding promised credit, and then relied on that condition to accelerate the loan as against the guarantors.  Citing the rule that a promisee may discharge a

73

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

promisor's contractual duty by unjustly causing the happening of a condition of that duty, the court held that the bank's unjust causative conduct could serve to discharge the guarantors' obligations. *Id.* at 534-35. Here, too, since the Lender's own conduct in suddenly withholding promised funding knowingly and unjustly caused Sun Capital to be unable to meet its financial obligations, the Lender cannot use that self-created situation to claim a default (and the actual Lender did not in fact do so).

### 4.   The Purported July 2009 Revocations Were Ineffective

Finally, the Receiver argues that "whatever written or oral waivers" were actually given by Mr. Gunlicks were later revoked by the Receiver on July 7, 2009. (Mem. Opp. at 44). The Receiver acknowledges that revocation would operate "on a going forward basis only" (*id.* at 45), so that none of the conduct that Mr. Gunlicks authorized in the preceding nine years could be retroactively rendered improper as a result of the July revocation. However, aside from the fact that the "going forward basis" lasted only one week before the Receiver issued his July 15, 2009 Transfer Notices based on the alleged defaults, the Receiver's attempt to revoke all prior "waivers and consents" was in any event ineffective, for several reasons.

First, the Receiver's purported revocations did not occur until July 2009, 5½ months after the credit agreement had terminated as a result of the Lender's material breach and repudiation in late January 2009. Having already caused the termination of the agreement and forfeited its right to further performance by the Borrower, the Lender no longer had any right to demand compliance with any provisions of the credit agreement. *See In re Adelphia Business Solutions, Inc.*, 341 B.R. 415, 428 (Bankr.

74

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

S.D.N.Y. 2003) (lender that repudiated credit agreement thereby became "unable to avail itself of covenants in" the agreement, including borrower's contractual waivers of setoff rights); *Weintraub v. Schwartz*, 516 N.Y.S.2d 946, 948-49 (2d Dep't 1987) (since plaintiffs breached their own obligations under employment agreement, they would be precluded from seeking to enforce restrictive covenant therein against defendant); *Staten Island Univ. Hosp. v. Comprehensive Habilitation Servs., Inc.*, 2008 WL 680715, *3 (N.Y. Sup. Ct. Mar. 13, 2008) (party that breached agreement by failing to make payments "is not entitled to enforce any provision under the breached agreement"); *Daniggelis v. Pivan*, 513 N.E.2d 92, 96 (Ill. App. 1987) (lender whose agent committed initial breach could not recover from borrower, under the rule that "a party to a contract who commits the first breach of its terms cannot maintain an action for a subsequent breach by the other party.").  Consequently, even if the Lender's demands for strict compliance with the old CSA terms could have operated prospectively in a continuing executory agreement, they had no force at all when issued after the agreement had already been terminated by the Lender's own repudiation.  The Receiver does not cite any authority allowing a party to revoke a waiver or insist upon strict compliance after its own repudiation has terminated the contract.

Second, the attempted revocations would also fail for the reasons exemplified in *Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 178 (1982). There, after the mortgagor defaulted on its payments, the bank orally waived its right to accelerate the principal in order to give the mortgagor time to negotiate an unforced sale of the premises.  The Court held that the mortgagor was entitled to assert waiver and

75

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

estoppel defenses to foreclosure because the bank may not have effectively withdrawn that waiver before bringing suit.

Summarizing the pertinent principles, the Court highlighted an important distinction between waivers and modifications: "A modification, because it is an agreement based upon consideration, is binding according to its terms and may only be withdrawn by agreement," not unilaterally. *Id.* at 184. A waiver, not being a binding agreement, "can, to the extent that it is executory, be withdrawn, provided the party whose performance has been waived is given notice of withdrawal and a reasonable time after notice within which to perform." *Id.* However, "[a] waiver, to the extent that it has been executed, cannot be expunged or recalled." *Id.* Also, a waiver may rise to an estoppel, which "rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury," to prevent an unjust enforcement of rights against a party "who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought." *Id.* These principles defeat the Receiver's attempted revocation here.

The Receiver overlooks that a modification, as a binding bilateral agreement, "may only be withdrawn by agreement." *Nassau Trust*, 56 N.Y.2d at 184; *O'Connor v. Curcio*, 724 N.Y.S.2d 171, 173 (App. Div. 2001). The Receiver cannot unilaterally withdraw or undo the parties' modifications described above, which were based upon mutual assent and consideration. *See Schubert v. Lucent Techs. Inc. (In re Winstar Commcns., Inc.)*, 554 F.3d 382, 409, 410-11 (3d Cir. 2009) (applying New York law; rejecting defendant's contention that it "simply unilaterally waived" a contract

76

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

requirement and then withdrew that waiver, the court found instead that the contract was "indeed modified by the parties' course of performance," precluding unilateral revocation).

Even if analyzed as a pattern of waivers, however, there still could be no effective revocation. A waiver cannot be expunged or recalled "to the extent that it has been executed." *Nassau Trust*, 56 N.Y.2d at 184; *Island Estates Mgmt., Inc. v. MBA-Manorhaven, LLC*, 2008 WL 4700416, *7 (N.Y. Sup. Ct. 2008); *see Madison Ave. Leasehold, LLC v. Madison Bentley Assocs., LLC*, 811 N.Y.S.2d 47, 55 (App. Div. 2006) (finding no default because landlord's consistent acceptance of late rent payments without protest constituted a waiver of the lease provision requiring prompt payment; and "[o]nce waived, the default in timely payment of rent is extinguished and cannot later be revived, like a phoenix, into a material default"), *aff'd*, 8 N.Y.3d 59 (2006).

Here, the great majority of the matters about which the Receiver complains have already been executed, barring any withdrawal of a waiver. For example, as to the parties' departure from CSA § 2.2, requiring loan proceeds to be used for the purchase of Accounts, the last loan was made in mid-January 2009 and Sun Capital already executed its uses of all loan proceeds long before the purported revocation was issued in July 2009. Similarly, any Borrowing Base calculations not in compliance with § 1.12 (requiring the Borrowing Base to include only Eligible Accounts) were completed and accepted long ago in connection with the past loans. As there will be no loans going forward, the purported revocations would have no executory application at all. The Receiver is estopped from enforcing the restrictions of the original CSAs because Sun Capital "in

77

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

justifiable reliance upon the [Lender's] words or conduct, has been misled into acting

upon the belief that such enforcement would not be sought." *Nassau Trust*, 56 N.Y.2d at

184; *see 1523 Real Estate v. E. Atl. Props.*, 2009 WL 2340668, *16 (N.Y. Sup. Ct. Aug.

27, 2009) (the ability to withdraw or retract a waiver is limited to the extent that "the

retraction would be unjust in view of a material change of position in reliance on the

waiver") (quoting N.Y. U.C.C. § 2-209(5) and citing cases).

 This estoppel principle applies when a detrimental change in position in reliance

on the waiver makes it unfair to revert to strict enforcement. *See Nassau Trust*, 56

N.Y.2d at 186-87; *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,

7 N.Y.3d 96, 106-07 (2006) (where plaintiff waived its rights under a noncompete

agreement and indeed encouraged defendant's competing activity, there were triable

issues concerning the scope of the waiver and whether equitable estoppel prevented

plaintiff from later invoking the noncompete agreement after the parties' relationship

soured); *Won's Cards, Inc. v. Samsondale/Haverstraw Equities, Ltd.*, 566 N.Y.S.2d 412,

417 (App. Div. 1991) (if commercial tenant's statements amounted to waiver of its right

to claim landlord breached exclusive use provision of lease, that waiver could rise to an

estoppel because assignee landlord had detrimentally relied on tenant's statements in

assuming lease); *National Indem. Co. v. Ryder Truck Rental*, 630 N.Y.S.2d 621, 624

(Sup. Ct. 1995) (applying rule that where an insurer undertakes the defense of a case

without asserting non-coverage defenses, in reliance on which the insured loses the right

to control its own defense, insurer will be estopped from later denying coverage), *aff'd*,

646 N.Y.S.2d 169 (App. Div. 1996); *Computer Strategies, Inc. v. Commodore Business*

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Machs., Inc.*, 483 N.Y.S.2d 716, 722 (App. Div. 1984) (where plaintiff had changed its position in reliance on defendant's waiver of payment terms, defendant could not retract the waiver as it did not give plaintiff reasonable time to alleviate the prejudice); *Ashton v. Board of Educ.*, 255 N.Y.S.2d 154, 158-59 (Sup. Ct. 1963) (finding that board of education was estopped from rescinding its consent to a new alignment of its boundaries where another board of education had relied upon that consent and voters had approved the overall reorganization plan), *aff'd*, 255 N.Y.S.2d 245 (App. Div. 1964).  *See also LaGuardia Assocs. v. Holiday Hospitality Franchising, Inc.*, 92 F. Supp. 2d 119, 130 (E.D.N.Y. 2000) (franchisor could not suddenly withdraw waiver and cause termination of franchises, where it would jeopardize the operations of major hotels at New York's airports and risk the jobs of over 400 employees).

