UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA – FORT MEYERS DIVISION

Case No. 2:09-cv-445-FtM-229SPC
_____

DANIEL S. NEWMAN, as Receiver for Founding Partners
Capital management Company; Founding Partners Stable-
Value Fund, L.P.; Founding Partners Stable-Value Fund II,
L.P.; Founding Partners Global Fund, Ltd.; and Founding
Partners Hybrid-Value Fund, L.P.,

                                        Plaintiff,

vs.

SUN CAPITAL, INC., a Florida Corporation, SUN
CAPITAL HEALTHCARE, INC., a Florida corporation,
and HLP PROPERTIES OF PORT ARTHUR, LLC, a
Texas limited liability company,

                                        Defendants.
_____

## OBJECTIONS BY THE ROMAN CATHOIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS TO PROPOSED SETTLEMENT TRANSACTION

**NOW INTO COURT**, through undersigned counsel, comes The Roman Catholic

Church of the Archdiocese of New Orleans (the "Archdiocese"), which respectfully submits this

opposition to the proposed settlement transaction filed by Plaintiff Daniel S. Newman, not

individually but solely in his capacity as Receiver (the "Receiver") for Founding Partners Capital

Management Company ("FPCM"), Founding Partners Global Fund, Ltd. ("Global Fund"),

Founding Partners Stable-Value Fund, L.P. ("Stable-Value"), Founding Partners Stable-Value II,

L.P. ("Stable-Value II") and Founding Partners Hybrid-Value Fund, L.P. ("Hybrid-Value")

(FPCM, Global Fund, Stable-Value, Stable Value II and Hybrid Value are collectively referred

1

to as the "Receivership Entities"; Global Fund, Stable-Value, Stable-Value II and Hybrid Value are collectively referred to as the "Receivership Funds").

The Archdiocese objects to the Proposed Settlement for the following reasons:

1.   The settlement agreement identifies a grand jury proceeding initiated by the Louisiana Attorney General as one of the "claims" that appears to be subject to the settlement.  The agreement further states that investors who accept the settlement and payment agree not to "assist or cooperate with any person to . . . pursue any claim against any Releasee . . . ." No settlement should be approved that conditions financial payment on an agreement not to "assist or cooperate with" law enforcement.

2.   The requirement that all persons receiving any benefit of the receivership must release their own claims against third parties causes the settlement to be unfair, because (1) the release lacks consideration; (2) no effort was made to assess the value of individual claims or provide adequate compensation for them; and (3) because the owners of those claims were denied access to discovery on the issue of liability and were stayed from seeking discovery elsewhere, thus the settlement violates their due process rights.

3.   The choice imposed by the Proposed Settlement order violates the constitutional rights of the Archdiocese, because it requires the Archdiocese to either forfeit its property interest or accept investment in entities that are potentially impermissible investments for the Archdiocese for reasons of religious principle.

## **FACTUAL BACKGOUND**

In 2008, FPCM solicited the Archdiocese through its investment consultant to invest in Stable-Value.  FPCM represented the fund as a non-traditional investment that offered diversification to other portfolio holdings, because it was not correlated to the equity and bond

markets. FPCM presented the fund as a relatively secure opportunity for income, that invested in high quality "investment grade" medical receivables from small hospitals that do not have the resources to fund their revenue cycle. As is more fully discussed below, the Sun Capital Principals participated in Gunlick's sales efforts and confirmed statements in his presentation.

By the time that the Archdiocese invested: (1) the business model for FPCM and Sun Capital had failed; and (2) redemptions had been suspended. Nonetheless, the defendants failed to disclose those facts or other important information about the quality and character of the investment. For those reasons, and the reasons more fully stated below, the Archdiocese promptly notified the appropriate agencies and filed suit for damages.

**1.     Gunlicks' Representations to the Archdiocese and the Investment Consultant's Due Diligence Review**

In or about mid-2008, William L. Gunlicks, the chief executive officer of FPCM, travelled to New Orleans, Louisiana to solicit investments in Stable-Value. Gunlicks met with the Archdiocese's investment consultant to present information about Stable-Value. During the presentation, Gunlicks described Stable-Value as follows:

- Stable-Value lends money to a company, which, in turn, purchases high quality, short-term, medical receivables which essentially could be liquidated within 90 days;

- The loans from FPCM were substantially over-collateralized because Stable-Value received, as security for the loans it made, interest in the stock of the hospitals that sold the receivables, as well as an interest in the proprietary software product developed by Sun Capital, and an interest in the receivables themselves;

- Stable-Value provided investors with a safe, steady return of 13% per year because of the proprietary software that Sun Capital had used in identifying and purchasing high quality medical receivables;

- The receivables purchased by Stable-Value were "investment grade"; and

- In the event a receivable purchased for Stable-Value was uncollectible, it was simply returned to the hospital and replaced by another "good" receivable, thereby eliminating any risk of non-payment.

