UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DANIEL S. NEWMAN, as a Receiver for
Founding Partners Capital Management
Company; Founding Partners Stable-
Value Fund, L.P.; Founding Partners
Stable-Value Fund, II, L.P.;
Founding Partners Global Fund, Ltd.,
and Founding Partners Hybrid-Value
Fund, L.P.,

                    Plaintiff,

vs.                                    Case No.  2:09-cv-445-FtM-29SPC

SUN CAPITAL, INC. a Florida
corporation; SUN CAPITAL HEALTHCARE,
INC., a Florida corporation; HLP
PROPERTIES OF PORT ARTHUR, LLC, a
Texas limited liability company,

                    Defendants.
_____

### OPINION AND ORDER

The issue before the Court is whether to approve a proposed

settlement agreement between the Receiver and defendants, to which

numerous objections have been filed.  For the reasons set forth

below, the Court would approve the settlement agreement except for

one non-financial provision.  The Court will suggest a modification

of that provision; will give the parties an opportunity to consider

such a modification; and will withhold a final decision pending

notification by the parties as to their positions on the proposed

modification.

### I.

This matter came before the Court on a Joint Motion for

Expedited Approval of Proposed Procedure to Obtain Court Approval of the Proposed Settlement Transaction (Doc. #248) and Supplement (Doc. #249), both filed on December 9, 2011.  The Court entered an Order Preliminar[il]y Approving Settlement Transaction and Scheduling Deadlines (Doc. #255) on December 27, 2011, as clarified by an Order (Doc. #258) filed on January 12, 2012.  Objections to the proposed settlement agreement were filed by the Roman Catholic Church of the Archdiocese of New Orleans (Doc. #259), 118 Investors (Docs. #260, 262), and TJNJH Investment Partnership and Kathleen Ann Olberts (Docs. #264, 275).  The objectors adopted each other's objections, except perhaps for those objections unique to the Roman Catholic Church of the Archdiocese of New Orleans[1], TJNJH, and Olberts[2].  Defendants' Omnibus Memorandum In Response to Investor Objections (Doc. #278) and The Receiver's Response to Investor Objections (Doc. #279) were filed on February 24, 2012.  The Receiver's Notice of Compliance with the Court's Order Preliminarily Approving the Settlement Transaction (Doc. #292) and the Receivers' Notice of Filing [of the Disclosure of Fees and Costs] (Doc. #293) were then filed.  The 118 Investors also filed

---

[1]Specifically, the Archdiocese of New Orleans asserts an objection based on religious freedoms contained in the United States Constitution.  This objection was not adopted by any other objector.

[2]TJNJH and Olberts joined in the objections with the 118 other Investors.  In addition, they also filed a separate objection (Doc. 275-5) which raise matters relevant only to investors in both Stable-Value and Hybrid-Value funds.

a sealed Confidential Supplement to Objections of Investors to Proposed Settlement (Doc. #S-4), to which the Receiver filed a sealed Response (Doc. #S-5).

The Court held a fairness hearing on the proposed settlement on March 30, 2012, and heard from counsel for the parties and counsel for the objectors. Defendants and the Receiver, as requested by the Court (Doc. #299), filed supplemental responses to the Hybrid-Value Objection on May 11, 2012. (Docs. ##302-303.) As the Court stated at the end of the fairness hearing, the Court appreciates the assistance of all counsel in the development and discussion of the issues in this case.

## II.

### A.   SEC Action

The origin of this case began with a five-count civil action in Case No. 2:09-cv-229-29SPC filed by the United States Securities and Exchange Commission (the SEC) against Founding Partners Capital Management Company ("Founding Partners Management") and William L. Gunlicks ("Gunlicks") ("the SEC Action") on April 20, 2009. The SEC Action also named two Sun Capital entities and the four other Founding Partners entities as relief defendants. Founding Partners Management was described as a Florida corporation registered as an investment advisor with the SEC, and Gunlicks was described as the president, CEO, and sole shareholder of Founding Partners Management, and the beneficiary of management fees obtained by

Founding Partners Management.

The SEC Action alleged that Founding Partners Management and Gunlicks (collectively the "SEC Defendants") operated three hedge funds and one mutual fund which solicited funds from various investors. Since 2001, Founding Partners Management made loans with the investment funds to Sun Capital, Inc. and Sun Capital Healthcare, Inc. (collectively, "Sun Capital") through its primary fund, Founding Partners Stable-Value Fund, LP ("Stable-Value"). Sun Capital, Inc. utilized the loans from Founding Partners Management to fund the discounted purchase of accounts receivables; Sun Capital Healthcare, Inc. utilized the loans from Founding Partners Management to purchase discounted accounts receivable from healthcare providers. Sun Capital would draw on the loans to purchase the discounted receivables, and then repay the loans after collecting the receivables from the payors. The SEC Action alleged that the SEC defendants had solicited funds from investors based upon representations that the Stable-Value loans to Sun Capital constituted a safe investment opportunity. These representations included that Sun Capital was factoring short-term (i.e., collected within 150 days), highly liquid receivables that fully secured the loans made by Stable-Value to Sun Capital.

The SEC Action alleged that beginning in 2004, the SEC Defendants permitted Sun Capital to purchase longer-term receivables that were less liquid and much riskier, and to use loan

proceeds to make working capital loans to financially troubled hospitals that Sun Capital had purchased. The SEC Defendants were alleged to have continued to solicit investors without disclosing the change in use of the underlying loans and the increased risks presented to the safety of their investments.

The SEC Action alleged that Sun Capital owed $550 million on the Stable-Value loans, only 32% of which was invested in and secured by the less risky, short-term receivables that the SEC Defendants had described to their investors. The $550 million constituted 99% of Stable-Value's portfolio, and all that remained of investors' money was Sun Capital receivables and any other assets of Sun Capital securing the loans. The SEC alleged that the investors' money was at immediate risk of being used to support Sun Capital's working capital requirements and of being diverted directly to the SEC Defendants; that the SEC Defendants had continued to solicit investors without disclosing significant recent redemption requests; that the SEC Defendants falsely represented to investors that they had audited financial statements for 2007; that the SEC Defendants failed to disclose a consent Order in a SEC administrative proceeding; and that the SEC Defendants used fund assets to pay personnel expenses.

