**EXECUTION VERSION**

# SETTLEMENT AGREEMENT

## PREAMBLE

THIS SETTLEMENT AGREEMENT (this "Agreement") is made as of [_____], 2011, by and among the following:  Sun Capital Healthcare, Inc., a Florida corporation ("SCHI"); Sun Capital, Inc., a Florida corporation ("SCI"); Success Healthcare, LLC, a California limited liability company ("Success"); Promise Healthcare, Inc., a Florida corporation ("Promise"); Peter R. Baronoff, an individual ("Baronoff"); Howard B. Koslow, an individual ("Koslow"); Lawrence Leder, an individual ("Leder" and together with Baronoff and Koslow, each a "Principal" and collectively, the "Principals"); Malinda Baronoff, an individual ("Mrs. Baronoff"); Jane Koslow, an individual ("Mrs. Koslow"); Carole Leder, an individual ("Mrs. Leder" and together with Mrs. Baronoff and Mrs. Koslow, each a "Spouse" and collectively, the "Spouses"); Mark Dawson, an individual ("Dawson"); the subsidiaries and affiliates of SCHI, SCI, Success, and Promise identified on Annex I attached hereto (together with SCHI, SCI, Success and Promise, each an "Affiliated Company" and collectively, the "Affiliated Companies"); and Founding Partners Designee, LLC, a Delaware limited liability company, as designee ("FP Designee"), of Founding Partners Stable-Value Fund, L.P., a Delaware limited partnership ("Stable-Value"), Founding Partners Global Fund, Ltd., a corporation organized under the laws of the Cayman Islands ("Global"), Founding Partners Stable-Value Fund II, L.P. ("Stable-Value II"); and Founding Partners Hybrid-Value Fund, L.P. ("Hybrid-Value")(these funds sometime collectively referred to as "Founding Partners"); and Daniel S. Newman, Esq., solely in his capacity as the court-appointed receiver (the "Receiver") of Founding Partners and Founding Partners Capital Management Company ("FPCM").  Each of the Affiliated Companies, the Principals, the Spouses, Dawson, the FP Designee and the Receiver is hereinafter referred to as a "Party", and together the "Parties".  By its execution of the Consent attached hereto as Annex II (the "Consent") each of the Individual Signing Investors thereby, *inter alia*, approves and accepts this Agreement and the transactions contemplated hereby and by the other Transaction Documents.

## RECITALS

**WHEREAS**, Stable-Value is an investment fund that holds loans that were made to SCHI and SCI in the approximate aggregate amount of $550 million (the "Loans");

**WHEREAS**, FPCM is the general partner and the fund investors are limited partners in one or more of the funds comprising Founding Partners ("Fund Investors");

**WHEREAS**, on April 20, 2009, the United States Securities and Exchange Commission filed an action against William L. Gunlicks and FPCM, which named as relief defendants Stable-Value, Global, Stable-Value II, and Hybrid-Value;

**WHEREAS**, by order dated May 20, 2009 of the United States District Court for the Middle District of Florida (the "District Court"), the Receiver was appointed for Stable-Value, Global, Stable-Value II, Hybrid-Value, and FPCM;

**WHEREAS**, the Receiver alleges that there are, *inter alia*, existing defaults or events of default by SCHI and SCI on the Loans;

**WHEREAS**, SCHI and SCI allege that there are, *inter alia*, existing breaches by Founding Partners under the loan documents for the Loans;

**WHEREAS**, the Fund Investors, through a claims process, will be the beneficiaries of certain causes of action relating to the Loans that were asserted by the Receiver on behalf of Founding Partners against certain of the Companies in the District Court (the "*Newman v. Sun Capital* Litigation"), and the Fund Investors would be the ultimate beneficiaries of certain additional causes of action relating to the Loans that were threatened to be asserted by the Receiver against the Companies and the Principals;

**WHEREAS**, certain Fund Investors have also purported to assert, or attempted to assert, other causes of action directly against the Companies and/or the Principals in the District Court and in other jurisdictions;

**WHEREAS**, SCHI and SCI have asserted certain causes of action relating to the Loans against the Receiver as representative of Founding Partners in the District Court;

**WHEREAS**, each of the foregoing claims and actions of record are currently subject to a court-ordered stay of proceedings; and

**WHEREAS**, through this Agreement, the Parties desire to resolve all claims relating to the aforementioned pending and threatened claims relating to the Loans and the Fund Investors' investments in Founding Partners.

**NOW, THEREFORE**, in consideration of the agreements and covenants contained herein, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

1.1    Definitions and Interpretation.  Words and expressions used in this Agreement and, to the extent relevant, any other Transaction Document, shall be interpreted in accordance with SCHEDULE 1.

## ARTICLE II

## THE TRANSACTIONS

2.1    The Transactions.  Subject to, and in accordance with, the terms and conditions set out herein and in the relevant Transaction Documents:

(a)    Transfer of Real Property Entities and Other Entities to Promise.  On the Closing Date, the Principals and Spouses, as the case may be, shall cause one hundred percent (100%) of the equity interests in the entities identified on Schedule 2.1(a) to be transferred to Promise pursuant to an Equity Transfer Agreement in the form attached as Exhibit A (the "Promise Equity Transfer Agreement").

      (b)      <u>Sun/Success Transfer</u>.

      (i)      Each of the Principals and the Spouses, as the case may be, shall, on the Closing Date, execute and deliver to the FP Designee a stock transfer agreement in the form attached as <u>Exhibit B-1</u> (the "<u>Stock Transfer Agreement</u>"), pursuant to which the Principals and the Spouses, as the case may be, shall transfer to the FP Designee, as designee of Founding Partners, as of the Closing Date, one hundred percent (100%) of the shares of SCHI and SCI.

      (ii)      Each of the Principals and the Spouses shall, on the Closing Date, execute and deliver to the FP Designee an assignment and assumption agreement in the form attached as <u>Exhibit B-2</u> (the "<u>Assignment Agreement</u>"), pursuant to which the Principals and the Spouses shall transfer to the FP Designee as of the Closing Date, one hundred percent (100%) of the equity interests of Success.

      (c)      <u>Promise Stock Issuance</u>.  Promise shall, on the Closing Date, execute and deliver to SCHI a subscription agreement in the form attached as <u>Exhibit C</u> (the "<u>Promise Subscription Agreement</u>"), pursuant to which Promise shall issue common shares to SCHI, equaling ninety six percent (96%) of the common shares of Promise and one-hundred percent (100%) of the preferred shares of Promise contemplated by <u>Section 2.1(f)</u>.  The Receiver, on behalf of Stable-Value, hereby authorizes SCHI to accept the common shares and the preferred shares of Promise in exchange for the cancellation of certain indebtedness due from Promise to SCHI.

      (d)      <u>Senior Term Loan</u>.  Immediately after the filing of the Promise Amended and Restated Articles of Incorporation and the execution and delivery of the Promise Subscription Agreement and the Stock Transfer Agreement, Promise shall, on the Closing Date, execute and deliver to SCHI, a senior loan and security agreement in the form attached as <u>Exhibit D</u> (the "<u>Senior Loan and Security Agreement</u>") together with the documents, instruments and agreements required to be executed and delivered in connection therewith, pertaining to a $75,000,000 senior secured term loan and including, but not limited to, guaranties from the subsidiaries of Promise set forth on <u>Schedule 2.1(d)</u> (the "<u>Promise Subsidiary Guarantors</u>") who shall unconditionally guarantee all of the obligations of Promise thereunder.  The $75,000,000 senior secured term loan shall be deemed to be fully funded as of the effective date from loans previously made to Promise by SCHI.

      (e)      <u>Subordinated Term Loan</u>.  Immediately after the filing of the Promise Amended and Restated Articles of Incorporation and the execution and delivery of the Promise Subscription Agreement and the Stock Transfer Agreement, Promise shall, on the Closing Date, execute and deliver to SCHI, a subordinated term note in the form attached as <u>Exhibit E</u> (the "<u>Subordinated Note</u>") together with the documents, instruments and agreements required to be executed and delivered in connection therewith, pertaining to a $125,000,000 subordinated term loan and including, but not limited to, guaranties from the Promise Subsidiary Guarantors who shall unconditionally guarantee all of the obligations of Promise thereunder.  The $125,000,000 subordinated term loan shall be deemed to be fully funded as of the effective date from loans previously made to Promise by SCHI.

(f)     Promise Preferred Stock.  Promise shall, on the Closing Date, amend and restate the Articles of Incorporation of Promise in the form attached as Exhibit F (the "Promise Amended and Restated Articles of Incorporation"), pursuant to which Promise shall, *inter alia*, establish a class of preferred shares (to be issued to SCHI pursuant to Section 2.1(c), with a liquidation preference and mandatory redemption value of $75,000,000.

(g)     Transfer of Other Entities Owned by Principals and Spouses to FP Designee.  The Principals and Spouses, as the case may be, shall, on the Closing Date, transfer to the FP Designee one hundred percent (100%) of the equity interests of each of the entities identified on Schedule 2.1(g) pursuant to an Equity Transfer Agreement in the form attached as Exhibit G (the "FP Designee Equity Transfer Agreement").

(h)     Restructuring of Promise/Stockholders' Agreement.  Simultaneous with the issuance of shares in Promise to SCHI on the Closing Date, Promise and the stockholders of Promise (which shall be SCHI, the Principals, the Spouses and Dawson) shall enter into an amended and restated stockholders' agreement in the form attached hereto as Exhibit H (the "Stockholders' Agreement") addressing the governance, management, transfer and disposition of Promise shares and other matters relating to Promise set forth therein, including the disposition of Promise restricted shares by the Principals, the Spouses and Dawson.

(i)     Baronoff Agreement.  On the Closing Date, Baronoff and certain of the Companies shall execute and deliver an employment agreement (the "Baronoff Employment Agreement") in the form attached hereto as Exhibit I (which Exhibit shall be filed under seal with the District Court) or, in the alternative, a consulting agreement (the "Baronoff Consulting Agreement").

(j)     Koslow Consulting Agreement.  On the Closing Date, Koslow and certain of the Companies shall enter into a consulting agreement in the form attached hereto as Exhibit J (the "Koslow Consulting Agreement").

(k)     Leder Consulting Agreement.  On the Closing Date, Leder and certain of the Companies shall enter into a consulting agreement in the form attached hereto as Exhibit K (the "Leder Consulting Agreement").

(l)     Secured Notes.  On the Closing Date, Promise shall execute and deliver to the Principals and their respective Spouses, and Dawson, four (4) secured promissory notes in the aggregate amount of US$5,884,000 in the form attached hereto as Exhibit L (collectively, the "Secured Notes"), which Secured Notes shall be secured by the Performance Security.

(m)     Mutual Releases.  On the Closing Date, the Parties, and the Consenting Fund Investors (including, for the avoidance of doubt, the Individual Signing Investors) shall exchange releases (the "Mutual Releases") in the applicable form of Release of Claims attached hereto as Exhibit M-1 , Exhibit M-2 and Exhibit M-3 (a "Release of Claim").

(n)     Disclosure Statement.  On the Closing Date, the Principals and the Spouses shall deliver a disclosure statement in the form attached hereto as Exhibit N (the "Disclosure Statement"), which the FP Designee shall acknowledge in writing.

(o)     <u>Performance Security, Insurance, etc</u>.  On the Closing Date, Promise (with the cooperation of and as approved by the FP Designee) shall, for the Principals, the Spouses and Dawson, as applicable, all in a manner acceptable to the Principals:

(i)     obtain tangible security (the "<u>Performance Security</u>") in the form of a first priority lien on the real property and personal property (other than the W/C Lender Collateral (defined below)) located at or relating to the operations of Promise Hospital of Louisiana, Inc. (Bossier City Campus and Shreveport Campus) and Bossier Land Acquisition Corp. (A) to cover the Personal Guarantees to the extent they are not removed by Closing notwithstanding Promise's commercially reasonable efforts to do so, and (B) to secure all payments to the Principals, the Spouses and Dawson under the Secured Notes, the Baronoff Consulting Agreement (if applicable), the Koslow Consulting Agreement and the Leder Consulting Agreement <u>provided, that</u> the Performance Security shall not include a lien on any of the following assets of Promise Hospital of Louisiana, Inc. (collectively, the "<u>W/C Lender Collateral</u>"):   (1) all present and future Accounts Receivable, (2) all present and future "instruments" (as such term is defined in Article 9 of the Uniform Commercial Code in effect in the State of New York) arising out of any Accounts Receivable, (3) all now owned or hereafter acquired deposit accounts (as such term is defined in Article 9 of the Uniform Commercial Code in effect in the State of New York) into which proceeds from any Accounts Receivable are deposited, (4) all Books and Records, whether now owned or hereafter acquired related to the foregoing and (5) any and all replacements and proceeds of any of the foregoing; <u>provided, further, that</u> the Principals, the Spouses and Dawson shall enter into a mutually acceptable intercreditor arrangement with the W/C Lender with respect to the W/C Lender Collateral; and

(ii)     provide proof of insurance coverage to satisfy the provisions of <u>ARTICLE VI</u>.