In reliance on the Lender's repeated approvals and indeed encouragement to deviate from the CSA, Sun Capital altered and greatly expanded its whole financing program.  It agreed to take large new loans and to pay very high interest rates on ever-increasing principal balances.  Sun Capital committed to prospective financing obligations and liabilities that it cannot now just abandon or stop performing – without going out of business or putting hospitals out of business, drying up the DSH receivables and dramatically impairing the cash collateral.  Sun Capital never would have taken on these great obligations to the Lender or third parties if the Lender had enforced the terms of the original CSAs, and it would be most unjust now, at this late date when the obligations cannot simply be undone, to allow a revocation in order to create a current default based upon an unalterable state of affairs resulting from the past reliance.  Thus,

79

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

even if this lengthy and continuous course of agreed-upon deviations did not amount to modifications (although they did, because they involved mutual assent and consideration), they would in any event constitute waivers of enforcement rights that the Receiver would be estopped from now attempting to assert.[30]

In sum, the Receiver's July 2009 revocations and demands were ineffective for several reasons. They cannot operate either to reclassify as defaults any ongoing past practices that were not considered defaults when they were being performed, or to create new 2009 defaults based upon the nonpayment of interest following the Lender's repudiation of the credit agreement.

**D.    Equity Bars the Receiver's Unfair, Exploitive Tactics**

Even if any of the alleged breaches were found to be a breach of a still-extant provision of the original CSA, it would be only a technical breach that could not justify

---

[30] Even if there were some feasible executory application, *Nassau Trust* also bars a revocation where the relying party has not been given "a reasonable time after notice within which to perform." 56 N.Y.2d at 184. *See LaGuardia Assocs.*, 92 F. Supp. 2d at 130 (franchise could not be terminated for payment defaults where franchisor had repeatedly waived payment due date and then suddenly withdrew waiver, for "[h]aving permitted plaintiffs to become addicted to payment delays, [defendant] could not simply cut them off cold turkey," but rather, "[a] reasonable time for returning to strict compliance with the payment terms in the [a]greements is required as a matter of equity"); *Island Estates*, 2008 WL 4700416 at *8 (question of fact whether ten months would be reasonable time to complete performance of construction project).

Here, the Receiver did not afford even a remotely reasonable time. He issued his letter generically revoking all "waivers and/or consents" on July 7, 2009; and then only a week later served the Transfer Notices and filed his lawsuit claiming breaches of contract warranting foreclosure. Even if the credit agreement were to be revived and loans were to recommence, Sun Capital would need a substantial amount of time to revert to its 2000-01 procedure of using loan proceeds only to purchase Accounts and to meet the Borrowing Base calculation requirement. Given the seven-year course of conduct in which Sun Capital, at the Lender's behest, made increasingly large hospital investments and commitments – which cannot just suddenly be abandoned in mid-stream – a reasonable time to attempt to make an orderly transition back to a limited program strictly within the CSA would likely be years, not weeks.

80

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

the huge forfeiture of Sun Capital's entire healthcare financing business. First, equity would not permit such a forfeiture upon a technical breach, especially when there has been no actual injury to the Lender. Second, equity would not reward a lender whose conduct breached the covenant of good faith and fair dealing.

### 1.    Technical Breaches Do Not Justify a Great Forfeiture

Since "equity abhors forfeitures," equity "will often intervene to prevent a substantial forfeiture occasioned by a trivial or technical breach." *Fifty States Mgmt. Corp. v. Pioneer Auto Parks*, 46 N.Y.2d 573, 576-77 (1979). While clauses permitting acceleration of the entire debt upon a default are enforceable, "where the breach asserted as the basis for the acceleration is trivial or inconsequential, the forfeiture may be viewed as an unconscionable penalty and equitable principles come into play." *Tunnell Pub'g Co. v. Straus Commcns., Inc.*, 565 N.Y.S.2d 572, 574-75 (App. Div. 1991) (generally, a provision that "provides for acceleration as a result of a breach of any of its terms, however trivial or inconsequential," is likely to be considered an unconscionable penalty and will not be enforced). A trivial or inconsequential breach is one that is "collateral to the primary obligation" of the party, and for which the remedy sought would be "disproportionate to any loss" that could accrue to the other party. *Fifty States*, 46 N.Y.2d at 577-78.

A court may equitably refuse to enforce a forfeiture-inducing provision when the circumstances involve "some element of fraud, exploitive overreaching or unconscionable conduct ... to exploit a technical breach," *Fifty States*, 46 N.Y.2d at 577, such as when there is no showing of real impairment of a lender's security. *See Tunnell*

81

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Pub'g*, 565 N.Y.S.2d at 575 (denying lenders' summary judgment motion where defendant had breached a no-dissolution clause but enforcement could be denied because a financially stable successor corporation had assumed the liability and the security bargained for by plaintiffs had not been impaired); *Suits v. Suits*, 698 N.Y.S.2d 203, 203 (App. Div. 1999) (attempted enforcement of acceleration clause was unenforceable where plaintiff would not have been prejudiced by acceptance of defendant's tender of a cure); *Headquarters Rest Corp. v. Reliance Vending Co.*, 519 N.Y.S.2d 662, 663 (App. Div. 1987) (acceleration clause in installment payment contract was unconscionable because it permitted acceleration based upon any default); *Home Sav. Bank of Upstate N.Y. v. Baer Props. Ltd.*, 460 N.Y.S.2d 833, 834-35 (App. Div. 1983) (lender's summary judgment motion denied where enforcement of due-on-sale clause of mortgage would be unconscionable because plaintiff's security had not been impaired, yet detrimental impact on defendants would be great); *Karabu Corp. v. Pension Benefit Guaranty Corp.*, 1997 WL 759462, *14 (S.D.N.Y. Dec. 10, 1997) (since the value of the lender's collateral had held steady or increased, the alleged breaches of maintenance obligations were trivial or inconsequential breaches that could not equitably support acceleration of the debt).

Here, the Receiver appears to be engaging in "exploitive overreaching or unconscionable conduct ... to exploit a technical breach," *Fifty States*, 46 N.Y.2d at 577, in seeking to impose a great forfeiture as a penalty for relatively trivial or artificial breaches. In an overzealous effort to find defaults he can exploit, the Receiver has mischaracterized documents and testimony, disregarded obvious bilateral agreements and an eight-year course of conduct, and focused on collateral covenants and conditions that

82

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

the actual Lender considered unimportant, such as duplicative financial reports and officer's certificates.

Furthermore, the Receiver has not shown any actual risk of impairment of the Lender's security as a result of any of the more recent alleged breaches, which simply continue the same course of conduct that was consistently authorized and approved by the Lender for many years. The Receiver does not and cannot show that the collateral the Lender bargained for has worsened in the last several months, or that the Lender has suffered any other real injuries, as a result of any supposed breaches by Sun Capital in 2009. (Leder Aff. ¶ 84; Mazzarino Decl. ¶¶ 7, 10-11, 21, 29; Hopwood Decl. ¶¶ 11-12). There is thus no countervailing equitable justification for the Lender's rash and misguided efforts to seize control of Sun Capital's finances and destroy its business – which, ironically, <u>will</u> impair much of the collateral when hospitals are forced out of business.

### 2.   The Receiver's Self-Help Tactics Breach Good Faith and Fair Dealing

Implied in all contracts is a covenant of good faith and fair dealing, which circumscribes a party's performance of even discretionary acts under the contract. *See, e.g., Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389 (1995); *Carvel Corp. v. Diversified Mgmt. Group Inc.*, 930 F.2d 228, 230-31 (2d Cir. 1991); N.Y. U.C.C. § 1-203, 62½ McKinney's Consol. L. of N.Y. Ann. (West 2002) ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement.")

Any claim of default leading to acceleration or other harsh consequences may be

83

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

rejected if it does not appear to have been exercised in good faith. *See Advanced Safety Sys. NY, Inc. v. Mfrs. & Traders Trust Co.*, 592 N.Y.S.2d 159, 160 (App. Div. 1992) (denying bank's summary judgment motion where evidence suggested bank's termination of loan and exercise of setoff rights against plaintiff's bank accounts, though permitted by the agreement's terms, were not exercised in good faith); *Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank*, 524 N.Y.S.2d 531, 535-36 (App. Div. 1988) (denying bank's summary judgment motion where evidence suggested that bank's acceleration of loan under its "deems itself insecure" clause was not made in good faith); *Components Direct, Inc. v. European Am. Bank & Trust Co.*, 572 N.Y.S.2d 359, 361 (App. Div. 1991) (while the loan agreement gave the bank an absolute right to terminate credit, since plaintiff was dependent upon bank's funding for its existence, "the obligation of good faith would require a period of notice to allow the corporate plaintiff a reasonable opportunity to seek alternate credit"); *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 760 (6th Cir. 1985) (applying New York law) (upholding verdict for borrower where lender gave no notice before cutting off funding and demanding repayment; "just as Irving's discretion whether or not to advance funds is limited by an obligation of good faith performance, so too would be its power to demand repayment."); *Duffield v. First Interstate Bank of Denver*, 13 F.3d 1403, 1405-06 (10th Cir. 1993) (lender breached covenant of good faith and fair dealing by invoking an asset seizure provision without reasonable notice and a good faith basis, destroying borrower's business, after creating expectation that borrower's practices would be allowed to continue and seizure would not be invoked without good reason and adequate chance to cure); *Reid v. Key Bank of S.*

84

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Maine*, 821 F.2d 9, 16 (1st Cir. 1987) (bank acted in bad faith in precipitously and without warning halting further advances on which it knew Reid's business depended, in failing to make a sufficient effort to negotiate alternative solutions to any problems it perceived, and in failing to give notice that it intended to terminate the relationship entirely).