3

Thereafter, in August 2008, the Archdiocese sent its investment consultant to an on-site visit to Sun Capital for the purpose of conducting due diligence on Stable-Value. They were accompanied by John L. Eckholdt, the Chief Financial Officer of the Archdiocese, and Alan Arnold, a member of its Investment Committee. Together, they all met in Boca Raton, Florida with Gunlicks and Sun Capital's representatives, including Mr. Baronoff, the CEO and a director, Mr. Koslow, the president and director, and Mr. Leder, the secretary and a director. Sun Capital, Inc., and Sun Capital Healthcare, Inc., acting through Messrs. Baronoff, Koslow, and Leder (collectively the "Sun Capital Principals") assisted Gunlicks in offering the investment. Specifically, the Sun Capital Principals confirmed the accuracy of statements made by Gunlicks and otherwise supported his efforts to solicit an investment by the Archdiocese.

Gunlicks and the Sun Capital Principals explained to the Archdiocese the relationship between Stable-Value and the hospitals that originated the debts in which Stable-Value claimed to have invested all of its assets. Gunlicks and the Sun Capital Principals informed the Archdiocese of the following:

- Stable-Value invested in short-term, investment quality receivables;

- Collateral for Stable-Value represented short-term receivables that generally were paid within 90 days and lasted no more than 120 days;

- Stable-Value invested in receivables that had been screened by a proprietary computer software system that ensured the receivables represented items that were legitimate and that financial intermediaries, such as Medicare, Medicaid and Blue Cross, would promptly pay;

- Less than 80% of the value of any receivables was advanced to Sun Capital such that the loans by Stable-Value were substantially over-secured, and the risk of non-payment was therefore negligible; and

- The Sun Capital Principals confirmed that Sun Capital owed a contractual obligation to replace and receivables not promptly paid.

During the on-site visit, no mention was made of loans by Stable-Value for any purpose other than the purchase of receivables. Specifically, there was no mention of any loans backed by workers' compensation receivables or disproportionate share payments, loans for working capital, or construction loans.

In the presence of the Sun Capital Principals, Gunlicks misrepresented or omitted material information regarding the Fund, its investments, and business relationships and other facts that were required to be disclosed in order to avoid misleading the Archdiocese.  Upon information and belief, those facts included, but were not limited to, the following:

- Gunlicks stated that the receivables were "investment grade", when, in fact, many of them were questionable.

- Gunlicks stated that the receivables were typically paid within thirty to sixty days, when the average holdings had substantially longer durations.

- Gunlicks stated that the loans made to Sun Capital were fully secured with the short term, high quality health care receivables, when, in fact, some of the loans made to Sun Capital were applied to the hospitals themselves to keep them operating so as to protect the disproportionate share payments, which would be paid only if the hospitals were in operation at the time the payments were made. Gunlicks would not allow Sun Capital to repay the loans' principal balances, as he wanted to maintain a steady investment return for the Stable-Fund investors. As a result, Sun Capital had to look for other opportunities, which led Sun Capital to purchase workers compensation and disproportionate share payments beginning in 2004.

- Stable-Value held risky, long term receivables, such as workers compensation receivables and disproportionate share payments, which was approved by Gunlicks. Upon information and belief, as of December 31, 2008, just prior to the Archdiocese investment, approximately $136 million of Sun Capital's receivables had been outstanding for more than 150 days.  An additional $40 million in workers compensation and disproportionate share payments that were less than 120 days old were outstanding, but by their nature were unlikely to be collected within 150 days.

- Gunlicks did not disclose that FPCM held any equity interest in the hospitals from which Sun Capital purchased receivables.

- Gunlicks approved of the use of loans from Sun Capital for hospital operating expenses, rather than strictly limiting them for the purchase of high quality health care receivables, as he had represented to the Archdiocese.

- In the fall of 2008, Sun Capital informed Gunlicks and FPCM that Sun Capital required approximately $8-12 million in working capital to keep certain hospitals operating in order to protect outstanding disproportionate share payments of approximately $120 million.  FPCM then provided Sun Capital with approximately $24 million in additional investor funds.