On April 20, 2009, the Court entered an *ex parte* temporary Order Freezing Assets and Other Emergency Relief (the "Asset Freeze Order"), which applied to the SEC defendants and certain named

relief defendants, and an Order Appointing Receiver for certain Founding Partner entities (the Receivership Entities). The Asset Freeze Order was continued in effect by an Opinion and Order filed on May 7, 2009. On May 13, 2009, the Court denied an SEC request for an asset freeze order as to Sun Capital, and disqualified and removed the initial Receiver. On May 20, 2009, the Court entered an Order Appointing Replacement Receiver (the "Receivership Order") appointing Daniel S. Newman, Esq. as the replacement receiver (the Receiver) of the Receivership Entities. The Receivership Order provided that the Receiver shall, among other things:

> (a) Take immediate possession of all property, assets and estates of every kind of Founding Partners and each of the Founding Partners Relief Defendants, whatsoever and wheresoever located, . . .;

> (b) Investigate the manner in which the affairs of Founding Partners and the Founding Partners Relief Defendants were conducted and institute such actions and legal proceedings, for the benefit and on behalf of Founding Partners or the Founding Partners Relief Defendants and their investors and other creditors as the Receiver deems necessary against those individuals, corporations, partnerships, associations and/or unincorporated organizations which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated or transferred money or other proceeds directly or indirectly traceable from investors in Founding Partners and the Founding Partners Relief Defendants . . .; and

> . . .

> (f) Defend, compromise or settle legal actions, including the instant proceeding, in which Founding Partners, any of the Founding Partners Relief Defendants, or the Receiver are a party, commenced either prior to or subsequent to this Order, with authorization of this Court . . . .

6

The SEC Action remains pending.

**B.   Current Case - "Sun Capital Litigation"**

On July 14, 2009, the Receiver filed a nine-count Complaint (Doc. #1) against three Sun Capital entities seeking the recovery of over $500 million (the "Sun Capital Litigation").  The lawsuit asserted breach of contract claims arising from the loan agreements between Stable-Value and Sun Capital, as well as claims for replevin, foreclosure of security interest, fraudulent transfer, and aiding and abetting breach of fiduciary duty.  The case has been extensively litigated, with no foreseeable end in sight.  The Sun Capital defendants filed an Answer, raised eighteen (18) Affirmative Defenses, and filed a six-count Counterclaim alleging breach of contract and promissory estoppel (Doc. #29).  The Receiver was allowed to file a twelve-count Amended Complaint (Doc. #195), and is prepared to file an additional case asserting claims which the Court precluded from being brought as part of the instant case.[3]  (See Doc. #193.)

On June 1, 2010, the Receiver served numerous subpoenas *duces tecum* on the Sun Capital entities and related entities.  Sun Capital then filed a Motion to Stay the litigation for 120 days for purposes of settlement discussions (Doc. #196).  The Motion essentially asserted that a significant group of investors were

---

[3]The Receiver advised the Court at the evidentiary hearing that the parties in this case have a tolling agreement as to this potential Complaint.

engaging in a *palace coup* of sorts by attempting to settle the Sun Capital Litigation (and more) without the Receiver's participation. The Receiver opposed the Motion to Stay arguing, among other things, that claims in the Sun Capital Litigation belonged to the Receivership, and thus any settlement must involve the Receiver.

On July 8, 2010, the Court issued an Order (Doc. #202) staying the Sun Capital Litigation for 60 days.  In its Order, the Court stated, among other things:

> The Court clearly has the discretionary authority to grant a reasonable stay in a case, and pursuit of a settlement can be a reasonable basis for a stay. This particular case is not typical, and literally cries out for a good faith effort at resolution before the only people left standing are the lawyers and other litigation professionals.  It would appear that a settlement may only be accomplished if the efforts include substantial involvement of an informed Receiver in the settlement process. The Receiver was appointed not only for his legal and business acumen, but to bring common sense to a process, which by its very nature can be complex.

(Doc. #202, pp. 1-2).  The stay has been extended several times to allow continued settlement discussion, and remains in effect.  A number of significant motions remain fully briefed and pending.

## C.   The Settlement Agreement

The terms of the Settlement Agreement (Doc. #249) proposed by the parties to the Sun Capital Litigation extend significantly beyond the parties and claims in this case in an effort to arrive at a global settlement as to Sun Capital.  The Settlement Agreement provides for relief which none of the parties could obtain through this litigation.  It directly impacts the parties and consenting

8

investors, and also indirectly impacts non-consenting investors.

The Settlement Agreement essentially provides that the ownership interests in the Sun Capital factoring companies, hospital companies, and associated real estate holding companies will be transferred to a newly formed, wholly-owned subsidiary of Stable-Value, the Founding Partners Designee, LLC, a Delaware limited liability company (FP Designee) (Doc. #248-3, Exh. 4), in exchange for broad releases of investor and Receiver claims and potential claims and for financial considerations. Following the conclusion of a Court-approved investor claims process, the Receiver will distribute membership interests in the FP Designee to those investors of the Receivership Entities who join in the Settlement Agreement. This will effectively transfer ownership of FP Designee from Stable-Value to the investors whose interests are validated through the claims process. Those investors will run FP Designee, effectively taking charge of the efforts they hope will maximize recovery of their investments. Investors who do not participate in the Settlement Agreement will not be eligible for distribution of a membership interest in FP Designee, but retain all rights and claims they may have against the Sun Capital related parties (although Sun Capital would essentially be owned by the settling investors).

More specifically, the material terms of the proposed Settlement Agreement are as follows:

(1)  **Parties:**  On one side of the Settlement Agreement are the Affiliated Companies, the Principals, the Spouses, and Dawson.  The Affiliated Companies consist of defendants Sun Capital, Inc. (SCI) and Sun Capital Healthcare, Inc. (SCHI), along with Success Healthcare, LLC (Success), Promise Healthcare, Inc. (Promise) and forty-six (46) specifically identified affiliate/subsidiary entities (including defendant HLP Properties of Port Arthur, LLC). (Doc. #249, pp. 49-51, Annex I.)  The individual Principals are Peter R. Baronoff (Baronoff), Howard B. Koslow (Koslow), and Lawrence Leder (Leder).  The Spouses are Malinda Baronoff, Jane Koslow, and Carole Leder.  Dawson is Mark Dawson.  On the other side of the Settlement Agreement are the Receiver; FP Designee; and Founding Partners  Stable-Value Fund, Ltd (Stable-Value), Founding Partners Global Fund, Ltd (Global), Founding Partners Stable Value Fund II, L.P. (Stable Value II), and Founding Partners Hybrid-Value Fund, L.P. (Hybrid-Value) (collectively, Founding Partners).