(p)     <u>Forgiveness of Shareholder Loans</u>.  On the Closing Date, all loans made by any of the Companies to one or more of the Principals and the Spouses set forth on <u>Schedule 2.1(p)</u> (the "<u>Shareholder Loans</u>") shall be forgiven in their entirety.

## ARTICLE III

## CLOSING

3.1     <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>"), will take place in escrow or at the offices of Proskauer Rose LLP, Eleven Times Square, New York, NY 10036 at 10:00 a.m., local time, on [_____], 2011, or, if all of the conditions set forth in <u>Sections</u> <u>4.1</u>, <u>4.2</u> and <u>4.3</u> have not been satisfied or waived on such date, at such other time and place as the Parties may agree.  The date on which the Closing actually occurs is referred to in this Agreement as the "<u>Closing Date</u>."

3.2     <u>Closing Deliveries of the Principals, the Spouses, Dawson, and the Affiliated Companies</u>.  At the Closing, the Principals, the Spouses, Dawson and the Affiliated Companies will deliver or cause to be delivered to the FP Designee, as applicable:

(a)      (i) certificates representing the Equity Securities of SCHI and SCI to be delivered pursuant to the Stock Transfer Agreement, duly endorsed in blank or accompanied by stock powers duly executed in blank in form for transfer together with any other documents that are necessary to convey to the FP Designee good title to such Equity Securities, free and clear of any and all Liens, (ii) a certificate representing ninety six percent (96%) of the common shares of Promise in the name of SCHI, and (iii) a certificate representing one hundred percent (100%) of the preferred shares of Promise, in the name of SCHI;

(b)      a certificate dated as of the Closing Date, executed on behalf of the Companies, confirming the satisfaction of the conditions specified in Section 4.2(a) and (b);

(c)      certificates of the secretary of each Company dated as of the Closing Date and attaching with respect to such Company (i) its Constitutive Documents and all amendments thereto as in effect on the Closing Date; (ii) evidence of its existence and good standing certified by a competent authority; (iii) all resolutions of its board of directors relating to this Agreement, the other Transaction Documents and the transactions contemplated by this Agreement and such Transaction Documents; and (iv) incumbency and signatures of its officers executing this Agreement or any other Transaction Document;

(d)      counterparts duly executed by the Principals, the Spouses and Dawson of each Transaction Document to which the Principals, the Spouses and Dawson are a party;

(e)      counterparts duly executed by each Affiliated Company of each Transaction Document to which such Company is a party;

(f)      resignations of all officers, directors and managers of the Companies, as the case may be, effective as of the Closing Date requested by the FP Designee;

(g)      as to the Transaction Documents, opinion letters of Proskauer Rose LLP and other counsel to the Companies (immediately prior to the filing of the Promise Amended and Restated Articles of Incorporation and the execution and delivery of the Promise Subscription Agreement and Stock Transfer Agreement), the Principals and the Spouses, addressed to the FP Designee and dated the Closing Date, in substance and form reasonably satisfactory to the FP Designee, limited to valid existence; due execution; due authority; and no conflicts with Constitutive Documents;

(h)      any other item required to be delivered at Closing by any Principal, Spouse, Dawson or any Company under the terms of any Transaction Document to which any Principal, Spouse, Dawson or Company is a party; and

(i)      such other documents, instruments and agreements as the FP Designee may reasonably request for the purpose of consummating the transactions contemplated by this Agreement.

3.3      Closing Deliveries of the FP Designee.  At the Closing, the FP Designee will deliver or cause to be delivered to the Principals, the Spouses, Dawson and the Affiliated Companies, as the case may be:

(a)      a certificate dated as of the Closing Date, executed by the FP Designee, confirming the satisfaction of the conditions specified in <u>Section 4.3(a)</u> and <u>(b)</u>;

(b)      certificates of the secretary of the FP Designee dated as of the Closing Date and attaching with respect to FP Designee, as applicable (i) its Constitutive Documents and all amendments thereto as in effect on the Closing Date; (ii) evidence of its existence and good standing certified by a competent authority; (iii) all resolutions of its board of directors relating to this Agreement, the other Transaction Documents and the transactions contemplated by this Agreement and such Transaction Documents; and (iv) incumbency and signatures of its officers executing this Agreement or any other Transaction Document;

(c)      counterparts duly executed by the FP Designee of each other Transaction Document to which the FP Designee is a party;

(d)      as to the Transaction Documents, opinion letters of Broad and Cassel, as counsel to the FP Designee, addressed to the Companies, the Principals and the Spouses and dated the Closing Date and in substance and form reasonably satisfactory to the Companies and the Principals, limited to valid existence; due execution; due authority; and no conflicts with Constitutive Documents;

(e)      cause the Receiver to deliver to the Principals and the Spouses, the pledged certificates or allow Promise to cancel on its stock ledger any previously pledged certificates which cannot be located and issue to the Principals and the Spouses new certificates, representing their existing Equity Securities of Promise;

(f)      any other item required to be delivered at Closing by FP Designee under the terms of any Transaction Document; and

(g)      such other documents, instruments and agreements as the Principals and the Companies may reasonably request for the purpose of consummating the transactions contemplated by this Agreement.

All items delivered by the Parties at the Closing will be deemed to have been delivered simultaneously, and no items will be deemed delivered or waived until all have been delivered.

## ARTICLE IV

## CONDITIONS

4.1      <u>Conditions to Obligations of the Parties</u>.  The obligations of the Parties under this Agreement are subject to the satisfaction at or prior to the Closing of the following conditions (any of which may be waived by the Parties, as applicable, in whole or in part):

(a)      <u>Settlement Approval Order; Antitrust</u>.  (i) The Settlement Approval Order shall have been entered, and, (ii) if applicable, the required waiting period (and any extension thereof) under any antitrust laws shall have expired or been terminated;

7

(b)  <u>Other Governmental Authorizations; Consents</u>.  All necessary Governmental Authorizations and Consents listed in Section 6 of the Company Disclosure Schedules have either been obtained, or all notices have been given, and all filings have been made with, all Governmental Authorities, and all requests for Consents from, and the giving of all other notices to, all other Persons, have been made;

(c)  <u>No Action</u>.  No Governmental Body shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) or order, writ, injunction or decree that is then in effect and has the effect of making the transactions contemplated hereunder illegal or otherwise preventing or prohibiting consummation of such transactions;

(d)  <u>No Material Adverse Effect</u>.  There shall be no pending or, to the knowledge of a Party, threatened in writing, Proceeding by any Person against, pertaining to or seeking to enjoin any aspect of the operation of the Companies' business or the consummation of the transactions contemplated by this Agreement or otherwise that could reasonably be expected to have a Material Adverse Effect and there shall be no pending action against any Party or any of his, her or its affiliates, or any of his, her or its properties, assets, or any officer, director or manager, in his or her capacity as such, of any Party or any of his or its affiliates, with respect to the consummation of the transactions contemplated hereunder which could reasonably be expected to have a material adverse effect;

(e)  <u>Investor Releases</u>.  The delivery of duly executed Releases of Claims from the Fund Investors (including the Individual Signing Investors) (the "<u>Consenting Fund Investors</u>") to the Affiliated Companies, the Principals, the Spouses and Dawson, in an amount equal to at least fifty one percent (51%) in number of Fund Investors and sixty six and two-thirds percent (66 2/3%) of investment of Fund Investors in Founding Partners;

(f)  <u>Receiver Approval, etc</u>.  The Receiver shall have approved and accepted, or be directed by the District Court to approve, accept, or acquiesce in, the transactions contemplated by this Agreement and the other Transaction Documents, and a Release of Claims in the form of <u>Exhibit M-3</u> shall have been delivered or the relief sought therein so ordered;

(g)  <u>Promise Amended and Restated Articles of Incorporation</u>. Promise shall have filed the Promise Amended and Restated Articles of Incorporation and obtained evidence of filing thereof from the Florida Secretary of State;

(h)  <u>Senior Term Loan and Subordinated Term Loan</u>.  Immediately after the filing of the Promise Amended and Restated Articles of Incorporation and the execution and delivery of the Promise Subscription Agreement and the Stock Transfer Agreement, the Senior Loan and Security Agreement and the Subordinated Note shall be executed and delivered; and

(i)  <u>Working Capital Line of Credit</u>.  Immediately after the filing of the Promise Amended and Restated Articles of Incorporation and the execution and delivery of the Promise Subscription Agreement and the Stock Transfer Agreement, (i) Promise and certain of its subsidiaries shall enter into a senior secured revolving loan agreement with a lender (the "<u>W/C Lender</u>") for a working capital line of credit on terms acceptable to FP Designee, and

execute and deliver such other documents, instruments and agreements required to be executed and delivered in connection therewith, (ii) SCHI shall enter into a mutually acceptable intercreditor arrangement with the W/C Lender and (iii) the Principals, the Spouses and Dawson shall enter into a mutually acceptable intercreditor arrangement with the W/C Lender with respect to the W/C Lender Collateral.

4.2     <u>Conditions to the Obligations of the FP Designee and the Receiver</u>.   The obligation of the FP Designee and the Receiver to consummate the Closing is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the FP Designee and the Receiver, in whole or in part):

(a)     <u>Accuracy of Representations and Warranties</u>.   The representations and warranties of the Companies, the Principals, the Spouses and Dawson in this Agreement and any other Transaction Document must have been true and correct in all material respects as of the date of this Agreement and must be true and correct in all material respects as of the Closing Date;

(b)     <u>Performance of Covenants</u>.   All of the covenants and obligations that each of the Companies, the Principals, the Spouses and Dawson are required to perform or comply with under all Transaction Document to which they are a party on or before the Closing Date must have been performed and complied with in all material respects;

(c)     <u>New York Law</u>.   The Receiver shall engage New York counsel, at the Companies' advance expense upon execution of a retainer letter, to provide the Receiver with advice on the application of New York law to the Transaction Documents, and the Receiver shall be satisfied with such advice, provided that such expenses shall be reasonable and such expenses shall be subject to <u>Section 9.1</u> otherwise;

(d)     <u>No Action</u>.   There must not be in effect any Law or Judgment, and there must not have been commenced or threatened any Proceeding, that in any case could (A) prevent, make illegal or restrain the consummation of, or otherwise materially alter, any of the transactions contemplated by the Transaction Documents or (B) cause any of the transactions contemplated by the Transaction Documents to be rescinded, reformed or altered following consummation;

(e)     <u>No Material Adverse Effect</u>.   Since the date of this Agreement, there must not have been any Material Adverse Effect;

(f)     <u>Due Diligence; Focus Management Group</u>.   The FP Designee and the Receiver (i) must be satisfied with the results of its due diligence investigation relating to the Principals, the Companies and their assets and (ii) receive from Focus Management Group a due diligence bringdown report;

(g)     <u>Valuation Estimate</u>.   The FP Designee and the Receiver must receive from MTS Health Partners, a valuation estimate for Promise and its Subsidiaries (including all Subsidiaries to be transferred to Promise as contemplated by this Agreement), and Success and its Subsidiaries, which valuation estimate may include a range of values estimated in good faith but shall not include any reliance opinions;

(h)     Transaction Documents.  The Companies and the Principals, the Spouses and Dawson must have delivered or caused to be delivered each document that Section 3.2 requires them to deliver; and

(i)     Audit Adjustments.  To the extent that the Interim Balance Sheets and the related unaudited statements of operations of Promise and Success do not include estimates for known audit adjustments that will be required at year end to conform such Financial Statements to GAAP, information will be disclosed to provide such known estimates to the FP Designee and the Receiver.

4.3     Conditions to the Obligations of the Principals, the Spouses, Dawson and the Companies.  The obligation of the Principals, the Spouses, Dawson and the Companies to consummate the Closing is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Principals or the Companies, as applicable, in whole or in part):

(a)     Accuracy of Representations and Warranties.  The representations and warranties of the FP Designee in this Agreement and the other Transaction Documents must have been true and correct in all material respects as of the date of this Agreement and must be true and correct in all material respects as of the Closing Date;

(b)     Performance of Covenants.  All of the covenants and obligations that the FP Designee is required to perform or comply with under this Agreement or any Transaction Document on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)     No Action.  There must not be in effect any Law or Judgment, and there must not have been commenced or threatened any Proceeding, that in any case could (A) prevent, make illegal or restrain the consummation of, or otherwise materially alter, any of the transactions contemplated by the Transaction Documents or (B) cause any of the transactions contemplated by the Transaction Documents to be rescinded, reformed or altered following consummation;

(d)     Transaction Documents.  (i) The FP Designee must have delivered or caused to be delivered to the Companies and the Principals each document that Section 3.3 requires them to deliver and (ii) each of the Individual Signing Investors must have delivered a duly executed Release of Claims;

(e)     Performance Security.  The Principals, the Spouses and Dawson, shall have received fully executed first priority mortgages in recordable form, with respect to the real property, and security agreements and other security documents with respect to the personal property (other than the W/C Lender Collateral) located at or relating to the real property and operations of Promise Hospital of Louisiana, Inc. (Bossier City Campus and Shreveport Campus) and Bossier Land Acquisition Corp. and shall have entered into a mutually acceptable intercreditor arrangement with any working capital lender who is granted a lien on the W/C Lender Collateral;

(f)     Insurance.  Insurance coverage shall be in full force and effect to satisfy the provisions of <u>ARTICLE VI</u>;

(g)     <u>Shareholder Loans</u>. The forgiveness of the Shareholder Loans shall be reflected in the Books and Records; and

(h)     <u>Corporate Governance</u>. The managers and directors, as applicable, for FP Designee, SCHI and Promise as of the Closing Date (i) shall be reasonably qualified to serve in such positions, and (ii) neither the Receiver nor its designee will hold more than twenty percent (20%) of the seats on the board of managers or board of directors, as applicable, of FP Designee, SCHI or Promise.