Here, the Lender first cut off funding to Sun Capital in January 2009 and then, despite knowing that Sun Capital could not both meet its commitments to third parties and continue paying interest to the Lender without the promised funding, and despite having therefore agreed in February upon a deferral of interest payments pending the anticipated restructuring, the Lender (under new management) declared Sun Capital in default on those interest payments, as well as several other provisions of the original CSAs that had not been followed for years, in April 2009. The initial Receiver's declaring those defaults, in disregard of all the parties' prior modifications, and after the Lender's own repudiation caused Sun Capital great hardship, bespeaks bad faith. And the current Receiver's adherence to that course in issuing draconian Transfer Notices, despite having had the true facts of the credit relationship explained to him at length, also bespeaks bad faith.

In sum, the Receiver's tactics reflect exploitive, unconscionable overreaching, geared toward a precipitous (and imprudent) liquidation of the Lender's investment in Sun Capital three years too early. The Receiver may be in a hurry to bring in some assets, pay off investors, and close down the Stable-Value fund prematurely, but that is not a legitimate reason to destroy Sun Capital or its hospital clients' businesses.

85

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

E.      **Injunctive Relief Is Appropriate in These Circumstances**

Courts have entered injunctions against inequitable default remedies in similar

circumstances.  For example, in *Neuro-Rehab Assocs., Inc. v. Amresco Comm'l Fin.,*

*L.L.C.*, 2006 WL 1704258, *4-6 (D. Mass. June 19, 2006), the court barred acceleration

and foreclosure because the lender was relying upon defaults that did "not appear to have

caused any substantial harm to its security interests and thus may be immaterial as a

matter of law."  *Id.* at *4.  The court noted that such remedies had been barred as

inequitable "where the default relied upon to accelerate was technical or minor and

resulted in no prejudice or impairment to the lender's security interest or where the

acceleration was not being exercised as a means to protect the lender's security interest

but instead was motivated by inequitable considerations, such as the lender's desire to

take advantage of a technical default to coerce full payment."  *Id.* (citing cases).  Thus, as

here, plaintiff had a reasonable likelihood of success on its claim that defendant's

purported acceleration of the note was wrongful and violative of the covenant of good

faith and fair dealing.  *Id.* at *5-6.

In *Karabu Corp. v. Pension Benefit Guaranty Corp.*, 1997 WL 759462, *18

(S.D.N.Y. Dec. 10, 1997), the court granted declaratory and permanent injunctive relief

to counterclaimant TWA, rejecting the claims of the lender, Karabu, that various TWA

defaults relating to maintenance obligations justified an acceleration of the loan.  For

some of the maintenance defaults TWA had not been given proper notice and opportunity

to cure, some had been cured before the acceleration, and some had been waived by

virtue of Karabu extending TWA's loan.  *Id.* at *10-12.  TWA's failure to obtain

86

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Karabu's consent for 21 F.A.A. maintenance check extensions simply did not constitute

material breaches justifying acceleration, for given that TWA had performed thousands

of maintenance operations, and that the value of Karabu's collateral had meanwhile held

steady or increased, "the trivial or inconsequential failure to obtain prior consent for 21

short term extensions cannot – equitably – form the basis for acceleration of TWA's

debt." *Id.* at *11 n.13, 14 & n.18.  Judgment was granted to TWA on its counterclaims

for a declaration that it was not in default and an injunction preventing Karabu from

claiming a default in respect of certain maintenance issues. *Id.* at *18.

   *See also Mid-America AG Network, Inc. v. Monkey Isl. Devel. Auth.*, 109 Fed.

Appx. 187, 190-91 (10th Cir. July 8, 2004) (affirming injunction against termination of

lease, where  the tenant's construction of a breaching sewage system had previously been

approved and acquiesced in, waiving and orally modifying the lease terms; and a small

payment default would not justify a great forfeiture tenant's million-dollar construction);

*Central La. Electric Co. v. Dolet Hills Mining Venture*, 116 F. Supp. 2d 726, 738, 739-

40, 744 (W.D. La. 2000) (granting injunction requiring plaintiff to withdraw its

foreclosure and acquisition notices; the court rejected plaintiff's interpretation of the

financial covenant allegedly breached because plaintiff had acquiesced in defendant's

interpretation for 15 months and only claimed default when it was seeking ways to

terminate the contract; and given that "[s]erious, and oft-times disastrous, legal and

financial consequences attend a declaration of default, particularly in cases such as this

involving multi-million dollar contracts," plaintiff was required to give clear and

unequivocal advance notice of the alleged default and opportunity to cure); *LaGuardia*

87

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*Assocs. v. Holiday Hospitality Franchising, Inc.*, 92 F. Supp. 2d 119, 130 (E.D.N.Y. 2000) (granting permanent injunction against termination of franchise based on payment defaults, where franchisor had repeatedly waived payment due date and allowed 60-day grace period, and then suddenly revoked waiver and declared default; "[h]aving permitted plaintiffs to become addicted to payment delays, Holiday could not simply cut them off cold turkey"); *Destiny USA Holdings, LLC v. Citigroup Global Mkts. Realty Corp.*, 2009 WL 2163483, *13-14, 19 (N.Y. Sup. Ct. July 17, 2009) (granting preliminary injunction declaring default notices null and void and requiring lender to honor draw-downs on credit line, where notices of default were based on an erroneous definition of "deficiency" that was at odds with the parties' custom and practice).

Here, too, a preliminary injunction is appropriate. Sun Capital has a strong likelihood of success on its position that the Transfer Notices were unjustified because all the claimed breaches were not breaches of the parties' actual agreements as modified, or were excused by the Lender's own breach and repudiation in January 2009, or were too minor to justify a forfeiture, especially given the lack of any real impairment to the Receiver's security. The Receiver's effort to exploit this unfortunate situation of the Lender's own making, to force a premature liquidation of a debt that is not due until 2013, should be enjoined.

III.     **The Irreparable Injury Is Obvious and Unrebutted**

As Sun Capital demonstrated in its July 22 papers in support of the TRO, there is a great threat of irreparable harm because if the Receiver seizes Sun Capital's bank accounts and incoming funds, which are Sun Capital's sole source of funds since the

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Lender ceased funding in January 2009, (a) Sun Capital's healthcare financing operations will be destroyed and it will be forced to go out of business, (b) Sun Capital and its principals will suffer damage to their business reputations and good will in the hospital communities they have been serving, (c) the 21 acute-care hospitals that Sun Capital has been financing will also be forced to implement emergency evacuation procedures, move 1,000 patients, shut down operations, and put 3,500 employees out of work, and (d) hundreds of millions of dollars' worth of receivables will become uncollectible, impairing Sun Capital's ability to repay the loan to the Lender.  (Doc. 11 at 15-17; Doc. 11-3 ¶¶ 16-21, 25, 30).[31]  (See also Leder Aff. ¶¶ 111-21).

The Receiver's response is that (a) Mr. Koslow, the affiant, was lying and concealing facts concerning the threatened harm to Sun Capital and its affiliates, their future prospects, and their past business judgment, (b) putting Sun Capital out of business does not count as irreparable harm because Sun Capital is already struggling financially and does not deserve to stay in business, and (c) some of the threatened risks to patients might not occur because the Receiver, armed with his purported expert, will make fine funding decisions after he takes over Sun Capital's business.  None of this defeats Sun Capital's showing that it and its affiliates will suffer grave and irremediable injury if the Receiver is permitted to accelerate the loan and seize all of Sun Capital's funds.

---

[31]  A court may grant an injunction that prevents harm to third parties so long as a movant is also benefiting. *See Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1136 (11th Cir. 1984); *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 374 (5th Cir. 1981); *Rau v. Apple-Rio Mgmt. Co.*, 85 F. Supp. 2d 1344, 1352 (N.D. Ga. 1999), *aff'd*, 251 F.3d 161 (11th Cir. 2001).  Here, it is entirely appropriate to enter an injunction that would prevent the severe societal harms flowing from the closure of 21 hospitals in needy communities, the dangers of moving 1,000 critically-ill patients, and the loss of 3,500 jobs, as well as the direct destruction of Sun Capital's business.