- As of February 2009, roughly $64 million of the total outstanding loans made to Sun Capital by Stable-Value was used by Sun Capital to make loans to related parties, primarily the hospitals that it owned. (Sun Capital also loaned $450,000 to its CFO for the purchase of a house).

- It was never disclosed by any party that the hospitals in which Sun Capital invested or to which it loaned money were distressed or in poor financial condition and required working capital loans to continue doing business.

After the on-site due diligence meeting, the Archdiocese's investment consultant compiled materials on Stable-Value, which were presented to the Archdiocese's Investment Subcommittee on October 31, 2008. Gunlicks attended the October 31, 2008, meeting and repeated to the Investment Committee statements that included statements made during the onsite due diligence meeting in Florida. After that meeting, on or about November 24, 2008, the Archdiocese completed the Subscription Agreement for investment in Stable-Value and it was forwarded to FPCM. On January 9, 2009, the Archdiocese transmitted its investment of five million dollars ($5,000,000) to Gunlicks and FPCM for investment in Stable-Value. The affidavit of John L. Eckholdt, Chief Financial Officer of the Archdiocese, is attached as Exhibit "A" as proof of the Archdiocese's status as an investor in Stable-Value.[1]

## 2. Prior to the Archdiocese Investment, Unbeknownst to the Archdiocese, Redemptions in Stable-Value had Been Suspended

---

[1] The Receiver certainly is aware of the Archdiocese's claim because its investment was part of the allegations in the lawsuit originally brought by the *Securities and Exchange Commission v. Founding Partners et al.*  See "*Securities and Exchange Commission v. Founding Partners Capital Management, Co., et al,*" Case No. 2:09-CV-229-FM-29 SPC, paragraphs 40-43.

As of the the October 31, 2008, presentation to the Archdiocese Investment Committee, there was only a single redemption request for $11 million outstanding. Gunlicks advised redemption requests, including any future request that might be made by the Archdiocese, would be satisfied in less than 60 days.

Unbeknownst to the Archdiocese, prior to the time FPCM accepted the $5 million payment from the Archdiocese, Stable-Value had received a flood of redemption requests in the amount of approximately $382 million, or 70% of Stable-Value's assets.  Stable-Value already had severe liquidity problems due to the shift from short-term to longer term, more risky receivables. Stable-Value already could not satisfy all of the redemption requests.

FPCM also recognized that its business model had failed.  FPCM had already instructed Sun Capital not to take on any new factoring clients.  FPCM later added that it would not allow Sun Capital to borrow further to support existing factoring clients.  By December 31, 2008 – also just prior to the Archdiocese's investment – FPCM **suspended all redemptions** in Stable-Value. Gunlicks wrote to investors – **other than the Archdiocese** – to announce that redemptions could no longer be honored. However, none of this information was given to the Archdiocese and none of the foregoing stopped Gunlicks from taking $5 million from the Archdiocese.

FPCM accepted and deposited the Archdiocese's investment of five million dollars on January 9, 2009 into the Stable-Fund. It did so without informing the Archdiocese that it had suspended redemptions. Though FPCM provided payment information to obtain the $5 million investment, nobody let the Archdiocese know that the investment model for Stable-Value and the business model for Sun Capital had failed.

## **PROCEDURAL BACKGROUND**

On or about September 23, 2009, the Archdiocese filed a Petition for Damages against Sun Capital Healthcare, Inc., Sun Capital, Inc., Baronoff, Koslow, Leder and others to recover investment losses it suffered as a result of its investment in Stable-Value, an investment fund managed by FPCM and its owner, Gunlicks.

At the time of the filing of the Petition for Damages, Gunlicks and FPCM already were defendants in an enforcement action brought by the Securities Exchange Commission in the Middle District of Florida, FPCM had been placed into receivership, and the federal court had issued an injunction prohibiting the filing of litigation against FPCM, Stable-Value, or the assets of Gunlicks, which are now property of the receiver.

Along with FPCM, and its owner, Gunlicks, Sun Capital, Inc., Sun Capital Healthcare, Leder, Koslow and Baranoff, misrepresented the nature of the investment sold to the Archdiocese and took its $5 million investment without disclosing that the business model for the investment had failed and that Stable-Value was being gutted as investors demanded the return of their money.

In late June and early July 2010, the Archdiocese filed a Supplemental and Amended Petition and a Corrected Amended Petition to add Gunlicks and FPCM as defendants, in accord with this Court's order allowing such so long as a stay was sought in their Louisiana state court case.