(2)  **Required Percentage of Investor Participation:**  The Settlement Agreement is conditioned on a certain minimum percentage of investors agreeing to participate by executing a form Consent (Doc. #248-2) and a form Release of Claims (Doc. #248-1) attached to the Settlement Agreement.  Unless waived by the parties, at least 51% in number of the Fund Investors, and 66-2/3% of investment of Fund Investors in Founding Partners, must execute releases in order for the obligations under the Settlement

Agreement to commence.  (Doc. #249, p. 8, Article IV, 4.1(e).)

(3)  **What Receiver and Settling Investors Receive**:  If at least the requisite number of investors approve the Settlement Agreement, the Receiver and settling investors receive the following:

(a)  **Ownership of Various Entities**: The newly-created entity, FP Designee, will become the owner of various entities now owned or controlled by the Affiliated Companies, Principals, Spouses, and/or Dawson.  This transfer of ownership will be accomplished by the following transactions:

(i)  **Promise**:  Principals and Spouses will transfer 100% of their equity interests in eleven identified entities to Promise (Doc. #249-1, pp. 5-15.)  Promise will issue common stock and will issue preferred stock with a liquidation preference and mandatory redemption value of $75 million.  Ninety-six percent (96%) of the common shares and 100% of the preferred shares of Promise will be issued to SCHI in exchange for the cancellation of $150 million indebtedness due SCHI from Promise (Doc. #249-1, Exh. C.)  The remaining 4% of the common stock (the Retained Equity) will be retained by Principals, Spouses, and Dawson.  An Amended and Restated Articles of Incorporation (Doc. #249-3, Exh. F) will be entered by the new ownership of Promise.  Pursuant to the next transaction, this Promise stock (less the 4%) will effectively be owned by FP Designee.

11

      **(ii)    SCHI/SCI:**    Principals  and  Spouses  will transfer 100% of the shares of SCHI and SCI to FP Designee (Doc. #249-1, Exh. B-1.)  An Amended and Restated Stockholders' Agreement (Doc. #249-3, Exh. H) will be entered.

      **(iii)    Success:**    Principals  and  Spouses  will transfer 100% of their equity interests in Success to FP Designee (Doc. #249-1, Exh. B-2.)

      **(iv)   Other Entities:**  Principals and Spouses will transfer  100%  of  their  equity  interests  in  Superior  Hospital Corporation, Inc. to FP Designee.[4]

    **(b)    Description of Entities:**    The Receiver represents that collectively the entities own or lease and operate eighteen hospitals, two medical office buildings and a nursing school.

      **(i)    Promise:**    Promise's facilities consist of fifteen long term acute care hospitals which provide medical care to  patients  who  suffer  from  conditions  too  complex  to  be effectively managed by skilled nursing or sub-acute facilities, and require inpatient care for longer durations than general acute care

---

[4]The Settlement Agreement specifically states that 100% will go to "each of the entities identified on Schedule 2.1(g) pursuant to an Equity Transfer Agreement in the form attached as Exhibit G." (Doc. #249, p. 4.)  However, Schedule 2.1(g) is not attached to the Settlement Agreement.  The Equity Transfer Agreement, provided in Exhibit G, however, states that 100% will go to the corresponding companies listed in Exhibit A to the Equity Transfer Agreement which is attached to the Settlement Agreement.  (Doc. #249-3, p. 21.)  The only company listed in Exhibit A is Superior Hospital Corporation, Inc.

hospitals are organized or staffed to provide.

(ii)   **Success:**   Success, the community-based hospital division, operates two general acute care hospitals and one psychiatric facility as well as two medical office buildings and a nursing school.   Success hospitals offer a variety of medical-surgical services such as primary care, emergency services, general surgery, bariatric surgery, internal medicine, cardiology, oncology, senior care, and wound care, and provide inpatient and outpatient ancillary services including rehabilitation and diagnosis.   Success's psychiatric hospital offers acute and geriatric services as well as other behavioral care programs.

(iii)   **Other Entities:**   The other entities involved own real estate which is utilized by Promise or Success.

(c)   **Senior Term Loan:**   After the ownership transfers described above, Promise will execute a Loan and Security Agreement (Doc. #249-1, Exh. D) with SCHI.   This is a guaranteed $75 million senior secured term loan which accrues interest at LIBOR[5] plus 7.5% annually, payable quarterly.   As of closing, this will be deemed to be fully funded from previous loans made by SCHI to Promise.   The loan will be repaid upon maturity, which shall not exceed five years after the closing.   This loan is secured by a first-priority security interest in all assets of Promise and its operating and real estate subsidiaries, except for: (I) those assets in which the

---

[5]LIBOR is the acronym for London Interbank Offered Rate.

Principals, Spouses and Dawson are being granted a security interest (in which SCHI is obtaining a subordinated second-priority security interest), and (ii) certain accounts and books and records and other related assets, which are being pledged to secure a line of credit that Promise intends to obtain as a condition precedent to the closing.

(d)   **Subordinated Term Loan:**   After the ownership transfers described above, Promise will also execute a Subordinated Term Note (Doc. #249-2, Exh. E) with SCHI.  This is a guaranteed $125 million subordinated term note which accrues interest at 12% annually, payable quarterly, and is subordinated to the Senior Term Loan.  As of the closing, this loan will be deemed to be fully funded from previous loans made by SCHI to Promise, and shall have a term of five years after closing.  This loan is secured by a second-priority security interest in all assets of Promise and its subsidiaries, except for: (I) those assets in which the Sun Principals, Spouses and Dawson are being granted a security interest (in which SCHI is obtaining a subordinated third-priority security interest); and (ii) certain accounts and books and records and other related assets, which are being pledged to secure a line of credit that Promise intends to obtain as a condition precedent to the closing.

(e)   **Mutual Releases:**  Upon closing the transaction, the Receiver and the Sun Capital-related individuals and entities will

exchange mutual general releases in an agreed-upon Release of Claims form (Docs. ##248-1, 249-3, Exh. M.)  The mutual releases do not release each other from claims arising from the closing Transaction Documents.  The contents of the releases are discussed more fully below.