# ARTICLE V

## REPRESENTATIONS AND WARRANTIES

5.1     <u>Representations and Warranties of the Companies</u>.  The representations and warranties set out in <u>SCHEDULE 5.1</u> (the "<u>Company Warranties</u>") are incorporated by reference herein.

5.2     <u>Representations and Warranties of the Principals and Dawson</u>.

(a)     The representations and warranties set out in <u>SCHEDULE 5.2(a)</u> (the "<u>Principals' and Dawson's Warranties</u>") and the Disclosure Statement are incorporated by reference herein.

(b)     Each Principal, each Spouse and Dawson acknowledges, and will acknowledge at the Closing, that, with respect to any Equity Securities being transferred to or subscribed by, Promise, SCHI or the FP Designee, in connection with the transactions contemplated hereunder, that (i) Promise, or SCHI or FP Designee on behalf of Founding Partners, has given value to such Principal, Spouse or Dawson and (ii) neither any Principal, Spouse nor Dawson has notice of any adverse claim to the Equity Securities.

5.3     <u>Representations and Warranties of the FP Designee</u>.  The representations and warranties set out in <u>SCHEDULE 5.3</u> (the "<u>FP Designee Warranties</u>") are incorporated by reference herein.

## ARTICLE VI

## INDEMNIFICATION, DUTY TO DEFEND, AND INSURANCE

6.1     <u>General</u>.

(a)     From and after the Closing Date, Promise, Success, SCHI, SCI, and FP Designee (collectively referred to as "Indemnitors") shall jointly and severally indemnify and defend any Indemnitee who is or becomes or is threatened to be made a party or witness to any threatened or pending action, suit or proceeding of any kind, whether civil, criminal, administrative, regulatory or investigative (collectively referred to as a "Proceeding"), that relates in whole or in part to any actual or alleged act or omission of the Indemnitee in connection with the Indemnitee's position as a director, officer, partner, shareholder, member, employee or consultant (which shall include cooperation as provided for under the employment agreement and consulting agreements with the Principals, as applicable) or agent of any of the Companies, or by reason of any action alleged to have been taken or omitted in such capacity (a "Company-related Legal Proceeding"), including, without limitation, any ancillary or enforcement proceeding, and in particular including all aspects of each Proceeding listed on Schedule 6.1(a) and any action arising under any of the Transaction Documents.  For the avoidance of doubt, the foregoing indemnification and defense obligations include, without limitation, claims for monetary damages against Indemnitee in respect of an alleged breach of fiduciary duties.

(b)     The indemnification and duty to defend provided by this ARTICLE VI shall be for all Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with such Company-related Legal Proceeding and any appeal therefrom.  Each of Promise and Success shall indemnify and defend the Indemnitees, to the extent the Company-related Legal Proceeding concerns the actions of the Indemnitee in his capacity as an officer or director of that Company, to the fullest extent permitted by the applicable law of the Company's state of incorporation or organization.  In addition,  FP Designee and Promise, as acquiring parties in the transfer transactions contemplated in this Agreement, shall fully indemnify and defend each Indemnitee, regardless of capacity, in connection with any Company-related Legal Proceeding, in accordance with the provisions of this ARTICLE VI, and shall assume all indemnification obligations of the other Companies as necessary to fulfill the provisions of this ARTICLE VI.

(c)     Indemnitee shall have the right to select counsel in all matters covered by this ARTICLE VI in which the Company-related Legal Proceeding involves any of the Founding Partners funds, FPCM, the Receiver, the FP Designee, or any of the Fund Investors, or concerns any of the Transaction Documents (which shall include matters involving cooperation as provided for under the employment agreement and consulting agreements with the Principals, as applicable).  In all other instances covered by this Article, the Indemnitors shall have the right to select counsel to defend against any Proceeding for which an Indemnitee is indemnified or defended under this Article.

(d)     In the event that the FP Designee or any Subsidiary of the FP Designee or the Receiver brings any Proceeding against any Indemnitee involving claims under any of the Transaction Documents (a "TD Action"), then notwithstanding anything to the contrary set forth in any Transaction Document, the provisions of this Section 6.1(d) shall control.  In the event any TD Action is commenced, FP Designee shall have the right, at its option and in addition to any other actions permitted by law or pursuant to any of the Transaction Documents, but subject to Section 6.1(e), to cause Promise to escrow an amount equal to fifty percent (50%) of amounts due such Indemnitee under his/her respective Secured Note, and to deposit any such amount into

escrow with an appropriate financial institution in a reasonable and customary manner for the purpose of providing a fund to re-pay Indemnitors for Expenses paid by Indemnitors on the Indemnitee(s)' behalf in connection with the defense of such TD Action in the event that any such Indemnitee(s) is found liable for such TD Claim.  In the event that the Indemnitee(s) prevail in any such TD Action, any funds so deposited into escrow shall promptly thereafter be released to the applicable Indemnitee(s).  This provision does not affect in any manner the Indemnitee(s)' other rights to indemnity, costs of defense and all other rights, or the Indemnitors' obligations, under this <u>ARTICLE VI</u>.

   (e) Prior to the bringing of any claim for which the FP Designee seeks to exercise its right of escrow pursuant to <u>Section 6.1(d)</u>, the FP Designee, or any Subsidiary of the FP Designee, or the Receiver, must first pursue mediation pursuant to this Section.  The sole purpose of such mediation is for the mediator(s) to determine whether or not there exists a reasonable basis to bring any such TD Action.  In making such determination, the mediator(s) is/are not to determine whether he or she or they believe that the claimant will ultimately be successful on the merits of the claim, but merely that there is a reasonable basis to bring a legal action to resolve such claim.  In the event that the mediator(s) determine that there is a reasonable basis to bring the TD Action, then the FP Designee may thereafter exercise its right of escrow under <u>Section 6.1(d)</u>.  In the event that the mediator(s) determine that there is not a reasonable basis to bring the TD Action, then the FP Designee may not exercise its right of escrow under <u>Section 6.1(d)</u> with respect to such TD Action.  However, the determination of the mediator(s) will not in any manner affect the right of FP Designee, or any Subsidiary of the FP Designee, or the Receiver, to bring any TD Action or be used in any way as evidence in any Proceeding to establish liability or lack thereof.  Each mediator will be a retired Florida judge or any Florida attorney that is qualified as a mediator or arbitrator under any applicable governing body and who is independent and not affiliated with any party to the dispute.  In the event that the FP Designee, or any Subsidiary of FP Designee, or the Receiver, is required to initiate a mediation pursuant to this <u>Section 6.1(e)</u>, it shall send a written notice to that effect to the applicable Indemnitees.  Within 30 days of the receipt of such notice the parties shall endeavor in good faith to mutually agree upon a single mediator for this purpose.  If the parties are unable to mutually agree to a single mediator with such 30-day period, then within 5 days thereafter, each of the FP Designee, on one hand, and the applicable Indemnitee(s), on the other hand, shall select a mediator and send written notice thereof to the other party.  The two mediators so specified shall promptly select a third mediator and the mediation will be decided by the majority vote of such three mediators.  The mediator(s) so selected shall schedule a mediation meeting in either Miami-Dade, Broward or Palm Beach County, Florida within 10 days after its/their appointment, or such other date as mutually agreed to by the parties in writing, and provide written notice thereof to the applicable parties.  Each such party and its attorneys and agents shall have the right to be present at such meeting.  At the meeting, the FP Designee, or the Subsidiary of the FP Designee, or the Receiver, shall provide such evidence of the reasonableness of its claims in the subject TD Action as it desires.  The rules of evidence shall not apply to such meeting nor will any discovery be allowed by either party; however, the mediator(s) will allow each party to present any evidence or facts and to generally present its views with respect to the matter at hand.  Moreover, the parties agree that any evidence or testimony presented at such meeting shall not be admissible in any Proceeding.  The mediator(s) shall issue a brief written decision within 10 days after the meeting and provide copies thereof to each applicable party.  The costs and expenses of the mediator(s) will be borne solely by the Indemnitors.

6.2     Partial Indemnification.

(a)     If Indemnitee is entitled under any provision of this **ARTICLE VI** to indemnification by the Indemnitors, jointly and severally, for some or a portion of the Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with any Proceeding, or in defense of any claim, issue or matter therein, and any appeal therefrom but not, however, for the total amount thereof, the Indemnitors shall nevertheless, jointly and severally indemnify Indemnitee for the portion of such Expenses, judgments, fines and amounts paid in settlement to which Indemnitee is entitled.

(b)     An Indemnitee shall not be entitled to indemnification hereunder for any portion of a Judgment or other final adjudication from which no further appeal can be taken if it is established that (i) the Indemnitee acted with actual intent to injure, but provided that this exclusion does not apply to any of the Proceedings listed on Schedule 6.1(a);  or (ii) the Indemnitee is guilty of a violation of the criminal law, unless the Indemnitee establishes that it acted without criminal intent; or (iii) the Indemnitee is found liable for any damages arising out of a breach of any representation, warranty or covenant in any of the Transaction Documents.

6.3     Duty to Defend; Notification and Defense of Claim; Settlement.

(a)     Indemnitors shall be obligated to provide a defense to each Indemnitee, including the payment of all associated Expenses incurred by or on behalf of Indemnitee in connection with any Company-related Legal Proceeding, jointly and severally, during the course of such Company-related Legal Proceeding, as follows.  No Expenses paid hereunder shall be subject to recoupment at any time, except as set forth in Section 6.3(b) hereof.

(i)     Indemnitors shall be obligated to provide a defense to each Indemnitee, including the payment of all associated Expenses, in any Company-related Legal Proceeding in which Indemnitee is named as a party, subject to the right of Indemnitee to select counsel in accordance with Section 6.1(c) hereof.

(ii)     Indemnitors shall be obligated to provide a defense to each Indemnitee, including the payment of all associated Expenses, in connection with any subpoena or request for testimony or information issued in connection with any Company-related Legal Proceeding in which Indemnitee is not a party, subject to the right of Indemnitee to select counsel in accordance with Section 6.1(c) hereof.

(iii)     All Expenses incurred by or on behalf of Indemnitee in defending any portion of any Company-related Legal Proceeding under subsections (i) or (ii) above shall be paid by the Indemnitors, jointly and severally, as they arise, within thirty (30) days after receipt by the Indemnitors of a statement requesting payment(s) from time to time.

(b)     Solely in the event that Indemnitee is adjudicated in a final, non-appealable Judgment to be guilty or liable pursuant to any of the exclusions of Section 6.2(b), then any such Indemnitee shall be obligated to repay Indemnitors for all Expenses paid by Indemnitors solely in defense of the matter adjudicated to fall within any of the foregoing exclusions.

(c)     Promptly, and in any event within 10 days after receipt by Indemnitee of notice of the commencement of any Proceeding (or any written threat thereof) for which indemnification or defense will be sought, Indemnitee shall notify the Indemnitors of the commencement thereof.

(d)     Notwithstanding any other provision herein to the contrary, to the extent that Indemnitee is, by reason of Indemnitee's corporate or consulting status with respect to any of the Companies or any corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise in which Indemnitee is or was serving or has agreed to serve at the request of any of the Companies, a witness or otherwise participates in any Proceeding at a time when Indemnitee is not a party in the Proceeding, the Indemnitors shall jointly and severally indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith.

(e)     No Indemnitor shall, without the prior written consent of an Indemnitee (which consent shall not be unreasonably withheld), settle, compromise or consent to the entry of any Judgment in any pending or threatened Proceeding in respect of which indemnification or defense may be sought hereunder by such Indemnitee, unless such settlement, compromise or consent includes an unconditional release of such Indemnitee from all liability arising out of such Proceeding.  No Indemnitee shall, without the prior written consent of an Indemnitor (which consent shall not be unreasonably withheld), settle, compromise or consent to the entry of any Judgment in any pending or threatened Proceeding in respect of which indemnification or defense may be sought hereunder by such Indemnitee.

6.4     <u>Insurance and Subrogation</u>.