89

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

### A.    The Loss of Even a Struggling Business Is Irreparable Injury

Many cases hold that substantial business losses or closures constitute irreparable injury.  In addition to the cases cited in the TRO motion (Doc. 11 at 15), *see Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931-32 (1975) (a threat of bankruptcy "certainly" meets injunction standard, "for otherwise a favorable final judgment might well be useless"); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (the loss of "an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm"); *LaGuardia Assocs.*, 92 F. Supp. 2d at 131 (loss of substantial part of an ongoing business constitutes irreparable harm); *Diamond Waste, Inc. v. Monroe County*, 796 F. Supp. 1511, 1519 (M.D. Ga. 1992) ("tremendous business losses" from loss of customers and revenues and inability to perform a contract, which would force movant out of business, was "clearly a showing of irreparable harm"); *Travellers Int'l AG v. Trans World Airlines, Inc.*, 684 F. Supp. 1206, 1216 (S.D.N.Y. 1988) (finding irreparable harm where 90% of plaintiff's business was dependent upon TWA, so an unjustified termination of the contract would "destroy Travellers' unique business"); *Northeast Hotel Assocs. v. Prime Motor Inns, Inc. (In re Prime Motor Inns, Inc.)*, 131 B.R. 233, 235 (Bankr. S.D. Fla. 1991) (harm found because permitting defendants to accelerate the loan could cause "devastating consequences" to plaintiffs by triggering acceleration of other loans).

A loss of reputation, credibility, or good will also constitutes irreparable harm. *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1157 (10th Cir. 2001) (finding irreparable injury where, since defendant was refusing to provide

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

satellite service to plaintiff's subscribers, plaintiff's customers were dissatisfied and plaintiff suffered losses to its reputation and credibility); *Travellers Int'l*, 684 F. Supp. at 1216 ("even if an entire business is not destroyed, the loss of goodwill resulting from the termination of an entire product line is often immeasurable and significant").

Where a contracting party's proposed action threatens the movant's business viability, an injunction is appropriately entered in order to prevent business losses that could result in an "empty victory" after trial. *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986). There, a cooperative association, Tri-State, complained that one of its members, Shoshone, had agreed to sell its assets to a third party in violation of the parties' contract. Tri-State used its contracts with its members as security for government loans. *Id.* at 353-54. Allowing an immediate asset sale by Shoshone would jeopardize Tri-State's viability, possibly triggering similar action by other members and preventing Tri-State from meeting its government obligations. Irreparable harm was found because Tri-State had no protection against the loss of its business while the litigation progressed, and might instead be left after trial with "an empty victory": "Shoshone may be found to have breached its contract with Tri-State, but in the meantime Tri-State would have ceased to exist." *Id.* at 356. That is precisely the type of harm that needs to be prevented here.[32]

Attempting to distinguish Sun Capital's cases, the Receiver urges a new rule that

---

[32] The Receiver's point elsewhere that the CSA would bar Sun Capital from obtaining consequential damages for Lender breaches (Mem. Opp. at 48) underscores the irreparable harm: if that contractual provision were enforced, the injury to Sun Capital, though great, could not be adequately compensated by damages.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

only a "viable" business can suffer injury if it is destroyed, whereas Sun Capital is

assertedly insolvent and not viable. (Mem. Opp. at 53-54). This argument fails both

factually and legally. First, despite the Receiver's assertions, Sun Capital is not

insolvent. (Leder Aff. ¶ 113; Hopwood Decl. ¶¶ 16-17). To the extent that Sun Capital

was "on its last legs even prior to the appointment of the Receiver [in May 2009]" (Mem.

Opp. at 53), that is because it had recently had its promised funding suddenly shut off in

January, after it had taken on large obligations to third parties as well its huge debt to

Stable-Value in reliance on the promised funding and the expected restructuring

transaction, and had not been able to complete that restructuring because Gunlicks was

ousted. (Leder Aff. ¶¶ 43-46, 54; Frew Decl. ¶¶ 3-5, 11).[33]

Second, contrary to the Receiver's argument, a company's precarious financial

condition may militate in favor of an injunction. In *Rio Grande Cmty. Health Ctr., Inc. v.*

*Rullan*, 397 F.3d 56 (1st Cir. 2005), an injunction was entered requiring the Secretary of

Health to make emergency prospective payments for Medicaid reimbursement to the

plaintiff hospital, "due to [the hospital's] precarious financial position," until a proper

prospective payment plan was established. *Id.* at 65, 77. Plaintiff showed that it "would

have to close its doors if it did not get a prompt payment." *Id.* at 66. The defendant

argued there was no irreparable injury because plaintiff did not show any causation

between its financial woes and defendant's failure to pay. Rejecting that argument, the

---

[33] Notably, Sun Capital's "last legs" have held up rather well over the last year. Despite the utter lack of funding, its financial condition now is no worse, and in some respects is better, than it was in early 2009. Moreover, Sun Capital's own collateral for its hospital loans (which also serves as Stable-Value's collateral) is stronger than it was a year ago. (Mazzarino Decl. ¶¶ 7, 9-11, 21, 29; Hopwood Decl. ¶¶ 7, 12).

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Court found that the threat of the loss of the business, coupled with the plaintiff's dire financial situation, established irreparable injury. *Id.* at 76.

Similarly, in *Janmort Leasing, Inc. v. Econo-Car Int'l, Inc.*, 475 F. Supp. 1282 (E.D.N.Y. 1979), the court enjoined the termination of a franchise agreement pending final resolution of the parties' breach claims. The franchisee was "critically dependent upon its ECI affiliation," without which it would lose cash flow and customers and be unable to meet its expenses and bank obligations, making it likely the business would fold. *Id.* at 1295. Indeed, "defendants have from the inception of this lawsuit emphasized [plaintiff's] precarious fiscal state, however unintentionally bolstering plaintiff's claim that without its Econo-Car affiliation [plaintiff] is not a viable business enterprise." That fact supported plaintiff's need for the injunction. *Id.* To the extent that Sun Capital has already suffered financial setbacks resulting from the actions of the Lender and the Receiver, that only makes the threatened harm that much greater if it loses its sole source of cash flow.

Nor is there any merit to the Receiver's suggestion that the threatened harm to the Sun principals' business reputations and good will is "naked speculation." (Mem. Opp. at 54 n.50). Sun's principals, who have personal experience in and understanding of the commercial and healthcare financing businesses, can fairly assess and predict the likely consequences of the Receiver's conduct. Moreover, there is actual evidence of the negative results of the Receiver's July 2009 asset seizure: A significant SCI client,

**REDACTED** to seek alternate financing because of the

93

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

problems with the Receiver. (Leder Aff. ¶ 114 & n.49).[34]  Some Promise and Success

hospitals bounced checks and were unable to pay suppliers, and the negative publicity

caused some suppliers to impose more onerous payment-on-delivery requirements that

would prevent the hospitals from obtaining essential supplies on credit.  Doctors declined

to admit patients to the Promise and Success hospitals, resulting in a notable decline in

census (and therefore revenues).  Additionally, Promise and Success have lost several of

their key personnel.  Several referring doctors have indicated that if funding is cut off

again, they will stop referring patients, as it would be negligent to refer patients to a

facility that might be unable to purchase necessary supplies, or worse, require a patient

evacuation. (Leder Aff. ¶¶ 116-18).

Also, Promise's investment banker, Ms. Frew, has described several material,

adverse effects of the Receiver's injurious conduct on Promise and Success (together

"Superior"):


REDACTED


---

[34] SCI also lost                                    ; income when, in early 2009, it was forced to tell a
large client it would have to find alternate financing because of the Lender's failure to provide
funding to Sun Capital. (Leder Aff. ¶ 114 n.49.)  While that was not caused by the Receiver's
July 2009 seizure, it illustrates the kind of injury that occurs when funding is cut off.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

# REDACTED

All these injuries have already occurred, and would only be repeated with much greater severity if the Receiver is permitted to seize Sun Capital's assets.

**B.**   **The Sundry Jabs at Koslow's Affidavits Are Unfair and Pointless**

The Receiver takes issue with various statements made by Mr. Koslow, the Chief Operating Officer of Sun Capital and one of the owners of the Promise and Success affiliates, who has personal knowledge of the matters described and lengthy experience in the financing business.  The Receiver chooses to couch all his arguments in terms of Mr. Koslow allegedly making "false and misleading" statements and "concealing" facts from the Court, when the reality is only that Mr. Koslow did not conform to the Receiver's preference of treating all Sun Capital's expenditures as improper "dissipation" and "self-dealing," casting all the hospitals as hopelessly doomed money-pits, and anguishing over irrelevant historical events.  But putting aside all the rhetoric, the Receiver's arguments do not alter the reality that irreparable harm will befall Sun Capital, its principals, its hospital clients, their employees, and possibly their patients if the Receiver is permitted to take away Sun Capital's assets.

For example, the Receiver goes on about supposedly "false and misleading" statements concerning the likelihood of Sun Capital or its affiliates attracting an investment or refinancing transaction and the future profitability of various hospitals. (Mem. Opp. at 58-59).  He also rants about what he perceives to have been undesirable historical business decisions by Sun Capital, which again were all approved by the Lender, and speculates that he himself, together with his supposed "expert", could do a

95

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

better job of managing Sun Capital and its affiliates than have the Sun Principals. (Mem. Opp. at 60-63). These attacks, in addition to being unjustified and unfounded (see Leder Aff. ¶¶ 83-84, 87-90, 92, 96, 98, 99; Mazzarino Decl. ¶¶ 25, 26 & n.3), are all irrelevant to the irreparable harm analysis. Sun Capital does not need to demonstrate that it "deserves" to be permitted to continue running its own business (Mem. Opp. at 61), or that it has a foolproof business plan going forward. Even if the Receiver's second-guessing opinions were correct, they would not negate the fact that Sun Capital and its clients will suffer great injury if its bank accounts are seized.