In conformity with the instructions of this Court, on September 20, 2010, the Archdiocese filed an Ex-Parte Motion to Stay in the state-court action, pending the earlier of a motion for relief from the stay or a final resolution of this action and the action brought by the Securities and Exchange Commission.  The Ex-Parte Motion to Stay was granted on September 21, 2010.

The Proposed Settlement attempts to compromise both the Receiver's claims and the direct claims that individual investors, such as the Archdiocese, have and that the Receiver does not own. The Proposed Settlement releases:

> All liabilities arising from any and all claims, demands, controversies, actions, causes of action whether asserted or unasserted, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, proceedings, agreements, promises, variances, trespasses, obligations, liabilities, fines penalties, costs, expenses, attorneys' fees, and damages of whatsoever character, nature, or kind, in law or in equity, whether known or unknown, fixed or contingent, liquidated or unliquidated, pending or not pending, disclosed or not disclosed, ***whether directly, representatively, derivatively or in any other capacity*** (collectively, the "Claims"),
>
> which against the Releasees the Releasors ever had, now have or hereafter can, shall or may have for, upon or by reason of:
>
> ***any Claims in any way related to the investments by any of the Fund Investors into Founding Partners or FPCM, the Loans and the credit relationship between Founding Partners or FPCM and any of the Companies, and any uses of the proceeds of the Loans by any of the Companies or transfers between the Companies or Affiliated Companies***; any Claims in any way related to the facts, statements or omissions alleged in the actions or proceedings listed on <u>Exhibit A</u> and/or in any proposed amended pleading or intervenor pleading that was sought to be filed in such actions or proceedings; and any Claims in any way related to any actions or omissions of the Receiver relating in any manner to his role as the Receiver of Founding Partners and FPCM (collectively, the "<u>Released Claims</u>").

(emphasis added). Clearly, the language contained in the Release and Proposed Settlement seeks to bar the individual claims, including those of the Archdiocese, a claim specifically listed on Exhibit A thereto.  The Receiver has no power or authority to assert claims for any individual investor, and the Court has no jurisdiction over such claims.

It cannot be said that all direct claims are identical, and few, if any, are likely to involve facts as egregious as those presented by the Archdiocese. No effort was made in the settlement

process to determine the factual basis for such claims, to establish the value of such claims or to

provide any consideration whatsoever for the release of such claims.

## LAW AND ARGUMENT

The Archdiocese objects to the Proposed Settlement filed by Receiver for the following

reasons:

1. The Proposed Settlement seeks to release the rights of individual investors which do not belong to the Receiver, and the receiver has made no reasonable effort to determining whether the terms of the settlement are unfairly prejudicial to investors like the Archdiocese, which relied on direct misrepresentations in connection with its investment;

2. The individual investors have had no access to the information the Receiver has taken years to analyze for purposes of establishing liability;

3. For moral and religious reasons the Archdiocese has grave concerns as to whether it can participate in the Proposed Settlement and which participation may violate the Archdiocese's First Amendment Rights; and

4. The Proposed Settlement improperly requires that the individual investors accept payment in return for agreement not to cooperate with law enforcement; thereby improperly attempting to link settlement discussions with matters that are the exclusive province of law enforcement.

The Proposed Settlement submitted by the Receiver in this matter is not "fair" to the

individual investors. In order to accept any benefit of the receivership, investors are forced to

release claims which do not belong to the Receiver. The Receiver should not obligate individual

investors to release their direct claims by conditioning the Proposed Settlement on their release

of direct claims which do not belong to the Receiver.  Furthermore, the Receiver cannot seek

compromise of the individual investor's claims **without making any effort to determine the**

**value of each claim** and the potential liability of the Sun Capital Principals to each investor. Additionally, before being asked to accept such a settlement, investors must be provided access to discovery relating to the potential liability of any person who will receive benefit of a release. Also, settlement negotiations should not interfere with any proceedings or investigations being pursued by law enforcement agencies. For the above reasons, more thoroughly explained below, the Archdiocese respectfully requests that this Court deny the Proposed Settlement submitted by the Receiver as written.