        **(f)**     **Distribution from Receiver:**    Following the conclusion of a Court-approved claims process by investors, the Receiver will distribute membership interests in the FP Designee to releasing investors of the Receivership Entities pursuant to an Equity Transfer Agreement (Doc. #249-3, Exh. G.)  This will effectively transfer ownership of FP Designee from Stable-Value to those releasing investors whose interests are validated through the claims process.

        **(g)**  **Rights of Recourse:**  The Principals and Dawson make certain representations and warranties to the FP Designee in Schedule 5.2(a) to the Settlement Agreement and in a Disclosure Statement substantially in the form as Exhibit N attached to the Settlement Agreement.  These representations and warranties survive for a period of 18 months after the closing of the transactions (or until certain earlier liquidity events).  Any claim for breach of these representations and warranties must be brought by FP Designee within that 18-month or shorter period.

    **(4)**  **What Defendants (and Others) Receive:**  If a sufficient number of investors approve the Settlement Agreement, the

15

defendants (and others) receive the following:

(a)  **Releases**:  The form Release of Claims (Docs. #248-1, Doc. #249-3, Exh. M) is a broad release involving not only defendants in this case but related persons and entities.  The persons and entities to be released (Releasees) are virtually anyone connected with the defendants, but excluding certain named persons and entities.  The Receiver and investors doing the releasing (Releasors) broadly give up all past, current, and future claims for liability in any way related to the investments, loans, credit relationship, or use of loan proceeds; release claims in a list of specific pending civil actions or proceedings (and one criminal investigation); and release any act or omission of the Receiver.  The claims to be released therefore include, without limitation, the parties' claims in the Sun Capital Litigation and the Receiver's as-yet un-asserted claims against individuals and entities other than the defendants that the Receiver had sought to add to this case by amendment.  The release does not, however, include any claim arising under or relating to the performance or enforcement of the closing Transaction Documents.  The Releasors agree not to commence any action involving the Released Claims, except to enforce a release executed in connection with the Settlement Agreement.

(b)  **Investor "Gag" Provision**:  The Release of Claims obligates the Releasors not "to assist or cooperate with any other

person to commence, prosecute or pursue any claim against any Releasee," but allows Releasors to respond to subpoenas or court orders (Docs. #248-1, 249-3, Exh. M.)  The Releasors must notify the affected party of any such supboena or court order.

(c) **Confidentiality Provision**: The Settlement Agreement provides for a broad confidentiality agreement precluding settling investors from disclosing a wide array of information about Principals, Spouses, Dawson, and Sun Capital (Doc. #249, §7.7.) The Settlement Agreement defines confidential information as any information other than "publicly available or freely useable material lawfully obtained from another source." (Id.) The provision also includes non-disclosure of the terms of the settlement transactions contemplated by the Settlement Agreement, although most of that information is publicly available in the court file.  Additionally, all information obtained from the other parties and attorneys is deemed confidential.

(d) **Indemnification for Breach of Release and Settlement Agreement**:  If a Releasor breaches the release provisions, the Releasor must indemnify and hold harmless each Releasee from broadly defined losses and damages (Doc. #248-1.)  Additionally, the Principals, Spouses, and Dawson (collectively the "Indemnitees") are indemnified from and after the closing by Promise, Success, SCHI, SCI and FP Designee for any claims relating to the Indemnitees' actions or omissions on behalf of any of the

17

Settlement Entities.   The indemnification obligations include a duty by the indemnifying parties to defend the Indemnitees and to advance all necessary and reasonable expenses relating to any indemnified proceedings.   Certain types of claims, however, are not covered by such indemnification.

(e)   **Baronoff Employment Agreement:**   Peter Baronoff will enter into an Employment and Consulting Agreement with Promise and Success, which provides for what is believed to be market-rate compensation for his continuing services as President and CEO of Promise and Success.   The Agreement has been filed under seal (Doc. #S-4), but provides for a substantial salary, potential bonuses, and payment for consulting services.

(f)   **Koslow Consulting Agreement:**   Howard Koslow will enter into a Consulting Agreement with Promise which provides for payment of $1,800,000 in $50,000 monthly installments for three years in exchange for his consulting services.   Payment of the fees are secured by a Performance Security.   (Doc. #249-3, Exh. J.)

(g)   **Leder Consulting Agreement:**   Lawrence Leder will enter into a Consulting Agreement with Promise which provides for payment of $1,800,000 in $50,000 monthly installments for three years in exchange for his consulting services.   Payment of the fees are secured by a Performance Security.   (Doc. #249-3, Exh. K.)

(h)   **Secured Notes:**   Principals, Spouses, and Dawson will receive Secured Promissory Notes in the aggregate amount of

18

$5,884,000 payable by Promise (Doc. #249-3, Exh. L.)  The secured notes will be issued in proportion to their ownership interests in Promise following the closing.  The secured notes will generally provide for payment of the amounts, without interest, in three annual payments.

      **(i)   First Priority Lien (Performance Security):**  The Principals will be granted a first-priority lien on certain real and personal property of certain of the Settlement Entities as security for any payments due to the Principals, Spouses, or Dawson under the Secured Promissory Notes, the Consulting Agreements, and for certain continuing personal guaranty obligations of the Principals.

      **(j)   Loan Forgiveness:**  Loans totaling $1.7 million in principal made by various Sun Capital-related entities to Principals and Spouses will be forgiven in their entirety.

      **(k)   Cancellation of Indebtedness:**  SCHI will cancel $150 million indebtedness owed by Promise in exchange for the 96% of the common shares and 100% of the preferred shares of Promise.

      **(l)   Insurance:**  For a period of six years after closing, Promise and Success will maintain director's and officer's insurance for the benefit of any Indemnitee who was serving as a director, officer, employee, consultant or agent of any of the Settlement Entities.

      **(m)   Promise Stock Ownership:**  The Principals, Spouses

19

and Dawson will continue to own 4% of the issued and outstanding common stock of Promise, in approximate proportion to their current ownership interests in Promise.   This Retained Equity will be subordinate to certain amounts payable under the Senior Term Facility, the Subordinated Term Loan, and the Preferred Stock.   In addition, one-half of the Retained Equity may be subject to cancellation under certain circumstances.