(a)     Promise and Success must purchase and maintain, for a minimum of six (6) years from the Closing Date, insurance on behalf of any Indemnitee who was or is serving as a director, officer, employee, consultant or agent of Promise, Success or any affiliated entity, against any liability asserted against, and incurred by, Indemnitee or on Indemnitee's behalf in any such capacity, or arising out of Indemnitee's status as such, whether or not Promise or Success would have the power to indemnify Indemnitee against such liability under the provisions of this Agreement.  Said insurance shall not operate to relieve or limit the Indemnitors' obligations to indemnify and defend Indemnitees as set forth in <u>Sections 6.1</u> to <u>6.3</u> above.  If Promise or Success has such insurance in effect at the time Promise or Success receives from Indemnitee any notice of the commencement of a Company-related Legal Proceeding, such Indemnitor shall give prompt notice of the commencement of such Proceeding to the insurer(s) in accordance with the procedures set forth in the policy(ies).  Promise shall thereafter take all necessary or desirable action to cause such insurer(s) to pay, on behalf of the Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policy(ies).

(b)     In the event of any payment by Promise or Success under this Agreement, Promise or Success shall be subrogated to the extent of such payment to all of the rights or recovery of Indemnitee with respect to any insurance policy, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable Promise or Success to bring suit to enforce such rights in

accordance with the terms of such insurance policy.  Promise or Success shall pay or reimburse all Expenses actually and reasonably incurred by Indemnitee in connection with such subrogation.

(c)     Neither Promise nor Success shall be liable under this provision to make any payment of amounts otherwise indemnifiable hereunder (including, but not limited to, judgments, fines and amounts paid in settlement or ERISA excise taxes or penalties) if and to the extent that Indemnitee has otherwise actually received such payment under this provision or any insurance policy, contract, agreement or otherwise.

6.5     Certain Definitions. For purposes of this Article only:

(a)     The term "Expenses" shall be broadly and reasonably construed and shall include, without limitation, all direct and indirect costs of any type or nature whatsoever including, without limitation, all attorneys' fees and related disbursements, appeal bonds and other out-of-pocket costs, actually and reasonably incurred by Indemnitee in connection with any Company-related Legal Proceeding or with establishing or enforcing a right to indemnification under this Agreement or otherwise.

(b)     The term "judgments, fines and amounts paid in settlement" shall be broadly construed and shall include, without limitation, all direct and indirect payments of any type or nature whatsoever, as well as any penalties or excise taxes assessed on a person with respect to an employee benefit plan.

(c)     "Promise" and "FP Designee" shall include all successors, except for any successors resulting from a Promise Fundamental Change to which the provisions of Section 6.6 apply.

6.6     Promise Fundamental Change.  In the event of a Promise Fundamental Change (in one or more transactions) that is a bona fide transaction on arms' length terms and conditions, approved by Promise's board of directors and resulting in a change of control of Promise in a stock sale, merger or similar transaction whereby Promise or its successor is controlled by Persons who did not control Promise immediately prior to such transaction (the resulting entity, the "Acquirer"), the indemnification obligations under this ARTICLE VI shall be retained by all of the Indemnitors other than the Acquirer as a liability in connection with such transaction, but the Acquirer shall be released as an Indemnitor simultaneous with the closing of such change of control transaction, so long as FP Designee and/or Promise (as applicable, depending on the nature of the Promise Fundamental Change) comply with the provisions of the following sentence.  In return, FP Designee and/or Promise shall escrow, or cause to be escrowed, $15,000,000 of the sale(s) proceeds to be available to the Indemnitors to satisfy any continuing indemnification obligations under this ARTICLE VI.  Following any such transaction, if FP Designee desires to reduce the escrow amount, the FP Designee shall request in writing to the Principals the release of funds in accordance with the provisions of Section 9.3.  If the Principals do not agree with the amount of funds requested to be released from escrow, the parties shall conduct good faith negotiations to attempt to reach agreement on an appropriate amount of the escrowed funds to be released.  In the event the parties are unable to reach agreement, either party may request that such dispute be submitted to arbitration for resolution before a single

arbitrator in either Miami-Dade, Broward or Palm Beach County, Florida, in accordance with the Commercial Arbitration Rules of the American Arbitration Association then pertaining, and Judgment upon the award rendered may be entered in any court having jurisdiction.  The decision by any such arbitrator shall be final and binding on the parties.  This provision does not affect in any manner the obligations of the Indemnitors under this <u>ARTICLE VI</u>.

## ARTICLE VII

## COVENANTS

7.1    <u>Operational Covenants of the Companies</u>.  Subject to the next sentence, each Company covenants and agrees that, between the date of this Agreement and the Closing, except or as otherwise contemplated by this Agreement, such Company shall conduct its business only in, and such Company shall not take any actions except in the ordinary course of business in the same manner as heretofore conducted and, to the extent consistent therewith, such Company shall use all reasonable efforts to preserve intact its business organization, to keep available the services of the present officers, employees and consultants, to preserve its present relationships with customers, suppliers and other persons with which it has significant business relations, to preserve its properties and assets in a state of repair and condition that materially complies with all applicable Laws and is consistent with the requirements and normal conduct of its business, and to refrain from intentionally or knowingly taking or failing to take any action that could reasonably be expected, individually or in the aggregate, result in any Company or Companies incurring any new liability in excess of One Hundred Thousand Dollars ($100,000) other than those under existing contracts in the ordinary course of business.  Any Company may take action outside the ordinary course of business if (y) such Company gives the FP Designee and the Receiver in writing twenty one (21) days' notice (or less if the Chief Executive Officer makes a request for a shortened notice period and reasonably demonstrates that such shortened notice period is necessary) of the proposed action, and no written response is received by such Company from either the FP Designee or the Receiver during the applicable notice period or (z) the FP Designee and the Receiver shall otherwise agree in writing.  By way of amplification and not limitation, except as otherwise contemplated by this Agreement, no Company shall, between the date of this Agreement and the Closing, directly or indirectly do, or agree to do, any of the following without the prior written consent of the FP Designee and the Receiver:

(a)    amend or otherwise change its Constitutive Documents;

(b)    issue, sell, pledge, lease, dispose of, encumber or authorize the issuance, sale, pledge, lease, disposition or encumbrance of, or grant any options for, (i) any Equity Securities of any class, or any options, warrants, convertible securities or other rights of any kind to acquire any Equity Securities of, or any other ownership interest, or (ii) any assets that are material, individually or in the aggregate, to its business, except for encumbrances, dispositions and sales of assets or products in the ordinary course of business;

(c)    except for the monthly distributions to the Principals from HLP Properties, Inc. and LH Acquisition, LLC in the aggregate amount of US$90,000, declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect

to any Equity Securities, or extend any loan or advance, other than in the ordinary course of business, to any other Person;

(d)     (i) reclassify, combine, split, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any of its Equity Securities, and (ii) dissolve, liquidate, seek protection under bankruptcy or similar Laws or seek the appointment of a custodian, receiver, liquidator, trustee or similar official;

(e)     (i) acquire (by merger, consolidation, or acquisition of stock or assets) any corporation, partnership or other business organization or division thereof or any share or interest thereof; (ii) incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse or otherwise as an accommodation become responsible for, the obligations of any Person, or make any loans, advances or roll-overs, except in the ordinary course of business and after informing the FP Designee and the Receiver of the transaction particulars; (iii) enter into any contract or agreement other than in the ordinary course of business or as otherwise provided or permitted in this Agreement; (iv) authorize any capital expenditures which are, in the aggregate, in excess of the aggregate amounts specified in the capital expenditure budget set forth at Schedule 7.1(e) attached hereto; or (v) enter into or amend any Material Agreement;

(f)     increase the compensation payable or to become payable to its officers or employees, or grant any severance or termination pay to (except pursuant to existing agreements or policies), or enter into or amend any employment or severance agreement with, any director, officer or other employee, establish, adopt, enter into or amend any collective bargaining, bonus, profit sharing, thrift, compensation, stock option, restricted stock, pension, retirement, welfare, deferred compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any directors, officers or current or former employees, except to the extent required by applicable Law or pay or accrue any bonuses to any of the Principals, Spouses or Dawson;

(g)     make any change with respect to its accounting policies or procedures except insofar as may be required by Law and after informing the FP Designee and the Receiver;

(h)     make any Tax election or settle or compromise any Tax liability, which involves an amount in excess of US$100,000 except to the extent reserved or provided for in the Financial Statements;

(i)     except as set forth on Section 9 of the Company Disclosure Schedule, pay, discharge or satisfy any material Liabilities, other than the payment, discharge or satisfaction in the ordinary course of business of Liabilities reflected or reserved against in the Companies' financial statements or incurred in the ordinary course of business;

(j)     sell or in any way transfer or dispose of any Equity Securities of or other equity interests in any of its Subsidiaries;

(k)     compromise or settle any Proceeding (i) for an amount in excess of US$100,000 or (ii) which could reasonably be expected to have a Material Adverse Effect;

(l)     knowingly or intentionally take any action or fail to take any action that could reasonably be expected to cause any representation or warranty of any Company not to be true and correct on the Closing Date as provided in <u>Section 4.2(a)</u>; or

(m)     enter into any agreement or commitment to do any of the foregoing.

7.2     <u>Compliance with Laws</u>.  From the date of this Agreement through the Closing, each Company shall comply in all material respects with all Laws applicable to each such entity, except as set forth on <u>Section 9</u> of the Company Disclosure Schedule.

7.3     <u>Access to Information</u>.  From the date of this Agreement through the Closing, on two (2) business days' notice each Company shall allow the FP Designee and the Receiver full access during normal business hours to, and furnish it with all documents, records, work papers and information with respect to, all of the properties, assets, personnel, books, contracts, Governmental Authorizations, reports and records relating to the Companies and their Affiliates as the FP Designee or the Receiver may reasonably request in writing in advance.

7.4     <u>Further Assurances; Consents</u>.   From the date of this Agreement through the Closing and for a reasonable time period thereafter, each of the Companies, the Principals, the Receiver and FP Designee shall use commercially reasonable efforts (A) promptly to take, or cause to be taken (including actions after the Closing), all actions, and to do, or cause to be done, all things necessary to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Documents and to procure the fulfillment of the conditions precedent set forth herein and therein, (B) as promptly as practicable after the entry by the Parties into this Agreement, or the approval of this Agreement by the District Court, give all notices to, and make all filings with, all Governmental Authorities, and to request all Consents from, and give all other notices to, all other Persons, that are necessary in connection with the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement including, without limitation, the Settlement Approval Order, and (C) as promptly as practicable (which may be after the Closing), obtain all Governmental Authorizations, and obtain all Consents from all other Persons, that are necessary in connection with the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, which must be in full force and effect, and all applicable waiting periods (and any extensions thereof) under applicable Law must have expired or otherwise been terminated.

7.5     <u>Non-Solicitation</u>.  Except as set forth in the next sentence**,** until the Closing, no Company shall, or cause its directors, officers, stockholders, members, managers, partners, employees, agents, consultants and other advisors and representatives to, directly or indirectly: in each case relating to any business combination or joint venture transaction involving any Company or any other transaction to acquire all or any part of the business, properties or assets of any Company or any Equity Securities of any of them (whether or not outstanding), whether by merger, purchase of assets, purchase of stock, tender offer, lease, license or otherwise, (A) solicit, initiate, encourage, knowingly facilitate, or entertain any inquiry or the making of any proposal or offer; (B) enter into, continue or otherwise participate in any discussions or negotiations; (C) furnish to any Person any non-public information or grant any Person access to its properties, assets, books, contracts, agreements, personnel or records; (D) approve or

19

recommend, or propose to approve or recommend, or execute or enter into, any letter of intent, agreement in principle, merger agreement, acquisition agreement, option agreement or other contract; or (E) propose, whether publicly or to any director, stockholder, member or manager, or agree to do any of the foregoing for the purpose of encouraging or facilitating any proposal, offer, discussions or negotiations; in any instance other than with the FP Designee in connection with the transactions contemplated by this Agreement.  If any Company or any or their respective, directors, officers, stockholders, members, managers, partners, employees, agents, consultants or other advisors and representatives receives, prior to the Closing, any offer, proposal, request, inquiry or other contact (an "Offer"), directly or indirectly, of the type referenced in this Section 7.5, such Company will, prior to substantively responding to any such Offer (i) notify the FP Designee and the Founding Partners Investor Steering Committee (or any of their respective professionals) of the occurrence of the Offer, and such other information related thereto as the Founding Partners Investor Steering Committee may reasonably request, and (ii) only take such action thereto as agreed to by the Parties and the Founding Partners Investor Steering Committee.

       7.6    Notices of Certain Events.

      (a)    The Principals shall promptly notify the other Parties of:

      (i)    any notice or other communication from any Person alleging or raising the possibility that the transactions contemplated by this Agreement might give rise to any claims or causes of action or other rights by or on behalf of such Person or result in the loss of any rights or privileges of any Principal to any such Person;

      (ii)    any notice or other communication from any Governmental Body relating to the transactions contemplated by this Agreement;

      (iii)    any actions, suits, claims, investigations or proceedings commenced or threatened against, relating to or involving or otherwise affecting any Party that relate to the consummation of the transactions contemplated by this Agreement; and

      (iv)    the occurrence of any fact or circumstance which might make any representation or warranty made hereunder by any Principal false in any material respect or result in the omission or the failure to state a material fact.