The Receiver complains that Mr. Koslow assertedly said that Sun Capital is presently only recycling receivables, thereby concealing that Sun Capital is continuing to engage in "self-dealing" by funding the Promise and Success hospitals' operating costs. (Mem. Opp. at 55-57). This is just a matter of the Receiver now relabeling, as improper self-dealing, hospital financing activities that the Lender approved for years, including hospital development commitments that Sun Capital and Promise incurred in 2008 in reliance on the Lender's strong encouragement and promise of additional funding. Sun Capital is today simply continuing to make the same uses of its funds that the Lender approved when the loans were made. As Sun Capital has repeatedly explained, Sun Capital has been recycling incoming receivables payments not only to purchase additional receivables, but also to pay its operating expenses and to advance funds to complete the non-deferrable committed projects that FP had previously committed to fund. (Leder Aff. ¶¶ 83-85; Koslow 5/4/09 Aff. ¶¶ 22-23). (All incoming funds are necessarily "recycled" because of course there have been no new loan proceeds for the

96

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

last 14 months.)  In any event, none of the Receiver's rhetoric about what Sun Capital's

principals "should have" done negates the basic point that Sun Capital will go out of

business if the Receiver seizes all of its funds.

The Receiver also complains about Sun Capital's purchases of DSH receivables

because they have attendant risks (which of course all receivables do and indeed all high-

return investments do).  (Mem. Opp. at 64-66).  This is pointless because again,

regardless of the Receiver's opinion, the Lender approved the DSH purchases (Mem.

Opp. at 38 n.40) and they are part of the security package the Receiver inherited; and

indeed Sun Capital has had a successful record with DSH (Hopwood Decl. ¶ 25).  None

of the Receiver's attacks negate the fact that if hospitals are forced to close, then the DSH

receivables will become unrecoverable.

Also unfair and pointless is the Receiver's complaint about the Sun Principals'

treatment of the two Sun Capital entities as a unit.  (Mem. Opp. at 73-74).  That is how

they have been treated for accounting purposes since 2003, pursuant to the Lender's

specific instruction.  (Leder Aff. ¶¶ 57, 87).  Whether or not the Receiver now approves

of the contracting parties' historical choices – which he impugns with colorful but

unfounded accusations of "stealing" "entrusted" funds (Mem. Opp. at 74) – is

irrelevant.[35]  The reality, not altered by the Receiver's disapproval, is that Sun Capital –

---

[35]  Since Sun Capital owns the funds in the bank accounts (see Point I.A above), it is nonsensical
and empty rhetoric for the Receiver to declare that Sun Capital is "stealing" from the SCI lockbox
and misusing funds "entrusted to it for a different purpose." (Mem. Opp. at 74).  Sun Capital is
not stealing its own funds.  To the extent that the lockbox funds represent accounts receivable
payments, they are not entrusted for any purpose, they are simply payments due to Sun Capital.
To the extent they represented (in the past) loan proceeds from the Lender, they were in fact
being used for the very purposes for which the loans were made and approved by the Lender.

97

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

both SCHI and SCI – will suffer injury if their access to cash flow is cut off.

The Receiver next argues that patient safety is an economic issue rather than a health and safety issue. (Mem. Opp. at 67). This is false, as there are serious non-economic health and safety issues. (See Leder Aff. ¶¶ 119-21).[36] This is in any event also pointless, because even if it were purely an economic issue, that would not eliminate the threatened harm. Much of the threatened injury here is indeed economic, yet could not be calculated or adequately compensated later in damages. It would indeed be harmful to be forced to expend the $13-15 million cost of implementing patient evacuations and shut-down procedures (7/22/09 Koslow Aff. [Doc. 11-3] ¶ 16), when such costs should not have to be incurred at all. And there is obvious harm to both Sun Capital and its hospital clients if Sun Capital could not provide the necessary funding because its assets had been seized.[37]

The Receiver asserts, absurdly, that the patient-related harm has been "mooted"

---

[36] In addition to the physical harm that could occur in transit, patients also may suffer from "transfer trauma," a phenomenon in which the transfer of geriatric patients to any unfamiliar surroundings produces an increased rate of morbidity and mortality. Numerous courts have recognized the existence of transfer trauma and have considered it when issuing injunctive relief to prevent the closure of healthcare facilities. *See, e.g., Evergreene Nursing Care Ctr. v. Leavitt*, 2007 WL 1601476, *4 (W.D. Va. June 4, 2007) (preliminarily enjoining termination of Medicare provider agreement and considering transfer trauma that nursing home's patients may suffer if forced to relocate); *John E. Andrus Memorial, Inc. v. Daines*, 2008 WL 5705732, at *9, 12 (Mag. S.D.N.Y. July 17, 2008) (noting that "the best planning and arrangements cannot eliminate all the risks of transfer trauma"; finding residents of a nursing home would suffer irreparable harm due to transfer trauma if forced to relocate), *adopted & mod'd*, 600 F. Supp. 2d 563 (S.D.N.Y. 2009).

[37] The Receiver's reprimand that Sun Capital "could have asked the Receiver for the funds needed to transfer hospitals" (Mem. Opp. at 67) is offensive and arrogant. Not even the actual Lender ever had the right to make management decisions for Sun Capital or its hospital clients; and neither Sun Capital nor its clients are obliged to or willing to subject themselves to a regime of "asking the Receiver" for operating funds or business judgments. (7/22/09 Koslow Aff. ¶¶ 29-32).

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

because the Receiver "specifically assured" Sun Capital that "the Receiver would provide funding to ensure patient safety and would consent to a Court Order to that effect." (Mem. Opp. at 69).  This argument overlooks the fact that the prospect of the Receiver taking over Sun Capital's business and decision-making is itself an element of the threatened harm, which cannot be "mooted" by the Receiver's magnanimous "assurance" that he would act appropriately on patient safety or any other subject.[38]

A claim for injunctive relief only becomes moot if "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Reich v. Occupational Safety & Health Review Comm'n*, 102 F.3d 1200, 1201 (11th Cir. 1997) (citing *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).  The "mere assurance" that a problem will be corrected is not sufficient to render an injunction moot. *Arrington v. Fuller*, 237 F. Supp. 2d 1307, 1311 (M.D. Ala. 2002).  There, the plaintiffs sought a preliminary injunction to place in trust intercepted state tax refunds held for over six months by the defendant agency head in violation of law. *Id.* at 1310.  The defendant argued that because he was already in the process of implementing a new system that would distribute the funds properly and would be operational within a month, the plaintiffs' injunction request had become moot. *Id.* at 1311.  The court rejected that argument because "the mere assurance that the problem will be corrected"

---

[38] Similarly irrelevant is the Receiver's suggestion that he can be trusted to deal appropriately with the funds in the lockbox accounts that belong to the hospitals.  (Mem. Opp. at 72).  Even assuming that the Receiver would in fact conduct himself well if he were to take over Sun Capital's assets, that is not the issue here.  The issue is only whether Sun Capital and its affiliates would suffer irreparable injury if its sole source of cash flow were taken away, and the Receiver's assertions about his own capabilities do not alter the answer to that question.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

did not meet the two-part mootness standard.  *Id.*

The Receiver obviously cannot show that "there is no reasonable expectation that the alleged violation will recur," because he has made clear his continuing intention to seize Sun Capital's bank accounts if given the chance, triggering the same irreparable harm.  Nor can he demonstrate "that interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," because Sun Capital continues to rely, as it must, on the funds flowing into in the lock-box accounts, and the Receiver continues to threaten to seize those assets on which Sun Capital's business depends.

Finally, again arrogating to himself powers that he does not have, the Receiver argues that FP "is the rightful owner of Promise." (Mem. Opp. at 71).  He declares that "Founding Partners is the only party with a legitimate claim to … the Promise Hospitals" because "the Promise stock now belongs to Founding Partners under the Amended Pledge Agreement due to breaches of the HLP Agreement and the SCI CSA," and "the Amended Pledge Agreement acts to transfer ownership to Founding Partners." (Mem. Opp. at 70-71).  This is nonsense.  While it is true that in 2006 the Sun Principals pledged their stock in Promise to Stable-Value to secure the obligations of HLP and SCI (see Pl. Ex. BB, Amended and Restated Pledge Agreement, which "replaces in its entirety" the prior pledge agreement, *id.* at 13 ¶ 14(o)), that Agreement does not provide for any automatic transfer of ownership or control as the Receiver suggests.  Rather, even if there were an Event of Default, that Agreement sets forth a procedure for collecting and selling the collateral to cover the stated obligations.  (*Id.* at 8 § 12).  (The HLP and SCI obligations together only amount to about $23.5 million, a fraction of the overall value of

100

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Promise.)  There is no provision for automatic transfer of ownership or managerial

control of any portion of the Promise equity at any time.