1.      **The Proposed Settlement is Conditioned Upon the Release of Rights that are Individual in Nature and Do Not Belong to the Receiver**

The Proposed Settlement addresses claims that do not belong to the Receiver. "An equity receiver, like a bankruptcy trustee, has standing for all claims that would belong to the entity in receivership, and which would thus benefit its creditors and investors, but no standing to represent the creditors and investors in their individual claims." *Miller v. Harding*, 248 F.3d 1127, 1127 (1st Cir. 2000); *See also Scholes v. Lehmann*, 56 F.3d 750,753 (7th Cir. 1995) ("an equity receiver may sue only to redress injuries to the entity in receivership"). Because the claims fall outside of the claims which belong to the Receiver, this Court does not have jurisdiction to approve a settlement that is conditioned upon the release of individual investor direct claims.

Counsel for the Archdiocese sought to ensure that any settlement entered into by the Receiver would protect the individual interests of all investors in Stable-Value. Counsel for the Archdiocese informed counsel for the settling parties that adequate consideration must be given to the individual investors who have asserted direct claims relating to investments induced based upon misrepresentations, omissions and violations of securities laws. The Archdiocese has consistently objected to any attempt to compromise such claims without **adequate**

**consideration** and without providing parties like the Archdiocese with access to documents relating to the issue of liability. In light of the compelling evidence supporting the Archdiocese's individual claim, the release should not occur without due process and without adequate consideration. However, despite forceful and repeated communication of those concerns to the settling parties, including the Receiver, the Proposed Settlement seeks to do just that.

2.     **The Individual Investors Have Not Had Access to Any of the Discovery the Receiver Took Years to Analyze for Purposes of Establishing Liability**

The strengths of each of the individual claims varies as to each investor, and, unless adequate consideration is provided, a collective settlement should not impair the rights of investors, who have viable, direct claims, independent of the receivership.  Approval of any compromise of direct claims should provide adequate notice and access to all of the discovery materials on the issue of liability that: (1) were made available to other parties to the settlement; and (2) are essential to evaluate the individual investors' claims, including those of the Archdiocese. In the Proposed Settlement, however, the Receiver has made no determination of the value of the individual claims that the Proposed Settlement seeks to release – indeed, the Receiver has made absolutely no effort to do so. Moreover, the investors have been denied the ability to do so on their own.  The individual investors have not been provided with adequate notice of settlement of their claims **and access to discovery materials** on the critical issue of liability.

The individual investor's claims based upon misrepresentations, omissions and violations of securities laws are not based on the same factual predicate as the Receiver's claims. In its Motion for Approval, the Receiver argues that the Proposed Settlement is fair in part based on the review of financial information, numerous site visits, and review of a detailed financial and

accounting due diligence review. The Receiver argues that his review of financial information establishes the fairness of the Proposed Settlement. That argument is without merit as it relates to the release of individual investors claims, because no discovery is allowed on issues of liability and no damage analysis was done on the issue of whether each individual investor was or was not defrauded.

It is **not necessary** that the individual investors should be forced to sign a release in order to participate in the Receiver's Proposed Settlement. The Proposed Settlement states that "[u]nder the terms of the Settlement Agreement, only those investors in the Receivership Funds who agree to release the Sun-Related parties from all claims that those investors may have or have asserted against the Sun-Related parties and who furnish a signed release will be eligible for distribution of a membership interest in the FP Designee." Proposed Settlement, p. 3. "Non-releasing investors shall retain any rights and claims they may have against the Sun-Related Parties, **but will not be eligible for distribution of a membership interest in the FP Designee**." Proposed Settlement, p. 3 (emphasis added). The case includes compromise of claims that involve enforcement of promissory notes and other assets of the estate, which represent the proceeds of investors' assets.[2] Individuals should be entitled to participate in the recovery, which represents the proceeds of their own property, without waiving their direct claims. The denial of such participation is tantamount to denial of due process.

"The goal in both securities-fraud receiverships and liquidation bankruptcy is identical—the fair distribution of the liquidated assets." *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 334 (7th

---

[2] The Receiver's Complaint in this matter clearly provides that it is founded on the default of two or more loans, evidenced by promissory notes, totaling approximately $555 million by the defendants. ¶16-17. The Complaint alleges that Sun Capital and Sun Healthcare used the proceeds of those loans to purchase ineligible accounts receivables and real estate transactions (most of which were not secured by mortgages). Complaint, ¶ 20-30.