**(5)   Miscellaneous Other Provisions**

**(a)    Governance Structure of FP Designee Prior to Distribution**:  Upon Court approval, FP Designee will be formed by the Receiver as a subsidiary of Stable-Value operating in accordance with the FP Designee organizational documents.

**(i)**    Prior to the distribution of the equity interests in FP Designee to releasing investors whose interests are validated in the claims process, FP Designee shall be managed by a board of managers (the "Board") consisting of five members.

**(ii)**   The Receiver (or his designee) may be one of the five members of the Board, and the remaining four members are to be persons associated with various investors in the Receivership Funds (or their designees) and reasonably qualified to serve in such positions.

**(iii)**  Baronoff will be entitled to one seat on the Board of Directors of Promise for as long as he serves as CEO of Promise.

**(iv)**  Until the distribution of membership interests of FP Designee to releasing investors is completed, the approval of the Receiver or his designee on the Board shall be required to approve certain major decisions specified in the FP Designee's organizational documents.

**(v)**  In the event that a majority of the other Board members oppose the vote of the Receiver or his designee on any such major decision, they may, if the Court authorizes such a procedure as part of its continuing jurisdiction over the supervision of the Receivership, petition this Court to potentially overrule the vote of the Receiver or his designee on such major decisions.

**(vi)**  FP Designee anticipates that following the distribution of membership interests to releasing investors pursuant to the pre-closing claims process, new Board elections will be held, with the Board to be selected by vote of the members of FP Designee.

**(b)**  **Conditions to Closing:**  The obligations of the parties to consummate the transactions contemplated by the Transaction Documents are contingent upon, among other things,

**(i)**  entry of an order of the Court approving the Settlement Agreement and granting related relief;

**(ii)**  the Receiver's receipt of advice as to the application of New York law to the applicable Transaction Documents by New York corporate counsel to be retained by the Receiver and to

be paid by the Settlement Entities or Sun Entities, and the Receiver being satisfied with such advice;

**(iii)** receipt of all necessary governmental authorizations or third-party consents;

**(iv)** accuracy of representations and warranties of each party and performance of the covenants applicable to such party;

**(v)** entry by Promise into a working capital line of credit; and

**(vi)** the solicitation of releases from all Receivership Fund investors and receipt of a sufficient number of executed releases from the investors in the four Receivership Funds.

## III.

Although this case does not involve a class action, all parties and investors, including the objectors, agree that the Court applies the standard developed in class action cases for review of the proposed settlement agreement.[6] A district court reviews a class action settlement for fairness, reasonableness, adequacy, and the lack of collusion between the parties, and considers such factors as: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the range of possible

---

[6]Court approval of a settlement in this case is only required because the Receiver is compromising claims affecting the Receivership Entities in the SEC Action.

22

recovery at which a settlement is fair, adequate, and reasonable; (4) the anticipated complexity, expense, and duration of litigation; (5) the opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." <u>Faught v. Am. Home Shield Corp.</u>, 668 F.3d 1233, 1240 (11th Cir. 2011). <u>See also</u> <u>Cotton v. Hinton</u>, 559 F.2d 1326 (5th Cir. 1977).[7] Approval of a settlement agreement is within the sound discretion of the court. <u>Christo v. Padgett</u>, 223 F.3d 1324, 1335 (11th Cir. 2000); <u>Leverso v. Southtrust Bank</u>, 18 F.3d 1527, 1531 (11th Cir. 1994).

## A.  Factors For Fair, Reasonable, and Adequate Settlement

The ultimate issue is whether the Settlement Agreement is fair, reasonable, and adequate.[8]  The very nature of settlement is compromise, which leaves no one completely satisfied.  Simply because good faith arguments can be articulated does not render a settlement unfair, unreasonable, or inadequate. This is especially so in this case, where regardless of the Court's view, each investor gets to vote with his feet.  An investor can simply walk away, not sign the Consent or Release, and pursue its own individual claims against defendants, or if the Settlement

---

[7]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[8]No one argues that there has been collusion between the parties, and the Court affirmatively finds a lack of collusion.

Agreement is approved, against FP Designee.

**(1)   Likelihood of Success at Trial**

The Receiver evaluates his likelihood of success in the case as "uncertain." (Doc. #279, p. 8.)  This seems to the Court to be a realistic appraisal.  While convinced of the merits of the case, the Receiver candidly notes that both legal and factual issues are hotly contested and the Court has already ruled against the Receiver on several key requests.  The strongest individual investor claim appears to be that of the Archdiocese, but that only comprises a very small percentage of the claims to be settled.  Sun Capital remains vociferous as to its innocence, and significant defenses and counterclaims have been asserted.  Litigation outcomes are seldom a certainty, but this case appears to be especially problematic for all involved.

**(2)   Range of Possible Recovery**

The possible judgment in this case in favor of the Receiver ranges from $0 to the $500 million-plus sought in the Complaint.  The range of possible recovery on any positive judgment is substantially less, since the likely collectable value of even a $550 million judgment may be virtually pennies on the dollar.  The Receiver views the value of defendants (estimated by the Receiver at between $115 and $203 million) as being their assets and the ongoing business operations of Promise, not in an ability to pay a judgment.   The objectors have submitted sealed documents

questioning the future viability of the entities as an ongoing business.  Additionally, defendants have asserted a Counterclaim which may be offset against any recovery by the Receiver.  The Receiver also notes the possibility of eventual bankruptcy protection for defendants.  As Receiver's counsel stated at the fairness hearing, even a litigation win may be simply a pyrrhic victory.

### (3)  Range of Possible Fair, Adequate, and Reasonable Recovery

The range of fair, adequate and reasonable recovery is similarly large.  All things being equal, the defendants owe the $500 million-plus loaned to them.  But the uncertainty of judgment and recovery by the Receiver also infects the calculation of a reasonable settlement range.  As discussed in more detail below, the Court concludes that the proposed Settlement Agreement is well within the range of fair, adequate, and reasonable recoveries.