      (b)    The Companies shall promptly notify the other Parties of:

      (i)    any notice or other communication from any Person alleging or raising the possibility that the transactions contemplated by this Agreement might give rise to any claims or causes of action or other rights by or on behalf of such Person or result in the loss of any rights or privileges of any Company to any such Person;

      (ii)    any notice or other communication from any Governmental Body relating to the transactions contemplated by this Agreement;

      (iii)    any actions, suits, claims, investigations or proceedings commenced or threatened against, relating to or involving or otherwise affecting any Party that

relate to the consummation of the transactions contemplated by this Agreement or that could reasonably be expected to have a Material Adverse Effect and

(iv)    the occurrence of any fact or circumstance which might make any representation or warranty made hereunder by the Company false in any material respect or result in the omission or the failure to state a material fact.

(c)    Except for any public filings made in the Newman v. Sun Capital Litigation, the FP Designee shall promptly notify the other Parties of:

(i)    any notice or other communication from any Person alleging or raising the possibility that the transactions contemplated by this Agreement might give rise to any claims or causes of action or other rights by or on behalf of such Person;

(ii)    any notice or other communication from any Governmental Body in connection with the transactions contemplated by this Agreement;

(iii)    any actions, suits, claims, investigations or proceedings commenced or threatened against, relating to or involving or otherwise affecting any Party that relate to the consummation of the transactions contemplated by this Agreement; and

(iv)    the occurrence of any fact or circumstance which might make any representation or warranty made hereunder by the FP Designee false in any material respect or result in the omission or the failure to state a material fact.

(d)    Except for any public filings made in the Newman v. Sun Capital Litigation, the Receiver shall promptly notify the other Parties of:

(i)    any written notice or other communication from any Person alleging or raising the possibility that the transactions contemplated by this Agreement might give rise to any claims or causes of action or other rights by or on behalf of such Person;

(ii)    any written notice or other communication from any Governmental Body relating to the transactions contemplated by this Agreement; and

(iii)    any actions, suits, claims, investigations or proceedings commenced or threatened in writing against, relating to or involving or otherwise affecting any Party that relate to the consummation of the transactions contemplated by this Agreement.

7.7    <u>Confidentiality</u>.

(a)    Any information (except publicly available or freely usable material lawfully obtained from another source) respecting any Party or its Affiliates will be kept in strict confidence by all other parties to this Agreement and their respective Affiliates, directors, officers, managers, employees, agents, attorneys, accountants, and professional advisors. Except as required by Law, each Party and their respective Affiliates, directors, officers, managers, employees or agents, will not disclose the terms of the transactions contemplated hereunder at any time, currently, or on or after the Closing, regardless of whether the Closing takes place,

21

except as necessary to their attorneys, accountants, or professional advisors, in which instance such persons and any employees or agents shall be advised of the confidential nature of the terms of the transaction and shall themselves be required by the applicable party to keep such information confidential, and except to the District Court and the Fund Investors and their agents and representatives.  Except as required by Law, each Party shall retain all information obtained from the other Parties and their attorneys on a confidential basis except as necessary to disclose to their respective attorneys, accountants and professional advisors, in which instance such persons and any employees or agents of such party shall be advised of the confidential nature of the terms of the transaction and shall themselves be required by such party to keep such information confidential.  Notwithstanding the foregoing, the terms and conditions of all Confidentiality Agreements entered into with Proskauer Rose LLP or Patton Boggs LLP shall continue in full force and effect and are incorporated herein by reference.

(b)     The foregoing provision shall not be applied to prevent any Party from cooperating with any criminal law enforcement authorities.

(c)     The Parties shall be permitted to disclose this Agreement and the other Transaction Documents in an action to enforce the Transaction Documents, provided that notice is given to the other Parties as soon as practical of such disclosure.

(d)     The obligations under this section shall survive termination of this Agreement.

## ARTICLE VIII

## TERMINATION

8.1     Termination.

(a)     This Agreement shall immediately terminate and be of no further force or effect upon the mutual written agreement of the Parties that it be terminated.

(b)     Prior to the Closing Date, FP Designee or the Companies may by written notice given to all other Parties terminate this Agreement if any fact, matter or event (whether existing or occurring on or before the date of this Agreement or arising or occurring afterwards) comes to the notice of FP Designee or the Companies which:

(i)     constitutes a material breach by one or more of the other Parties to this Agreement which breach, if capable of being remedied, is not remedied within thirty (30) days from the date the other Party(s) is/are notified by the FP Designee or the Companies of such breach; or

(ii)     constitutes the issuance by any court or tribunal of competent jurisdiction of a final non-appealable Judgment or the taking by any court or tribunal of any other nonappealable final action, in each case having the effect of permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement or any other Transaction Document, including the District Court's disapproval of the transactions contemplated by this Agreement without an opportunity for rehearing.

(c)      Any Party may terminate this Agreement if the Closing has not occurred prior to March 31, 2012.

(d)      Upon the termination of this Agreement solely as provided for in this section, the other Transaction Documents, if any, shall also automatically terminate.  All rights and obligations of the Parties hereunder shall cease to have effect except that:

(i)      the provisions which are expressed to survive the termination of this Agreement shall survive; and

(ii)      the provisions of <u>Section 9.1</u> of this Agreement which require the Companies to pay the reasonable out-of-pocket expenses incurred by each Party in connection with the transactions contemplated by this Agreement, shall remain in full force and effect and be enforceable by the Parties.

(e)      If, notwithstanding the occurrence of any fact, matter or event which would otherwise give rise to a right to terminate this Agreement under this <u>ARTICLE VIII</u>, a Party does not exercise such termination right, the fact that such Party has not exercised such termination right shall not constitute a waiver of any right or entitlement of such Party to make any claim under this Agreement or any other Transaction Document prior to the Closing Date.

## ARTICLE IX

### MISCELLANEOUS

9.1      <u>Expenses</u>.  The Companies shall pay the reasonable out-of-pocket expenses of each Party (and, for purposes of FP Designee, the expenses incurred by the Founding Partners Investor Steering Committee) incurred by such Party in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated by this Agreement (and for purposes of the Receiver and his professionals, such reasonable expenses relating to the *Newman v. Sun Capital* Litigation as are approved by the District Court upon application by the Receiver, but not to include any amounts already paid), <u>provided, that</u> only the reasonable fees and expenses of Broad and Cassel; Berkowitz, Dick Pollack & Brant; Huron Consulting Group; Receiver's New York counsel; Proskauer Rose LLP; Cain Brothers & Company, LLC; Patton Boggs LLP; Specialty Finance Partners LP; Nightingale; and MTS Health Partners, L.P.; shall be paid prior to Closing (on a weekly basis upon the Companies' receipt of an invoice for services rendered and expenses incurred in each case).  The obligation of the Companies to pay each Party's reasonable out-of-pocket expenses shall survive termination of this Agreement.

9.2      <u>Original Stockholders Agreement</u>.  Each of Promise, the Principals, the Spouses and Dawson agree to the amendment of the Stockholders Agreement dated as of August 25, 2003 (the "<u>Original Stockholders Agreement</u>"), among Promise and each of the Principals and Spouses and Dawson and hereby (i) waives compliance with the terms of Section 6(i) *No Dilution of Percentage Ownership; Loans to and from the Corporation* of the Original Stockholders Agreement, and (ii) consents to the transactions contemplated by this Agreement and by the other Transaction Documents.

9.3   <u>Notices</u>.  All notices, consents and other communications under this Agreement must be in writing and will be deemed given (i) when delivered personally, (ii) on the third business day after being mailed by certified mail, return receipt requested, (iii) upon receipt of written confirmation if sent by facsimile or (iv) the next business day after delivery to a recognized overnight courier, to the Parties at the following addresses (or to such other address as such Party may have specified by notice given to the other Parties pursuant to this provision):

<u>If to any Company</u>:                                    <u>with copies to</u>:
999 Yamato Road, 3rd Floor                     Proskauer Rose LLP
Boca Raton, FL  33431                             11 Times Square
Attention: Peter R. Baronoff                    New York, NY  10036
Facsimile: (561) 826-0171                        Attention: Vincenzo Paparo, Esq.
                                                             Facsimile: (212) 969-2900


<u>if to Baronoff or Mrs. Baronoff</u>:               <u>with copies to</u>:



[                ]                                         Proskauer Rose LLP
                                                             11 Times Square
                                                             New York, NY  10036



Facsimile: [                ]                        Attention: Vincenzo Paparo, Esq.
                                                             Facsimile: (212) 969-2900

<u>If to Koslow or Mrs. Koslow</u>:                   <u>with copies to</u>:



[                ]                                         Proskauer Rose LLP
                                                             11 Times Square
                                                             New York, NY  10036



Facsimile: [                ]                        Attention: Vincenzo Paparo, Esq.
                                                             Facsimile: (212) 969-2900

if to Leder or Mrs. Leder:                          with copies to:


[                    ]                                Proskauer Rose LLP
                                                     11 Times Square
                                                     New York, NY  10036


Facsimile: [              ]                          Attention: Vincenzo Paparo, Esq.
                                                     Facsimile: (212) 969-2900

If to the FP Designee:                              with copies to:

[                    ]                                Patton Boggs, LLP
                                                     2000 McKinney Avenue, Suite 1700
Attention: [              ]                          Dallas, TX 75201
Facsimile: [              ]                          Attention:  James C. Chadwick, Esq.
                                                     Facsimile:  (214) 758-1550

                                                     and

                                                     Broad and Cassel
                                                     7777 Glades Road, Suite 300
                                                     Boca Raton, Florida 33134
                                                     Attention: David J. Powers, P.A.
                                                     Facsimile: (561) 483-7321
If to the Receiver:                                 with copies to:

One Biscayne Tower                                  Broad and Cassel
2 South Biscayne Blvd.                              7777 Glades Road, Suite 300
21st Floor                                          Boca Raton, Florida 33134
Miami, FL 33131

Facsimile: (305) 373-9443                           Attention: David J. Powers, P.A.
                                                     Facsimile:  (561) 483-7321

    9.4   <u>Waiver</u>.  The failure by any Party to enforce any term or provision of this Agreement shall not constitute a waiver of the right to enforce the same term or provision, or any other term or provision, thereafter.  No waiver by any Party of any term or provision of this Agreement shall be deemed or shall constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided in writing.

    9.5   <u>Amendment of Agreement</u>.  No modification of, deletion from, or addition to this Agreement shall be effective unless made in writing and executed by each Party hereto.

9.6     Entire Agreement.    This Agreement and the other Transaction Documents supersede all previous oral and written agreements, understandings, representations and warranties, and courses of conduct and dealing between the Parties as to the subject matter hereof and thereof.

9.7     Assignment.    This Agreement and any other Transaction Document shall not be assignable in whole or in part by any Party without the prior written consent of the other Parties.

9.8     Governing Law; Venue.    The validity, interpretation and performance of this Agreement and (unless expressly provided otherwise in the relevant Transaction Document) each other Transaction Document shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any conflict of laws rule or principle that might require the application of the laws of another jurisdiction.    Any action or proceeding arising out of or relating to this Agreement and each other Transaction Document (unless expressly provided otherwise in the relevant Transaction Document) shall be brought only in (a) the United States District Court, Middle District of Florida, Fort Myers Division, if said Court expressly retains jurisdiction over all matters relating to the enforcement of the Transaction Documents in the Settlement Approval Order, as shall be requested by the Parties, or (b) if that Court does not expressly retain such jurisdiction, then in a state or federal court situated in New York County, New York.

9.9     Construction of Agreement.    The provisions of this Agreement shall be liberally construed to effectuate the intended settlement of the disputes and the release of all related claims.    Section headings have been inserted for convenience only and shall not be given undue consideration in resolving questions of construction or interpretation.    For purposes of determining the meaning of, or resolving any ambiguity with respect to, any word, phrase, term or provision of this Agreement, each Party shall be deemed to have had equal bargaining strength in the negotiation of this Agreement and equal control over the preparation of this document, such that neither the Agreement nor any uncertainty or ambiguity herein shall be arbitrarily construed or resolved against any Party under any rule of construction.

9.10    Severability.    In the event that any term or provision of this Agreement is held by any court of competent jurisdiction to be illegal, invalid or unenforceable for any reason, then the term or provision shall be severed, and the remainder of this Agreement shall remain valid and enforceable.

9.11    Cumulative Rights.    Except as provided otherwise in this Agreement, the rights and remedies of a Party under or pursuant to this Agreement are cumulative, may be exercised as often as such Party considers appropriate and are in addition to its rights and remedies under general law.

9.12    Damages.    Each of the Parties shall be entitled to pursue claims for damages from another Party if any of the provisions of this Agreement or any other Transaction Document are not performed in accordance with their specific terms or are otherwise breached.

9.13    Specific Performance.    Each of the Parties acknowledges and agrees that the other Parties would be damaged irreparably if any of the provisions of this Agreement or the

Stockholders Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each Party agrees that the other Party(ies) shall be entitled, without the necessity of pleading or proving irreparable harm or lack of an adequate remedy at law or posting any bond or other security, to an injunction or injunctions to prevent breaches of the provisions of this Agreement or the Stockholders Agreement and to enforce specifically this Agreement or the Stockholders Agreement and the terms and provisions hereof.