Equally nonsensical is the Receiver's contention that FP is the "rightful owner of

Promise" because it "funded the Sun Principals' acquisition of the hospital[s] and

involuntarily subsidized their operations." (Mem. Opp. at 71).  The mere fact that a

lender lends funds does not create an automatic ownership interest in whatever the funds

are used for; and there was nothing "involuntary" about Stable-Value's agreement,

following extensive due diligence, to subsidize the hospitals' operations in the

expectation that they would become profitable over time and be well worth the

investment.  (Leder Aff. ¶¶ 35-38, 47).[39]

In sum, although the Receiver devotes 23 pages to a purported rebuttal of Sun

Capital's showing of irreparable injury, none of his arguments actually do rebut that

showing.  The Receiver's effort to convert this injunction factor into an occasion for

miscellaneous *ad hominem* attacks is unavailing, for it does nothing to change the actual

irreparable harm that will befall Sun Capital and its hospital clients if the Receiver seizes

their sole source of funding.

IV.    A Balancing of the Harms Favors Sun Capital

As Sun Capital demonstrated in its TRO motion, no harm would befall the

_____

[39]  Ironically, although the Receiver now asks the Court to simply deem Stable-Value an owner of
Promise (Mem. Opp. at 70, 71), giving Stable-Value an ownership interest in Promise (in
exchange for debt reduction) is precisely what the parties were trying to achieve in negotiating
the restructuring transaction in early 2009.  However, that effort was thwarted when Gunlicks was
ousted, and neither the Initial Receiver nor the current Receiver attempted to revive the
negotiation, preferring the internecine warfare route.

101

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Receiver if he is prevented from taking over Sun Capital's bank accounts, because his only legitimate interest – maintaining the value of the security he inherited – would not be impaired because the funds flowing into and out of the lockbox accounts were remaining roughly even month to month. (Doc. 11 at 17-18). It is now more than seven months later, and not only has there been no further impairment of the security, but in fact it has actually improved in some respects. (Leder Aff. ¶ 84; Mazzarino Decl. ¶¶ 7, 9-11, 21, 29). The Receiver therefore has no basis to suggest any injury to himself if he is not permitted to seize Sun Capital's assets.

The Receiver alleges, erroneously, that Sun Capital has engaged in "continuous dissipation of collateral" which has given him "a great basis for insecurity." (Mem. Opp. at 74). This again simply reflects the Receiver's mode of relabeling approved uses of loan proceeds as "dissipation."

## REDACTED

[40] The Receiver has merely appended new labels to old uses in a wrongful effort to create a specter of harm.

What the Receiver has not done is to show any actual impairment of any of the

---

[40] The Receiver's suggestion that funds transferred to Promise are somehow less secure than funds transferred to other clients is meritless. The Promise hospitals are parties to the same Purchase and Sale Agreements as every other Sun Capital client, with the same protections therein, and the Lender agreed to operate in this manner. (Pl. Ex. U at Ex. B).

102

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

security for the Lender's loans, either the cash accounts or any of the other forms of security the Receiver inherited.  Overall receivables have increased over year-end 2008, as have all categories of healthcare receivables except DSH receivables (which the Receiver's expert labels as "risky" anyway).  (Leder Aff. ¶¶ 84 & n.37; Hopwood Decl.¶¶ 11-12, 24).  The Receiver has no basis for his dramatic assertion that his cash collateral "is fast dwindling." (Mem. Opp. at 75).  It is staying the same.

Thus, the Receiver's alleged "insecurity" is premised solely on his (and his purported expert's) persistent mischaracterization of the financial records and the uses of funds.  The Receiver's vague feeling of insecurity would not constitute irreparable harm.  See AGCO Corp. v. Massey Tractor Co., 2009 WL 1010047, *2 (S.D. Ala. Apr. 14, 2009) ("Plaintiff's assertion that '[t]he ability of the defendants to pay the debt if the collateral is lost is unknown,' is insufficient to establish requisite irreparable injury element").

Even after several months' worth of discovery and financial analysis, the Receiver does not offer any evidence that any collateral is actually likely to be lost if Sun Capital is allowed to continue controlling its own bank accounts.[41]  All the alleged "dissipation" and "diversion" of funds is nothing more than Sun Capital continuing to use its funds and

---

[41] This absence of evidence distinguishes *Plainfield Specialty Holdings II, Inc. v. Children's Legal Servs. PLLC*, 634 F. Supp. 2d 833 (E.D. Mich. 2009), cited by the Receiver.  There the court found that the lender would suffer irreparable harm because there was evidence that the borrower was secretly diverting assets from the lockbox and instructing others not to pay receivables owed to it.  *Id.* at 846-48.  Here, Sun Capital has not attempted to secrete funds, and on the contrary, it voluntarily provided the Receiver with monitoring access to the lockbox accounts and voluminous current financial information so that he may monitor the status of his security.  (7/22/09 Koslow Aff. ¶¶ 13, 21-22, 36).

103

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

meet its commitments just as it had for years with the Lender's approval.[42]  Sun Capital

cannot suddenly stop using its funds this way, without destroying its own business and

putting hospitals out of business, and there is simply no reason why it should have to do

that.

The Receiver complains of a lack of assurance that the loan will be repaid.

(Mem. Opp. at 51).  But that risk has always been present, and has not been increased by

anything Sun Capital has done in the last year.  The overall security for the loan is no less

valuable today than it was when the Lender agreed, following ample due diligence, to

make loans for hospital acquisitions secured by the future value of the hospitals.  Indeed,

the overall security has improved, just as Gunlicks intended when he told Sun Capital to

defer interest and protect the collateral; and that is what Sun Capital has done.

(Mazzarino Decl. ¶¶ 7-12; Frew Decl. ¶ 6).  While the Receiver's concern about how Sun

Capital will repay the outstanding $550 million principal in 2013 is understandable, his

seizing control of Sun Capital's bank accounts will not increase the likelihood of full

repayment.  Rather, it will actually decrease that likelihood by putting the Borrower out

of business, ending the cash flow and causing hospitals to close and DSH receivables to

become uncollectible.[43]

---

[42]  As noted above (p. 21), the personal loans and investments about which the Receiver complains did not involve the use of any Stable-Value loan proceeds, as they were either made from Sun Capital profits or made in the years before SCI began borrowing from Stable-Value.

[43]  What would have improved the situation was finalizing the restructuring transaction in early 2009, to convert a large piece of the debt into Lender equity and greatly reduce the outstanding amount due.  Rather than fairly negotiating such a transaction or even considering it (Frew Decl. ¶ 7), however, both the Initial Receiver and this Receiver have instead sought a complete takeover of all Sun Capital's assets by fiat.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

The Receiver asserts that the Sun Principals "cannot sustain their burden of proof that they are capable stewards of the Receiver's collateral or that they can be trusted to make responsible funding decisions"; and have "not explained why Founding Partners would be unable to properly manage the collateral and make proper funding decisions for the hospitals," and "certainly cannot meet this burden in view of the expert assistance of Huron." (Mem. Opp. at 74, 75-76). This is specious. Neither Sun Capital or its principals have any such burden of proof on this motion. This is not a competition, in which the prize of Sun Capital's business will be awarded to the "better" management candidate; and Sun Capital does not need to make any showing either that its managers are good candidates or that the Receiver and his expert are bad candidates. Sun Capital's burden here is only to demonstrate that it and its affiliates would suffer irreparable harm if its assets are taken and its business is destroyed, whereas the Receiver will not suffer any injury because there is no real threat to the value of his security and no legally cognizable harm from being unable to control someone else's funds.

The Receiver's complaint of harm because an injunction "preserves the Sun Principals' stewardship over Promise and Success, which may have some value to be realized, if managed responsibly" (Mem. Opp. at 75), reveals that his real goal here is just to take over all of the Sun Principals' assets, as the Initial Receiver tried (but failed) to do through a motion to extend the receivership to cover Sun Capital. (No. 09-cv-229 Doc. 36, Doc. 70 at 5). He seeks to eliminate the Sun Principals' "stewardship" of their own

105

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

assets, by whatever means possible, so that he can take control of Promise and Success.[44] Whether his plan is to liquidate their assets quickly (at a loss) to fund his receivership enterprise, or to bide his time and reap the future benefits as the hospitals become profitable, he has no right to effect such a coup and no basis to claim injury if his takeover is thwarted.  Balancing the hardships clearly favors Sun Capital.

## V.   An Injunction Serves the Public Interest

Sun Capital demonstrated that preventing the Receiver's asset seizure would serve the public interest by avoiding unnecessary societal harms flowing from shutting down 21 desperately needed acute-care hospitals, relocating more than 1,000 critically ill patients (a dangerous process), throwing 3,500 employees out of work; and, incidentally, destroying the entire value of DSH receivables and vastly reducing the value of other receivables and security interests that would otherwise benefit the FP investors in the long run.  (Doc. 11 at 24).  There is simply no reason to set in motion these wide-ranging negative effects if they can be avoided.