Cir. 2010). As such, analogizing between receivership and bankruptcy cases can be helpful. In the absence of exceptional circumstances, bankruptcy courts routinely refuse to confirm a plan of reorganization containing third-party releases. *See, e.g., In re Digital Impact, Inc.,* 223 B.R. 1, 14 (Bankr. N.D. Okla.1998) (bankruptcy court does not have jurisdiction to approve non-debtor releases by third parties); *In re Arrowmill Dev. Corp.,* 211 B.R. 497, 506 (Bankr. D.N.J. 1997) ("Keeping in mind the Third Circuit's analysis that section 524(e) specifically limits the scope of the discharge, and that the Bankruptcy Code does not contemplate a discharge of nondebtors, this court holds that plans of reorganization may not contain provisions which discharge nondebtors."); *In re Elsinore Shore Assocs.,* 91 B.R. 238, 252 (Bankr. D.N.J. 1988) (plan provisions deeming non-debtor proponents and their principals to be discharged and released from any and all claims were prohibited by the Code and relevant case law); *In re Monroe Well Serv., Inc.,* 80 B.R. 324, 334 (Bankr. E.D. Pa. 1987) (debtors could not obtain confirmation of a plan which would attempt, over the objection of creditors, to discharge the obligations of non-debtors). Thus, to the extent the Receiver seeks approval of a release by the individual investors of claims they may have against the released third-parties (other than derivative claims which the Receiver owns), it should not be approved.

For example, in *In re Conseco*, the court stated, that a plan provision predicating receipt of distribution on granting third party releases violated the best interest of creditors test, because creditors could not be held to have voluntarily agreed to a release simply by accepting a distribution. 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003). The Court stated that

> under § 1129(a)(7)(A)(ii), a plan cannot be confirmed unless each non-accepting creditor gets at least as much as it would get in a Chapter 7 liquidation. Under previous plan provisions, creditors who did not vote to accept the plan but were clearly entitled to a distribution in a Chapter 7 liquidation had to release non-debtors to receive a distribution. These provisions violated the best interests

> of creditors test because they forced creditors to accept the release or to give up the distribution to which they were entitled under § 1129(a)(7)(A)(ii). In addition, under these circumstances, a creditor's mere acceptance of a distribution under the plan cannot be construed as a voluntary consent to the release.

*In re Conseco*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003).

The same logic is applicable in this case. In the Proposed Settlement, nearly all of the assets of the Sun Capital Principals are being transferred to the FP Designee to be distributed to the releasing investors. By requiring the individual investors to release their direct claims in order to participate in the distribution, the Receiver is essentially forcing the individual investors to accept the release or to give up their right to participate in the distribution. No consideration whatsoever is being given to their individual claims. Thus, under these circumstances, there is no voluntary consent to the release if the individual investors with viable direct claims wish to participate in the recovery to which they are entitled.

Furthermore, in *In re AOV Industries, Inc.*, the court held that a plan which required a creditor with a unique direct claim against a non-debtor third-party to provide a release of the non-debtor in order to receive a distribution unfairly discriminated against that creditor because the majority of creditors had no such claim. 792 F.2d 1140, 1152 (D.C. Cir. 1986). The objecting creditor in *In re AOV Industries* had a unique, highly viable claim against the non-debtor that other creditors in the class did not. *Id.* As such, the court found unequal treatment based on that creditors direct, rather than an indirect claim, it was required to release. *Id.*

Similarly, in this case, the Proposed Settlement seeks to require the Archdiocese, an investor with a unique, highly viable direct claim against the Sun Capital Principals, to execute a release of the Sun Capital Principals in order to receive a distribution under the Receiver's Settlement. This treatment simply is not fair in light of the Archdiocese's claim based on the fact

that, after redemptions had been suspended in Stable-Value, without notifying the Archdiocese, their investment was accepted. To our knowledge, the Archdiocese was the last investor in FPCM's Stable-Value Fund before securities regulators put the fund out of business. Few, if any, other investors in Stable-Value have this same factual background in support of its direct claim, particularly as it relates to the Sun Capital Principals. As such, this Court should not require the Archdiocese to release its claim in order to participate in the distribution.

3.      **For Moral, Religious and Constitutional Reasons the Archdiocese Should Not Be Forced To Participate in the Proposed Settlement and, Therefore, the Court Should Deny the Request to Approve the Settlement**

The settlement herein contemplates that the investors would become owners or shareholders in hospitals and long-term care centers that are owned and/or operated by the Sun Capital Principals.  The Archdiocese, as a diocese of the Roman Catholic Church, cannot own any property and/or participate in any medical actions and/or activities that violate the teachings and religious principles of the Roman Catholic Church.  This includes but is not necessarily limited to entry of an order requiring equity participation in hospitals which engage in abortion, contraception, end-of life care, and/or other activities that violate the teachings of the Roman Catholic Church, which may, by way of example also include counseling contrary to Church teaching. (The foregoing list is not exhaustive and depends on a comparison of activities with Church teachings).