### (4)  Anticipated Complexity, Expense, and Duration of Litigation

There is no question that if this case does not settle, its litigation will be lengthy, time-consuming, expensive, and most likely unsatisfying to all concerned.  The Receiver-related fees are approximately $2 million.  Just the sealed documents on the pending motion for a preliminary injunction are more than a foot thick.  Discovery would continue, with 61 subpoenas from the Receiver alone outstanding.  Issues seem to abound, and no issue

seems too small to demand close attention and substantial memoranda. Counsel for the Receiver stated at the fairness hearing that if litigation is to proceed, the complaint in the anticipated new case would be "bigger, messier, uglier, and more involved than the current proceedings." This factor clearly favors settlement.

### (5) Stage of Proceedings of Settlement

While it pains the Court to state about a case filed in 2009, the proposed Settlement Agreement comes at a relatively early stage of the court proceedings. Major motions and issues are pending, significant discovery is sought by the parties if there is no settlement, and the shadow of a complex and lengthy trial does not yet loom over the case.

### (6) Opposition to the Settlement

The proposed Settlement Agreement has drawn significant opposition for a material number of investors. As noted previously, three sets of objections have been filed concerning the proposed Settlement Agreement. As the Court understands, the objectors do not object to a settlement of the litigation in principle, but object to this settlement. The Court will summarize and then discuss the major objections by category. The Court adopts the positions articulated by the Receiver (Doc. #279, pp. 6-47) and defendants (Doc. #278, pp. 4-42) to the extent not inconsistent with the discussion below.

(a) **Lack of Reliable Information:** The objectors all

26

assert a need and desire for more reliable information about Sun Capital before being called upon to decide whether to accept the Settlement Agreement.  The objectors seek what they consider to be reliable financial information, such as audited financial statements and interim financial statements prepared in accordance with U.S. Generally Accepted accounting Principals (GAAP), to support the value of the Sun Capital settlement entities.  The objectors recognize the voluminous information provided via the Receiver's online data room and do not contest the Receiver's diligence in providing the information.  Instead, the objectors assert this information is tainted because it comes in large part from the persons accused of wronging in the first place.  The objectors seek completed audits for 2009 and 2010, supplemented by GAAP-based interim financials for 2011, plus production of information regarding the tax impact of the proposed settlement on the settling entities and Founding Partner funds, a formal tax opinion, and a third-party valuation opinion as to the value of the settlement entities.  The objectors also seek additional discovery, including various unaudited financial statements.  All this is necessary, the objectors assert, in order to form a reliable opinion of the value of the settlement assets to make the ultimate determination as to whether to accept the Settlement Agreement.

It is a fact of litigation life that no one wants to make a settlement decision until the last tidbit of information has been

27

obtained.  It is also a fact of litigation life, however, that by the time all information sought is obtained, the benefits of settlement may have long since evaporated.  It is clear to the Court that a tremendous amount of information has been obtained and shared, although clearly not as exhaustive as it will be if the case is not settled.  Further, even if the settlement is rejected and litigation proceeds, not all of the information sought by the objectors will necessarily be available.  The Court finds that the information obtained and shared by the Receiver, as summarized at Doc. #279, pp. 16-22, is sufficient to allow the investors to make intelligent decisions as to the Settlement Agreement.

(b)   **Lack of Financial Transparency**:  The objectors assert that certain aspects of the Settlement Agreement have been sealed, thus preventing the investors from accurately valuing the assets they are to receive.  The sealed information relates to the amount and terms of the working capital line of credit for Promise and the third-party advisory fees paid by defendants in connection with the proposed settlement.  There is also an objection to fees paid to the FP Investor Steering Committee.  Additionally, objectors assert they have not been provided six specified items of promised confidential information.  (Doc. #260, p. 17.)

Much of the requested information has now been disclosed. (See Docs. #279, p. 26; #293).  The Court therefore concludes that the investors have been provided ample information to make a

reasonable evaluation of the Settlement Agreement.

(c)   **Continued Participation by Principals:**   The objectors take exception to the consulting agreements with the Principals and the continued employment of Baranoff as CEO. Essentially, the objectors assert this simply continues to keep the fox in the hen house.

At the fairness hearing, counsel for the Receiver stated that this issue had been considered and it was determined that the Receiver needed the expertise of these individuals to give the FP Designee a better chance of success.   A board of directors will exist which will provide close supervision.   The Court finds the objectors' concerns to be justified, but concludes that the Receiver's position and protective measures are reasonable.

(d)   **Indemnification Provisions:**   The objectors assert that the indemnification obligation under the Settlement Agreement is over broad, unduly favorable to the Principals, and potentially limitless.   It essentially requires the releasing investors to indemnify the Principals for their fraudulent behavior, and to ultimately be responsible for paying any recovery obtained by non-releasing investors.

The investors are certainly correct in their observations that the indemnification provisions are broad and favorable to the Principals.   Counsel for the Receiver indicated this, and many other provisions, were the subject of intensive negotiations.

29

There is nothing unusual about indemnification in general, and the investors will simply have to decide for themselves whether the breadth and scope of this indemnification provision is unduly favorable towards the Principals.  While the provision is certainly worthy of careful consideration, it does not render the Settlement Agreement inherently unfair, unreasonable, or inadequate.

(e)  **Limitations on Setoff Rights**:  The objectors object to FP Designee's limited rights of setoff against future payments owed to the Principals in § 9.15 of the Settlement Agreement if there are breaches of any representation, warranty or covenant in the Transaction Documents.  Objectors assert this superficial right is "practically useless."  (Doc. #260, p. 18).  This is so, objectors contend, because damages can only be set off against amounts owed <u>after</u> a final, non-appealable judgment, and by the time such a judgment is obtained it is likely that there will be little or nothing in the way of payments still owed to the Principals and therefore little to be set off against. Additionally, these investors object because the provision would not cover breaches of representations, warranties or covenants of Sun Capital, which are substantially more extensive than those of the Principals.

The set-off provision includes an escrow provision which ameliorates some of the concerns.  The desire of a final judgment is certainly not unreasonable or unfair to warrant disapproval of

the settlement agreement.  The investors will simply have to weigh this provision along with the others to determine if the Settlement Agreement overall meets with their approval.

(f) **Formula for Distribution of Investor Interest in New Entity:**  The objectors assert that the terms for determining an investor's share in FP Designee are vague.  The Settlement Agreement provides that the exact formula for this calculation will be submitted by the Receiver to the Court as part of a request to approve a claims process.  Objectors claim a need for the precise formula now.  The Court finds that a precise formula is not necessary for the investors to be able to determine whether to approve or disapprove the Settlement Agreement.