9.14     Prevailing Parties.  With regard to any action or other proceeding filed or brought by any Party against another Party in connection with this Agreement or any other Transaction Document, the Prevailing Party (defined below) shall be entitled to recover from such other Party all of its reasonable costs and expenses incurred in connection with such dispute, including expenses, court costs, witness fees and legal and accounting fees.  The term "Prevailing Party" means that Party whose position is upheld in a final non-appealable Judgment rendered in such proceeding.  This provision is in addition to, and not in limitation of ARTICLE VI.

9.15     Setoff.  In addition to any other rights or remedies, if the FP Designee, directly or indirectly, incurs losses or damages (including reasonable costs and expenses) as a result of any breach by a Principal of a representation, warranty or covenant in this Agreement or any of the Transaction Documents as adjudicated in a final non-appealable Judgment (a "Principal's Obligation"), then the FP Designee shall be permitted to set off or cause any Subsidiary of the FP Designee to set off the Principal's Obligation against any amounts owing by the FP Designee or any Subsidiary of the FP Designee to or on behalf of such Principal.

9.16     Counterparts.  This Agreement may be executed in any number of identical counterparts, each of which is an original, and all of which together constitute one and the same agreement.  Any signatures delivered by a Party by facsimile or electronic mail transmission shall be deemed an original signature hereto.

9.17     Survival; Covenant Not to Sue.  The covenants and agreements contained in this Agreement (other than covenants and agreements to be performed after the Closing, including Sections 7.4 and 7.7 and   ARTICLE VI and ARTICLE IX hereof) shall expire on the Closing Date.  The representations and warranties contained in this Agreement shall survive the Closing and continue in full force and effect until the earlier of (a) the expiration of the eighteen (18) month period immediately following the Closing Date and (b) a Promise Fundamental Change.  Immediately following the last day of such survival period (the "Survival End Date"), such representations and warranties shall expire automatically, and each Party covenants not to sue after the Survival End Date on such representations and warranties, except that the representations and warranties contained in Section 1 (Organization), Section 2 (Capitalization; Subsidiaries), and Section 3 (Authority) of SCHEDULE 5.1 (Company Warranties); Section 1 (Legal Capacity to Contract and Perform) and Section 5 (Title to Securities) of SCHEDULE 5.2(a) (Principals' and Dawson's Warranties); and Section 1 (Legal Capacity to Contract and Perform) of SCHEDULE 5.3 (FP Designee Warranties) shall survive in perpetuity with respect only to the matters addressed therein.

9.18     Receiver's Execution.  The Receiver's execution of this Agreement as the receiver of Founding Partners and FPCM and such entities' agreement to be bound by the provisions hereof is conditioned upon the receipt of the Settlement Approval Order; provided,

<u>however</u>, that such Parties shall be bound by the provisions of <u>Sections</u> <u>7.4,</u> <u>7.6,</u> <u>7.7,</u> <u>8.1</u> and <u>ARTICLE IX</u> of this Agreement.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of the date indicated in the first sentence of this Agreement.

<u>**AFFILIATED COMPANIES:**</u>

SUN CAPITAL HEALTHCARE, INC.

By:_____
    Name:  _____
    Title:  _____

SUN CAPITAL, INC.

By:_____
    Name:  _____
    Title:  _____

SUCCESS HEALTHCARE, LLC

By:_____
    Name:  _____
    Title:  _____

PROMISE HEALTHCARE, INC.

By:_____
    Name:  _____
    Title:  _____

AFFILIATED COMPANIES SET FORTH ON ANNEX I

By:_____
    Name:  _____
    Title:  _____

**PRINCIPALS:**

_____
Peter R. Baronoff

_____
Howard B. Koslow

_____
Lawrence Leder

**SPOUSES:**

_____
Malinda Baronoff

_____
Jane Koslow

_____
Carole Leder

**DAWSON:**

_____
Mark Dawson

**FP DESIGNEE:**

FOUNDING PARTNERS DESIGNEE, LLC

By:_____
    Name:  _____
    Title:  _____

**<u>RECEIVER:</u>**

_____
Daniel S. Newman, Esq.

**SCHEDULE 1**

**Definitions and Interpretation**

**1.     Definitions.**

For the purposes of this Agreement:

"<u>Accounts Receivable</u>" shall have the meaning ascribed to it in <u>Section 7(b)</u> of the Company Warranties.

"<u>Acquirer</u>" shall have the meaning ascribed to it in <u>Section 6.6</u> of this Agreement.

"<u>Affiliate</u>" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person.  In addition to the foregoing, if the specified Person is an individual, the term "Affiliate" also includes (a) the individual's spouse, (b) the members of the immediate family (including parents, siblings and children) of the individual or of the individual's spouse and (c) any corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity that directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with any of the foregoing individuals.   For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Affiliated Company</u>" or "<u>Affiliated Companies</u>" shall have the meaning ascribed to it in the <u>PREAMBLE</u> to this Agreement.

"<u>Agreement</u>" shall have the meaning ascribed to it in the <u>PREAMBLE</u> to this Agreement.

"<u>Assignment Agreement</u>" shall have the meaning ascribed to it in <u>Section 2.1(b)(ii)</u> of this Agreement.

"<u>Baronoff</u>" shall have the meaning ascribed to it in the <u>PREAMBLE</u> to this Agreement.

"<u>Baronoff Consulting Agreement</u>" shall have the meaning ascribed to it in <u>Section 2.1(i)</u> of this Agreement.

"<u>Baronoff Employment Agreement</u>" shall have the meaning ascribed to it in <u>Section 2.1(i)</u> of this Agreement.

"<u>Books and Records</u>" shall have the meaning ascribed to it in <u>Section 8</u> of the Company Warranties.

"<u>Closing</u>" shall have the meaning ascribed to it in <u>Section 3.1</u> of this Agreement.

"<u>Closing Date</u>" shall have the meaning ascribed to it in <u>Section 3.1</u> of this Agreement.

"Company" or "Companies" shall mean the Affiliated Company or the Affiliated Companies, *but excluding* Trieste Land Ventures, LLC and F.G.C. Courtyard, Inc.

"Company Disclosure Schedule" refers to the disclosure schedule attached to the Company Warranties, which are incorporated by reference herein.

"Company-related Legal Proceeding shall have the meaning ascribed to it in Section 6.1(a).

"Company Warranties" shall have the meaning ascribed to it in Section 5.1 of this Agreement.

"Consenting Fund Investors" shall have the meaning ascribed to it in Section 4.1(e).

"Consent" shall have the meaning ascribed to it in PREAMBLE to this Agreement.

"Consents" means notice, consent, approval or waiver under, any permit, license, contract or other agreement with an unaffiliated party to which any Company is a party or by which any Company or any of its assets are bound.

"Constitutive Documents" means, in reference to any Company, its Certificate of Incorporation, Certificate of Formation, bylaws, partnership agreement, limited liability company agreement or other document of similar import, as the same may be amended from time to time.

"Disclosure Statement" shall have the meaning ascribed to it in Section 2.1(n) of this Agreement.

"District Court" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Equity Securities" means shares of capital stock of any class or series or similar security, or any securities convertible into or exercisable for such securities, or any warrant, option or right to acquire such securities.

"Financial Statements" shall have the meaning ascribed to it in Section 7(a) of the Company Warranties.

"Founding Partners" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Founding Partners Investor Steering Committee" means that certain ad hoc group of Individual Signing Investors.

"FPCM" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"FP Designee" shall have the meaning ascribed to it in the PREAMBLE of this Agreement.

"FP Designee Equity Transfer Agreement" shall have the meaning ascribed to it in Section 2.1(g).

"FP Designee Warranties" shall have the meaning ascribed to it in Section 5.3 of this Agreement.

"Fund Investors" shall have the meaning ascribed to it in the RECITALS to this Agreement.

"GAAP" means the generally accepted accounting principles in the United States of America as in effect from time to time.

"Global" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Governmental Authorizations" means any consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with any Governmental Body.

"Governmental Body" means any United States federal, state, local, or non-U.S. governmental or quasi-governmental agency, authority, court, tribunal, commission, board or other body.

"Hybrid-Value" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Indemnitors" shall have the meaning ascribed to it in Section 6.1.

"Indemnitee" shall mean each of Baronoff, Koslow, Leder, Mrs. Baronoff, Mrs. Koslow, Mrs. Leder and Dawson.

"Individual Signing Investors" means SSR Capital Partners LP, Rhino Holdings, Inc., Edge Capital Investments Ltd., Bermuda Commercial Bank Limited and Convergent Wealth Advisors.

"Intellectual Property" means any and all of the following:  (i) U.S., international and foreign patents, patent applications and statutory invention registrations; (ii) trademarks, licenses, inventions, service marks, trade names, trade dress, slogans, logos and Internet domain names, including registrations and applications for registration thereof; (iii) copyrights, including registrations and applications for registration thereof, and copyrightable materials; (iv) trade secrets, know-how and similar confidential and proprietary information; (v) u.r.l.s; and (vi) any other type of Intellectual Property right, and all embodiments and fixations thereof and related documentation, registrations and franchises and all additions, improvements and accessions thereto, whether registered or unregistered or domestic or foreign.

"Interim Balance Sheet" shall have the meaning ascribed to it in Section 7(a) of the Company Warranties.

"Judgment" means any final order, injunction, judgment, decree, ruling, assessment or arbitration award of any court, tribunal or arbitrator.

"Koslow" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Koslow Consulting Agreement" shall have the meaning ascribed to it in Section 2.1(j) of this Agreement.

"Law" means law, statute, treaty, rule, regulation, ordinance, decree, order, code, binding case law or principle of common law of any Governmental Body.

"Leder" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Leder Consulting Agreement" shall have the meaning ascribed to it in Section 2.1(k) of this Agreement.

"Lien" means any lien, encumbrance, charge, claim, equitable interest, option, pledge, hypothecation, security interest, mortgage, right of way, easement, encroachment, burden, title defect, adverse claim, community property interest, servitude, preemptive right, right of first option, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any Equity Security), transfer, receipt of income, or exercise of any other attribute of ownership.

"Liability" or "Liabilities" shall have the meaning ascribed to it in Section 9 of the Company Warranties.

"Material Adverse Effect" means any event, change, circumstance, effect or other matter that has, or could reasonably be expected to have, either individually or in the aggregate with all other events, changes, circumstances, effects or other matters, with or without notice, lapse of time or both, a material adverse effect on (a) the business, assets, liabilities, properties, financial condition, operating results, or operations of the Companies or (b) the ability of the Companies to perform its obligations under this Agreement or to consummate timely the transactions contemplated by this Agreement.

"Material Agreements" means the agreements (including all amendments thereto) to which each Company is a party or a beneficiary or by which such Company or any of its material assets is bound and that is either not terminable upon notice of 30 calendar days or less without incurring any penalty or other Liability other than payment accrued prior to termination or involves aggregate payments by such Company in excess of $100,000 (collectively, the "Material Agreements"), including without limitation the following agreements:  (i) agreements pursuant to which such Company sells or distributes any products or performs any services; (ii) real estate leases (which leases for the avoidance of doubt exclude leases for offsite storage locations or administrative offices); (iii) agreements evidencing, securing or otherwise relating to any indebtedness for borrowed money secured by real property mortgages for which such Company is liable; (iv) capital or operating leases or conditional sales agreements relating to vehicles, equipment or other assets that has been capitalized in accordance with the Companies' capitalization policy; (v) agreements pursuant to which such Company is entitled or obligated to acquire any assets from a third party; (vi) non-employee benefit related insurance policies; (vii) employment, consulting, non-competition, separation, confidentiality and Intellectual Property related agreements; and (viii) indemnification agreements with or for the benefit of any shareholder, director, officer, member, manager or employee of such Company.

"Mrs. Baronoff" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Mrs. Koslow" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Mrs. Leder" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Mutual Releases" shall have the meaning ascribed to it in Section 2.1(m) of this Agreement.

"*Newman v. Sun Capital* Litigation" shall have the meaning ascribed to it in RECITALS of this Agreement.

"Other Parties" shall have the meaning ascribed to it in Section 8.1(b) of this Agreement.

"Original Stockholders Agreement" shall have the meaning ascribed to it in Section 9.2 of this Agreement.

"Party," and together the "Parties," shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Performance Security" shall have the meaning ascribed to it in Section 2.1(o)(i) of this Agreement.

"Person" means an individual or an entity, including a corporation, limited liability company, partnership, trust, unincorporated organization, association or other business or investment entity.

"Personal Guarantees" means the following personal guarantees of the Principals for any obligations of the Companies to third parties: (i) Guaranty of Lease dated as of November 14, 2008 by the Principals in favor of AFG Investment 5, LLC, pursuant to which the Principals, jointly and severally, guarantee the obligations of Success Healthcare 1, LLC owing pursuant to that certain Amended and Restated Master Lease Agreement with respect to that certain real property located at 7500 East Hellman Avenue, Rosemead, California, up to an aggregate amount not to exceed $1,000,000; and (ii) Limited Guaranty dated September 19, 2008 by the Principals in favor of Concordia Bank & Trust, Co., pursuant to which the Principals, jointly and severally, guarantee the obligations of Vidalia Real Estate Partners LLC owing to Concordia Bank & Trust, Co., pursuant to financings thereby, up to a maximum amount not to exceed $780,000.