In opposition, the Receiver again raises his point that he has committed to providing funding as necessary to protect patients, and will ensure that viable hospitals remain funded and that non-viable hospitals "will be shut down in an orderly fashion that protects patient lives."  (Mem. Opp. at 76).  Aside from the fact that it will not be for the

---

[44] Any doubt about this is dispelled by the Receiver's statements that if he wins this motion, he will ensure "that hospitals that are not viable or not transferrable for value will be shut down in an orderly fashion that protects patient lives," and if a hospital "is determined not to be viable, the Receiver's staff will investigate the most cost-effective way to close the hospitals."  (Mem. Opp. at 76 & n.63).  These kinds of hospital managerial decisions are not the Receiver's to make, and would not be even if he were permitted to seize the Sun Capital bank accounts.

106

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Receiver to make these decisions for any of the hospitals (whether owned by Promise or Success or others), his "trust me" assurances will not avoid the societal harms nearly as well as preventing the negative effects in the first place.

The Receiver also reiterates weakly that an injunction would hurt the public interest by "undermin[ing] the sanctity of contracts and security interests." (Mem. Opp. at 77). That, however, is a purely theoretical point because (1) here there has been no actual impairment of the Receiver's security interests and there will be no such impairment as a result of the injunction, and (2) the jurisprudence discussed above (Points II.A, II.D) shows that as a matter of public policy the "sanctity" of contracts and security interests must sometimes yield to equitable principles of preventing unfair forfeitures and unconscionable overreaching by lenders – which is certainly in the public interest.[45]

In any event, given the societal importance of the medical services provided by the acute-care hospitals that Sun Capital has been financing, the risks and disruptions of patient evacuations and hospital closures, and the threat of thousands of lost jobs, on balance the public interest favors maintaining the *status quo* by enjoining step one of the Receiver's hostile takeover attempt.

## VI.    The Receiver Shows No "Unclean Hands" Bar

Finally, the Receiver argues that the requested injunction should be denied due to alleged unclean hands by Sun Capital. He reiterates his unsupported assertions that "Sun

---

[45]  The Receiver's assertion that an injunction "would unfairly deprive the investors of their collateral" (Mem. Opp. at 77) is nonsensical. The FP investors do not have any collateral, or any rights in Sun Capital's assets, and will not be deprived of anything.

107

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

knowingly furthered Mr. Gunlicks' fraud on the investors" and declares that Sun Capital

therefore "cannot sustain its burden of proof that it acted with clean hands." (Mem. Opp.

at 78).  He further alludes to other inequitable conduct, including providing allegedly

false financial statements to the Lender, offering the Receiver an allegedly fraudulent

mortgage, allegedly submitting false affidavits to this Court, and allegedly breaching the

credit agreement in various ways.  (*Id.* at 78-79).[46]  This argument is fruitless.

First, Sun Capital does not have a burden to prove that it acted with clean hands;

the Receiver has the burden to prove the opposite.  In the injunction context, as in any

other, "[t]he party asserting an unclean hands defense carries the burden of establishing

each of the elements of this affirmative defense." *JTH Tax, Inc. v. H&R Block Eastern

Tax Servs., Inc.*, 128 F. Supp. 2d 926, 949 (E.D. Va. 2001), *aff'd in part & vac'd in part

on oth. grds.*, 28 Fed. Appx. 207 (4th Cir. 2002); *CBS Broadcasting Inc. v. Primetime 24

Joint Venture*, 48 F. Supp. 2d 1342, 1359 (S.D. Fla. 1998) ("To prevail on this equitable

affirmative defense, [Defendant] would have to prove that Plaintiffs acted fraudulently,

deceitfully, unconscionably, or in bad faith").

Second, the Receiver does not meet the requirements for an unclean hands

defense.  The doctrine applies only where (1) the party "has committed some

unconscionable act" that (2) is "directly related to the subject matter in litigation" and (3)

"has injured the party attempting to invoke the doctrine." *Oracle Real Estate Holdings I,

LLC v. Adrian Holdings Co. I, LLC*, 582 F. Supp. 2d 616, 635 (S.D.N.Y. 2008) (quoting

---

[46]  The mortgage issue about which the Receiver complains involved an inadvertent error in the name used in a draft document.  Instead of bringing the error to Sun Capital's attention, the Receiver instead chose to say nothing and later claim it was a fraud.

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

*PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004)); *see Calloway v. Ptrs. Nat'l Health Plans*, 986 F.2d 446, 450-51 (11th Cir. 1993) (the wrongdoing must be "directly related to the claim against which it is asserted" and invoker must show "that it was personally injured by" the conduct); *JTH Tax*, 128 F. Supp. 2d at 949 (the invoker "must demonstrate (1) the [other's] conduct was in fact inequitable, (2) [the other's] conduct directly related to the claim which it has asserted against the [invoker] and (3) [the other's] conduct injured the [invoker].") (citing cases; citations omitted).  The unclean hands doctrine "cannot be asserted against a party seeking relief as a free-floating defense unconnected to the conduct at issue," *Tancogne v. Tomjai Enter. Corp.*, 408 F. Supp. 1237, 1254 (S.D. Fla. 2005), as the Receiver does here.

The unclean hands defense will not bar an injunction when, as here, the claimed misconduct rests solely on unproven allegations, *see Mitchell Co. v. Campus*, 2009 WL 1606844, *1 n.3 (S.D. Ala. June 4, 2009), or reflects only inadvertence or differing legal positions.  *See Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1355 (11th Cir. 1983) (rejecting argument that plaintiff used trademark improperly, as defendant did not show that conduct was anything other than inadvertent, given plaintiff's explanation); *Oracle Real Estate*, 582 F. Supp. 2d at 635 (rejecting defendant's argument that plaintiff acted unconscionably when it sought a TRO, preventing the sale of one of defendant's properties, because it was not shown that plaintiff acted with that knowledge, "much less that its actions were unconscionable"); *Smallbizpros, Inc. v. Court*, 414 F. Supp. 2d 1245, 1250 (M.D. Ga. 2006) ("While Defendants have shown that Plaintiff may have performed poorly under the Agreement, poor performance of some

109

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

contractual obligations – without more – does not constitute unclean hands."); *CBS Broadcasting*, 48 F. Supp. 2d at 1359 ("The fact that the parties are involved in a serious dispute over the requirements established by the SHVA, is insufficient to support the defense").

Similarly, an injunction is not barred when, as here, the alleged misconduct is not directly related to the movant's claim or did not injure the invoker. *See Merrill, Lynch, Pierce, Fenner & Smith v. Dunn*, 191 F. Supp. 1346, 1355 (M.D. Fla. 2002) (rejecting defense where alleged poaching conduct did not relate to matter in litigation nor did defendants show they had been injured by it); *JTH Tax*, 128 F. Supp. 2d at 951-52 (rejecting defense where the cited conduct was not directly related to the claim at issue and the defendant offered no proof that it was harmed by the conduct); *Tancogne*, 408 F. Supp. 2d. at 1254 (rejecting defense because plaintiff's alleged infringing conduct was not related to the infringing conduct by defendant at issue in injunction).

Here, the Receiver's "evidence" that Sun Capital knowingly furthered Mr. Gunlicks' fraud on the investors rests solely on unproven and demonstrably false allegations by two investors who are not parties here (see Leder Aff. ¶¶ 122-24); is not "directly related" to Sun Capital's claim here that the Transfer Notices are improper; and did not injure the Receiver. The other allegedly inequitable conduct relates only to allegedly inadequate performance under the credit agreement or differing legal positions. The Receiver cannot establish any unclean hands bar here.

110

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

**VII.**    <u>The Receiver Shows No Basis for a Bond</u>

      In its moving brief, Sun Capital noted that the Court has discretion on the amount of any bond, and it may elect to require no bond at all (as was the case for the TRO). Doc. 11 at 19; *see also Tancogne*, 408 F. Supp. 2d at 1252; *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978). In response, the Receiver urges the Court to require a bond in an unspecified amount "on the high side" because Sun Capital assertedly "continues to waste away" its cash assets and "will likely lose whatever value exists" in the Promise and Success hospitals, which will all likely "no longer be operational" by the time of trial on the merits. (Mem. Opp. at 79-80). He does not explain how these consequences would result from an injunction preventing him from seizing Sun Capital's bank accounts, nor provide any detail quantifying these hypothesized injuries.

      The language of Rule 65(c) does not "absolve[] the party affected by the injunction from its obligation of presenting evidence that a bond is needed," to inform the Court's exercise of its discretion. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003). "The burden is on the party affected by the injunction to present evidence that a bond is needed," and "[t]he bond amount may be set at zero if there is no evidence the party will suffer damages from the injunction." *Pac. Rollforming, LLC v. Trakloc Int'l, LLC*, 2007 WL 4181258, *1 (S.D. Cal. Nov. 21, 2007). A bond is not required when, as here, "no evidence is presented that a party will suffer damages from the issuance of an injunction." *Tancogne*, 408 F. Supp. 2d at 1252.