Due to the limited time period allowed to investors to object and the correlated lack of time to investigate the foregoing issues, the Archdiocese objects to this settlement for the following reasons.  In effect, the Receiver is seeking to force a settlement of investors in ownership of companies that potentially violate limitations in investment policies and the scope of permissible investments by the Roman Catholic Church. The Archdiocese cannot make or

accept such investments and, by virtue of the protections afforded by the Constitution, should not be forced to, because such compulsion would violate the First Amendment of the Constitution of the United States of America.

The Archdiocese is not suggesting that any party intended to cause the Archdiocese to forfeit assets or violate fundamental and well established principals. However, the proposed order and terms of settlement would do exactly that. Approval of this settlement would potentially force the Archdiocese to participate in ownership of companies that act contrary to Roman Catholic Church teaching. The Archdiocese believes that it cannot accept equity investments in the hospitals, without violating its investment policies and principals absent complete and exhaustive analysis of these investments.  Yet, the Proposed Settlement requires such investment in order to obtain any benefit from the receivership. The entry of an order which would potentially require either the forfeiture of assets or abandonment of matters of religious principal and beliefs constitutes religious discrimination in violation of the First Amendment. Although this settlement on its face does not expressly target the Archdiocese or Roman Catholic Church teaching, the effect of any such settlement is, nonetheless, clear.  It potentially imposes a burden on conscience that the Archdiocese cannot engage in, and this imposition violates both the Free Exercise and Establishment Clauses of the First Amendment. *See, e.g., Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 532 and 535 (1993); *Larsen v. Valente*, 456 U.S. 228, 244-45 (discussing the Establishment Clause of the First Amendment).

The Supreme Court has acknowledged the power of churches to decide for themselves, free of state interference, matters of church governance, doctrine and faith. *See Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952).  This First Amendment protection applies not only to protect churches from acts of legislature but also from court decisions. *See Kreshik v. St.*

*Nicholas Cathedral*, 363 U.S. 190 (1960). The Court should not force the Archdiocese to determine whether to participate in the settlement – and force the possibility of financial risk and reduced assets to recover its investment through litigation if it does not participate – if the conditions of settlement violate Roman Catholic Church teaching, thus violating the Archdiocese's First Amendment rights of church governance, doctrine and faith.[3]

Second, in addition, pursuant to *Employment Division v. Smith*, the First Amendment prohibits the Court from approving this settlement without the Archdiocese knowing whether such ownership would violate Church doctrine – or, even worse, if such would violate Church doctrine -- because Court approval would impose a substantial burden on the Archdiocese to choose between following the precepts of its religion or participating in a settlement. 494 U.S. 872 (1990); *See Sherbert v. Verner*, 374 U.S. 398 (1963), as interpreted by *Smith, supra*. Here the Archdiocese must choose between religious observance and foregoing settlement of a wrong through its lost investment. That is contrary to the First Amendment.

Third, such a conundrum that the Archdiocese is being placed in potentially by Court approval of the Proposed Settlement burdens the Archdiocese's religious exercise because it also implicates other rights, i.e., free speech rights, creating a "hybrid situation" that triggers strict scrutiny under *Smith*. The Archdiocese is being compelled to express with and associate with other owners of facilities that potentially are not in accord with Church teaching and doctrine. The ownership burdens are not narrowly tailored and, thus, do not satisfy the strict scrutiny test. As a result, as the Court's decision in *Smith* recognizes, the Archdiocese's forced participation in such a settlement would be contrary to the First Amendment.

Fourth, as alluded to above, the Court's approval of this settlement and the Archdiocese's

---

[3] *Kedroff* and *Kreshik* survived *Employment Division v. Smith*, *infra*.

having to decide whether or not to participate in the settlement runs afoul of the constitutional right of the Archdiocese to hold a point of view and/or ownership in companies that it finds morally objectionable, *see Wooley v. Maynard*, 430 U.S 705, 715 (1977), especially if possible assets are so depleted that the Archdiocese effectively loses its investment if it does not participate in the settlement.   Further, to put the Archdiocese in a position of sharing participation of ownership with others whose morals or activities the Archdiocese believes religiously objectionable is a violation of the freedom of expressive association.  *See Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) and *Hurley v. Irish-American Gay, Lesbian & Bisexual Group*, 515 U.S. 557 (1995).

Therefore, for these constitutional reasons, the Court should not approve this settlement.

**4.      The Proposed Settlement Appears to Ask the Individual Investors Not to Cooperate in a Criminal Proceeding**

The Proposed Settlement includes language whereby a signing individual investor would appear to be required to agree not to cooperate with law enforcement in an ongoing criminal investigation. The Release states "In addition, the Releasors shall not assist or cooperate with any other person to commence, prosecute or pursue **any claim against any Releasee** . . . ." The agreement identifies such claims as "any claims in anyway related to the facts, statements or omissions alleged in the actions or proceedings listed on Exhibit A." Included in Exhibit A to the Release, entitled Actions and Proceedings, is *Subpoena Duces Tecum* issued by the Louisiana Department of Justice to Daniel S. Newman as Receiver on June 21, 2011, and any related proceedings.

It is a federal crime to give a witness something of value to induce the witness not to testify. *Synergetics, Inc. v. Hurst*, 2007 WL 2422871 (E.D. Mo. 2007). The Release cannot require individual investors who wish to participate in the Proposed Settlement to obstruct justice

and accept monetary compensation in exchange for not communicating with law enforcement officials. Such approval could be construed as bribery, a violation of 18 USCA § 201(b)(3).[4]

Furthermore, Federal statutes and courts (through the Younger abstention doctrine) prohibit injunctions against state criminal proceedings. *See, Younger v. Harris*, 401 U.S. 27 (1971) (a federal injunction can run against a pending state criminal prosecution only on a "showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief."). "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect of effectuate its judgments." 28 U.S.C.A. § 2283.  Through the Proposed Settlement, the settlement attempts to accomplish indirectly, through acceptance of the settlement, something that could not otherwise be ordered by the Court and the resolution of criminal issues not within this Court's jurisdiction – an injunction against state court proceedings.

## CONCLUSION

The Archdiocese does not believe that the Proposed Settlement is fair to the individual investors as it seeks release of their direct claims, which do not belong to the Receiver, in order to participate in the Receiver's settlement without ensuring valid consideration and without access to discovery reviewed by Receiver. Further, absent further information and, then, even

---

[4] "Whoever directly or indirectly corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or with intent to influence such person to absent himself therefrom; shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States." 18 USCA § 201(b)(3).

with further information, the Archdiocese's forced participation in this settlement would violate its First Amendment rights. In addition, compelling the Archdiocese to not participate in any criminal investigation is contrary to law. Therefore, for all the foregoing reasons, The Roman Catholic Church of the Archdiocese of New Orleans respectfully submits this Opposition to Proposed Settlement Transaction.

Respectfully submitted,

_s/ Susan R. Healy_____
Susan R. Healy
Florida Bar No. 444332
*Attorney for Archdiocese of New Orleans*
**VERNON HEALY**
999 Vanderbilt Beach Road, Suite 200
Naples, FL 34108
Telephone:     (239) 649-5390
Facsimile:     (239) 325-1892

and

Kirk Reasonover, Esq.
Louisiana Bar No. 21039
Amanda Hogue, Esq.
Louisiana Bar No. 32504
*Attorneys for Archdiocese of New Orleans*
**REASONOVER & OLINDE, LLC**
400 Poydras Street, Suite 1980
New Orleans, Louisiana 70119
Telephone:     (504) 587-1440
Facsimile:     (504) 587-1577

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing objection has been forwarded to the following recipients pursuant to the order of the Court (document 255), by e-

filing, e-mailing and by depositing same in the United States mail, postage prepaid on this 30th

day of January, 2012:

Jonathan Etra, Esq.
David J. Powers, Esq.
*Attorneys for Receiver*
**BROAD AND CASSEL**
One Biscayne Tower
2 South Biscayne Blvd., 21st Floor
Miami, FL 33131
e-mail: jetra@broadandcassel.com
e-mail: dpowers@broadandcassel.com

Sarah S. Gold, Esq.
Karen E. Clarke, Esq.
*Attorneys for Defendants*
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036-8299
e-mail: sgold@proskayer.com
e-mail: kclarke@proskauer.com

     s/ Susan R. Healy
Susan R. Healy
Florida Bar No. 444332
*Attorney for Archdiocese of New Orleans*
**VERNON HEALY**
999 Vanderbilt Beach Road, Suite 200
Naples, FL 34108
Telephone:    (239) 649-5390
Facsimile:    (239) 325-1892