(g) **Magnitude of Related Party Transactions:**  The investors object to the magnitude of related party transactions orchestrated by the Principals since the date of the Security Agreements.  The transactions exist, and they are addressed as set forth in the Settlement Agreement.  The investors can keep the magnitude in mind as they contemplate the proposed resolution of the case.

(h) **Lack of Evaluation of Investor Claims By Receiver:**  The objectors assert that the Receiver should have performed a more detailed investigation of the individual claims which will be given up pursuant to the releases.  The objectors assert that not all claims are identical in terms of merit or strength, and that no

31

effort was made in the settlement process to determine the factual basis for the claims.  The Archdiocese, for example, asserts that its claim  is the strongest and is unique and "highly viable" (Doc. #259, p. 15.)

The Court finds that the Receiver has performed a sufficient evaluation of the investor claims and had no obligation to conduct any additional evaluation of the investor claims than was done in this case.  It would be surprising if all claims were of equal strength or merit, but this does not suggest that the Settlement Agreement would be different.  The individual investors are in the best position to evaluate the strength and merit of their own claims, and factor that into their evaluation as to whether or not to accept the Settlement Agreement.  Even when claims of non-settlors are to be barred, only a "very preliminary peek" is suggested.  In re Healthsouth Corp. Sec. Litig., 572 F.3d 854, 867-68 (11th Cir. 2009).

(i)  **Release of Criminal Investigation**:  The Archdiocese of New Orleans (the Archdiocese) objects to that portion of the Settlement Agreement release which identifies a criminal investigation by the Louisiana Attorney General as one of the claims subject to the Settlement Agreement and the releases.  The Archdiocese also objects to the provision of the Settlement Agreement release which precludes assistance or cooperation with anyone, including law enforcement officials.

This objection, especially when coupled with the broad confidentiality agreement contained in the Settlement Agreement, gives the Court grave concern. None of the parties or the investors have the legal ability to "release" a criminal investigation or prosecution. Whether to investigate and prosecute, and what charge to file, are decisions that generally rest in the sole discretion of the executive branch, United States v. Batchelder, 442 U.S. 114, 124 (1979), and is not subject to the private agreement between citizens. A person who relies upon a confidentiality agreement to preclude testimony in a criminal proceeding does so at his peril. United States v. Snipes, 611 F.3d 855, 871 (11th Cir. 2010). Additionally, even where a private confidentiality agreement is otherwise proper, it will not be enforced where its effect becomes obstructive of the rights of non-parties. See, e.g., Nestor v. Posner-Gerstenhaber, 857 So. 2d 953, 955 (Fla. 3rd DCA 2003); Scott v. Nelson, 697 So. 2d 1300, 1301 (Fla. 1st DCA 1997).

The Court will not approve a settlement agreement which precludes a person or entity from doing what is commonly recognized as a public duty - cooperating with law enforcement regarding the apprehension and prosecution of those who violate criminal laws. The prosecuting authorities may or may not decide to charge anyone or any entity, but it will not be because this Court has sanctioned a gag order which precludes cooperation. As one New York court has

stated in the employment context,

> Restrictions on discussion of the outcome of litigation
> do not carry the same risks as restraints on freedom of
> expression regarding underlying wrongdoing, if any.
> While such matters as monetary amounts of settlements, or
> even their very existence, may be of little or no genuine
> public interest, the courts can hardly be called upon to
> enforce an employer-employee exit agreement for the
> covering up of wrongdoing which might violate criminal
> laws. Disclosures of wrongdoing do not constitute
> revelations of trade secrets which can be prohibited by
> agreements binding on former employees.

McGrane v. Reader's Digest Ass'n, 822 F. Supp. 1044, 1052 (S.D.N.Y.

1993). See also Chambers v. Capital Cities/ABC, 159 F.R.D. 441,

444 (S.D.N.Y. 1995).

At the fairness hearing counsel for the Receiver asserted this
was not the intent of the Settlement Agreement. If so, modifying
the release and confidentiality language to clarify should not be
problematic. Thus, the Court does not approve this non-financial
provision of the Settlement Agreement, but will provide an
opportunity to revise this provision keeping the following in mind:

The current Release of Claims, as written, releases all claims
related in any way to matters listed in Exhibit A (Doc. #248-1, p.
2.) This exhibit should not include any criminal matter
whatsoever. Further, the broad confidentiality provision (Doc.
#249, §7.7) should be revised to make clear that it is not
applicable to cooperation with law enforcement officials. Any
other provision which may be fairly interpreted as restricting the
ability of parties to the Settlement Agreement to cooperate with

law enforcement officials will <u>not</u> be approved by this Court.  The parties shall have thirty (30) days to revise this provision of the Settlement Agreement and the investors shall have thirty (30) days thereafter to submit their objections *limited to this modification*.

    **(j)  Scope of Release:**  Some of the investors object to the scope of the release as it relates to non-defendant third parties.  They assert that the Settlement Agreement compromises claims the Receiver does not own, and claims against third parties not formally before the Court as defendants.  These objectors also assert that the global settlement lacks consideration and violates due process because they were denied access to discovery and their cases (if filed, such as was done by the Archdiocese) were stayed by the Receivership Order.  These objectors also assert that the Court lacks jurisdiction to approve such a settlement agreement.  Objectors want to participate in the recovery provided in the Settlement Agreement without waiving or releasing their direct claims against the defendants and related parties.  They claim that the denial of such participation without releases is "tantamount to denial of due process."  (Doc. #259, p. 13).  Additionally, objectors point to bankruptcy court cases which refuse to confirm a plan for reorganization containing third party releases.  (<u>Id.</u> at 14-15.)

    These objections are overruled.  No investor is compelled to accept the Settlement Agreement, and no investor suffers the loss

of a claim unless the investor accepts the Settlement Agreement. There is clearly consideration if the settlement is accepted, and no violation of due process. The Court also rejects the argument that it cannot approve a settlement which provides for third party releases. See e.g., In re Van Diepen, 236 F. App'x 498, 503 (11th Cir. 2007). Settlement agreements frequently include provisions extinguishing future claims by settling and even non-settling parties to facilitate settlement. In re Healthsouth Corp. Securities Litigation, 572 F.3d 854, 856 n.3 (11th Cir. 2009).

(k) **Religious Rights:** The Archdiocese objects to the Settlement Agreement as violating a host of its constitutional rights relating to religious freedom. Since the Settlement Agreement contemplates the investors ultimately owning and operating FP Designee, the Archdiocese is concerned that the activities of the entity and its hospitals may deviate from any number of its religious teachings and principles. The Archdiocese asserts that considering the Settlement Agreement itself also violates its constitutional rights to religious freedom, free speech, and association under the First Amendment.

The Court rejects these objections. Nothing about the Settlement Agreement impinges on the Archdiocese's constitutional rights. The Archdiocese decided to invest in secular activities, and now finds itself the victim of allegedly fraudulent statements. The Archdiocese is free to reject the Settlement Agreement for any

reason, including the religious concerns it has articulated. But a settlement agreement is not required to be tailored to the religious beliefs of each investor.

**(1) Inclusion of Hybrid-Value Fund:** Objectors TJNJH and Olberts[9] (the Hybrid-Value objectors) object to the inclusion in the Settlement Agreement of the Hybrid-Value fund in its entirety, rather than inclusion limited to its actual investments made in the Stable-Value funds. The Hybrid-Value Objectors assert that while the Complaint relates to claims arising from loan agreements between Stable-Value and Sun Capital entities, there are no loan or other agreements between the Hybrid-Value fund and any Sun Capital entity. The thrust of the settlement, they assert, is to pool funds unrelated to this action and then have a pro-rata distribution of assets recovered from all of the funds. These objectors further assert that any plan of distribution must be entirely separate from that involving the Stable Value funds, although the Hybrid-Value fund should be treated as a single investor in Stable Value funds and share in any settlement on its pro rata share of the investment in Stable Value funds. Additionally, the Hybrid-Value Objectors assert that a separate plan as to how the Hybrid-Value fund should be managed in the future must be developed with the full participation of its 12-15

---

[9]TJNJH and Olberts are the only objectors who are investors in both Stable Value and Hybrid Value.

investors after full disclosure of material by the Receiver regarding the eleven private equity investments which comprise the Hybrid-Value portfolio.

In response, the Receiver and the defendants contend that this argument relates to the calculation of the shares of the Releasing Investors' interest in the FP Designee should the settlement be approved. Thus, this is a distribution issue and is prematurely raised at this time. As to the merits of Hybrid-Value Objectors' objection, the Receiver contends that in the event he chooses to utilize a pro rata distribution approach such a distribution would be proper because the investors' funds have been commingled and the victims are similarly situated. The defendants disagree with this approach, and join with TJNJH and Olberts in arguing that Hybrid Value should only receive settlement proceeds which are proportionate to Hybrid Value's actual investment in Stable Value.

The Hybrid-Value Fund, unlike Stable-Value, was created for investment in private equity. The Hybrid-Value Fund did not invest fully in Stable Value, which ultimately loaned money to Sun Capital, and there is no dispute that Hybrid-Value was not party to any contract with Sun Capital or any of its affiliates. The parties seem to agree that at least a small portion of funds invested into Hybrid-Value found its way into loans made to Sun Entities, but the amount of funds involved, and how these funds

38

found their way into the loans, is unclear.[10]  Either Hybrid Value

invested directly in Stable Value, as the Complaint in the SEC

action suggests, or, SSR Capital Partners, LP[11], one of the 11

separate investment vehicles within Hybrid-Value's portfolio, made

an indirect investment of Hybrid-Value funds into Stable Value

which ultimately found their way into the Sun Capital loans.

The Hybrid-Value objectors do not make any argument that

Hybrid Value investors should be excluded from settlement

negotiations in this case, nor do they make an argument that none

of their funds should be included in the settlement funds.

Instead, these objectors assert that "it would be unreasonable and

unfair . . . for the Receiver to be allowed to lump the Hybrid-

Value fund, *in its entirety*, with the assets of all other

"Receivership Funds."   (Doc. #275-5, pp. 8-9)(emphasis in

original).  Hybrid-Value Objectors also seek to be treated as a

single investor in Stable Value for purposes of distribution of FP

Designee.  These objectors assert that any distribution should be

on a pro rata basis based on the proportionate interest in Stable

Value.

---

[10]The Hybrid-Value objectors specifically state, "only a small
portion of the funds invested by the dozen or so Hybrid-Value fund
investors in the private equity portfolio found its way into loans
made to Sun Entities and, significantly, no cognizable action has
been brought or even asserted by the Receiver in connection with
defrauding Hybrid-Value fund investors."  (Doc. #75-5, p. 7.)

[11]SSR Capital Partners, LP is a hedge fund that invested in
Stable-Value.

The Hybrid-Value Objectors object to the manner in which the Receiver will distribute assets, namely a pro rata distribution, despite the fact that the Receiver has yet to establish a distribution plan. Thus, the objection, as it relates to pro rata distribution, is speculation and premature. Accordingly, the Court overrules this objection at this time. As to using the entirety of the assets contained in the Hybrid-Value fund as funds for settlement, this is simply a settlement term that investors in Hybrid-Value must consider when deciding whether or not to approve the settlement, and does not render the Settlement Agreement unfair or unreasonable.

The Hybrid-Value objectors also request that the Receiver contact all of the Hybrid-Value Investors "to discuss the possibility of turning over direct responsibility for the management and control of the fund to its investors." (Doc. #275-5, p. 9.) These objectors contend that they are capable of assuming responsibility for the management and control of the assets that underlie Hybrid-Value and therefore the Receiver should relinquish control.

The Hybrid-Value objectors have failed to provide the Court with a legitimate basis to terminate the receivership over this entity. To the extent that these objectors take issue with the appointment of the Receiver, their objection is untimely and without a demonstrated legitimate basis.

Accordingly, it is now

**ORDERED:**

1.   The Court withholds approval of the Settlement Agreement. The Court will not approve those portions of the Settlement Agreement which seek to discourage cooperation with law enforcement officials.

2.   The parties shall have thirty (30) days to revise those provisions of the Settlement Agreement which discourage cooperation with law enforcement officials, or to inform the Court they decline to do so.

3.   Objections may be filed within thirty (30) days of the filing of the changes or the notice that no changes will be made, *limited only to this proposed modification*.

**DONE AND ORDERED** at Fort Myers, Florida, this   17th   day of May, 2012.

Copies:

Counsel of record

JOHN E. STEELE
United States District Judge