"Principal" or "Principals" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Principals' and Dawson's Disclosure Schedule" refers to the disclosure schedule attached to the Principals' and Dawson's Warranties, which are incorporated by reference herein.

"Principals' and Dawson's Warranties" shall have the meaning ascribed to it in Section 5.2(a) of this Agreement.

"Principals' Obligations" shall have the meaning ascribed to it in Section 9.15.

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"Promise" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Promise Amended and Restated Articles of Incorporation" shall have the meaning ascribed to it in Section 2.1(f) to this Agreement.

"Promise Equity Transfer Agreement" shall have the meaning ascribed to it in Section 2.1(a) to this Agreement.

"Promise Fundamental Change" means a sale, lease, exchange, transfer or other disposition of all or substantially all of the assets or capital stock of Promise (*including* a sale of all or substantially all of the assets of the subsidiaries of Promise *but excluding* any sale and leaseback of real property or any entry into a senior secured revolving line of credit) or a merger or consolidation of Promise with or into another Person.

"Promise Subscription Agreement" shall have the meaning ascribed to it in Section 2.1(c) to this Agreement.

"Promise Subsidiary Guarantors" shall have the meaning ascribed to it in Section 2.1(d) to this Agreement.

"Receiver" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Release of Claims" shall have the meaning ascribed to it in Section 2.1(m) to this Agreement.

"SCHI" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"SCI" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Secured Notes" shall have the meaning ascribed to it in Section 2.1(l) to this Agreement.

"Senior Loan and Security Agreement" shall have the meaning ascribed to it in Section 2.1(d) to this Agreement.

"Settlement Approval Order" means an order entered by the District Court, in form and substance mutually acceptable to the Parties, containing findings of fact and conclusions of law mutually acceptable to the Parties (including without limitation under Section 3(a)(10) of the Securities Act of 1933, as amended) and providing for the following relief at a minimum: (i)

approving the transactions contemplated by this Agreement and the other Transaction Documents, (ii) permitting the Receiver to close the transactions contemplated thereby, (iii) ordering the dismissal with prejudice of all claims and counterclaims in the *Newman v. Sun Capital* Litigation simultaneous with such Closing, (iv) requiring the Receiver to exclude any Fund Investors that do not execute and deliver a Release of Claims by the Closing Date from participating in any respect in any assets to be acquired by the FP Designee pursuant to this Agreement, (v) within some time period(s) to be specified by the District Court:  (A) ordering the Receiver to deliver to Proskauer Rose LLP, to be shared with the Companies and the Principals, a current list of all Fund Investors with name and outstanding amount(s) in Stable-Value and each of the other funds comprising Founding Partners based upon the current books and records of Founding Partners available to the Receiver (subject to all such recipients entering into a confidentiality agreement relating thereto that is mutually acceptable to all such recipients and the Receiver) and (B) ordering that the Parties execute and deliver this Agreement, and (vi) ordering that the District Court retain jurisdiction over all matters relating to the enforcement of the applicable Transaction Documents.

"Shareholder Loans" shall have the meaning ascribed to it in Section 2.1(p) to this Agreement.

"Spouse" or "Spouses" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Stable –Value" "shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Stable –Value II" "shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Stock Transfer Agreement" shall have the meaning ascribed to it in Section 2.1(b)(i) to this Agreement.

"Stockholders' Agreement" shall have the meaning ascribed to it in Section 2.1(h) of this Agreement.

"Subordinated Note" shall have the meaning ascribed to it in Section 2.1(e) to this Agreement.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, or other legal entity of any kind of which such Person (either alone or through or together with one or more of its other Subsidiaries) owns, directly or indirectly, more than 50% of the stock or other equity interests, the holders of which are (a) generally entitled to vote for the election of the board of directors or other governing body of such legal entity or (b) generally entitled to share in the profits or capital of such legal entity.

"Success" shall have the meaning ascribed to it in the PREAMBLE to this Agreement.

"Tax" or "Taxes" means any and all taxes, charges, fees, levies, assessments, duties or other amounts payable to any federal, state, local or foreign taxing authority or agency,

including, without limitation: (i) income, franchise, profits, gross receipts, minimum, alternative minimum, ad valorem, value added, sales, use, service, real or personal property, capital stock, license, payroll, withholding, disability, employment, social security, workers compensation, unemployment compensation, utility, severance, excise, stamp, windfall profits, transfer and gains taxes, (ii) customs, duties, imposts, charges, levies or other similar assessments of any kind, and (iii) interest, penalties and additions to tax imposed with respect thereto.

"TD Action" shall have the meaning ascribed to it in Section 6.1(d).

"Transaction Documents" means this Agreement, the Consent, the Equity Transfer Agreements, the Stock Transfer Agreement, the Assignment Agreement, the Promise Subscription Agreement, the Senior Loan and Security Agreement, the Subordinated Note, the Promise Amended and Restated Articles of Incorporation, the Stockholders' Agreement, the Baronoff Employment Agreement, the Koslow Consulting Agreement, the Leder Consulting Agreement, the Mutual Releases, the Disclosure Statement, the Secured Notes and any other documents, instruments and agreements executed in connection with this Agreement and the transactions contemplated hereunder.

"W/C Lender" shall have the meaning ascribed to it in Section 4.1(i)(i).

"W/C Lender Collateral" shall have the meaning ascribed to it in Section 2.1(o)(i).

## 2.    Statutory References

References to a statute or statutory provision include:

(a)    that statute or provision as from time to time modified, re-enacted or consolidated whether before or after the date of this Agreement; and

(b)    any subordinate legislation or implementing regulation made from time to time under that statute or statutory provision.

## 3.    Recitals, Schedules, etc.

References to any Transaction Document shall include any recitals and schedules and references to Recitals, Schedules, Articles, Sections and similar terms, unless the context requires otherwise, are to recitals, articles and sections of, and schedules to, such Transaction Document.

## 4.    Information

References to books, records or other information mean books, records or other information in any form including paper, electronically stored data, magnetic media, film and microfilm.

## 5.    Contracts

References to any contract, document, public or private license, permit, registration, certificate, consent, approval or authorization shall include that contract, document, public or private

license, permit, registration, certificate, consent, approval or authorization as amended, novated, supplemented, varied or replaced from time to time.

## 6.    Meaning of references

Except where specifically required or indicated otherwise:

(a)    words importing one gender shall be treated as importing any gender, words importing individuals shall be treated as importing corporations and vice versa, words importing the singular shall be treated as importing the plural and vice versa, and words importing the whole shall be treated as including a reference to any part thereof;

(b)    references to a person or Person shall include any individual, firm, body corporate, unincorporated association, government, state or agency of state, association, joint venture or partnership, in each case whether or not having a separate legal personality. References to a company shall be construed so as to include any company, corporation or other body corporate wherever and however incorporated or established;

(c)    references to the word "include" or "including" (or any similar term) are not to be construed as implying any limitation and general words introduced by the word "other" (or any similar term) shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things;

(d)    no provision of this Agreement or any other Transaction Document will be construed adversely to a party solely on the ground that Party and its Affiliates were responsible for the preparation of such agreement or that provision;

(e)    references to "Dollars" or "$" are to United States Dollars; and

(f)    Headings, Article, Section and paragraph headings and the table of contents are inserted for ease of reference only and shall not affect construction.

## 7.    Awareness; Limitation of Liability

Unless it is expressly provided for where any statement qualified by "knowledge" of a Person or any similar expression, if such Person is a natural person, it shall mean to the actual knowledge of such person and, if such Person is an entity, it shall mean to the actual or constructive knowledge of the officers, directors, managers, or senior manager or executive, as the case may be, of such entity provided, that any such officer, director, manager, or senior manager or executive, as the case may be, is acting solely in such respective capacity and not in any individual capacity.

**SCHEDULE 5.1**

**Company Warranties**

The Companies hereby jointly and severally represent and warrant to the FP Designee as follows:

1.      Organization.  Each Company is duly organized, validly existing and in good standing under the Laws of its jurisdiction and has full power to own its properties and to conduct its business as presently conducted.  Each Company is duly authorized, qualified or licensed to do business and is in good standing in all jurisdictions in which its business or operations as presently conducted make such qualification necessary.  No Company is required to be qualified to do business in any jurisdiction where the failure to be qualified would reasonably be expected to have a Material Adverse Effect.

2.      Capitalization; Subsidiaries.

(a)      Section 2(a) of the Company Disclosure Schedule contains an organizational chart of the Companies identifying each Company, all issued and outstanding Equity Securities of such Company and the holders of its Equity Securities.  Except as set forth on Section 2(a) of the Company Disclosure Schedule, no Company is a party to any agreement relating to the proposed formation of any joint venture, association or other Person.

(b)      Except as set forth in Section 2(b) of the Company Disclosure Schedule: (i) there are no other securities, options, warrants, calls, rights, commitments or agreements of any character (including, without limitation, under any employment, consulting, severance or similar agreement) to which any Company is a party or by which it is bound obligating such Company to issue, deliver, sell, repurchase or redeem, or cause to be issued, delivered, sold, repurchased or redeemed, any Equity Securities of such Company or obligating such Company to grant, extend, accelerate the vesting of, change the price of, or otherwise amend or enter into any such security, option, warrant, call, right, commitment or agreement, (ii) there are no Equity Securities of any Company reserved for issuance and (iii) there are no Equity Securities of any Company held in treasury.

(c)      All outstanding Equity Securities of each Company are duly authorized, validly issued, fully paid and non-assessable and are not subject to preemptive rights, conversion price adjustment rights or rights of first refusal created by applicable Law, the Constitutive Documents or any agreement to which the Company is a party or by which it is bound.  The Equity Securities of each Company held by such Company's Equity Security holders are not subject to conversion price adjustment rights or rights of first refusal created by applicable Law or any agreement to which such shareholders are a party or by which they are bound.  Except for the liens in favor of Stable-Value, as applicable, and as set forth in Section 2(c) of the Company Disclosure Schedule, all outstanding Equity Securities of each Company owned by another Company, the Principals, Spouses and Dawson are free of any Liens.  All Equity Securities of each Company were issued in compliance in all material respects with all applicable federal and state securities Laws.  There are no contracts, commitments or agreements relating to voting, purchase or sale of any Equity Securities of any Company between or among such Company and

any Equity Security holder of such Company, except as may be contained in the Transaction Documents. There are no contracts, commitments or agreements relating to voting, purchase or sale of any Equity Securities of any Company between or among any Equity Security holders of such Company, except as may be contained in the Transaction Documents.

(d)     True and complete copies of all agreements and instruments relating to or issued under any Company option plan or otherwise relating to the issuance of options or securities convertible into Equity Securities of any Company have been provided or made available to the FP Designee and such agreements and instruments have not thereafter been amended, modified or supplemented and there are no agreements to amend, modify or supplement such agreements or instruments in any case from the forms of agreements or instruments provided to the FP Designee.

3.     Authority.  Each Company has all requisite corporate power and authority to execute, deliver and perform this Agreement and the Transaction Documents to which such Company is a party.  The execution, delivery and performance by each Company of this Agreement and the Transaction Documents to which such Company is a party have been duly authorized by all necessary corporate action on the part of such Company, including requisite approval of the board of directors, shareholders, members, managers, partners, as applicable, of such Company.  This Agreement and the Transaction Documents to which the Company is a party have been duly executed and delivered by the Company.  This Agreement and the Transaction Documents to which each Company is a party constitute the legal, valid and binding agreements of such Company, enforceable against such Company in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance or similar Laws affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at Law or in equity).

4.     Constitutive Documents.  Each Company has delivered to the FP Designee true, correct and complete copies of such Company's Constitutive Documents and any minute books, stock transfer records and other organizational agreements, documents and records of such Company, as the case may be.  All such documents and agreements include, if available, complete and accurate minutes or consents reflecting all material actions taken by the board of directors or managers (including any committees) or similar governing body and shareholders or members of such Company, as applicable.

5.     No Violation.  Neither the execution or delivery by any Company of this Agreement or the Transaction Documents to which such Company is a party, nor the consummation of the transactions contemplated hereby or thereby, will conflict with or result in the breach of any material term or provision of, require consent or violate or constitute a material default under (or an event that with notice or the lapse of time or both would constitute a breach or default), or result in the creation of any Lien on any Equity Securities of such Company or the assets of such Company pursuant to, or relieve any third party of any obligation to such Company or give any third party the right to terminate or accelerate any obligation under, any provision of any Constitutive Document, contract, agreement, Permit or Law to which such Company is a party or by which any asset of such Company is in any way bound or obligated.

6.    <u>Governmental Authorizations and Consents</u>.  Except as set forth on <u>Section 6</u> of the Company Disclosure Schedule, no Governmental Authorization or Consent is required on the part of any Company in connection with the transactions contemplated by this Agreement or the Transaction Documents to which such Company is a party.

7.    <u>Financial Statements</u>.

(a)    True and complete copies of the following financial statements have been delivered to the FP Designee:  (i) the unaudited balance sheets of the Companies described therein as of the most recent month that has ended more than twenty days prior to the date of this Agreement (collectively, the "<u>Interim Balance Sheet</u>") and the related unaudited statements of operations of the Companies described therein for the months from January 1, 2011 through the date of the Interim Balance Sheet (subject to 2010 year-end audit adjustments); (ii) the audited balance sheets of Success as of each of December 31, 2008, December 31, 2009 and December 31, 2010, and the related audited statements of operations for each of the years then ended; (iii) the audited balance sheets of Promise as of each of June 30, 2007, June 30, 2008, June 30, 2009, December 31, 2009 and December 31, 2010, and the related audited statements of operations for each of the periods then ended; and (iv) the unaudited balance sheets of each of the Companies not included in the financial statements provided pursuant to clause (ii) or (iii) hereof as of each of December 31, 2008, December 31, 2009 and December 31, 2010, and the related unaudited statements of operations for each of the years then ended (all of the foregoing, collectively, the "<u>Financial Statements</u>").  The Financial Statements present fairly in all material respects the financial condition of the Companies at the dates specified and the results of its operations for the periods specified and, except for SCHI and SCI, have been prepared in accordance with GAAP, consistently applied but for the footnotes and 2010 year-end audit adjustments.  The Financial Statements have been prepared from the Books and Records of the Companies, which accurately and fairly reflect the transactions of, acquisitions and dispositions of assets by, and incurrence of Liabilities by the Companies.

(b)    <u>Section 7(b)</u> of the Company Disclosure Schedule hereto sets forth as of the date of the Interim Balance Sheet, all accounts, notes and other receivables, whether or not accrued, and whether or not billed, of each Company, in accordance with GAAP except for SCHI and SCI (the "<u>Accounts Receivable</u>").  Except as set forth on <u>Section 7(b)</u> of the Company Disclosure Schedule, all Accounts Receivable arose in the ordinary course of business and represent valid obligations of customers of such Company arising from bona fide transactions entered into in the ordinary course of business.

8.    <u>Books and Records</u>.

(a)    The books and records, ledgers, employee records, customer lists, files, correspondence, and other records of every kind (whether written, electronic or otherwise embodied) owned or used by each Company or in which such Company's assets, business or transactions are otherwise reflected (the "<u>Books and Records</u>") accurately and fairly, in reasonable detail, reflect such Company's transactions, acquisitions and dispositions of assets and incurrence of Liabilities. Each Company maintains a system of internal accounting controls sufficient to provide reasonable assurance that:

(i)     transactions are executed in accordance with management's authorization;

(ii)     access to assets is permitted only in accordance with management's authorization; and

(iii)     recorded assets are compared with existing assets at reasonable intervals, and appropriate action is taken with respect to any differences.

(b)     [Intentionally Omitted].

(c)     Section 8(c) to the Company Disclosure Schedule is a complete and correct list of all savings, checking, brokerage or other accounts of each Company pursuant to which such Company has cash or securities on deposit and such list indicates the signatories on each account.

9.     Absence of Undisclosed Liabilities.  To the Companies' knowledge, no Company has any direct or indirect debts, obligations or liabilities of any nature, whether absolute, accrued, contingent, liquidated or otherwise, and whether due or to become due, asserted or unasserted (collectively, "Liabilities") except for:  (i) Liabilities reflected in the Interim Balance Sheet; (ii) current Liabilities incurred in the ordinary course of business and consistent with past practice after the Interim Balance Sheet date; (iii) Liabilities incurred in the ordinary course of business and consistent with past practice under the Material Agreements and (iv) the liability set forth on Section 9 of the Company Disclosure Schedule.

10.     Absence of Certain Changes.  Except to the extent arising in the ordinary course of the Companies' business or as set forth on Section 10 of the Company Disclosure Schedule, since the Interim Balance Sheet date, there has not been:

(a)     any Material Adverse Effect;

(b)     any declaration, setting aside or payment of any dividends or distributions in respect of any Equity Securities of any Company, or any redemption, purchase or other acquisition by any Company of any of the Equity Securities of any Company;

(c)     any material payment or transfer of material assets (including, without limitation, any distribution or any repayment of indebtedness) by or for the benefit of any Company;

(d)     any material revaluation downward by any Company of any of its assets, including the writing down or writing off of notes or Accounts Receivable;

(e)     any entry by any Company into any commitment or transaction material to any Company including, without limitation, incurring capital expenditures;

(f)     any increase in indebtedness for borrowed money of any Company, or any issuance or sale of any debt securities, or any assumption, guarantee or endorsement of any Liability of any other Person, or any loan or advance to any other Person;

(g)     any material breach or default (or event that with notice or lapse of time would constitute a material breach or default), resulting in termination under any Material Agreement;

(h)     any material change by any Company in its accounting methods, principles or practices;

(i)     any material increase in the benefits under, or the establishment or amendment of, any bonus, insurance, severance, deferred compensation, pension, retirement, profit sharing or other employee benefit plan, or any increase in the compensation payable or to become payable to directors, officers or employees of any Company;

(j)     any termination of employment (whether voluntary or involuntary) of any officer or key employee of any Company;

(k)     any theft, condemnation or eminent domain proceeding or any damage, destruction or casualty loss affecting any material asset used in any Company's business, whether or not covered by insurance;

(l)     any sale, assignment or transfer of any material asset used in any Company's business;

(m)     any waiver by any Company of any material rights related to its business;

(n)     any action, other than in the ordinary course of business and consistent with past practice, to pay, discharge, settle or satisfy any claim or Liability;

(o)     any settlement or compromise of any pending or threatened suit, action or claim relevant to the transactions contemplated by this Agreement;

(p)     any issuance, sale or disposition of, or agreement or commitment to issue, sell or dispose of, by any Company any Equity Securities of such Company;

(q)     any authorization, recommendation, proposal or announcement of an intention to adopt a plan of complete or partial liquidation or dissolution of any Company; or

(r)     any acquisition or investment in the equity or debt securities of any Person (including in any joint venture or similar arrangement) by any Company; or any other material transaction, agreement or commitment entered into by or affecting any Company or its business, except in the ordinary course of business and consistent with past practice.

11.     <u>Disclosure</u>.  No representation or warranty by any Company contained in this Agreement or any other document, certificate or other instrument delivered to or to be delivered by or on behalf of the Company pursuant to this Agreement, contains any untrue statement of a material fact or omits to state any material fact necessary, in light of the circumstances under which it was made, in order to make the statements herein not materially misleading.

**SCHEDULE 5.2(a)**

**Principals' and Dawson's Warranties**

Each Principal and Dawson (except where noted) hereby represents and warrants to the FP Designee as follows:

1.    <u>Legal Capacity to Contract and Perform</u>.  Each Principal and Dawson represents and warrants that (a) he has the requisite power, authority, and legal capacity to make, execute, enter into, and deliver this Agreement and to fully perform his respective duties and obligations under this Agreement, and (b) neither this Agreement nor the performance by such party of any duty or obligation under this Agreement will violate any other contract, agreement, covenant, obligation or restriction by which such party is bound.

2.    <u>No Undisclosed Inducements</u>.  Each Principal and Dawson has executed and entered into this Agreement in reliance solely upon his own independent investigation and analysis of the facts and circumstances, and that no representations, warranties, or promises other than those set forth in this Agreement were made by any Party or any employee, agent or legal counsel of any Party to induce said Principal to execute this Agreement.

3.    <u>Representation by Counsel</u>.  Each Principal and Dawson has acted pursuant to the advice of legal counsel of his own choosing in connection with the negotiation, preparation, and execution of this Agreement.

4.    <u>No Violation</u>.  The execution, delivery and performance of this Agreement and the Transaction Documents to which each Principal and Dawson is a party, as applicable, will not conflict with or result in the breach of any material term or provision of, or violate or constitute a material default under, any charter provision or bylaw or under any material agreement, order or Law to which such Principal or Dawson, as applicable, is a party or by which such Principal or Dawson, as applicable, is in any way bound or obligated.

5.    <u>Title to Securities</u>.  Except for the liens in favor of Stable-Value, as applicable, and as set forth in the Original Stockholders Agreement: (a) the Principals, Spouses and Dawson hold of record and own directly the Equity Securities of each Affiliated Company set forth on <u>Section 8</u> of the Principals' and Dawson Disclosure Schedule and such Equity Securities are held free and clear of any restrictions on transfer (other than any restrictions under the Securities Act, and state securities laws), Taxes, Liens, options, warrants, purchase rights, contracts, assignments, commitments, equities, claims, and demands;  (b) neither any Principal, Spouse nor Dawson is party to any option, warrant, purchase right, or other contract or commitment that could require such Principal, Spouse or Dawson to sell, transfer, or otherwise dispose of any Equity Security of any Company other than this Agreement;  (c) neither any Principal, Spouse nor Dawson is a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any Equity Security of any Affiliated Company and (d) the Equity Security of the Affiliated Companies held by the Principals, Spouses and Dawson are not subject to preemptive rights, conversion price adjustment rights or rights of first refusal created by applicable Law or any agreement to which the Principals, Spouses or Dawson are a party or by which the Principals, Spouses or Dawson are bound.

6.      Governmental Authorizations and Consents.  No Governmental Authorization or Consent is required on the part of the Principals or Dawson in connection with the transfer of the Equity Securities of the Companies to the FP Designee or the Transaction Documents to which the Principals and Dawson are parties (in their individual capacities).

7.      Proceedings.  There is currently no pending or, to the actual knowledge of any Principal or Dawson, as applicable, threatened (in writing) Proceeding by any Person against or relating to any Principal or Dawson or to which any Equity Securities of any Company directly owned by the Principals or Dawson are subject or relating to the transactions contemplated by this Agreement and the Transaction Documents or the consummation thereof.  Neither the Principals nor Dawson, are subject to or bound by any currently existing judgment, order, writ, injunction or decree that will prevent the consummation of the transactions contemplated by this Agreement.

8.      Equity Securities.  Section 8 of the Principals' and Dawson's Disclosure Schedule lists all Equity Securities held by any of the Principals, the Spouses and Dawson, in the Affiliated Companies.

9.      Financial Statements.   The Principals hereby represent that the Financial Statements present fairly in all material respects the financial condition of the Companies at the date specified and the results of their operations for the periods specified.  The Financial Statements have been prepared from the Books and Records of the Companies, which accurately and fairly, in reasonable detail, reflect the transactions of, acquisitions and dispositions of assets by, and incurrence of Liabilities by, the Companies.

**SCHEDULE 5.3**

**FP Designee Warranties**

FP Designee represents and warrants to the Principals and the Companies as follows:

1.  <u>Legal Capacity to Contract and Perform</u>.  FP Designee represents and warrants that (a) it has the requisite power, authority, and legal capacity to make, execute, enter into, and deliver this Agreement and to fully perform its respective duties and obligations under this Agreement, (b) neither this Agreement nor the performance by FP Designee of any duty or obligation under this Agreement will violate any other contract, agreement, covenant, obligation or restriction by which FP Designee is bound, and (c) it is without knowledge of facts that would make this Agreement (or portions thereof) capable of avoidance now or in the future.

2.  <u>No Undisclosed Inducements; No Implied Warranties</u>.  FP Designee represents that it has executed and entered into this Agreement in reliance solely upon its own independent investigation and analysis of the facts and circumstances, and that no representations, warranties, or promises other than those expressly set forth in this Agreement and the Disclosure Statement were made by any Party or any employee, agent or legal counsel of any Party to induce FP Designee to execute this Agreement.  Without limiting the foregoing, FP Designee acknowledges that neither the Principals, the Spouses nor Dawson, as applicable, has made and does not now make any representation or warranty of any kind or nature, express or implied, with respect to the transactions contemplated by this Agreement other than those expressly set forth in this Agreement and the other Transaction Documents.

3.  <u>Representation by Counsel</u>.  FP Designee represents that it has acted pursuant to the advice of legal counsel of its own choosing in connection with the negotiation, preparation, and execution of this Agreement.

4.  <u>No Violation</u>.  The execution, delivery and performance by FP Designee of this Agreement and the Transaction Documents to which FP Designee is a party will not conflict with or result in the breach of any material term or provision of, or violate or constitute a material default under, any charter provision or bylaw or under any material agreement, order or Law to which FP Designee is a party or by which FP Designee is in any way bound or obligated.

5.  <u>Governmental Authorizations and Consents</u>.  No Governmental Authorization or Consent is required on the part of the FP Designee in connection with the transfer of the Equity Securities of the Companies to the FP Designee or the Transaction Documents to which the FP Designee is a party.

6.  <u>Proceedings</u>.  There is currently no pending or, to the actual knowledge of FP Designee, threatened (in writing) Proceeding by any Person against or relating to FP Designee or relating to the transactions contemplated by this Agreement and the Transaction Documents or the consummation thereof.  The FP Designee is not subject to or bound by any currently existing judgment, order, writ, injunction or decree that will prevent the consummation of the transactions contemplated by this Agreement.