111

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Thus, a court will reject the affected party's request for a high bond if, as here, it fails to present evidence supporting the request. *See Manpower Inc. v. Mason*, 377 F. Supp. 2d 672, 681 (E.D. Wis. 2005) (termination of franchise was enjoined; franchisor speculated that franchisee's future conduct might lead to $20 million in damage but it provided no evidence as to the pecuniary difference between its profits if the franchise were terminated and its profits if the franchise continued, so the court required only a $1,000 bond); *Urologix, Inc. v. Wood*, 2008 WL 2790230, *10 (M.D. Fla. July 18, 2008) (because affected parties based their bond request on speculative claims, they provided no basis for requested amount, and court selected movant's proposed amount instead); *Carabetta Enters., Inc. v. City of Asbury Park (In re Carabetta Enters., Inc.)*, 162 B.R. 399, 408 (Bankr. D. Conn. 1993) (no bond required because affected party "made no showing that a quantifiable economic loss would result" from the injunction).[47]

Here, the Receiver provides no evidence of any quantifiable harm he will suffer if wrongfully enjoined. He argues that "Sun has already jeopardized or dissipated (Mem. Opp. at 79-80). But even if that were true as a historical matter (and it is not), it would not establish that the Receiver will in the future suffer any actual economic harm resulting from the injunction that he would not suffer if it were denied, let alone a quantifiable amount.

---

[47] The Receiver cites a case in which the court suggested that "because an error in setting the bond too high is not serious, district courts should err on the high side." *Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F. Supp. 2d 1065, 1078 (E.D. Wis. 2007). (Mem. Opp. at 79). As that court immediately went on to state, "However, a district court cannot simply set the bond at whatever high number it thinks appropriate; instead reasons must support the number chosen." *Id.* (requiring nominal bond of $1,000 because no evidence was presented). Since the Receiver has not even chosen a number, let alone provided reasons therefor, there is no foundation at all for his bond request.

112

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Also, a bond is appropriately waived when, as here, the injunction movant "has a high probability of succeeding in the merits of its claim," *University Books & Videos, Inc. v. Metro. Dade County*, 33 F. Supp. 2d 1364, 1374 (S.D. Fla. 1999); *see Pac. Rollforming,* 2007 WL 4181258 at *1 ("a strong likelihood of success on the merits may favor a 'minimal bond or no bond at all'") (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000)); and when, as here, the hardship to the movant of posting a bond outweighs the possible loss to the enjoined party, *see Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991) (no bond required where hospital movant would have become insolvent absent the injunctive relief and there was little risk to government agency from the injunction requiring it to advance funds); *Continuum Co. v. Incepts, Inc.*, 873 F.2d 801, 804 (5th Cir. 1989) (court should not set a bond amount that "would impose great hardship on [movant] and, as a practical matter, might well render the injunction infeasible or useless to it"); *Johnson v. Tampa Sports Auth.*, 2006 WL 2970431, *1 (M.D. Fla. Oct. 16, 2006) (requiring no bond where it would be a hardship to plaintiff and the claimed injury to defendants was unlikely); *Baldree v. Cargill, Inc.*, 758 F. Supp. 704, 707 (M.D. Fla. 1990) (requiring no bond where defendant would suffer no economic harm from continuing to do business with plaintiffs, who had shown high likelihood of success), *aff'd*, 925 F.2d 1474 (11th Cir. 1991); Doc. 11 at 19.

The hardships to Sun Capital clearly outweigh the hardships, if any, to the Receiver. The Receiver has failed to establish that a bond is necessary in any amount, while Sun Capital, with its high probability of success on the merits, would suffer greatly from having to post any substantial security due to its financial situation (which the

113

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Receiver notes, and which was created by the Lender's default in the first place).  A bond could eviscerate the benefits of the injunction by requiring Sun Capital to divert its limited funds away from hospital financing, perhaps even rendering the injunction useless.  Weighing the equities here, the Court, in its discretion, should continue not to require the posting of any bond.

## VIII.   There Is No Need for an Evidentiary Hearing

Sun Capital does not believe there is a need for an evidentiary hearing.  There do not appear to be any genuine credibility determinations that need to be made on any pertinent subjects.  The extensive affidavit and deposition testimony provided by Sun Capital and its affiliates was given by persons with personal knowledge of the events they have experienced over the last nine years.  The Receiver has offered no competing testimony of anyone with personal knowledge except for Mr. Fues, and his (notably few) assertions are demonstrably incorrect, being refuted by documentary evidence and belied by the parties' lengthy course of conduct and appearing to reflect a belated revisionist effort after investors started complaining and the SEC started investigating.  (See *supra* at 21 n.4, 59, 60-61; Leder Aff. ¶¶ 58, 62 & 72 n.34; Hopwood Decl. ¶ 13).

Similarly, the opinion of the Receiver's "expert," Mr. Kennelly,[48] is also shown to be incorrect and unfounded through the written evidence and the affidavits of Mr. Leder,

---

[48]  Prior to the inclusion of this "expert" opinion in the Receiver's opposition papers, there had been no disclosure of his identity or his written report in accordance with Fed. R. Civ. P. 26(a)(2). And his incendiary language, opinions on subjects as to which he claims no expertise (such as Sun Capital's management's "motivations" in investment decisions), and his complete ignorance of the entire early record he claims to have reviewed, make his status as an "expert," in any traditional sense, highly suspect.  (See Hopwood Decl. ¶¶ 18-31).

114

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Sun Capital's CFO; Mr. Hopwood of Focus Management, a turnaround consulting firm; Mr. Mazzarino of Tatum Partners, a management consulting firm; and Ms. Frew of Cain Brothers, an investment banking firm. Since the paper form of their testimony is sufficient to permit the Court to assess the reliability of the Receiver's submissions, there is likely no need for an evidentiary hearing to address these matters.

The Receiver has also submitted affidavits of certain investor representatives who purport to describe events involving the Sun Principals. While Sun Capital does strenuously dispute those allegations, they are irrelevant here because they do not concern whether or not Sun Capital was in default under the parties' modified credit agreement or would suffer irreparable harm if the Transfer Notices were permitted, or whether the Lender would suffer harm if the Receiver is unable to seize Sun Capital's assets. There is no need for a hearing to address these immaterial investor allegations.

In any event, because this is only a motion for a preliminary injunction and not a trial for a permanent injunction, the Court need not resolve every last factual issue. "To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Noble v. Tooley*, 125 F. Supp. 2d 481, 483 (M.D. Fla. 2000). This is because a "substantial likelihood of success on the merits requires a showing of only *likely* or *probable*, rather than *certain*, success." *Schiavo v. Schiavo*, 357 F. Supp. 2d 1378, 1383 (M.D. Fla. 2005); *Paul Y. by Kathy Y. v. Singletary*, 979 F. Supp. 1422, 1425 (S.D. Fla. 1997) ("'likelihood of success' on the merits is not to be equated with 'success' on the merits").

In fact, "[a]t the preliminary injunction stage, a district court may rely on

115

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

affidavits and hearsay materials which would not be admissible evidence for a permanent injunction." *Noble*, 125 F. Supp. 2d at 485 (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)). *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing."). Nor would it be fair to do so here, where the Receiver has stonewalled discovery and claimed some different status from an ordinary litigant, due to which, after initiating this proceeding with his imprudent lockbox seizure, he suddenly falls back on the position that discovery from him would be too burdensome and a "waste" of his limited resources. (Doc. 153 at 17, n.10; Doc. 81 at 20).

Sun Capital respectfully submits that the Court has before it, in paper form, more than enough material to assess the relevance and reliability of the Receiver's arguments in opposition to the injunction motion, and to conclude that Sun Capital has met its burden on the four relevant factors.

## CONCLUSION

For the foregoing reasons, Sun Capital respectfully asks this Court to enter a preliminary injunction (a) declaring the existing Transfer Notices to be null and void and requiring the Receiver to withdraw them, and (b) prohibiting the Receiver, the Lender, or their representatives from exercising any further self-help steps or contractual remedies or otherwise altering the *status quo* until the contracting parties' rights and obligations have been adjudicated.

116

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

Dated:  March 2, 2010

Respectfully submitted,

By:  *Karen Clarke*

Sarah S. Gold, Esq. (*pro hac vice*)
Florida Bar No. 0032190
Karen E. Clarke, Esq. (*pro hac vice*)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
Tel: (212) 969-3000
Fax: (212) 969-2900
sgold@proskauer.com
kclarke@proskauer.com

- and -

Jonathan Galler, Esq.
Florida Bar No. 0037489
jgaller@proskauer.com
PROSKAUER ROSE LLP
2255 Glades Road, Suite 340W
Boca Raton, FL 33431
Tel: (561) 241-7400
Fax: (561) 241-7145
*Attorneys for Defendants*

117

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 2, 2010, I caused the foregoing document to be delivered to the Clerk of Court and served on counsel of record identified on the following Service List in the manner specified.

_Karen E. Clarke (pro hac vice)_

## SERVICE LIST

*Daniel S. Newman, as Receiver v. Sun Capital, Inc., et al.,*
Case No. 2:09-cv-445-FtM-29SPC
(Ancillary to Case No. 2:09-cv-229-FtM-29SPC)

UNITED STATES DISTRICT COURT,
MIDDLE DISTRICT OF FLORIDA – FORT MYERS DIVISION

Jonathan Etra
Michael Shafir
Broad and Cassel
21st Floor
2 South Biscayne Blvd.
Miami, FL  33131
Tel.:  305.373.9447
Fax:  305.995.6403
E-mail: jetra@broadandcassel.com
*Attorneys for Daniel S. Newman, Esq.,*
 *as Receiver*
**Via Federal Express**

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL**